22STCV31623

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: William Highberger

Electronically FILED by Superior Court of California, County of Los Angeles on 09/28/2022 09:01 AM Sherri R. Carter, Executive Officer/Clerk of Court, by G. Carini,Deputy Clerk

J. Owen Murrin (SBN 75329)
Murrin Law Firm
7040 E. Los Santos Drive
Long Beach, California 90815
Phone: 562-342-3011
Fax: 562-724-7007
E-mail: jmurrin@murrinlawfirm.com
Attorneys for MICHAEL HOLLIFIELD, et al.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

**MICHAEL HOLLIFIELD; MICHAEL ANDERSON; JANELLE ANDERSON; RHONDA AMEY; JULIETA CABIGAS; LARRY CARLSON; CATHERINE CARLSON; THOMAS WAYNE CARLSON; MARILYN L. CARLSON; BENYAPA FEIG; BERNARD FEIG; LINDA V. HILDEBRAND; JOHN MILLHOLLON – TURNER; JAVEN POYYAK; CONNIE POYYAK; RICHARD SHAON; YVETTE SHAON; KATHRYN MARY SMITH**

**Plaintiffs,**

**v.**

**RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; CHOICE ENERGY HOLDINGS, LLC; CHOICE ENERGY HOLDINGS III, LLC; PRMH LENDERS FUND III, LLC; STRATEGIC ENERGY ASSETS VII,**

**Case No.** 22STCV31623

**COMPLAINT INCLUDING CLASS ACTION ALLEGATIONS**

1. **SECURITIES FRAUD (VIOLATION OF CORPORATE SECTION 25401)**
2. **BREACH OF FIDUCIARY DUTY**
3. **VIOLATION OF PENAL CODE 496**
4. **NEGLIGENCE**
5. **VIOLATION OF CORPORATE CODE §§ 25004, 25501.5, & CCP § 1029.8**
6. **FRAUD**
7. **FINANCIAL ELDER ABUSE**
8. **ACCOUNTING**
9. **VIOLATION OF SECTION 5 OF THE SECURITIES ACT, UNREGISTERED SECURITY**
10. **VIOLATION OF SECTION 15 OF THE EXCHANGE ACT (UNREGISTERED BROKERS-DEALERS AND AGENTS)**
11. **BREACH OF CONTRACT/RESCISSION**
12. **VIOLATION OF CIVIL CODE §3372**
13. **VIOLATION OF DECEPTIVE TRADE (PRACTICES ACT CA CIV. CODE 1770 AND 1782 ET SEQ)**
14. **UNJUST ENRICHMENT**
15. **VIOLATION OF TEXAS SECURITIES LAW**
16. **AIDING AND ABETTING**
17. **UNFAIR COMPETITION**
18. **DECLARTORY RELIEF**

**LLC; THOMAS JOSEPH POWELL; STEPHEN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND INC.; HOME BOUND FINANCIAL GROUP, LP; THOMAS CHAPMAN; WEALTHFORGE HOLDINGS, INC; WEALTH FORGE SECURITIES, LLC; CRONUS MINERAL HOLDINGS, LLC; LOVE 2 LIVE HOLDINGS, INC; TEXAS MINERAL HOLDINGS; MINERVA RESOURCES; MANAGEMENT LLC; 2X5 ENTERPRISES LIMITED PARTNERSHIP; 2X5 LLC; THOMAS CHAPMAN; MERCURY OPERATING, LLC; TED ETHEREDGE; PABLO CORTEZ; SHELLY PERDUE; WARREN TARYLE; ROGER A. CRABB; JAQUELINE KUIPER; CODY FLORES; JASON BLAKE; CCP §382 DEFENDANTS; DOES 1-300**

**Defendants.**

**19. INJUNCTION**
**20. CONSTRUCTIVE TRUST/RECEIVERSHIP**
**21. ALTER EGO**
**22. FRAUDULENT TRANSFER**
**23. CONTSTRUCTIVE FRAUD**
**24. CONSPIRACY**

**DECLARATION OF J. OWEN MURRIN PURSUANT TO CIVIL CODE §1780 (D)**

**JURY TRIAL REQUESTED**

Plaintiffs, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below) alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorneys, which included among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("S.E.C.") filings, wires and press releases issued by Defendants, and information obtained on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth hereinafter after reasonable discovery.

## NATURE OF CASE

1. This is a case where the Defendants created an endeavor hereinafter "Endeavor." It was designed to confuse, divide, conquer, and cheat investors and as part of that the Endeavor used

numerous entangled entities, which was part of the scheme to deceive and which continues to deceive. Some of these entities are: RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; and it also uses the term PETROROCK loosely. With the help of a village of participants, who are named as Defendants as aiding and abetting or co-conspirators, all Defendants in some way or another were able to put together, push out, and sell to the public an attractive narrative of an oil & gas investment opportunity that did not pan out and was not sustainable without continually resorting to using and seeking ‘other people’s money,’ a fact well known to them, or which should have been well known to them. The process utilized by the Endeavor to obtain other people’s money was illegal, deceptive and cloaked in concealment and utilized Ponzi scheme techniques. Had investors known all these things and the things enumerated in the complaint hereinafter alleged, they would not have invested. The Endeavor became a money machine for all involved (all named Defendants). The one unified goal was to amass as much money as possible under any guise or narrative using the same underlying Oil and Gas assets. The Endeavor created all sorts of programs, both equity or lender based. The original Endeavor that spawned all the other programs is the target of this suit, not each individual program because it is Endeavor that is the common denominator of all. The Endeavor is sued by way of naming the controlling individuals and entities some by the programs utilized but, it should not be lost, that it is the Endeavor that is the key Defendant herein, and it is believed and alleged that the Endeavor was a group of persons and entities that enlarged or shrank as time went by, but the catalysts and the key persons in charge were Thomas Joseph Powell, Stephen Toth, and their protégées and associates including vendors and professional aids including DOE Defendants 100-200 hereinafter “Protégées,” and including their entities (also known as the entity Doe Defendants 200-300). As a result of the Endeavor’s goal to amass money rather that create a viable investment, more and more programs came about, through different names and descriptions but with the

same common goal, that of feeding the Endeavor more money through the use of illegal unregistered activity using unlicensed persons who were accountable to the same administrative personnel which included Powell and Toth and the others above and below mentioned. It is irrelevant that these individuals and entities have gone their separate ways or have their own disputes between them as they are sued for their original wrongful conduct that created the Endeavor and contributed to the inducement and other improprieties that allowed the Endeavor to become what it became, a scheme that took advantage of innocent investors, the Plaintiffs herein as well as the "Class." The Plaintiffs herein requests class action certification. The class is on behalf of persons, trusts, or entities residing or doing business in or from California that purchased or otherwise acquired investments (also referred to as securities) from the Endeavor, the umbrella organization run by the Defendants. Hereinafter the persons who invested in this Endeavor are referred to as the "class.". Excluded from the Class are any investors that are the Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

## PARTIES

2. At all times herein, Plaintiff **MICHAEL HOLLIFIELD** was and is a resident of the City of Long Beach, County of Los Angeles, State of California.

3. At all times herein, Plaintiff **JANELLE ANDERSON** was and is a resident of City of Parker, County of Douglas, State of Colorado. At the time of the investment **JANELLE ANDERSON** was a resident of the City of LaVerne, County of Los Angeles, State of California.

4. At all times herein, Plaintiff **MICHAEL ANDERSON** was and is a resident of city of Parker, County of Douglas State of Colorado. At the time of the investment **MICHAEL ANDERSON** was a resident of the City of LaVerne, County of Los Angeles, State of California.

5. At all times herein, Plaintiff **RHONDA AMEY** was and is a resident of the City of Huntington Beach, County of Orange, State of California.

6. At all times herein, Plaintiff **JULIETA CABIGAS** was and is a resident of the City of Pasadena, County of Los Angeles, State of California.

7. At all times herein, Plaintiff **CATHERINE CARLSON** is and was a resident of the City of Carlsbad, County of San Diego, State of California.

8. At all times herein, Plaintiff **LARRY CARLSON** is and was a resident of the City of Carlsbad, County of San Diego, State of California.

9. At all times herein, Plaintiff **MARILYN L. CARLSON** is and was a resident of the City of New Braunfels, County of Comal, State of Texas.

10. At all times herein, Plaintiff **THOMAS WAYNE CARLSON** is and was a resident of the City of New Braunfels, County of Comal, State of Texas.

11. At all times herein, Plaintiff **BENYAPA FEIG** is and was a resident of the City of Redding, County of Shasta, State of California.

12. At all times herein, Plaintiff **BERNARD FEIG** is and was a resident of the City of Redding, County of Shasta, State of California.

13. At all times herein, Plaintiff **LINDA V. HILDEBRAND** was and is a resident of the City of San Jose, County of Santa Clara, State of California.

14. At all times herein, Plaintiff **JOHN MILLHOLLON – TURNER** was and is a resident of the City of Highland, County of San Bernardino, State of California.

15. At all times herein, Plaintiff **JAVEN POYYAK** was and is a resident of the City of Lake Forest, County of Orange, State of California.

16. At all times herein, Plaintiff **CONNIE POYYAK** was and is a resident of the City of Lake Forest, County of Orange, State of California.

17. At all times herein, Plaintiff **RICHARD SHAON** was and is a resident of the City of La Palma, County of Orange, State of California.

18. At all times herein, Plaintiff **YVETTE SHAON** was and is a resident of the City of La Palma, County of Orange, State of California.

19. At all times herein, Plaintiff **KATHRYN MARY SMITH** was and is a resident of the City of Los Gatos, County of Santa Clara, State of California.

20. At all times herein, RESOLUTE CAPITAL PARTNERS LTD., LLC, hereinafter referred to as "RCP," is a foreign limited liability company organized under the laws of the State of Nevada, with its principal place of business at either One Embarcadero Center, Suite 566, San Francisco, California 94111 or One Market Street, Suite 3600, San Francisco, California, 94105 with additional offices in Dallas and Minneapolis. RCP locates, facilitates, and manages specialized investment opportunities, including investments in energy, commercial real estate, and technology.

21. At all times herein, RESOLUTE CAPITAL MANAGERS, LLC, hereinafter referred to as "RCM," is a foreign limited liability company organized under the laws of the State of Nevada, with its principal place of business at either One Embarcadero Center, Suite 566, San Francisco, California 94111 or One Market Street, Suite 3600, San Francisco, California, 94105 with additional offices in Dallas and Minneapolis. RCP locates, facilitates, and manages specialized investment opportunities, including investments in energy, commercial real estate, and technology. RCP has ownership stakes in equity offerings, which is the subject matter of the equity investment mentioned herein.

22. At all times herein, RESOLUTE ENERGY CAPITAL, LLC, hereinafter referred to as "REC," is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at either One Embarcadero Center, Suite 566, San Francisco, California 94111 or One Market Street, Suite 3600, San Francisco, California, 94105. REC is responsible for acting as the lender's representative, but has failed to act to put the borrowers in default or to proceed to foreclosure because REC is captive to other DEFENDANTS.

23. At all times herein, LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY," is a limited liability company organized under the laws of the State of- Delaware, with a principal office in Irving, Texas. RCP is the managing member of LEGACY, and for PETROROCK MINERAL HOLDINGS, LLC, is its sole member. It is a company used by other Defendants to assist in carrying out the programs described herein.

24. At all times herein, PETROROCK MINERAL HOLDINGS, LLC, hereinafter referred to as "PETROROCK," is a limited liability company organized under the laws of the State of Texas with its principal place of business at 6321 Campus Circle Dr. E., Irving, Texas 75063-2712. PETROROCK's sole managing member is Home Bound Financial Group, LP, located at 1303 W. Walnut Hill Lane, Suite 305, Irving, Texas 75038-2965.

25. At all times herein, CHOICE ENERGY HOLDINGS, LLC, hereinafter referred to as "CHOICE," is a limited liability company operating under and pursuant to the laws of the State of California.

26. At all times herein, CHOICE ENERGY HOLDINGS III, LLC, hereinafter referred to as "CHOICE III," is a limited liability company operating under and pursuant to the laws of the State of California. CHOICE III is a company used by other Defendants to assist in carrying out the programs described herein.

27. At all times herein, PRMH LENDERS FUND III, LLC, hereinafter referred to as "PRMH" is a Nevada limited liability company doing business out of Irving, Texas.

28. At all times herein, STRATEGIC ENERGY ASSETS VII, LLC, hereinafter referred to as "SEA VII" is a limited liability company operating under and pursuant to the laws of the State of California. .

29. At all times herein, THOMAS JOSEPH POWELL (CRD # 5573929), an individual, is a person approximately 50 years old. He is believed to be a current resident of Reno, Nevada and is or

was also believed to be a resident of the City of San Francisco, County of San Francisco, State of California. He is the owner and/or Senior Managing Partner of RESOLUTE CAPITAL PARTNERS LTD., LLC (RCP). Other named entities are connected or work under RCP. THOMAS JOSEPH POWELL served as Senior Managing Partner for RCP. He also is the CEO of RCP. He is a Securities and Exchange Commission ("SEC") registered investment advisor responsible for the sale of investments that are the subject matter of this suit. THOMAS JOSEPH POWELL was also a consultant to HOME BOUND and acted as its chief financial officer. He has never been associated with a registered broker dealer. THOMAS JOSEPH POWELL held only a Series 65 license and was a seller (along with STEFAN TOTH) of these products.

30. At all times herein, STEFAN TOTH is a person approximately 50 years old. He resides in Frisco, Texas. STEFAN TOTH is the founder, co-owner, chairman, and CEO of HBFG, and was a seller of these products and also operates its subsidiaries, including HB, HBR, and PETROROCK. He has never been associated with a registered broker dealer up to the time that this matter was sold to Plaintiffs.

31. At all times, RESOLUTE CAPITAL ADVISORS, LLC ("RCA") is a Delaware limited liability company as of 2018. RCA registered with the SEC in September of 2018 as an investment advisor. RCA was, at all times relevant herein, the advisor to issuers utilized as part of this investment program including Choice Energy Holdings III and Legacy Energy.

32. At all times, HOMEBOUND RESOURCES, LLC, hereinafter referred to as "HBR," is a Texas liability company organized under the laws of the State of Texas with its principal place of business at 6321 Campus Circle Dr. E., Irving, Texas 75063-2712. HBR principal is Home Bound Financial Group, LP, located at 1303 W. Walnut Hill Lane, Suite 305, Irving, Texas 75038-2965.

33. At all times, HOMEBOUND INC., hereinafter referred to as "HB," is a Texas company organized under the laws of the State of Texas. One of HB's principals is STEPHEN TOTH.

34. At all times, HOME BOUND FINANCIAL GROUP LP, hereinafter referred to as "HBFG," is a Texas corporation organized under the laws of the State of Texas with its principal place of business at 6321 Campus Circle Dr. E., Irving, Texas 75063-2712. HBFG's partners are HB (General Partner, located at 4948 Eyrie Ct., Grand Prairie, Texas 75052), Love 2 Live, LP and 2X5 Enterprises Limited Partnership.

35. At all times herein, CRONUS MINERAL HOLDINGS, LLC is a 100% unity stock owned by TOTH.

36. At all times herein, LOVE 2 LIVE HOLDINGS, INC is a corporation believed to be owned by TOTH.

37. At all times herein, TEXAS MINERAL HOLDINGS is operating under and pursuant to the laws of the State of California.

38. At all times herein, THOMAS CHAPMAN was a resident of Orange County, California, now residing in Kettle Falls, Washington.

39. At all times herein, MINERVA RESOURCES MANAGEMENT LLC 100% unity stock owned by TOTH operating under and pursuant to the laws of the State of California.

40. At all times herein, 2X5 ENTERPRISES LIMITED PARTNERSHIP operating under and pursuant to the laws of the State of California.

41. At all times herein, 2X5 LLC operating under and pursuant to the laws of the State of California.

42. At all times herein, WEALTHFORGE HOLDINGS, INC is a company that operates business in California and all over the United States providing a platform to cut out financial advisors. This platform was deceptively employed here as the Plaintiff investors thought the person who introduced the product and company was acting in their best interest and was not a mere referral fee agent.

43. At all times herein, MERCURY OPERATING, LLC, is a Texas liability company controlled by TOTH and TOTH is controlling entity called Love 2 Live Holdings, LLC operating under and pursuant to the laws of the State of California.

44. Upon information and belief, TED ETHEREDGE is an individual domiciled and residing in Dallas or Fort Worth, Texas.

45. Upon information and belief, PABLO CORTEZ is an individual domiciled and residing in Dallas or Fort Worth, Texas.

46. Upon information and belief, SHELLY PERDUE is an individual domiciled and residing in Dallas or Fort Worth, Texas.

47. Upon information and belief, WARREN TARYLE is an individual domiciled and residing in Dallas or Fort Worth, Texas.

48. Upon information and belief, ROGER A. CRABB is an individual domiciled and residing in Dallas or Fort Worth, Texas.

49. Upon information and belief, JAQUELINE KUIPER is an individual domiciled and residing in Reno, Nevada.

50. Upon information and belief, CODY FLORES is an individual domiciled and residing in Dallas or Fort Worth, Texas.

51. Upon information and belief, JASON BLAKE is an individual domiciled and residing in San Francisco, California.

52. Plaintiffs are informed and believe and upon such information and belief allege that Defendants, DOES 1-300, inclusive, at all relevant times, were residents of or doing business in Los Angeles County, California, and that each of these fictitiously named Defendants are responsible for the acts and/or omissions herein alleged, and that Plaintiffs' injuries and damages as herein alleged were proximately caused by the acts and/or omissions of such fictitiously named Defendants.

53. Plaintiffs are unaware of the true and accurate names and capacities of DOE Defendants sued herein as DOES 1-300 and therefore sues those Defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to allege their true and accurate names and capacities when ascertained.

54. CCP§382 Defendants are the investors that are not in or from California and not a member of the class. The court may need these investors to make a total resolution of the matter and therefore they are named as parties consistent with California Code of Civil Procedure §382 to give the court this power if necessary.

## JURISDICTION & VENUE

55. At all times herein, all activities and contacts occurred in California, and the class is California based. The lead Plaintiff, Michael Hollifield resided in Los Angeles County, in the city of Long Beach when he bought his securities from the relevent Defendants. He presently still lives in Long Beach, California. Therefore, jurisdiction and venue is proper in California Superior Court, Los Angeles County. Civil Code § 1780 (d).

## GENERAL ALLEGATIONS

56. Defendants through the above-described Endeavor sold investments (securities) to customers at large, in this case, financial products through a confusing array of companies programs, sponsors, and salespersons (whose affiliations were blurry and purposely made that way) having an array of opportunities. Although they are considered one enterprise in this suit, Defendants played fast and loose by creating different programs and entities to confuse its identity, assets, association. In addition this confusion prohibits, on purpose, allowing Plaintiffs from figuring out which entity did what, and which entity held what assets; how entities related to each other; and which entities or assets were for the benefit of what kind of investors, (whether lenders or equity investors herein); and which assets or entities were for and controlled by which Defendant or insider. This prevented investors from figuring out which Defendant or insider might pose a threat or conflict as to the existence of the investment. All

of the above made it difficult for Plaintiffs to do any due diligence on their investments and to find out with whom they were actually dealing. Defendants made themselves almost incognito and non-transparent which made it possible for them to pull off what happened, dupe investors and eventually essentially a take over the underlying assets that made up the investment and/or allowed insiders or third-party participants to come in and take over assets of the investment, and/or allow investors to be granted the same thing over and over again unbeknownst to them. Also the arrangement as it was set up, made it easier for Defendants to exert and/or extort favorable unconscionable terms for itself in the agreement, including their own non- performance clause that allowed the "Endeavor" or someone associated therewith to take investor assets, which is what happened. All of the above and the confusion it created was purposeful on the part of Defendants and it allowed them to capitalize on the confusion and the different identities it created so no-one knew the real sponsor and who was in charge and how the affiliates and programs were supposed to interact. As a further result of the above, Plaintiff investors were unable to comprehend and react in time before the investment was lost or stolen by others.

57. Some of the promotional materials include language which in part states "Securities are offered through WEALTH FORGE SECURITIES, LLC, member FINRA/SIPC." WEALTHFORGE SECURITIES, LLC is wholly owned by WEALTHFORGE HOLDINGS INC. and presumably acts with WEALTHFORGE HOLDINGS INC.'s permission who controls it. It is alleged on information and belief that either WEALTH FORGE SECURITIES, LLC is liable or WEALTHFORGE HOLDINGS INC. is liable, or both are liable, as participants, or as an aiders and abettors, or as a co-conspirators to the activity that allowed this scheme to happen. If either WEALTHFORGE company was a broker dealer in any of these sales, they would be liable for violating FINRA rules and regulations and not doing due diligence and allowing investments to be sold that are not suitable or in the best interest of the Plaintiffs herein. Hereinafter, the term WEALTHFORGE is used by Plaintiffs as referring to either entity. If they were not acting as a broker dealer, then they were allowing another to act as a broker dealer illegally which itself is a transgression of security and FINRA rules. If they claim innocence for doing nothing then they are liable for not properly revealing themselves as the role they were playing and for allowing others to act as illegal broker dealers when they should have been the broker dealer. They are sued if that was their role for facilitating violations of security laws and

generally acting below the standard of care for entities engaged in helping issuers raise money. If they were acting as a broker-dealer, then it is alleged that they failed to follow broker dealer standards of care, and security rules and laws. In the alternative, if WEALTH FORGE SECURITIES, LLC is not liable for any of the above, it is sued as the parent company who provided the means, methods, and consultation to other Defendants on how to illegally market these investment and allowing this illegal investment to be available to Plaintiffs, the investors herein. It is illegal for all the reasons alleged above and below, incorporated by reference as though fully set forth hereat, and including WEALTHFORGE HOLDINGS INC. hereinafter knowingly fostering a system to sell this investment by advising Defendants to use nonregistered brokers to peddle unregistered securities. Also, it is believed on information and belief that WEALTHFORGE or its agents in conjunction with other above-named Defendants who, it is believed, created the organization of confusion above described consisting of multiple companies interacting with each other in such a complicated way that Defendants could and did hide behind the confusion purposefully created and taken advantage investors. Said activity is a form of misrepresentations which violated Civil Code §1770 et seq. It is alleged that if it had not been for the inside information about the industry that WEALTHFORGE, and other above-named Defendants brought to the table, Defendants could not have achieved the level of sales of securities they were able to achieve and Defendants would not have likely been able to engage in a national marketing sales campaign for customers and reached as far as California wherein the Plaintiffs herein are located. WEALTHFORGE and the other above-named Defendants treated this investment and these Defendants as a startup and gave these defendants the concept, tools, and the ability to accomplish an overly ambitious investment scheme which foreseeably would result in the losses, confusion, and chaos herein described and which took advantage of large numbers of investors including all the plaintiffs herein. WEALTHFORGE, and other Defendants, should have known better and they were negligent for providing the tools, backup information, concepts and support that they did. If these Plaintiff investors had been afforded more knowledge, or been provided with the required third-party due diligence of a reputable broker dealer, or had they known that they were not dealing with a reputable professional person, none of the above would have happened because Plaintiffs would not have entered this investment. WEALTHFORGE was and is an expert, in investment and security law on a national level.

They knew better and cannot say they were just a vendor. Plaintiff investors needed safeguards, and WEALTHFORGE, and associated Defendants above mentioned could have put the needed safeguards into place, but did not. They failed to provide the supervision and the policies that they knew the SEC requires be available to investors in securities transactions. WEALTHFORGE perpetuated a system that allowed the promoter of this investment to "quickly initiate a subscription", to be able to close a deal while the investor was mixed up and still confused over the sponsorship and affiliations of the entities they were invested in. As such WEALTHFORGE was a party to creating and perpetuating confusion related to the entities Defendants utilized to sell investments to Plaintiff's which Plaintiffs bought. This allowed investors to believe there were multiple different affiliations and sponsors when there was only one endeavor trying to parley one investment to support another. There was a complete lack of transparency on the part of WEALTHFORGE, which transparency is required under this part of the law, and which caused a deception to these investor Plaintiffs. Under the circumstances, WEALTHFORGE, in association with the other above-named Defendants, were duty-bound to make complete full disclosures, or not create such confusion in the first place. Neither did they do. There was confusion whether this investment was done in conjunction with a legitimate FINRA broker or representative or SEC approved security advisor. Defendants planted the seed that it was and this is a deception and a misrepresentation that violates the provisions of Civil Code §1770 to which WEALTHFORGE allowed or facilitated.

58. In addition, these Defendants pawned off and benefited from the above confusion by having many layers of entities all working in a confusing way. Still, WEALTHFORGE, and the other named Defendants had responsibility because WEALTHFORGE helped put the deal together that became the prototype for others, and purposely or negligently helped or allowed it to operate in a convoluted and confusing manner. WEALTHFORGE committed inadequate "diligence" of Defendants and the investments. They provided the platform and template that made this mass selling of Defendants multiple investments possible. WEALTHFORGE did not put its foot down to insist on proper disclosures or improve the organizational structure so as to eliminate the known confusion. Defendant WEALTHFORGE, and the other Defendants, were remiss, deceitful, and/or negligent to allow the statement "securities are offered through WEALTHFORGE Securities LLC, member FINRA/SIPC" to

be contained in various Defendant's promotional materials and therefore be associated with this investment.

59. The above actions of Defendants also violates Section §1770(a) because it involves passing off goods as those of another, of false sponsorship and false or confusing misrepresentation of affiliation. It is believed all of this was present in this investment due in part to WEALTHFORGE's and the other named defendant's involvement.

60. Plaintiff investors were not afforded the protections that they expected and which should have been provided for such investors when buying the kind of financial product (security) that this was represented to be. Failure to explain all the above is deception and misrepresentation. Plaintiff investors thought they had registered securities professionals helping them, when they did not.

61. This case involves investors who were sold investment vehicles, most of which were loans, others were equity investments. Plaintiffs were to be the recipient of the return of their principal investment plus interest or appreciation. The investments were portrayed by Defendants as suitable and safe for each of the Plaintiff's retirement money. Many of the Plaintiffs herein used their IRA money to invest. The loans were represented to be short-term with a definite maturity date and capable of providing regular cash flow from a reputable reliable source until paid. As it turned out, the borrowers are amorphous entities hardly reputable or reliable and not easily discernable. The borrowers are intertwined with other entities and affiliates and make up the Defendants herein. The structure of the loan or ownership of the borrower entity is so complicated that it is difficult to comprehend without significant financial prowess or extensive legal knowledge of legal entity structures; which the Plaintiffs herein do not possess. Defendants knew that Plaintiffs were not sophisticated in these matters and Defendants took advantage of Plaintiffs' lack of financial prowess or lack of legal knowledge by using complicated, lengthy, and confusing legal documents which Plaintiffs signed under Defendants' representation that there is no need to read or understand the voluminous complicated material as they were standard satisfactory provisions. In fact, many of the things discussed below were not satisfactory for these Plaintiffs and the terms were confusing and not fair. An example of an unfairness includes

making Texas the forum, applying Texas law, requiring a very strange form of arbitration with confusing conditions and requirements. Another unfairness is referring to the lenders, (some of the Plaintiffs herein) as a secured lender, but yet with no ability to be able to foreclose, according to the legal documents Plaintiffs had to sign. Also, there is an onerous attorney fee and indemnity provisions found in the Business Loan Agreement (BLA) at §33.26 and 5.5.6 that no reasonable lender would agree to. These provisions make the lenders (the Plaintiffs herein) liable to the borrower and not the other way around, as is typical where the borrower is liable to the lender. Also, this agreement is further so one-sided that no reasonable lender would enter into it because this agreement gives the borrower the right to seek an injunction through the courts but not the Plaintiffs, the lenders herein. See BLA §6.5.1. The documents Plaintiffs signed were so confusing and one-sided against them that the documents were tantamount to an ambush that contained provisions that prevented a citizen to redress grievances and/or Plaintiffs from protecting themselves and their substantial investment. In fact, it is the work of an unscrupulous investment. In short, the contracts, especially the arbitration agreement is an unfair adhesion contract. Defendants' actions and the contractual documents are unconscionable. Nevertheless, the investments were represented as suitable for retirees and/or conservative investors such as Plaintiffs. This was a consumer retail investment opportunity, developed, controlled, and organized by THOMAS POWELL, STEFAN TOTH, TED ETHEREDGE, PABLO CORTEZ, SHELLY PERDUE, WARREN TARYLE, ROGER A. CRABB, JAQUELINE KUIPER, CODY FLORES, and JASON BLAKE who utilized financial advisors to sell these investments. The investments were sold throughout California including in Orange County. THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN was financial advisor at the time since transferring to the State of Washington ." These investments were sold to investors as investments to be used for family and household purposes.

62. The investment product sold to MICHAEL HOLLIFIELD included a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $490,000 on or about July 2, 2018, (2) a loan to PETROROCK LENDERS FUND II, LLC aka PRMH Lenders Fund II, LLC, hereinafter referred to as "PRMH", for $100,000 on or about September 26, 2017 (3) a loan for CHOICE ENERGY HOLDINGS III, LLC hereinafter referred to as "CHOICE III", for $200,000 on or about January 31, 2019, These loans were to accrue interest in conformity with standardize promissory note. The first investment, LEGACY, had a starting interest of 9.5%, subject to penalties, late fees, and higher interest if late. The second investment, PRMH had a starting interest of 7.5%. The third investment, CHOICE, had a starting interest of 8.5%. MICHAEL HOLLIFIELD also invested in an equity position in Strategic Energy Assets VII, LLC for $100,000 on or about November 29, 2018. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this agreement or on any of the documents.

63. The investment product sold to MICHAEL ANDERSON included a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $256,000 on or about July 18, 2018. This loan was to accrue interest in conformity with standardize promissory note. LEGACY, had a starting interest of 9.5%, subject to penalties, late fees, and higher interest if late. Defendants have advised Plaintiffs MICHAEL and JANELLE ANDERSON that they are not able to perform on the original terms of this agreement or on any of the documents.

64. The investment product Defendants sold to RHONDA AMEY included a loan to CHOICE ENERGY HOLDINGS II LLC, for $50,000 on or about October 2, 2018. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 7.5%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments

have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

65. The investment product sold to JULIETA CABIGAS included a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $50,000 on or about July 18, 2018. This loan was to accrue interest in conformity with standardize promissory note. LEGACY, had a starting interest of 8%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this agreement or on any of the documents.

66. The investment product Defendants sold to LARRY CARLSON included a loan to PRMH Lenders Fund II, LLC for $114,000 on or about June 27, 2017. This loan was to accrue interest in conformity with a standardized promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

67. The investment product Defendants sold to CATHERINE CARLSON included a loan to PRMH Lenders Fund II, LLC for $65,000 on or about November 28, 2017. This loan was to accrue interest in conformity with a standardized promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

68. The investment product Defendants sold to THOMAS WAYNE CARLSON and MARILYN L. CARLSON included a loan to CHOICE ENERGY HOLDINGS III, LLC hereinafter referred to as "CHOICE" for $65,000 on or about February 11, 2019, and another loan to CHOICE ENERGY HOLDINGS III, LLC for $75,000 on or about May 31, 2020. These loans were to accrue interest in conformity with a standardize promissory note. The first investment, CHOICE, had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. The second investment, CHOICE, had a starting interest of 8.5%. Even though these Plaintiffs have demanded payment and communication with Defendants personally and through their representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

69. The investment product Defendants sold to BENYAPA FEIG and BERNARD FEIG is an equity position in Strategic Energy Assets VII, LLC for $75,000 on or about December 6, 2018.

70. The investment product Defendants sold to LINDA V. HILDEBRAND included a loan to CHOICE ENERGY HOLDINGS, LLC, for $50,000 on or about April 10, 2018. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 7.5%, subject to penalties, late fees, and higher interest if late. A copy of relevant note payable is attached hereto as Exhibits 12. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this or any of the documents.

71. The investment product Defendants sold to JOHN MILLHOLLON – TURNER IRA included a loan to ADVANTAGE CAPITAL HOLDINGS IV FUND, LLC EQUITY (held at Forge Trust Co. IRA), for $100,000 on or about April 10, 2018. The investment had a starting interest of 6.75%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has

demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this or any of the documents.

72. The investment product Defendants sold to JAVEN POYYAK included a loan to CHOICE ENERGY HOLDINGS III, LLC, hereinafter referred to as "CHOICE", for $100,000 on or about April 4, 2019, and (2) a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $50,000 on or about May 23 , 2018. These loans were to accrue interest in conformity with its standardize promissory note. The first investment, CHOICE, had a starting interest of 8.5 %, subject to penalties, late fees, and higher interest if late. The second investment, LEGACY had a starting interest of 9%. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

73. The investment product Defendants sold to CONNIE POYYAK included a loan to CHOICE ENERGY HOLDINGS III, LLC for $63,000 on or about April 4, 2019. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 8.5%, subject to penalties, late fees, and higher interest if late. A copy of relevant note payable is attached hereto as Exhibits 7. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

74. The investment product Defendants sold to RICHARD SHAON included a loan to PRMH Lenders Fund II, LLC for $274,000 on or about June 1, 2018. This loan was to accrue interest in conformity with a standardized promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. RICHARD SHAON also invested in an equity

position in Strategic Energy Assets VII, LLC for $50,000 on or about November 29, 2018. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

75. The investment product Defendants sold to YVETTE SHAON included a loan to PRMH LENDERS FUND II, LLC for $156,000 on or about June 1, 2018. This loan was to accrue interest in conformity with a standardize promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. A copy of relevant note payable is attached hereto as Exhibits 10. YVETTE SHAON also invested in an equity position in STRATEGIC ENERGY ASSETS VII, LLC for $50,000 on or about November 29, 2018. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

76. The investment product Defendants sold to KATHRYN MARY SMITH included a loan to CHOICE ENERGY HOLDINGS I LLC, for $103,000 on or about May 1, 2019. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 4.76%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents.

77. Plaintiffs believe that the way these investments were put together and sold to them amounted to a criminal enterprise that used misrepresentations and Ponzi scheme tactics to defraud Plaintiffs. Written material refers to Defendants' organization as having a "margin of safety" for lenders within a Legacy Energy promotional booklet and disclosure document. This is one of many statements which created the impression there was built in protection when all that was deception. This product

was represented to be a suitable consumer retail investment which it was not. Plaintiffs had no idea that they had been taken until the company abruptly stopped payment, which shattered the belief that the investments were safe. In fact, except for few payments initially made to Plaintiffs, it is believed Plaintiffs will suffer a total loss.

78. None of the Plaintiffs possess sophisticated financial skills. Plaintiffs were misled about the qualities and characteristics of this investment. Plaintiffs had no training or expertise in the area of finance, lending, or investments and relied upon Defendants when Defendants told Plaintiffs that these are short-term simple loans, and/or equity investments that would create cashflow. These loans are now due and have been due for months going on years and no cashflow at all has been produced by the equity investments. The equity investments should produce cashflow by now. Plaintiffs have been asking for some payment of their loans and equity investment to no avail. Plaintiffs are receiving no monies even though this is supposed to be the kind of investment that suitable for persons in retirement. Plaintiffs now seek all legal remedies available by law to get their money back. Plaintiffs request interest, attorney fees, and punitive and/or treble damages, or whatever the law allows.

79. These loans were introduced by CHAPMAN to Plaintiffs as short, safe loans suitable for retirement and conservative investors. Plaintiffs were led to believe by CHAPMAN that these were reputable investments – not high-risk endeavors with a real likelihood of failure or non-performance which is, in part, what happened.

80. Requiring Plaintiffs to submit to an out of state forum to resolve disputes is not only illegal and it also violates SEC rules. Texas is inconvenient for Plaintiffs and having to submit to an out of state forum is designed to be inconvenient for Plaintiffs.

81. POWELL, TOTH, Etheredge, Cortez, Perdue, Taryle, Crabb, Kuiper, Flores, and Blake developed this investment program as an adhesion contract to benefit and favor themselves and Defendants' investment as described herein. One provision says investors are to be fully secured, yet the reality is otherwise as the current status of events now reveal. The loans are not even secured by hard assets as promised. The investment is based upon an incomprehensible layer of morass in the form of many companies that Plaintiffs are unable to comprehend.

82. The loan(s) above mentioned created arbitrary borrowers and defined security as a non-exclusive interest in the project note together with the project loan documents and any other supporting obligations. In the LEGACY investment (the loan) see §2 of the Business Loan Agreement. All the loans in the other programs say the same thing on this point. The BLA further has a clause that states that the borrower (Defendant) is to be the one to file the UCC statements to perfect the Plaintiffs' equivalent of a lender's security interests. It declares this security to be a non-exclusive security interest, which is shared "Pari-passu" with all other lender investors giving loans to borrowers. The effect of this is something that sounds like security but isn't or is almost impossible to figure out what exactly it is. This is therefore fraud and deceit because it was sold as a safe, secure equivalent to any traditionally full secured loan.

83. A competent Financial Advisor would not allow conservative/retiree clients to invest in this flawed investment. POWELL, TOTH, Etheredge, Cortez, Perdue, Taryle, Crabb, Kuiper, Flores, and Blake used incompetent Financial Advisors and Brokers to produce sales. These financial advisors and brokers (in this case CHAPMAN) did not do the proper due diligence. POWELL, TOTH, ETHEREDGE, CORTEZ, PERDUE, TARYLE, CRABB, KUIPER, FLORES, and BLAKE incentivized Financial Advisors and Brokers by creating a fee structure that created loyalty to Defendants and a conflict of interest with Plaintiff Investors. It is further complicated by Section 3.9.1 of the BLA, wherein the borrower, is managed by another entity like Resolute Capital Partners, LTD "RCP." The primary purpose of the borrower (Defendant) is to finance the business and investment operations mainly PETROROCK in connection with its oil and gas interests. According to this mission, in case of a default, Resolute Energy Capital LLC, a Delaware corporation (REC), is the authorized representative of all the lenders. These lenders representatives are to represent all lenders when it comes to doing any foreclosure. Such an arrangement means Plaintiffs are without a direct remedy of their own and must depend on the lender representative whose allegiance is to Defendants, not Plaintiffs. It is a morass that makes the Plaintiffs impotent to protect their loan and foreclose if not paid. It makes the investment a sham and renders Plaintiffs' security ineffective and under the control of Defendants. This hamstrings Plaintiffs' ability to foreclose on the security or put appropriate pressure on Defendants to get paid back. There are also indemnity and hold harmless provisions imposed against Plaintiffs, which

are unheard of in arms-length transactions, and never properly explained. See LEGACY disclosure at BLA Section 3.26 for one example. Also, Plaintiffs cannot represent themselves. They are supposed to be represented by a representative that may resign at any time by giving notice according to Section 4.8. Lenders are tethered to a representation that gives most of its allegiance to Defendants further making Plaintiffs' security tenuous. None of this was explained or disclosed. Plaintiffs have no rights commonly availed to a lender rendering the loan with security an illusion.

84. Plaintiffs specifically allege that POWELL, TOTH, ETHEREDGE, CORTEZ, PERDUE, TARYLE, CRABB, KUIPER, FLORES, and BLAKE were acting as registered or licensed brokers and that they used their entities RCP, HBR and other Defendants as a vehicle to sell unregistered securities against the law. This violation entitles Plaintiffs to rescission and other damages. The SEC found POWELL and TOTH violated the laws by acting as unregistered brokers subjecting them to a cease-and-desist order, which POWELL and TOTH accepted.

85. The SEC order and settlement cited Defendants and their salespersons acting on behalf of the Defendants selling securities to retail investors as selling unregistered securities. This further justifies the return of Plaintiffs' money back.

86. Additionally, the SEC indicated Defendants made material misrepresentations and omitted material facts in both debt and equity offerings. This includes how the money was to be used, contrary to what it was represented, that Defendants were not registered licensed brokers. In fact, they were selling unregistered securities without an exemption to do so. Defendants failed to supply Plaintiffs with truthful supported projections of future oil production, repayment of debt, and distribution of one's equity investment.

87. In addition, Defendants made statements of potential tax benefits that were unavailable to certain investors which Defendants knew or should have known that these statements of potential tax benefits were not true.

88. Defendants overstated cash reserves and made incomplete disclosures regarding potential use of investor funds including the number of funds that would be used for payment or prior debt and equity investors. This is documented by the SEC Release No. 10987.

89. Defendants claimed exceptions from registration for these offerings pursuant to the provisions of the Securities Act and Regulation D, but no exemption from registration is or was applicable. This is documented in SEC Release No. 10987. Defendants offered securities using general solicitations including seminars, dinners, and radio shows, which are not permitted. This is documented in SEC Release No. 10987.

90. Defendants failed to take adequate steps to verify the accredited status of investors applicable and sold unregistered securities to approximately 200 non-accredited investors, which affected the viability and credibility of the offerings and hurt all investors not just the unaccredited investors. See SEC Release No. 10987. POWELL and TOTH made sales presentations at dinners and seminars and advised potential investors and the safes force Defendants, particularly POWELL and TOTH failed to take reasonable steps to verify the accredited status of investors when applicable under the claimed exemption and sold certain of the unregistered securities to hundreds of non-accredited investors. See SEC Release No. 10987.

91. Salespersons on behalf of Defendants directed investors out of IRA companies that handled traditional retirement accounts investments and into IRA companies that would accept investments in unregistered gas and oil offerings. This is indicative of manipulation on the part of investors that affects Plaintiffs and was not in the best interest of investors including the applicable Plaintiff herein, and in fact, violated the terms of these retirement investment accounts. See SEC Release No. 10987.

92. Neither POWELL nor TOTH were registered broker dealers or associated with registered broker dealers, yet each participated in selling these investment vehicles. They each also set sales guidelines and requirements including setting contractual terms between issuers and investors and overseeing investor's funds. They directed RCP and HOMEBOUND to pay transaction-based compensation based on commission to salespeople who referred investors to equity and debt funds. They make themselves were entitled to certain transaction-based compensation in the form of overrides based on the performance of these salespeople. They appeared at investor dinners and seminars and advised potential investors on the merits of participating. As such, they were salesmen of the very deal Plaintiff made that became this investment. This created a conflict-of-interest situation and situations that favored Defendants at an extraordinary unfair level to investors. They acted as illegal or

unregistered broker dealers in creating this global ill-conceived and deceptive program, allowing them to raise money for their own use.

93. POWELL and TOTH had ultimate authority over the statements in the offering materials for these equity and debt funds that were provided to investors. These were approved by POWELL and TOTH, for various Defendants including RSP and HOMEBOUND, creating a misleading impression to investors including these Plaintiffs herein. One of the misleading impressions made included representing the investment was capable of producing more oil and improving its performance at a level that is more than reasonably possible. Also, they both prepared offering materials stating that "Securities are offered through WealthForge Securities, LLC member FINRA/SIPC." In fact, the sellers of these securities to these Plaintiffs were unregistered brokers and/or financial advisors who were not FINRA members. All of this has not been properly explained and/or was concealed in a way that violates the anti-fraud laws and/or anti-fraud provisions of the securities laws of the State of California. One-page brochures were given out, which did not adequately support Defendant's oil well production projections and were not consistent with prior performance, amounting to further fraud, deception, or concealment of material facts.

94. Offering materials prepared by POWELL and TOTH and used by Defendants for funds did not adequately disclose the amount or percentage of investor funds that would be used for marketing, expenses, and commissions for salespeople, salaries, consultants, and prior offerings.

95. Offering materials approved by POWELL and TOTH and utilized by Defendants for the debt offerings contained statements and omissions of material facts concerning the use of investor funds that created a materially misleading impression. The offering materials disclosed that the issuers were using the money that Plaintiffs contributed to lend funds to PETROROCK and that PETROROCK would use the funds to acquire oil and gas leases, fund its business operations and investments, and, in certain offerings, make interest payments on other PETROROCK debt. These disclosures were materially misleading because investors were not told that the majority of assets raised would be used to make payments to investors in other Debt or Equity Funds. See SEC Release No. 10987.

96. POWELL and TOTH under the consultation and auspices of WealthForge Holdings, Inc directed RCP, HOMEBOUND, and other companies they controlled, to pay transaction-based

compensation in the form of commissions to salespeople who referred investors to the equity and debt funds, the subject of this suit. A first set of Defendants arranged it so that a second set of Defendants were entitled to certain transaction-based compensation that benefited the first set of Defendants, mainly Powell and Toth in the form of overrides, based on the sales produced by the salesforce. None of this was disclosed to Plaintiff investors. See SEC Release No. 10987 at Page 4, ¶13. The most unfortunate thing about this is that this system by-passed and perverted the protections that the securities laws provide which, among other things, is a well-regulated salesforce consisting of SEC approved financial advisors or FINRA representative bound by laws, rules and codes of ethics and strict obligations that was not provided here. The person that sold Defendants products to Plaintiff, Tom Chapman who not the writing agent on these transactions nor did he ever sign any paperwork as the advisor in putting these clients into this investment. These Plaintiff were all referred to the First set of Defendants who referred to Tom Chapman the "referring agent." All Chapman knew was that he was paid a referral fee for that introduction. The first set of Defendants processed plaintiff's paperwork via Docusign using WealthForge's system with each client going through that buying process directly with the first set of Defendants, referred to as "Resolute or Resolute Capital" all via email. The Plaintiffs are left unrepresented and without anyone performing due diligence or suitability analysis. Chapman did not sign any of the investment paperwork nor did he become a writing agent on any of those transactions. He explicitly was told to waive all such things and he had to declare he was not acting as a broker or financial advisor, which is against the law.

97. The investment was set up such the benefits would flow through and be dependent on the success of PETROROCK Mineral Rock LLC "Petrorock" as the centerpiece. Loans and equity investment were to support it as the holder of the major oil producing assets. PETROROCK loaned some of this money to TEXAS MINERAL HOLDINGS, which was an unauthorized act in violation of the investment provisions. But that got money outside of the investments free from the control of the Plaintiff/investors which is unfair and rendered PETROROCK impotent as a source of payments to investors.

98. At some point, TOTH and his companies took advantage of investors by using his companies that TOTH to control and take over companies that were to benefit investors. An example of

this is MERCURY OPERATING, LLC and MINERVA RESOURCES, LLC. It is alleged upon information that TOTH and/or one or more Defendants were able to make MERCURY OPERATING, LLC charge PETROROCK $23 million, which involved illegitimate charges that made it possible for TOTH or one his companies to charge exorbitant and illegitimate fees to take advantage of funds available for investors and allow him to benefit. It is also believed upon information that TOTH caused PETROROCK to sell oil and gas assets purchased with investors' funds to him or his companies at discount prices so they would benefit. The companies used for this are believed to be MINERVA RESOURCES, LLC. TOTH indirectly holds 100% of the voting units in MINERVA RESOURCES, LLC through various entities including MINERVA RESOURCES MANAGEMENT, LLC and CRONUS MINERAL HOLDINGS, LLC. MINERVA RESOURCES, LLC then took control of proceeds from the above at a distressed price for its own use, converting them into a profit. It is believed that MINERVA has acquired oil producing properties that are a revenue source that should belong to investors but through the above maneuver is obtaining a stream of income from a legitimate source, namely Conoco.

99. TOTH also caused PETROROCK and MINVERA RESOURCES, LLC to grant overriding royalty interest to his affiliated companies, namely Defendant CRONUS MINERAL HOLDINGS, LLC and 2X5 LLC. They are also believed to be holding stock controlled 100% by TOTH. It is believed that MINVERA RESOURCES, LLC has diverted millions of dollars to insiders and for overhead to aid their operations independent of the investors and to Plaintiffs' detriment and dis.

100. PETROROCK was represented as and was controlled by the Defendants, particularly TOTH and POWELL. They disclosed that they would produce over 500 barrels a day, which would be sufficient revenue to fund the business and return the expected profit to Plaintiffs and other investors. In fact it has only produced 4-5 barrels a day. It was the revenue from investors that funded all the glitter from that makes up everything. Defendant entities are now flourishing because of the $250 million of investor money that went into all these investments. By the end of 2019, PETROROCK had less than $100,000 in cash but it was still used as a figurehead in Defendants' marketing efforts. The concept of it deceptively brought more investors including Plaintiffs. By this time many fraudulent type transfers had taken place draining PETROROCK of value over to Defendant organizations.

101. It appears that PETROROCK was acting as a fraudulent business and Ponzi scheme. The transfers that occurred only saddled PETROROCK with liabilities and freed up the Defendants and their owners with wealth. On or about June 24, 2021, before the cease and desist with the SEC, but while Defendants knew that the SEC was investigating them, Defendants entered into an agreement to sell valuable assets to MINERVA RESOURCES, LLC. These assets should have been owned by investors. Apparently, MINERVA RESOURCES, LLC paid $3.328 million to PETROROCK but this was hardly and fair and adequate exchange. For that MINERVA received a release. This too was unfair and part of an avoidable or fraudulent transfer. These transfers were done with the intent to delay, hinder, and defraud PETROROCK and its affiliates and investors, mainly the Plaintiffs herein. Transfers were staged and took place in a way so as to switch liabilities to PETROROCK. TOTH and other related Defendant entities took advantage of this to increase their wealth at the expense of PETROROCK and investors. The alleged $3.328 million valuation is not of an equivalent value and is not a good faith exchange. The release issued should therefore be deemed voidable and fraudulent as well. It was also not executed properly within legal authority, so it can be voided for that reason as well. All of these Defendants in this scheme perpetuated a fraud or Ponzi type scheme in a way that is unfair and left the investor in the dark and without much of anything.

102. In early 2018, one of the Defendant's programs raised approximately $39.7 million from investors through the sale of promissory notes offering 8-9% annual interest, and loaned the money raised from investors to PETROROCK. In the offering materials prepared by POWELL and TOTH, prospective investors were told that the "primary purpose" of LEGACY was to "finance the business and investment operations of PETROROCK in connection with its Oil and Gas Interests" and that the funds they provided may be used for, among other things, the "repayment of other debt, loans and promissory notes" of PETROROCK affiliates. The offering materials for LEGACY as in other of Defendants investments were materially misleading because they failed to disclose the sum of the funds it received from investors and loaned to PETROROCK would be used to make distributions to equity investors in an undisclosed related-party transaction. In one offering, nearly half of the money raised was used to close-out the HBR VI and SEA III Funds, including making distributions to equity investors in those Funds. Defendants made those payments through a series of related-party transactions

that Defendants did not disclose in the offering materials. PETROROCK loaned the money it received from Legacy to Texas Mineral Holdings, LLC ("TMH"), an entity owned by HOMEBOUND, POWELL, and other RCP employees, which because this was not disclosed created a huge deception that infected the program and subsequent investment programs including the ones set further in this complaint. TMH then used the money to purchase the oil well interests owned by HBR VI and SEA III. Defendants set the price for that transaction without an independent appraisal or any other market-based valuation. The above was not properly disclosed and was a deception and material concealment of fact as just mentioned this and all subsequent investment programs.

103. Defendants touted the success of the HBR VI and SEA III offerings in marketing efforts for subsequent offerings, while failing to disclose the related-party nature of the sale of the HBR VI and SEA III well interests. Defendants stated that their investment vehicles had returned $93 million to oil and gas equity and debt investors, and that equity investors in HBR VI and SEA III had enjoyed an average 11% rate of return. These claims were materially misleading because Defendants failed to disclose that these purported returns were based on related-party and not market-based transactions and came primarily from other investor funds as opposed to successful operations. This activity affects these investments which are the subject matter of this proceeding. This is information that was not disclosed, was deceptive, and misled Plaintiffs herein to buy when they would not have done so had they been able to make an informed decision based on a fair and balanced set of facts.

104. POWELL, TOTH, and the other Defendants failed to use due diligence to see that its agents like THOMAS CHAPMAN were properly trained and supervised and their independence was not affected. Further, it was THOMAS CHAPMAN's responsibility to make sure that he had all of the information and that he engaged in due diligence relating to the investment before recommending it to these Plaintiffs. THOMAS CHAPMAN was negligent in failing to do adequate due diligence and/or was negligent in portraying these investments properly to Plaintiffs. THOMAS CHAPMAN perpetuated false facts and a false narrative about these investments. Due diligence would have detected all the faults outlined above including the likely potential for cash flow insufficiency which later came to plague these investments. It is believed the above failure is inexcusable because it is the job of THOMAS CHAPMAN serving as the financial advisor of Plaintiffs to see that this investment was

portrayed properly. If it was portrayed properly as the risky investment that it was and ill-conceived, then Plaintiffs would not have purchased these investments. As such, it was also unsuitable, not in the best interests of Plaintiffs, and should not have been sold by reputable financial advisors like POWELL, TOTH, CHAPMAN, and the companies they worked through.

105. By reason of the facts set forth herein, and throughout this complaint, the loan investments will be, or have been shown and/or are alleged as such to be the product of various acts of wrongdoing, including statutory wrongdoing, fraud, breaches of fiduciary duty, and acts of negligence, deception, and omission of material facts. Also, the loans are the product of adhesion contracts. These adhesion contracts are unconscionable. Defendants designed the loans to be the very foundation for the Resolute oil and gas programs. The loans were the backbone of the Resolute oil equity investments that were in part, dependent upon these loans and which these loans support. If the loans cannot be covered, and are no longer viable, it means the whole investment, especially the equity investments, were ill-conceived. It is alleged that Defendants failed to do proper due diligence and failed to calculate and discover basic flaws in the loan and subsequently the equity programs. Thus, the entirety of the numerous investments associated with the oil and gas programs, including both the equity and the loan investments, have become frozen because of Defendants' failure to properly project and forecast a reasonably accurate cash flow. The cash flow model projected was either poorly designed, or the programs were improvidently, negligently, or fraudulently managed and operated. In either case, either the failure of Defendants to do proper due diligence regarding the reasonableness of the cash flow projections, or the failure of Defendants to do proper due diligence as to the experience and track record of the operators and managers, the above-mentioned deficiencies create liability among Defendants as to the equity investments which arise out of the failures of the loan investment programs.

106. It is further believed that once it is proven that the loans, as an investment, are not viable, that proves the equity investments are not viable. In addition, once it is proven that the loans are fraught with all the wrongdoing alleged associated with them and as alleged, as such, throughout this complaint, the Resolute oil equity investments become tainted and suspect. Once tainted by this, the equity investments are exposed as non-viable and illegitimate investment themselves as they are dependent on and associated with the loan programs to be viable and legitimate. All the above makes

the equity investments the product of deceit and misrepresentation especially omission of material facts, namely Defendants omitting to advise Plaintiff investors how closely aligned and dependent the loan investments are to the equity investments, and how the loan program works (or does not work to Plaintiffs' disadvantage), and thus how there was a non-viable, illegitimate, or unconscionable aspect to these loans and thus tainting the interrelated equity investments. Also, the deficiency in the loan programs exposes the equity program as being tied to an overall deficient oil and gas program. This misrepresentation of material fact, and omission of material fact becomes the basis for Plaintiffs' seeking relief from their investments in the equity programs as well as the loan programs.

107. Defendants associated with WealthForge Securities, LLC, a FINRA Broker dealer, announced in Defendants marketing materials, that "Securities are offered through WealthForge Securities, LLC, a member of FINRA/SPIC."

108. Plaintiffs sent via certified mail to all Defendants dated July15, 2022 and a separate similar letter to Wealthforge Securities, LLC, WealthForge Holdings, Inc on August 19, 2022. Defendants were given the required 30 days to correct, repair or rescind, and or do any of the things allowed by California Civil Code §1770 et seq. They have not done anything. Plaintiffs therefore are entitled to the damages and remedies set forth in California Civil Code §1780 and related sections.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

109. This is a class action on behalf of persons or entities who purchased or otherwise acquired investments (also called securities) from the Endeavor, the umbrella organization run by the Defendants (the "class."). Plaintiffs seek to recover comprehensible damages caused by Defendants' violation of all causes of action especially the violations of Civil Code 1770 et seq.

110. Plaintiffs bring this action as a class action. The class is on behalf of persons, trusts, or entities residing or doing business in or from California that purchased or otherwise acquired investments (also called securities) from the Endeavor, the umbrella organization run by the Defendants. (the "class."). Excluded from the Class are any investors that are the Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

111. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiffs at this time. They can be ascertained only through appropriate discovery. Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

112. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of laws and causes of action set forth herein.

113. The Representative Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

114. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants' acts as alleged against the law;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c. Whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

e. Whether Defendants acted knowingly or recklessly in issuing false and misleading statements during the Class Period;

f. Where the money went and what assets are viable

g. Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

h. Whether injunctive relief is necessary for the benefit of all.

115. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. A class action is a more efficient method of bringing this lawsuit rather than individual lawsuits.

**FIRST CAUSE OF ACTION:**
**SECURITIES FRAUD (VIOLATION OF CORPORATE SECTION 25401)**
**(Against all Defendants)**

116. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

117. Defendants, by reason of the above mentioned facts as set forth in the General Allegations, sold Plaintiffs securities in violation of California Corporation Code §25401 which prohibits offers or sales of securities including investment opportunities by means of a written or oral communication that contain: "Untrue statement[s] of a material fact or omits to state a material fact necessary in order to make the statement[s] made, in light of the circumstances under which they were made, not misleading."

118. Defendants sold this investment to Plaintiffs in a way that violated this statute. Defendants knew or should have known that the statements were false and/or that they were concealing material facts. Defendants knew or should have known that there were important facts that needed to be known to make a properly informed decision on this investment/loan but did not communicate all things truthfully. As a result, the investments were portrayed in a false light.

119. It was also improper, deceitful, or negligent to do the above and take Plaintiffs' money under the circumstances set forth in the general allegations of this complaint. Defendants intentionally failed to describe the investment truthfully, especially in failing to explain the money invested went into promoting or supporting other investments and in portraying this investment as suitable for retirement money. This investment was also fraudulent because it was represented by the persons who sold this to them or were in charge of the offering when what they bought was a security that could be legally sold

i.e. registered security. They were also not told the true facts about the oil and the structure and the full onerous requirements. Thus, losses would impose on Plaintiffs. Plaintiffs allege any fraud set forth anywhere in this document above or below.

120. Defendants associated with WealthForge Securities, LLC, a FINRA Broker dealer, broadcasted orally and in writing included in marketing materials, that "Securities are offered through WealthForge Securities, LLC, a member of FINRA/SPIC." However, WEALTHFORGE now denies being involved with the Plaintiffs herein or acting as the FINRA affiliated registered representative for these Plaintiffs. If WEALTHFORGE was as represented then it failed to perform its function. In either case, Defendants association with WealthForge Securities, LLC and this statement was misleading and deceitful.

121. Selling securities and/or an investment opportunity like this under these false pretenses or while omitting material facts is deception and involves misrepresentation of material facts in violation of the law. Plaintiffs contributed money to Defendants thinking they had made an investment or loan that would make a good return for their retirement when it was too risky for that, and they should have been told so.

122. By reason of the above, Plaintiffs are entitled to rescission and damages, and or the damages set forth in California Civil Code § 25501 and/or Civil Code § 25501.5.

123. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.

124. Plaintiffs seek all other damages allowed by law for the above-described wrongdoing including costs of suit, investigation, and attorneys' fees.

**SECOND CAUSE OF ACTION:**
**BREACH OF FIDUCIARY DUTY**
**(Against all Defendants)**

125. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

126. Defendants were in a fiduciary relationship with Plaintiffs when they sold the above-mentioned products to Plaintiffs. Defendants had a conflict of interest with Plaintiffs because Defendants had an interest in selling the highest priced product with as many restrictions as possible.

That is opposite of what Plaintiffs wanted, yet the sale of higher priced products even unrealistically high-priced securities with unfavorable terms was sold to Plaintiffs using a referral system tantamount to commissions of salespersons including CHAPMAN whose allegiance was to Defendants, not Plaintiffs. This had the effect of taking advantage of Plaintiffs. In selling these investments and not disclosing this conflict of interest, and the other facts above alleged, Defendants were putting their own interests ahead of those of its customers, thus breaching the fiduciary duty owed to Plaintiffs, the customers.

127. Under the circumstances, Defendants wrongfully took Plaintiffs' money or excess money compared to the true value the investment represented. The money became illiquid. Plaintiffs did not consent to their money being taken in this way and had they known all the facts and full truth about this illiquid investment, and that it was not being secured in any traditional sense, and having no credible cash flow they would not have bought. Plaintiffs were tricked and became the subject of undue influence by Defendants. Fiduciaries should not make a sale under these circumstances, but Defendants did so because it served their interests not the customers, the Plaintiffs.

128. Defendants carried out their breaches of duty in association with each other.

129. Plaintiffs were harmed because they lost the money they put in for this investment and/or loans.

130. By reason of the above-described breach of fiduciary duty, Plaintiffs have suffered from pain, suffering, and mental anguish for which reimbursement is sought.

131. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

132. Plaintiffs seek all other damages allowed by law for the above-mentioned wrongdoing including costs of suit, investigation, and attorneys' fees.

**THIRD CAUSE OF ACTION:**
**VIOLATION OF PENAL CODE 496**
**(Against all Defendants)**

133. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

134. Defendants engaged in a course of conduct as described above that swindled Plaintiffs out of the money Plaintiffs gave to the Defendants as part of these investment programs.

135. Defendants conduct as above described, constitutes violations of Penal Code 496(a).

136. Plaintiffs seek all damages allowed by law, including treble the amount of actual damages sustani9ed by Plaintiffs, plus attorney fees and costs as allowed by Penal Code 496(a).

137. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

## FOURTH CAUSE OF ACTION: NEGLIGENCE (Against all Defendants)

138. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

139. Defendants were negligent for the reasons above described. Selling these products to Plaintiffs based on the lack of due diligence and not preparing Plaintiffs for the reality behind the investments and selling an investment not suitable for Plaintiffs or not in Plaintiffs best interest (as described throughout this document) is below the standard of care in the industry and is negligence. It was also below the standard of care to sell unregistered or unqualified securities without a legitimate exemption and to sell these products by and through unregistered or unlicensed persons. It was also below the standard of care to make misrepresentations about the program and the investments which misrepresentations are described in the General Allegation section or this claim, and in causes of action hereinafter.

140. As a result of the aforesaid acts of negligence of Defendants, Plaintiffs and beneficiaries are damaged by reason of the loss of the monies they contributed to the investments, as well as the loss of their property, money, and expenses necessary to get their money back.

141. As a result of the above acts, Plaintiffs also claim general damages for mental and emotional distress, pain, and suffering, caused by Defendants, subject to proof at the time of trial.

142. Defendants' conduct was a substantial factor in causing Plaintiffs' harm as described above. Plaintiffs seek reimbursement for the costs and expenses of dealing with this investment, including legal fees incurred for having to recover the property.

143. Plaintiffs seek all other damages allowed by law for the above-mentioned wrongdoing including costs of suit, investigation, and attorneys' fees.

144. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested.

## FIFTH CAUSE OF ACTION: CORPORATE CODE §§ 25004, 25501.5, & CCP § 1029.8 VIOLATION (Against all Defendants)

145. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

146. The above-mentioned facts show that Defendants sold Plaintiffs unregistered or unqualified securities in violation of California Corporation Code, particularly §25110. Defendants also had no state or federal exemption as noted above. Defendants acted as brokers and broker-dealers in selling these investments to Plaintiffs. Defendants were not properly licensed/registered including under California Corporate Code §§ 25004 and 25501.5. As a result, Defendants were not properly licensed/registered by law which itself is a violation and justifies voiding this transaction and returning Plaintiffs all monies given to Defendants. In addition, this puts Defendants in violation of California Code of Civil Procedure §1029.8.

147. California Code of Civil Procedure § 1029.8 states "unlicensed persons who cause injury or damage ... as a result of providing goods or services for which a license is required... shall be liable to the injured person for treble the amount of damages..." Had Plaintiffs dealt with a licensed person instead of an unlicensed people such as Defendants, Plaintiffs would have been protected and this situation would not have happened because no reputable licensed person would sell these securities to Plaintiffs. Even if that were not the case, sales by unlicensed persons render sales void and therefore justify rescission.

148. It was below the standard of care for a seller to sell unregistered securities in this manner and when one does that, the transaction is void entitling Plaintiffs to his money back. Rescission or disgorgement is mandated, and damages are appropriate.

149. In addition to the above-mentioned remedies, Plaintiffs have been damaged, in having to suffer significant losses as above described, including pain and suffering, loss of the use of their money, loss of interest or the loss of the value of a well-managed account, loss of their principal, all to the tune of approximately $5,000,000, including accrued interest, for which Plaintiffs seek reimbursement.

150. By reason of the above, Defendants are liable to Plaintiffs.

151. It was also improper, illegal, deceitful, or negligent to sell unregistered or unqualified securities to Plaintiffs and take Plaintiffs money under these circumstances.

152. By reason of the above, and as a proximate result of selling unregistered or unqualified securities, Plaintiffs were harmed because if these securities were registered or qualified, there would have been more protections and disclosures and Plaintiffs would not have bought these products. Whether Plaintiffs would have bought them or not is no excuse. Failure to register or qualify this security automatically allows for damages.

153. By reason of the above, Plaintiffs are entitled to rescission and damages. Plaintiffs seek their money back and interest thereon. Additionally, Plaintiffs seek all damages allowed by law for selling unregistered securities.

154. By reason of the above-mentioned conduct, Plaintiffs are entitled to treble damages and attorneys' fees and costs at the discretion of Court, which Plaintiffs request.

155. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.

**SIXTH CAUSE OF ACTION:**
**FRAUD**
**(Against all Defendants)**

156. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

157. The conduct of Defendants was fraudulent because there was omission of material facts and there was misrepresentation of material facts. What information that was provided, was not truthful nor complete. There was concealment of material facts and omission of material facts not disclosed, thus Defendants sold Plaintiffs products that were misleading. Full disclosure of all material facts was not even attempted, making this situation all the more fraudulent.

158. Defendants also made a contract that is comparable to a false promise. Defendants did not intend that the product they were providing would meet Plaintiffs' needs because Defendants knew information that Defendants did not disclose to Plaintiffs as described in more detail earlier in the Complaint. Defendants also knew or were reckless not to know that the investments were not a suitable investment for these Plaintiffs. Defendants either knew, or were reckless in not knowing, that they could not and would not be able to perform as promised or as portrayed as above described, yet Defendants sold these investment products anyway knowing this. These false promises include concealments as above described herein including not disclosing Plaintiffs' money was going predominantly to other investment programs. Another falsity stated in the promotional brochures and orally was that these "Securities are offered through WealthForge Securities, LLC member FINRA/SIPC." Wherein, in fact, none of the securities sold to the above-mentioned Plaintiffs were purchased through FINRA registered representatives or brokers. Defendants made statements in emails and in brochures, implying that all investments were legitimate, viable, and safe for investing retirement money and offered legally consistent to the state and federal securities laws and the laws governing broker dealer activity. In fact there were not none of this was true. The above quotation was misleading and deceitful as none of the Plaintiff investors were afforded the investor protections offered through a FINRA Broker Dealer.

159. Further, there is a statement that there were sufficient cash reserves for a margin of safety, which turned out to be untrue. In the lender programs and promissory notes, there was a statement that

Plaintiffs can get their money back if Plaintiffs request so in writing. Even though Plaintiffs made this request in writing, their money was not returned as promised. Since Defendants knew of these falsities, this is categorized as deceit and fraud.

160. Defendants intended that Plaintiffs rely on what Defendants knew were false promises.

161. Plaintiffs were reasonably relied on Defendants' promises.

162. Defendants did not perform on the promises. Defendants gave Plaintiffs a sub-standard product and sub-standard service. In fact, Defendants sold to Plaintiffs what Defendants knew was inappropriate, unsuitable, onerous, and deceptive, contrary to Defendants' representation as cited in the General Allegation Section of this Complaint.

163. Plaintiffs were harmed for all the reasons and in all the ways above stated in other causes of action.

164. Plaintiffs' reliance on Defendants' promise was a substantial factor in causing the present harm. Plaintiffs reliance was reasonable.

165. Plaintiffs were harmed from their loss of investment including suffering, pain and mental anguish as a result of the above.

166. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

167. Plaintiffs seek all damages available by law.

**SEVENTH CAUSE OF ACTION:**
**FINANCIAL ELDER ABUSE (Welfare and Institution Code §15600 et sec.)**
**(Against all Defendants for RICHARD SHAON, BERNARD FEIG and LINDA V. HILDEBRAND only)**

168. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

169. As an "elder," within the meaning of Welfare and Institution Code §15610.27, Plaintiffs RICHARD SHAON, BERNARD FEIG and LINDA V. HILDEBRAND were entitled to the heightened rights and special statutory protections provided by California's Elder and Dependent Adult Civil Protection Act (EADACPA)", set forth in Welfare and Institution Code §15600 et sec. Under Welfare

and Institution Code §15610.30, a person is liable for financial elder abuse or for assisting financial elder abuse if they obtained the elder's property if they knew or should have known the conduct is likely to be harmful to the elder. Defendants didn't just do one sale with RICHARD SHAON; each time, dealing with an elder person entitled to extra protection. Plaintiffs as elders needed to improve their health and their surroundings, not make investments that could not likely materialize in their lifetime and would burden their heirs.

170. The activity of Defendants was a predatory practice in that it constitutes taking advantage of vulnerable elderly persons for Defendants' financial gain, which is what happened here when Defendants sold Plaintiffs these investments, which resulted in Plaintiffs losing their money.

171. The Center for Research at Boston College's study called "Aging Brain" says older people are particularly susceptible to deception and predatory practices because they suffer from cognitive decline, which impacts financial management skills, results in poor decision-making, leaving them particularly vulnerable to fraudulent marketing tactics.

172. Broker-dealers or people with fiduciary duties like Defendants play a critical role in preventing financial abuse of elderly persons. Reputable persons should have rules and regulations to prevent sales to elders in situations like this. It is believed that Defendants were grossly negligent or acted egregiously or intentionally in not having such rules and regulations or not monitoring each other if they did.

173. Defendants knew each sale was not suitable for Plaintiffs based on Plaintiffs' expectations because Defendants knew neither Defendants, nor the investment, could deliver as promised, yet Defendants persisted to continue to sell products to Plaintiffs.

174. Despite being an entity or person in possession of key facts, Defendants knowingly assisted and turned a blind eye and callous heart to the outrageous pilfering of Plaintiffs' money.

175. By reason of the above, all Defendants, including DOES 1-20, committed the above by knowingly assisting financial elder abuse.

176. Defendants' financial abuse has caused Plaintiffs to undergo financial losses as well as emotional stress and frustration because of the loss of so much money, depriving Plaintiffs of financial security. Defendants knew or should have known that their conduct was likely harmful to Plaintiffs or otherwise in violation of the Laws particularly California Code of Civil Procedure §15600.30.

177. Plaintiffs were harmed including suffering from their loss of investment and suffering pain and mental anguish as a result of the above.

178. By reason of the above-mentioned conduct, Plaintiffs are entitled to treble damages and attorneys' fees and costs at the discretion of Court, which Plaintiffs request.

179. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

180. Plaintiffs seek all damages available by law.

## EIGHTH CAUSE OF ACTION:
## ACCOUNTING
## (Against all Defendants)

181. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

182. Plaintiffs request the full and complete accounting of all records related to the programs as well as all the oil wells and Plaintiffs' transactions so a complete picture can be seen and so Plaintiffs will have all records related to what was purchased.

183. Plaintiffs are entitled to this information as accounting is a normal right of any investor or lender and equity requires investors have full access to their investments.

184. Plaintiffs seek all damages allowed by law for Defendants not already producing a paper accounting as requested by Plaintiffs.

185. Plaintiffs seek attorney's fees and costs.

**NINTH CAUSE OF ACTION:**
**VIOLATION OF SECTION 5 OF THE SECURITIES ACT (UNREGISTERED SECURITY)**
**(Against all Defendants)**

186. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

187. By reason of above mentioned conduct, Defendants POWELL, TOTH, and other companies willfully violated Section 5 of the Securities Act (15 U.S. Code § 77(e) and 15 U.S. Code § 17), which states that "[unless] a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such securities or a medium of any perspective, or (2) to carry or cause to be carried through the mails for an interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for the delivery after sale."

188. As a result of the conduct described above, Defendants POWELL, TOTH, RCP, and HOMEBOUND willfully violated Section 5 of the Exchange Act, which states that "[it] shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any perspective or otherwise any security, unless a registration statement has been filed as to such security."

189. By reason of the above, the remedy is rescission or disgorgement of all monies paid.

190. Plaintiffs seek all damages allowed by law by reason of Defendants acting and selling unregistered securities.

191. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitute oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

192. Plaintiffs seek all damages available by law.

**TENTH CAUSE OF ACTION:**
**VIOLATION OF SECTION 15 OF THE EXCHANGE ACT BY ACTING AS A BROKER-DEALER OR AGENT OF SAME WITHOUT REGISTRATION**
**(Against all Defendants)**

193. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

194. An unregistered broker selling securities is illegal, and that is what was done in this case. This violates Section 15 of the Exchange Act. As a result of the conduct described above, Defendants POWELL and TOTH willfully violated Section 15of the Exchange Act (15 U.S. Code § 780.3), which makes it unlawful for any broker or dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance" with Section 15(b) of the Exchange Act. Section 3(a)(4) of the Exchange Act defines "broker" generally to mean "any person engaged in the business of effecting transactions in securities for the account of others."

195. POWELL, TOTH, and CHAPMAN acted as brokers without being registered.

196. By reason of the above, the remedy is rescission of all monies paid.

197. In the alternative, Plaintiffs seek all damages allowed by law by reason of Defendants acting as brokers, being unregistered, and selling in the way above mentioned.

198. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

199. Plaintiffs seek all damages allowed by law.

## ELEVENTH CAUSE OF ACTION: BREACH OF CONTRACT/RESCISSION (Against all Defendants)

200. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

201. Plaintiffs were promised the benefits of a secured lender and the right to receive their principal back with interest and to have sufficient security and the protections comparable to those afforded of a lender, yet in reality, Plaintiffs have not received these rights including payments as promised on the loan. This constitutes a breach of contract. Defendants also promised investments with cash flow. That has not happened, which is another breach of contract. More importantly as described in the general allegations, Defendants have not delivered what was promised, and because of this, these investments were based upon fraud or mistake of fact and is subject to rescission for which Plaintiffs now seek, including a full refund of what Plaintiffs paid plus interest, less money paid.

202. Defendants' failure to deliver what was promised, an investment that would cash flow, also constitutes a breach of contract and grounds for rescission.

203. In fact, Defendants referring to Plaintiffs as lenders, Defendants selling Plaintiffs these investments based upon Plaintiffs being secured lenders is illusory. An illusory contract means there wasn't a meeting of the minds. If there wasn't a true meeting of the minds, the contract never came into being and therefore, for that reason as well, funds must be returned.

204. Plaintiffs elect to void the contract and seek their money back or seek declaratory relief from the Court, declaring this an illusory, fraudulent, deceptive contract entered into by mistake or trickery justifying returning Plaintiffs money to them.

205. In the alternative, Defendants have breached this contract by not giving Plaintiffs the security and interest promised. Under these circumstances, Plaintiffs are entitled to their money back. As such, Plaintiffs request the return of their principal as required in the contract.

206. Plaintiffs fully performed but Defendants have not.

207. Plaintiffs seek declaratory relief or return of all monies paid, plus interest and attorney's fees and/or damages allowed by law.

## TWELFTH CAUSE OF ACTION: CIVIL CODE §3372 VIOLATION (Against all Defendants)

208. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

209. Defendants held themselves out as investment advisors, financial advisors, and related terms. Defendants held themselves out as persons engaged in the business of advising others for compensation and as experts with respect to investments, generally, and particularly in the oil and gas investments. Defendants did a poor job and allowed Plaintiffs to purchase unsuitable products. In particular, Defendants represented themselves to be an expert with respect to the investment decisions in such oil and gas investments and implied that Defendants were acting in the capacity of the terms listed in Civil Code §3372 such as financial adviser, financial counselor, or investment adviser. As a result, Defendants are liable to Plaintiffs under that law.

210. Defendants obtained compensation as a result of the financial advice rendered to Plaintiffs, but Defendants failed to render the financial advice with due care and skill reasonably expected of a person who is an expert as defined by and required by Civil Code §3372. Defendants were not properly licensed and/or registered to act as an expert, as defined in Civil Code §3372, or as Defendants represented or implied. This is further against the law for which Defendants are liable.

211. Plaintiffs relied on Defendants' delivering services and advice of a level reasonable expected and set forth in Civil Code §3372. Plaintiffs were damaged by reason of their reliance on Defendants' services.

212. Defendants' services were not rendered with due care as reasonably expected and resulted in Plaintiffs not receiving what was portrayed. Defendants' services were instead rendered with fraud, deceit, dishonesty, ignorance, and/or lack of due diligence. Plaintiffs expected Defendants to render sound financial advice. Defendants did not.

213. Plaintiffs were to be the recipients of Defendants' advisory services as defined above. Defendants are liable to Plaintiffs for the damages caused in the purchase of this investment of $5,000,000 or to be determined according to proof at trial.

214. Plaintiffs also request all damages or remedies afforded by law including disgorgement of fees covered by this statute and/or anything allowed by law including attorney's fees and costs of suit.

215. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice for which punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

**THIRTEENTH CAUSE OF ACTION:**
**VIOLATION OF DECEPTIVE TRADE (PRACTICES ACT CA CIV. CODE 1770 ET SEQ)**
**(Against all DEFENDANTS ESPECIALLY ALL COMPANIES AND WEALTH FORGE SECURITIES, LLC)**

216. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

217. By reason of the letter or letters Plaintiffs submitted to Defendants and the failure of Defendants to provide any corrective action or remedies as required by law and because of the violations of law Defendants have committed as set forth in California Civil Code Civil Code §1770,

Plaintiffs are entitled to the remedies set forth in California Civil Code §1780. Those civil code sections are incorporated by reference set forth herein. Defendants were required to perform corrective action and have failed to do so. Plaintiffs therefore seek all damages allowed by law.

218. Defendants sold investments to customers at large, in this case, financial products through a confusing array of companies programs, sponsors, and salespersons (whose affiliations were blurry and purposely made that way). Defendants played fast and loose in their identity as to which entity held what assets and how entities related to each other and which were for the benefit of investors and which were for and controlled by insiders that might be a threat to the existence of the investment. This made it difficult for Plaintiffs to do any due diligence on their investments and to find out with whom they were actually dealing. Defendants made themselves incognito and non-transparent which made it possible for Defendants to pull off what happened, a takeover of the investment by insiders or third-party participants. Also, the arrangement as set up made it easier for Defendants to exert and /or extort favorable terms for itself in the agreement and all along the way including into non- performance and then allow the investor assets to be taken over by someone else, which is what happened. All because of the confusion over who was the sponsor and in charge and how the affiliates were supposed to interact, Plaintiff investors were unable to comprehend and react in time before the investment was lost or stolen by others.

219. Some of the promotional materials have language that states that "Securities are offered through WEALTH FORGE SECURITIES, LLC, member FINRA/SIPC." WealthForge Securities, LLC is wholly owned by WealthForge Holdings Inc. and acts with WealthForge Holdings Inc.'s permission. It is alleged on information and belief that either WealthForge Securities, LLC is liable or WealthForge Holdings Inc. are liable both referred to hereinafter as WEALTHFORGE. WEALTHFORGE did not act in conformity of law when it acted as the broker dealer. It failed to follow broker dealer standards of care and security rules and laws. If WEALTHFORGE was not the broker dealer, then this was a false statement and WEALTHFORGE is liable for the false statement in the promotional materials.

220. It is illegal for all the reasons alleged above, incorporated by reference as though fully set forth hereat, and including WEALTHFORGE knowingly fostering a system through the offering of this

investment by advising Defendants to use nonregistered brokers to peddle unregistered securities. Instead the salespersons were to be referred to as referring agents. This was not disclosed to Plaintiffs.

221. WEALTHFORGE is liable in conjunction with the other above-named Defendants for creating confusion in the organizational structure it help put together for Resolute Capital and or other Defendants. Defendants would hide behind the confusion purposefully created and took advantage of investors which they did all in the form of misrepresentations and other violations set forth in Civil Code §1770. It is alleged that if it had not been for the inside information about the securities industry and Defendants including WEALTHFORGE's assistance, then, Defendants would not have achieved the level of sales of securities they achieved in California.

222. WEALTHFORGE and the other above-named Defendants treated this investment and these Defendants as a startup and gave these Defendants the concept, tools, and the ability to accomplish an ambitious task- make sales easy regardless of what program it was. WEALTHFORGE with the help of all Defendants took advantage of large numbers of investors by helping the other Defendants be able to get away with peddling misinformation about the identities of the sponsor and operator of the investment. WEALTHFORGE, and other Defendants, should have known better and they were negligent for providing the tools, backup information, concepts and support that they did to the other Defendants to take advantage of the above situations. If these Plaintiff investors had been afforded more knowledge or known that they were not dealing with reputable profession people and entities of which WEALTHFORGE helped bring together, none of the above would have happened because Plaintiffs would not have entered this investment.

223. WEALTHFORGE and the other Defendants were experts, in investment and security law, or held themselves out as such. They knew better and cannot say they were just an innocent vendor that did what they were told. Plaintiff investors needed safeguards, and WEALTHFORGE, and associated Defendants above mentioned could have and were obligated by law to provide investor safeguards, but did not. They failed to provide the supervision and the policies that, they knew, the SEC and/or California Law requires be available to investors in securities transactions such as this.

224. All Defendants perpetuated a system that allowed the promoter of this investment to be able to convolute the sponsorship, the affiliations of the entities in relation to this investment and the

securities Plaintiffs bought. This allowed multiple affiliations and sponsors to run rampant as part of this investment. There was a complete lack of transparency as required under this part of the law causing a deception to these investor plaintiffs. Under the circumstances, WEALTHFORGE, along with the associated other above-named Defendants, were duty-bound to make better disclosures to clear things up, or not create such confusion in the first place. There was confusion whether this investment was done in conjunction with a legitimate FINRA broker or representative or SEC approved security advisor. Defendants planted the seed that it was and this is a deception and a misrepresentation that falls within Civil Code §1770.

225. In addition, these Defendants pawned off and benefited from the above confusion by having many layers of entities all working in a confusing way. Still, WEALTHFORGE, and the other named Defendants had the responsibility because it helped put the deal together and purposely or negligently made it operate and be this way. WEALTHFORGE condoned and created the deal. WEALTHFORGE made it possible, and it did not put its foot down to make proper disclosures or improve the organizational structure so as to eliminate the known confusion. Defendant WEALTHFORGE, and the other Defendants, were remiss, deceitful, and/or negligent to allow the statement "securities are offered through WealthFforge Securities LLC, member FINRA/SIPC" to be associated with this investment and contained in various promotional materials.

226. This is the kind of confusion that violates Section 1770(a) especially 2, 3, and 5.

227. It is also illegal in this section of the law for an unregistered person to act as a broker dealer and WEALTHFORGE and the other Defendants facilitated WEALTHFORGE or other Defendants to act as such. The above activity constitutes illegal aiding, abetting, and assisting others to act illegally.

228. All of these investments have contracts that bound Plaintiff to unconscionable provisions as described earlier but including and not limited to the unconscionable arbitration clause, unconscionable foreclosure provisions, forum and state law selection clauses, and assigning confusingly different entities to have authority and priority and favor over the investors. These unconscionable provisions should be declared void as they violate Civil Code Section 1770(a) at especially (19).

229. Defendants illegally offered and sold illegal financial products as described above in violation of Section 1770(a) (26) as described above. This include "advertising, offering for sale, or

selling a financial product that is illegal under state or federal law," WEALTHFORGE, and other Defendants facilitated the violation of this provision. This entire investment was illegal under state and federal law. There is no legitimate exemption for the sale of these investments to these Plaintiffs and these securities were not registered - so the sales of these financial products to Plaintiffs were illegal and should be declared illegal under this section of the law as well.

230. Further and probably the most egregious is that this entire investment program is based on so many entities and companies associated with it, that benefit the insiders and promoters with financial side payoffs, commissions, and overages that contributes to the confusion everywhere associated with this investment.

231. Confusion also abounds for which all Defendants are responsible and liable because it is unclear who is in control, who the sponsor is, and what are the affiliations and how are they are related and supposed to control and help each particular investment thrive. Due to this confusion and the fact that no one was apparently in charge, all Defendants are liable for this failed investment mess that could have been preventable with full and proper implementation and disclosure of the law as required by this law. The source/sponsorship, and the status of the participating Defendant entities that made up this security, were all under the control of WEALTHFORGE and other above-named defendants. There was confusion in association with the programs and which of the above-named entities they are associated with what program and how that related to the overall umbrella "Enterprise." The way the above Defendants set things up, it is impossible to figure out who sponsored which investment program and the roles played within each investment. This is illegal under this statute.

232. The above actions of Defendants as above described also violates Section 1770(a) including passing off goods as those of another, false sponsorship, false or confusing , misrepresentation of affiliation. It is believed all things were present in this investment due in part to WEALTHFORGE's and the other named Defendants' involvement.

233. As a result of the above, the Plaintiff investors were not afforded protection that they expected and which should have been provided them when buying the kind of financial product this was represented to be which be and which turned out not to be. Failure to explain all the above is

deception and misrepresentation and violation of Civil Code 1770 - 1782. People thought they had registered professionals behind then when they did not.

234. By reason of the above-mentioned facts and all facts set forth in this compliant, Defendants violated all aspects of the Deceptive Trade Practices Act or Civil Consumer Protection Statutes, particularly Civil Code 1770 - 1782.

235. Plaintiffs seek all damages allowed under Civil Code Section 1780, including actual and punctual damages and other relief the Court finds just and equitable including attorney's fees and punitive damages.

236. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitute oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

237. Plaintiffs also request all damages or remedies afforded by law including disgorgement of money paid, attorney's fees and costs of suit. This includes the senior citizen damages of $5,000 per person pursuant to Civil Code Section 1780.

**FOURTEENTH CAUSE OF ACTION:**
**UNJUST ENRICHMENT**
**(Against all Defendants)**

238. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

239. In the event the Court finds the loan agreement or the contribution of equity to be enforceable and not rescindable, Plaintiffs plead in the alternative, especially as to the money given as a loan, equitable relief be granted against Defendants so that the money may be returned under the doctrine of unjust enrichment.

240. By contributing the money, Plaintiffs have confirmed and bestowed a substantial benefit on Defendants.

241. Defendants have knowledge of this substantial benefit.

242. Defendants have accepted and retained this substantial benefit where Plaintiffs have contributed money to Defendant under the guide of a bona fide investment and under these

circumstances, it is unequitable for Defendants to retain the benefits without returning payment of equivalent value.

243. Therefore, it is alleged that Defendants have received unjust enrichment in the amount of the money Plaintiffs contributed, so Defendants should therefore return this money to Plaintiffs for a substantial amount.

244. As a direct and approximate result of Defendants' retention of Plaintiffs' money, Plaintiffs have been damaged in the amount of their contribution. Further as a direct and approximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer unrepairable harm and therefore request injunctive relief and enjoining Defendants from keeping the money and mandating the money be returned to Plaintiffs.

245. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitute oppression, fraud, and malice and justifies punitive damages.

246. Plaintiffs seek all remedies available under this cause of action including attorney's fees and costs allowed by law.

**FIFTEENTH CAUSE OF ACTION:**
**VIOLATION OF TEXAS SECURITIES LAW**
**(Against all Defendants)**

247. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

248. Defendants violated Tex. Rev. Civ. Stat. Ann. Article 581, Section 4(B), and Section 33 et seq.

249. Defendants willfully engaged in the creation or implementation of a scheme to defraud Plaintiffs of Plaintiffs hard-earned money.

250. Defendants willfully created promissory notes and equity investments giving the illusion that Defendants were offering a legitimate security investment backed by valuable assets when they were not.

251. The companies Defendants claimed had valuable assets had no substantial value at all.

252. In fact, Defendants were not a legitimate investment group with valuable assets. Instead, Defendants are a collection of individuals and entities who willfully and intentionally engaged in this scheme to defraud investors or raise monies in violation of this statue.

253. Defendants made untrue and misleading statements of material fact as previously alleged regarding the securities they sold to Plaintiffs.

254. Defendants associated with WealthForge Securities, LLC, a FINRA Broker dealer, which was broadcasted orally and in writing included in marketing materials, that "Securities are offered through WealthForge Securities, LLC, a member of FINRA/SPIC."

255. Defendant engaged in an act of business that operates as deceit and fraud upon Plaintiffs and other investors.

256. As a direct result of Defendants' securities fraud or violation of the Texas Blue Sky Act, Plaintiffs have been damaged in the amount of their contribution or lost profits their investments would have returned. As a result, Plaintiffs have suffered and continue to suffer immediate and irreparable harm and seek the return of all monies.

257. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitute oppression, fraud, and malice and justifies punitive damages.

258. Defendants have further dissipated the monies for personal or even business use until Plaintiffs are paid.

## SIXTEENTH CAUSE OF ACTION:
## AIDING AND ABETTING
## (Against all Defendants)

259. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

260. To the extent of one or more Defendants did not materially participate in the breach of fiduciary duty or securities violation, conversion, or violation of the Deceptive Trades Practices Act, Plaintiffs allege that Defendants aided and abetted such violations of these causes of action or any fraudulent activity.

261. The Defendants being sued for aiding and abetting knew that the other Defendants were committing violations of the above-mentioned causes of actions or other fraudulent activity. Further they knew that other Defendants were breaching their fiduciary duties.

262. The Defendants being sued for aiding and abetting substantially assisted and encouraged the other Defendants in the advancement of their wrongdoing.

263. As a direct result of Defendants' securities fraud or violation of the Texas Blue Sky Act, Plaintiffs have been damaged in the amount of their contribution or lost profits their investments would have returned. As a result, Plaintiffs have suffered and continue to suffer immediate and irreparable harm in sake of the return of all monies.

264. Defendants' conducts were in reckless disregard for the rights and safety of Plaintiffs and constitute oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

## SEVENTEENTH CAUSE OF ACTION: UNFAIR COMPETITION (Against all Defendants)

265. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

266. Plaintiffs suffered an injury in the form of loss of money, loss of value of money, the loss of use of money, the loss of capital to use for other investments, and a return of a property performing investment.

267. Defendants acted unlawfully, unfairly, and fraudulently in their business and practice consisting of engaging an unfair business practice. This includes using an unregistered broker dealer to sell unregistered and unqualified securities, the investment herein, without an exemption. This and the other things set forth in General Allegations and other causes of actions so that the Business and Professions Code §17200 was violated. Such acts including falsely representing this product to be safer and more secure than it was, selling this product under a supposed FINRA broker, which did not happen. This all constitutes an unfair business practice actionable under Business and Professions Code §17200.

268. As a result of this practice, Defendants benefited from the use of Plaintiffs' money, which is equivalent to receiving ill-gotten gains. It gives Defendants an unfair advantage in raising money compared to businesses that obey the law.

269. It is unfair because it allows Defendants' businesses to reap the benefit of money that could have been given to legitimate businesses that could have truly benefited investors and provided a just return.

270. Defendants associated with WealthForge Securities, LLC, a FINRA Broker dealer, which was broadcasted orally and in writing included in marketing materials, that "Securities are offered through WealthForge Securities, LLC, a member of FINRA/SPIC."

271. It is further fraudulent because of the specific fraud allegations set forth above.

272. There is a direct link between the alleged unfair competition including unlawful, unfair, or fraudulent business practices and Plaintiffs' loss of use of their money and the diminishment of the value of that money compared if the money was invested elsewhere.

273. As a further result, Plaintiffs has sustained harm due to Defendants' actions as described herein.

274. Plaintiffs seek relief against Defendants preventing Defendants from spending investor contributed money until this case is resolved.

275. Plaintiffs seek all other remedies allowed by law including restoration of lost monies or the value of the loss of monies or money lost including the loss of money Plaintiffs would have made if placed in a proper (legal and non-fraudulent) investment, security, or business.

276. Plaintiffs seek restitution to be restored to the status as Plaintiffs would have been had their money not been placed in Defendants' unfair business endeavor. Plaintiffs seek all damages and relief allowed by law including punitive damages as allowed by law.

277. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code §3294 or §3345 or both.

**EIGHTEENTH CAUSE OF ACTION:**
**DECLARTORY RELIEF**
**(Against all Defendants)**

278. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

279. An actual controversy has arisen between Plaintiffs and Defendants as to the enforceability, legitimacy, conscionability, fairness, and appropriateness of the arbitration provision.

280. Plaintiffs seek a declaration from the court that the arbitration agreement is not viable, is confusing, inconsistent, self-serving, and unfair to Plaintiffs and should not be enforced.

281. The arbitration agreement specially provides for the Court, not the arbitrator, to make a decision.

282. BLA Section 5.5.5 says, "Any challenge to the validity of this section shall be determined exclusively by the Court."

**NINETEENTH CAUSE OF ACTION:**
**INJUNCTION**
**(Against all Defendants)**

283. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

284. There is a controversy over the arbitration clause outlined above and also referenced in the declaratory relief above-mentioned. The court should find these provisions unenforceable and enjoin the arbitration.

285. In addition, the arbitration agreement at BLA Section 5.5.1 allows for Defendant borrower to seek an injunction against a lender. It allows the borrower's representative to seek foreclosure through Court mechanisms. Plaintiffs want their own injunctive relief, mandamus relief, and under the doctrine of mutuality of provisions, which is if one party has been given rights, the other party should have the same rights. Therefore, the Court should allow Plaintiffs injunctive relief and/or relief in the form of a mandamus to allow Plaintiff investors the right to foreclose independently than by the constraints of the unfair contract. Plaintiffs are supposed to be secured lenders and they have the right to and need for their money but they are tied by unfair and fraudulent provisions that the court should free them from.

286. Plaintiffs are likely to exceed on the merits to get injunctive relief above-mentioned. If a preliminary injunction or mandamus are not granted, Plaintiffs will suffer irreparable harm by not having an adequate remedy and opportunity to get their money back.

287. The balancing of equities favors the grant of the request for injunctive relief.

288. Injunction is in the public interest because it protects Plaintiffs' rights to pursue relief, which they have every right to do. It is in the public interest that parties in Plaintiffs' position have remedies. An injunction is necessary to prevent a multiplicity of judicial proceedings.

289. Plaintiffs seek all injunctive relief and mandamus and declaratory relief necessary to prevent possible irreparable harm. Plaintiffs seek to enjoin Defendants from using the money for any personal uses while this matter is pending. Plaintiff seek the right to foreclose on their security and all legal remedies available to obtain their money without having to suffer the delay and impediments of an arbitration procedure.

290. Plaintiffs seeks all other remedies and damages allowed by law plus attorney's fees.

**TWENTIETH CAUSE OF ACTION:**
**CONSTRUCTIVE TRUST/RECEIVERSHIP**
**(Against all Defendants)**

291. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

292. Plaintiff investors request constructive trust and necessary receiver. All proceeds have been diverted or let out of any investor entity particularly PETROROCK, the Defendant that rightfully should have been an asset of the investment. Plaintiff investors request a constructive trust be imposed on all proceeds generated by Defendants or their operations to the full extent of the law. They also ask to be paid for their losses, attorney's fees, costs, and any damages appropriate.

293. In addition to the above-mentioned remedies, Plaintiffs have been damaged, in having to suffer significant losses as above described, including pain and suffering, loss of the use of their money, loss of interest or the loss of the value of a well-managed account, loss of their principal, all to the tune of approximately $5,000,000, including accrued interest, for which Plaintiffs seek reimbursement.

294. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

**TWENTY FIRST CAUSE OF ACTION:**
**ALTER EGO**
**(Against all Defendants)**

295. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

296. Defendants' corporate identities should be disregarded. They should all be found vicariously liable for each other's misconduct because they are all a part of it and their assets have flown to their advantage and to the Plaintiff investors' disadvantage. Therefore, any of the Defendant corporations that participated in any way to this should be pierced and/or declared liable under the alter ego doctrine. These entities used the illusion that they were separate entities when they were not. They used the illusion that they were subsidiaries when they were not. They were all being controlled by the same person or Defendant entity that would serve the purpose of helping solicit or raise investor funds and eventually turning those funds for their own benefit and personal gain contrary to the investment as proposed to Plaintiffs.

297. Further, a corporate form of legal issues transfers assets out of fraudulent investor situations to self-dealing invasive corporate activities and structures should be set aside and declared illegal. In the alternative, the money should be disgorged, and profits of unjust conduct should be disgorged and returned to investors. Finally, these companies were at all times undercapitalized for what their purposes were to do, and they need to be pierced.

298. In addition to the above-mentioned remedies, Plaintiffs have been damaged, in having to suffer significant losses as above described, including pain and suffering, loss of the use of their money, loss of interest or the loss of the value of a well-managed account, loss of their principal, all to the tune of approximately $5,000,000, including accrued interest, for which Plaintiffs seek reimbursement.

**TWENTY SECOND CAUSE OF ACTION:**
**FRAUDULENT TRANSFER**
**(Against all Defendants)**

299. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

300. Even though there is actual fraud here and the Court should find fraud or deceit in association with how transfers were made. It is believed investors were in the bag. There is also liability here under constructive fraud. California Civil Code §3439.05 says, "A transfer made or obligation occurred by a debtor is voidable as to the creditor whose claim arose before the transfer was made or the obligation occurred if the debtor (in this case, all the Defendants or their predecessor companies) did the transfer and incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation." That is this obligation. Subsection B states, "A creditor making a claim for relief under subdivision A has the burden of proving the elements of the claim for relief by a preponderance of the evidence." By reason of the above, either actual or constructive fraud, before or after, the debt being incurred either before or after the transfer, either of which is alleged to have been the case, Plaintiffs have been damaged. What has happened because of the actual or constructed fraud is that all the money that was available through the investors have been bled out by these Defendant companies. Plaintiffs herein are directly injured by the activities of these Defendants.

301. Plaintiffs seek all relief available by law including the return of their money, damages, and attorney's fees.

302. In addition to the above-mentioned remedies, Plaintiffs have been damaged, in having to suffer significant losses as above described, including pain and suffering, loss of the use of their money, loss of interest or the loss of the value of a well-managed account, loss of their principal, all to the tune of approximately $5,000,000, including accrued interest, for which Plaintiffs seek reimbursement.

## TWENTY -THIRD CAUSE OF ACTION: CONTRUCTIVE FRAUD (Against all Defendants)

303. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

304. The Defendants were fiduciaries and as such had a fiduciary duty to be acting for the benefit and in the best interest of Plaintiffs.

305. The Defendants were the promoters, salespersons who were marketing, selling, and operating this investment.

306. There was concealment of material facts and omission of material facts not disclosed, thus Defendants sold Plaintiffs products that were misleading or contained concealment of material facts. This and what is enumerated below it already enumerated above amounts to constructive fraud in violation of Civil Code § 1573.

307. There were many concealments including not disclosing the real and true relationship of the parties operating the Endeavor and how they worked together. When it was described, it required describing so many moving parts and companies and programs that it was non-sensible and incomprehensible all-in violation of Civil Code 1770 et seq. It is believed this was done on purpose.

308. Defendants also knew or were reckless in not to knowing, and thus not telling Plaintiffs, that the investments were not a suitable investment for these Plaintiffs as they were not and they should not have been sold as they violated various laws, securities, rules, and regulations including those set forth in the above causes of action going to licensing of individuals selling the security, and Defendants selling unregistered securities.

309. Also Defendants did not tell Plaintiffs how much of the plaintiffs' invested money was going or coming from other investment programs under the Endeavor and that it was tantamount to a Ponzi scheme.

310. Further, there were statements made by Defendants that there was sufficient cash reserves for a margin of safety, which turned out to be untrue. In the lender programs and promissory notes, there were statements that Plaintiffs can get their money back if Plaintiffs requested so in writing. Even though Plaintiffs made this request in writing, their money was not returned as promised. Since Defendants knew of these falsities, this is categorized as deceit and actionable constructive fraud at least.

311. Plaintiffs were harmed for all the reasons and in all the ways above stated in other causes of action.

312. Plaintiffs' reliance on Defendants' promise was a substantial factor in causing the present harm including the loss of their investment.

313. Plaintiffs were harmed including from not only the loss of their investment but the suffering, pain, and mental anguish that followed the loss.

314. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345.

315. Plaintiffs seek all damages available by law.

**TWENTY-FOURTH CAUSE OF ACTION:**
**CONSPIRACY**
**(Against all Defendants)**

316. Plaintiffs incorporate by reference all the above paragraphs as though fully set forth herein.

317. The conduct of certain Defendants who were the primary instigators of the fraudulent and /or tortious conduct is described in the following causes of action. As to the other Defendants that were not primary participants, directly or indirectly, they can still be liable as co -conspirators to those tortious/fraudulent causes of action if the following conspiracy elements are present which Plaintiffs allege are present:

A. That the non-patriating defendants were aware that the primary co- conspirators were planning to commit the wrongful and tortious acts.

B. That the non- participating defendants agreed with the primary co-conspirators and intended that the wrongful torturous facts be committed.

C. A conspiracy may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators. Plaintiff is not required to prove that these non- participating co-conspirators personally committed a wrongful act or that they knew all the details of the agreement or the identities of all the other participants.

318. A conspiracy is an agreement by two or more persons to commit a wrongful act. Such an agreement may be made orally or in writing or may be implied by the conduct of the parties. That is what is involved here and set forth as to each co-conspirator in detail in the General Allegation section of this Complaint.

319. Plaintiffs were harmed for all the reasons and in all the ways above stated in other causes of action and the General Allegations of this Complaint.

320. Plaintiffs were harmed including suffering from their loss of investment and suffering pain and mental anguish as a result of the above.

321. Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

322. Plaintiffs seek all damages available by law.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against the Defendants as follows:

1. For general damages of no less than $20,000,000 and according to proof at trial;
2. For special damages according to proof at trial;
3. Damages including for pain suffering and mental anguish;
4. Return of Plaintiffs' money with interest
4. Rescission/return of all money plus interest;
5. Injunctive and mandamus assistance
5. Punitive damages as allowed by law;
6. For costs of suit incurred herein; and attorney fees as allowed by law;
7. For such other and further relief as this Court deems just and proper.

DATED: September 28, 2022 MURRIN LAW FIRM

J. Owen Murrin
Attorney for Plaintiffs MICHAEL HOLLIFIELD et al

**DECLARATION OF J. OWEN MURRIN PURSUANT TO CIVIL CODE §1780 (D):**

I, J. Owen Murrin, make the following declaration on behalf of Plaintiffs, particularly lead Plaintiff Michael Hollifield, based upon my own knowledge and believe the information set forth herein to be reliable and admissible and if called upon as a witness, I could and would testify competently thereto regarding the following:

1. At all times herein, all activities and contacts regarding the subject of this matter occurred in California, and the class is California based.
2. The lead Plaintiff, Michael Hollifield resided in Los Angeles County, in the City of Long Beach when he bought his securities from the relevent Defendants. He therefore sustained all his losses in Los Angeles Country. He presently still lives in Long Beach, Los Angeles, Country, California. A substantial number of other Plaintiffs in this action also reside or did business related to this matter in Los Angeles County, California.
3. Therefore, jurisdiction and venue is proper in California Superior Court, Los Angeles County. Civil Code § 1780 (d).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: Sept 28, 2022

J. Owen Murrin
Attorney