1  J. Owen Murrin (SBN 75329)
   Murrin Law Firm
2  7040 E. Los Santos Drive
   Long Beach, California 90815
3  Phone:  562-342-3011
   Fax:  562-724-7007
4  E-mail: jmurrin@murrinlawfirm.com
   Attorneys for MICHAEL HOLLIFIELD, et al.
5

6

7

8              U.S. DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

9

10

11  **MICHAEL HOLLIFIELD;**          Case No. 2:22-cv-07885-SB-RAO
    **MICHAEL ANDERSON;**
12  **JANELLE ANDERSON;**            **SECOND AMENDED COMPLAINT**
    **RHONDA AMEY;**                 **INCLUDING CLASS ACTION ALLEGATIONS**
13  **JULIETA CABIGAS;**               1. **SECURITIES FRAUD (VIOLATION OF**
    **LARRY CARLSON;**                   **CORPORATE SECTION 25401)**
14  **CATHERINE CARLSON;**             2. **BREACH OF FIDUCIARY DUTY**
    **THOMAS WAYNE CARLSON;**          3. **VIOLATION OF PENAL CODE 496**
15  **MARILYN L. CARLSON;**            4. **NEGLIGENCE AGAINST MULTIPLE**
    **BENYAPA FEIG;**                     **SELECT PERSONS**
16  **BERNARDO FEIG;**                 5. **VIOLATION OF CORPORATE CODE §§**
    **LINDA V. HILDEBRAND;**              **25110, 25004, 25501.5, & CCP § 1029.8**
17  **JOHN MILLHOLLON – TURNER;**      6. **FRAUD/FALSE PROMISE**
    **JAVEN POYYAK;**                  7. **FINANCIAL ELDER ABUSE**
18  **CONNIE POYYAK;**                 8. **THIRD PARTY BENEFICIARY**
    **RICHARD SHAON;**                    **CONTRACT**
19  **YVETTE SHAON;**                  9. **VIOLATION OF SECTION 5 OF THE**
    **KATHRYN MARY SMITH**               **SECURITIES ACT, UNREGISTERED**
20                                        **SECURITY**
                                      10. **VIOLATION OF CORPORATE CODE §**
21            **Plaintiffs,**             **25501.5**
                                      11. **BREACH OF CONTRACT/RESCISSION**
22         v.                         12. **VIOLATION OF CIVIL CODE §3372**
                                      13. **VIOLATION CALIFORNIA LEGAL**
23  **RESOLUTE CAPITAL PARTNERS LTD.,**   **REMEDIES ACT- CIV. CODE 1770 AND**
    **LLC;**                              **1782 ET SEQ)**
24  **RESOLUTE CAPITAL MANAGERS LLC;** 14. **CONSTRUCTIVE**
    **RESOLUTE ENERGY CAPITAL, LLC;**      **TRUST/RECEIVERSHIP**
25  **LEGACY ENERGY, LLC;**           15. **VOIDABLE TRANSFER**
    **PETROROCK MINERAL HOLDINGS,**   16. **CONTSTRUCTIVE FRAUD**
26  **LLC;**
    **PRMH LENDERS FUND III, LLC;**
27

28

                                         1

| | |
|---|---|
| THOMAS JOSEPH POWELL;<br>STEFAN TOTH;<br>RESOLUTE CAPITAL ADVISORS, LLC;<br>HOMEBOUND RESOURCES, LLC;<br>HOMEBOUND LLC;<br>HOME BOUND FINANCIAL GROUP, LP;<br>THOMAS CHAPMAN;<br>LOVE 2 LIVE HOLDINGS, INC;<br>2X5 ENTERPRISES LIMITED<br>PARTNERSHIP;<br>VELOCITY NORTH INVESTMENTS,<br>INC.;<br>CHAPMAN WEALTH STRATEGIES;<br>MERCURY OPERATING, LLC;<br>TED ETHEREDGE;<br>PABLO CORTEZ;<br>WARREN TARYLE;<br>JAQUELINE KUIPER;<br>LOVE 2 LIVE LLC;<br>FELFRAN INVESTMENTS LLC;<br>V&V RESIDENCE TRUST;<br>CAL.CODE OF CIV. PRO. §382<br>DEFENDANTS;<br>DOES 1-300<br><br>        **Defendants.** | 17. NEGLIGENCE AGAINST CHAPMAN<br>    AND COMPANIES<br>18. NEGLIGENCE AGAINST KUIPER<br>19. VIOLATION OF CORP CODE<br>    25403,25504 &25504.1<br>20. CONVERSION<br><br>DECLARATION OF J. OWEN MURRIN<br>PURSUANT TO CIVIL CODE §1780 (D)<br><br><br>       **JURY TRIAL REQUESTED**<br><br>Assigned to the Hon. Stanley<br>Blumenfeld, Jr.<br><br>Action Filed: Sept. 28, 2022<br><br>Action Removed: Oct. 28, 2022 |

Plaintiffs, individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below) alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through their attorneys, which included among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("S.E.C.") filings, wires and press releases issued by Defendants, information obtained on the Internet and similar legal filings against Defendants. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth hereinafter after reasonable discovery.

## NATURE OF CASE

1.      Defendant THOMAS JOSEPH POWELL (hereinafter "Powell") owned a number of Defendant companies referred to as the Resolute companies described below. Defendant STEFAN TOTH (hereinafter "Toth") owned and operated the Defendant Homebound companies described below and including PETROROCK MINERAL HOLDINGS, LLC, (hereinafter "PetroRock") MERCURY OPERATING, LLC, (hereinafter "Mercury") Minerva, and Cronus. Powell and Toth teamed up with TED ETHEREDGE, (hereinafter "Etheredge") PABLO CORTEZ, (hereinafter "Cortez") and WARREN TARYLE, (hereinafter "Taryle"), JAQUELINE KUIPER, (hereinafter "Kuiper") was an officer of Resolute but became overseer of all operations and created what is generally called the PetroRock investment funds. These investment funds were sold to investors through both debt and equity funds and have gone defunct and insolvent, leaving Plaintiffs with the losses which are the subject matter of this suit.

2.      All of the Plaintiff investors were retail investors who were not sophisticated in these matters. Some investors were accredited investors the time of purchase, some were not accredited. Plaintiff investors relied heavily on marketing and promotional material and the salesforce, which were all controlled by Defendants.

3.      Defendants' offerings and use of unregistered salespersons subjected them to regulatory action by the securities and Exchange Commission ("SEC"), and other state regulatory agencies such as the State of Washington Department of Financial Institutions Securities Division.

4.      On May 7, 2021, State of Washington Department of Financial Institutions Securities Division entered a consent order No.: S-19-2672-20-CO02 as a result of a settlement with Defendants Powell, Toth, Resolute Capital, the HomeBound Companies, Strategic Energy Assets, and the Resolute Capital-HomeBound Debt and Equity Entities, and their agents and employees. The consent order found that Defendants above mentioned violated Washington securities and investment statutes by Defendants offering and selling unregistered securities using unregistered brokers and salespersons.

Further, Defendants, "made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading." Pursuant to the consent order, Defendants were found jointly and severally liable in order to pay a fine of $200,000 and to pay investigative costs of $63,525.

5.      On September 24, 2021, the SEC issued a cease-and-desist order. This order made findings that imposed remedial sanctions. The order named Resolute Capital Partners, LTD, LLC, (RCP) Homebound Resources, LLC, Thomas J. Powell, and Stefan T. Toth as respondents; and that public administrative and cease-and-desist proceedings be instituted pursuant to Section 8A of the Securities Act, Sections 15(b), and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Stefan T. Toth ("Toth"); and  Thomas J. Powell ("Powell"). The order-imposed sanctions on Defendants including a suspension from involvement in any unregistered security offerings for two years, ordering Defendants to post a clearly referenced link to the SEC's order on a prominent area of the websites under Resolute and Homebound's control for a period of three years, and Defendants were ordered to engage a consultant to review Resolute and Homebound's policies and procedures.  Additionally, Powell, Toth and RCP were ordered to pay monetary penalties of $75,000, $75,000, and $225,000 respectively. A copy of this cease-and-desist order is attached hereto as Exhibit 31 incorporated by reference set forth hereat.

6.      Plaintiffs did not know and could not have known that they were defrauded by Defendants. Plaintiffs all invested prior to the September 24, 2021, SEC cease and desist order.

## **PARTIES**

7.      At all times herein, Plaintiff **MICHAEL HOLLIFIELD** was and is a resident of the City of Long Beach, County of Los Angeles, State of California.

8.    At all times herein, Plaintiff **JANELLE ANDERSON** was and is a resident of City of Parker, County of Douglas, State of Colorado. At the time of the investment, **JANELLE ANDERSON** was a resident of the City of LaVerne, County of Los Angeles, State of California.

9.    At all times herein, Plaintiff **MICHAEL ANDERSON** was and is a resident of city of Parker, County of Douglas State of Colorado. At the time of the investment, **MICHAEL ANDERSON** was a resident of the City of LaVerne, County of Los Angeles, State of California.

10.    At all times herein, Plaintiff **RHONDA AMEY** was and is a resident of the City of Huntington Beach, County of Orange, State of California.

11.    At all times herein, Plaintiff **JULIETA CABIGAS** was and is a resident of the City of Pasadena, County of Los Angeles, State of California.

12.    At all times herein, Plaintiff **CATHERINE CARLSON** is and was a resident of the City of Carlsbad, County of San Diego, State of California.

13.    At all times herein, Plaintiff **LARRY CARLSON** is and was a resident of the City of Carlsbad, County of San Diego, State of California.

14.    At all times herein, Plaintiff **MARILYN L. CARLSON** is and was a resident of the City of New Braunfels, County of Comal, State of Texas.

15.    At all times herein, Plaintiff **THOMAS WAYNE CARLSON** is and was a resident of the City of New Braunfels, County of Comal, State of Texas.

16.    At all times herein, Plaintiff **BENYAPA FEIG** is and was a resident of the City of Redding, County of Shasta, State of California.

17.    At all times herein, Plaintiff **BERNARDO FEIG** is and was a resident of the City of Redding, County of Shasta, State of California.

18.    At all times herein, Plaintiff **LINDA V. HILDEBRAND** was and is a resident of the City of San Jose, County of Santa Clara, State of California.

19.    At all times herein, Plaintiff **JOHN MILLHOLLON – TURNER** was and is a resident of the City of Highland, County of San Bernardino, State of California.

20. At all times herein, Plaintiff **JAVEN POYYAK** was and is a resident of the City of Lake Forest, County of Orange, State of California.

21. At all times herein, Plaintiff **CONNIE POYYAK** was and is a resident of the City of Lake Forest, County of Orange, State of California.

22. At all times herein, Plaintiff **RICHARD SHAON** was and is a resident of the City of La Palma, County of Orange, State of California.

23. At all times herein, Plaintiff **YVETTE SHAON** was and is a resident of the City of La Palma, County of Orange, State of California.

24. At all times herein, Plaintiff **KATHRYN MARY SMITH** was and is a resident of the City of Los Gatos, County of Santa Clara, State of California.

25. At all times herein, RESOLUTE CAPITAL PARTNERS LTD., LLC, hereinafter referred to as "RCP," is a foreign limited liability company organized under the laws of the State of Nevada, with its principal place of business at either One Embarcadero Center, Suite 566, San Francisco, California 94111 or One Market Street, Suite 3600, San Francisco, California, 94105 with additional offices in Dallas and Minneapolis. RCP locates, facilitates, and manages specialized investment opportunities, including investments in energy, commercial real estate, and technology. RCP is sometimes referred to as a Resolute company or a Resolute defendant.

26. At all times herein, RESOLUTE CAPITAL MANAGERS, LLC, hereinafter referred to as "RCM," is a foreign limited liability company organized under the laws of the State of Nevada, with its principal place of business at either One Embarcadero Center, Suite 566, San Francisco, California 94111 or One Market Street, Suite 3600, San Francisco, California, 94105 with additional offices in Dallas and Minneapolis. RCP locates, facilitates, and manages specialized investment opportunities, including investments in energy, commercial real estate, and technology. RCP has ownership stakes in equity offerings, which is the subject matter of the equity investment mentioned herein. RCM is sometimes referred to as a Resolute company or a Resolute defendant.

27.    At all times herein, RESOLUTE ENERGY CAPITAL, LLC, hereinafter referred to as "REC," is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at either One Embarcadero Center, Suite 566, San Francisco, California 94111 or One Market Street, Suite 3600, San Francisco, California, 94105. REC is responsible for acting as the lender's representative but has failed to act to put the borrowers in default or to proceed to foreclosure because REC is captive to other DEFENDANTS. REC is sometimes referred to as a Resolute company or a Resolute defendant.

28.    At all times herein, LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY," is a limited liability company organized under the laws of the State of Delaware, with a principal office in Irving, Texas. RCP is the managing member of LEGACY, and for PETROROCK MINERAL HOLDINGS, LLC, is its sole member. It is a company used by other Defendants to assist in carrying out the programs described herein.

29.    At all times herein, PETROROCK MINERAL HOLDINGS, LLC, hereinafter referred to as "PETROROCK," is a limited liability company organized under the laws of the State of Texas with its principal place of business at 6321 Campus Circle Dr. E., Irving, Texas 75063-2712. PETROROCK's sole managing member is Home Bound Financial Group, LP, located at 1303 W. Walnut Hill Lane, Suite 305, Irving, Texas 75038-2965.

30.    At all times herein, PRMH LENDERS FUND III, LLC, hereinafter referred to as "PRMH" is a Nevada limited liability company doing business out of Irving, Texas.

31.    At all times herein, THOMAS JOSEPH POWELL (CRD # 5573929), an individual, is a person approximately 50 years old. He is believed to be a current resident of Reno, Nevada and is or was also believed to be a resident of the City of San Francisco, County of San Francisco, State of California. He is the owner and/or Senior Managing Partner of RESOLUTE CAPITAL PARTNERS LTD., LLC (RCP). Other named entities are connected or work under RCP. THOMAS JOSEPH POWELL served

as Senior Managing Partner for RCP. He also is the CEO of RCP. He is a Securities and Exchange Commission ("SEC") registered investment advisor responsible for the sale of investments that are the subject matter of this suit. THOMAS JOSEPH POWELL was also a consultant to HOME BOUND and acted as its chief financial officer. He has never been associated with a registered broker dealer. THOMAS JOSEPH POWELL held only a Series 65 license and was a seller (along with STEFAN TOTH) of these products.

32.    At all times herein, STEFAN TOTH is a person approximately 50 years old. He resides in Frisco, Texas. STEFAN TOTH is the founder, co-owner, chairman, and CEO of HBFG, and was a seller of these products and also operates its subsidiaries, including HB, HBR, and PETROROCK. He has never been associated with a registered broker dealer up to the time that this matter was sold to Plaintiffs.

33.    At all times, RESOLUTE CAPITAL ADVISORS, LLC ("RCA") is a Delaware limited liability company as of 2018. RCA registered with the SEC in September of 2018 as an investment advisor. RCA was, at all times relevant herein, the advisor to issuers utilized as part of this investment program including Choice Energy Holdings III and Legacy Energy. RCA is sometimes referred to as a Resolute company or a Resolute defendant.

34.    At all times, HOMEBOUND RESOURCES, LLC, hereinafter referred to as "HBR," is a Texas liability company organized under the laws of the State of Texas with its principal place of business at 6321 Campus Circle Dr. E., Irving, Texas 75063-2712. HBR principal is Home Bound Financial Group, LP, located at 1303 W. Walnut Hill Lane, Suite 305, Irving, Texas 75038-2965. HBR is sometimes referred to as a Homebound company.

35.    At all times, HOMEBOUND LLC., hereinafter referred to as "HB," is a Texas company organized under the laws of the State of Texas. One of HB's principals is STEFAN TOTH. HB is sometimes referred to as a Homebound company.

36.    At all times, HOME BOUND FINANCIAL GROUP LP, hereinafter referred to as "HBFG," is a Texas corporation organized under the laws of the State of Texas with

its principal place of business at 6321 Campus Circle Dr. E., Irving, Texas 75063-2712.
HBFG's partners are HB (General Partner, located at 4948 Eyrie Ct., Grand Prairie,
Texas 75052), Love 2 Live, LP and 2X5 Enterprises Limited Partnership. HBFG is
sometimes referred to as a Homebound company.

37.     At all times herein, LOVE 2 LIVE HOLDINGS, INC is a corporation believed
to be owned by TOTH.

38.     At all times herein, TEXAS MINERAL HOLDINGS is operating under and
pursuant to the laws of the State of California.

39.     At all times herein, THOMAS CHAPMAN was a resident of Orange County,
California, now residing in Kettle Falls, Washington. He and his companies are
sometimes referred as the Chapman defendants.

40.     At all times herein, VELOCITY NORTH INVESTMENTS, INC. is the
company used by THOMAS CHAPMAN for his wealth management activities. This is a
one of THOMAS CHAPMAN's companies, sometimes referred as a Chapman
defendants.

41.     At all times herein, CHAPMAN WEALTH STRATEGIES is the company
used by THOMAS CHAPMAN for his financial services business. This is a one of
THOMAS CHAPMAN's companies, sometimes referred as a Chapman defendants.

42.     At all times herein, 2X5 ENTERPRISES LIMITED PARTNERSHIP operating
under and pursuant to the laws of the State of California.

43.     At all times herein, MERCURY OPERATING, LLC, is a Texas liability
company controlled by TOTH and TOTH's controlling entity Love 2 Live Holdings,
LLC operating under and pursuant to the laws of the State of California.

44.     Upon information and belief, TED ETHEREDGE is an individual domiciled
and residing in Dallas or Fort Worth, Texas.

45.     Upon information and belief, JAQUELINE KUIPER is an individual domiciled
and residing in Reno, Nevada.

46.    Plaintiffs are informed and believe and upon such information and belief allege that Defendants, DOES 1-300, inclusive, at all relevant times, were residents of or doing business in Los Angeles County, California, and that each of these fictitiously named Defendants are responsible for the acts and/or omissions herein alleged, and that Plaintiffs' injuries and damages as herein alleged were proximately caused by the acts and/or omissions of such fictitiously named Defendants.

47.    Plaintiffs are unaware of the true and accurate names and capacities of DOE Defendants sued herein as DOES 1-300 and therefore sues those Defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to allege their true and accurate names and capacities when ascertained.

48.    LOVE 2 LIVE, LLC is a company that received assets associated with this investment.

49.    FELFRAN INVESTMENTS LLC is a company that received assets associated with this investment.

50.    V&V RESIDENCE TRUST is a company that received assets associated with this investment.

51.    CCP§382 Defendants are any other investor similarly situated and/or a member of the class that is not in or from California.  The court may need these investors to make a total resolution of the matter and therefore they are named as parties consistent with California Code of Civil Procedure §382 to give the court this power.

## JURISDICTION & VENUE

52.    At all times herein, all activities and contacts occurred in California, and the class is California based. The lead Plaintiff, Michael Hollifield resided in Los Angeles County, in the city of Long Beach when he bought his securities from the relevant Defendants.  He presently still lives in Long Beach, California. Therefore, jurisdiction and venue is proper in California Superior Court, Los Angeles County. Civil Code § 1780 (d), or as properly removed to Federal Court.

## GENERAL ALLEGATIONS

53.     This case involves investors who were sold investment funds through an elaborate organization and chain of distribution all sponsored, supervised, controlled, or owned by Powell, Toth, Etheredge, Cortez, Taryle and Kuiper. The other Defendants named herein are all companies or trusts owned, operated, and/or controlled by Powell and Toth. Attached hereto as Exhibit 34 is a chart to help the reader visualize or appreciate the interrelationships between the parties and their companies and the "funds" created as part of this investment.

54.     Powell, Toth, and Kuiper combined their skills, resources, and prior organizations and created a sort of consortium that became this investment called PetroRock. As noted, PetroRock was a consortium and joint venture or joint enterprise of numerous people and companies that came together and presented themselves as a united front for the purpose of promoting Toth's controlled company, PetroRock Mineral Holdings, LLC, serviced by another Toth-controlled company, Mercury Operating, LLC, the designated operator for PetroRock. These companies came together with Toth's and Powell's other controlled companies. Powell's other companies were known as the "Resolute Companies" [including Resolute Capital Partners LTD, LLC ("RCP"); Resolute Capital Managers, LLC ("RCM"); Resolute Energy Capital, LLC "REC"); Resolute Capital Advisors, LLC ("RCA")] and Toth's other companies were known as the "Homebound Companies" [including Homebound Resources, LLC; Homebound LLC; and Homebound Financial Group, L.P.]. All of these companies claimed to have the ability to take investor money as either loans or equity to turn their money into profits or interest in loans that would go back to investors. Powell, Toth, Etheredge, Cortez, Taryle, and Kuiper used PetroRock as their figurehead and the central basis for raising money.  They later skimmed or misappropriated all the investor money to themselves or their companies.

55.     Nowhere in any of the investment disclosures do they mention "baggage" surrounding PetroRock. Disclosure of all material facts is required for any sale of securities.  The disclosure materials claim "PetroRock is an established company in

Texas with a demonstrated track record in acquiring, developing, and liquidating assets to proven Texas oil fields." What they do not say is that it has a history of developing ill-gotten gains at the expense of others in association with Toth, Mercury Operating, LLC, and Toth's Homebound company. If Defendants cheated people in the past, this is a relevant material fact that needed to be disclosed that was not.

56.    This is all documented in Exhibit 1, attached hereto.  A bankruptcy trial was held on September 6, 2017 (a date prior to any of the Plaintiffs herein investing, and 20 days prior to Plaintiff Hollifield investing $100,000 in the first of four funds he invested for a total of $990,000). The conclusion of law by Judge Hale makes the findings *res judicata* that Toth, PetroRock, and Mercury Operating, LLC, in association with the Homebound companies, engaged in fraudulent transfers that had to be "avoided" and recovered. The 2017 bankruptcy findings were a material fact that is required to be disclosed to potential investors. If disclosed to the Plaintiffs herein, these cautious retail investors would likely have steered clear of investing their retirement money with Defendants and therefore avoided their losses. For example, instead of disclosing this 2017 bankruptcy proceeding, the 2018 Strategic Energy Assets VII, LLC Confidential Investor Disclosure misleadingly states, "The company and its officers, directors and shareholders are not currently parties to any legal proceedings, nor are any legal proceedings threatened."  This is not full disclosure, but an omission of the material fact that Toth, PetroRock and Mercury had just been found to have engaged in fraudulent and voidable transfers. History repeats itself, as the Plaintiffs herein allege that after 2017, additional subsequent voidable transfers have occurred to the detriment of the Plaintiffs, that could and should have been taken into consideration by Plaintiffs before investing.

57.    Also, not disclosed in sufficient detail is the structure of the various companies that interact with PetroRock and Mercury. There are many questions to be answered. Why are there so many companies? Why does the structure need to be so complicated? The complicated structure of the intertwining various entities and persons allows for conduits to hide transfers of monies and perpetuate frauds or deceits to cheat investors.

Toth utilized his companies to make fraudulent transfers of investor assets just like he did previously prior to 2017, (Exhibit 1, 2017 Bankruptcy). Toth created new companies to receive, hide, and take over assets for insufficient consideration all to the detriment of the investors. None of this was disclosed to the investors. A big part of this case is to try to follow the money and get it back to the investors (the Plaintiffs).

58.     The structure that was disclosed to the investors was oversimplified and less than sufficient for a reasonable investor to make a determination about the viability of this investment and the funds. The essence of the disclosed information was that Toth and his Homebound companies, in association with partners like Ted Etheredge, Pablo Cortez, and Warren Taryle would produce oil from repaired oil wells. They claimed that they had the ability and experience to extract greater quantities of oil, to lower the expenses and then distribute cash back to the investors. They disclosed that they worked through Powell's Resolute companies to create and sell investments in the form of "funds".  Powell's Resolute companies sold the funds to the public through an elaborate salesforce.  The salesforce worked for and took orders starting around 2016 from Powell, Kuiper, and Toth who worked through the offices located in Reno, Nevada, San Francisco, California, and Minneapolis, Minnesota. They would occasionally use independent contractors as agents to sell the funds, such as Thomas Chapman and his companies.

59.     Again, the PetroRock/Homebound claim was that they had "a disciplined approach to targeting oil and gas projects by applying new methodology and technology to existing data in well logs."  These new technologies allegedly could allow for more efficient operations than other operators,  so they could still make profit even if oil prices were low. Plaintiffs allege that this was a scheme to hide the fact that PetroRock, Homebound and Resolute were actually a marketing machine that made their money by raising money, rather than through oil revenues, which is the hallmark of a Ponzi scheme. In 2019, when Powell, Toth and Kuiper were unable to produce the oil and revenue as represented, they turned to increasing the size of the offering, and to make

more sales of investments (creating more funds) to produce the money needed to operate. until everything collapsed.

60.    Near the end, Toth, Etheredge, and Cortez devised a plan to fraudulently transfer investor money to various companies and trusts, which is tantamount to theft/conversion of investor money. Upon information and belief, Ted Etheredge took a buyout, which itself was or is a fraudulent transfer or voidable transfer, which is requested to be set aside. This was all hidden from investors as part of a plan to deceive them, which it did.

61.    The companies that Toth, Etheredge, Cortez, and Warren Taryle created to hide investor money and which deserve being considered voidable or fraudulent transfers include (also see a schematic of the places and participants at Exhibit 34) the following companies:

1.    Love 2 Live, LLC – controlled by Toth

2.    Love 2 Live Holdings, LLC – controlled by Toth

3.    Felfran Investments, LLC – controlled by Toth

4.    V&V Residence Trust – controlled by Toth

5.    Cronus Mineral Holdings – controlled by Toth and currently in bankruptcy

6.    2x5 Enterprises Limited Partnership – controlled by Etheredge

7.    Constantine Capital – controlled by Cortez

8.    Minerva Resources – controlled by Cortez and currently in bankruptcy

9.    Texas Mineral Holdings – controlled by "company partners", Homebound companies, and Powell.

62.    The loose "Structure" between all these companies and prior companies were never disclosed, which constitutes material omission of facts in violation of security laws and is alleged to be fraudulent. No disclosures of this demonstrates a plan to deceive Plaintiffs. They would not have invested if they had known the structure was loose or non-existent. A disclosure is necessary and should have been given to show how they were supposed to work together to ensure that no one person or entity could take

advantage of investors. Now it is known there was no structure, or if there was structure then it was a loose structure. This needed to be disclosed to allow investors' "funds" to make reasonable investment decisions. This is exactly what caused the big downfall of these investments, and ultimately the investor losses. Since the structure was loose or non-existent, it was easy for this partnership of companies to take advantage of the money investors contributed. In the end, these partner companies and other insiders listed in the preceding paragraph were able to transfer and obtain all the investor-contributed money over to them.

63.    Plaintiffs are generally people who were planning for or in their retirement. This money has deprived them of money needed and essential for their retirement and basic needs.

64.    Defendant PetroRock was the entity tasked to pay out all the money for expenses and then pay the profit or loan interest to the investors from the oil operations. For the reasons listed above, when investors were asked what they invested in, even though the Plaintiffs invested in different funds, most would answer "PetroRock." PetroRock is listed in all of the investment contracts or funds as the reason for the fund (i.e. to loan or contribute money to help PetroRock). PetroRock is a signatory on most of the documents. Also, PetroRock is listed as a guarantor for the investors in all the lender funds. Here is a quote from wording substantially similar to all marketing materials. This one is from a Choice Energy Holdings, LLC, brochure:

> "PetroRock adds value, stability and diversity to its asset holdings by acquiring producing wells with upside drilling potential, as well as assembling groups of leases which can be packaged for larger development and sale to partner companies, independents, or institutional developer/operators." (See Exhibit 11 on Page 3, also found at DKT 45-3, page 32)

65.    SEC Release No. 10957, Exhibit 31 Page 6, says the following:

> "The debt offerings sold by Respondents involved promissory notes issued by financing companies wholly owned by PetroRock, a company owned by

> Homebound Financial and managed by Toth. Each of the Debt Funds lent the money it raised from investors to PetroRock."

66.     The buck should have stopped with PetroRock, for all roads pointed to PetroRock. All the various funds were designed to fund PetroRock so it could return a profit back to the investors. PetroRock served as the umbrella for all the other investments and funds. PetroRock ended up with no money because it could not produce what it was represented it could produce. It never had the potential to deliver the cash, interest, and return what was promised to the investors. This is because it never had the resources, like the stated oil production, that it represented it had. PetroRock never advised the investors of this.

67.     This constitutes intent to deceive and was a scheme hatched in false disclosures or concealments. The promoters (Toth, Powell, Etheredge, Cortez, and Taryle) and their companies are responsible for these omissions and the subsequent misrepresentations that arose as a result. But in addition to these misrepresentations, Toth, Powell, and Kuiper tried to avoid the eventual failure by implementing a more aggressive marketing campaign.  Eventually when they couldn't put Humpty together again, they planned an exit designed to enrich insiders at the expense of the investors (Plaintiffs). They, through their companies, took assets and cash flow from PetroRock for themselves or for other companies or for newly created companies which benefited themselves at the expense of the investors. We are again referring to Toth, Powell, Etheredge, Cortez, and Taryle. The effect is that at their command, they, or their companies,  like Mercury Operating, LLC, Love 2 Live Holdings, Inc., 2x5 Enterprises LTD Partnership, Love 2 Live, LLC, Felfran Investments, LLC, and V&V Residence Trust, misappropriated assets from PetroRock, that are supposed to be investor money.

68.     The above left PetroRock void of anything valuable and the sacrificial lamb for the impending expected and planned for collapse of the investment. It is alleged that the above was done for the main purpose of cheating the investors, including the Plaintiffs herein, to enrich themselves. One of the main purposes of this lawsuit is to set aside or

disgorge assets and monies wrongfully transferred to these companies and/or the promoters themselves. These transfers are believed to be going on still.

69.     The plethora of companies in the mix created purposeful confusion and deception and was part of the plan for why so many companies were created. Again, the whole structure, how the insiders worked, and how they agreed to work together is not in any disclosure and is a big reason for the failure of these investments. Having many companies was a pre-meditated way for people like Toth, Powell, Etheredge, Cortez, and Taryle to manipulate the transfer of money and assets over to other companies. It allowed them to hide money from investors or to claim that the transactions were just business transactions. It also allowed Toth, Powell, and Kuiper to deflect blame from one company to another. No one entity or person had accountability.  This also allowed the promoters, Toth, Powell, and Kuiper to appear incognito. This was planned and built into Defendants' organization structure from the beginning.

70.     Defendants through PetroRock and the salespeople amassed more than $250 million of retail investor money for these investments. The money was raised due to a successful marketing and selling program. The sales process involved rampant omission of material facts, and misrepresentation of material facts that lured in potential investors especially the Plaintiffs herein.

71.     PetroRock's products were sold by Toth and Powell under the oversight of Kuiper. Toth was not only the agent for PetroRock but Toth became the controller of PetroRock. That does not relieve PetroRock of its responsibility. When Toth stopped using PetroRock as its favored company for purposes of conducting investor business, Toth turned to his other companies. Toth took out money from PetroRock and in doing so permanently prejudiced PetroRock's future and the ability of Plaintiffs' investments to succeed. This left PetroRock insolvent. The fact that PetroRock became insolvent, does not immunize it from any liability. Also, just because PetroRock is insolvent does not mean it does not have significant assets.  Insolvency just means it cannot pay its bills

as they come due.  In fact it is believed PetroRock still has major assets. It is subject to wind up proceeding in Texas.

72.     It is alleged that PetroRock and Toth worked together and facilitated to move money out of PetroRock and into Toth's other companies. Such activity resulted in less money available to the investors. The fact that Powell also became a victim of these tactics does not excuse Powell from his earlier involvement of doing the same thing.

73.     PetroRock did not give accurate projections of cash flow or oil production to its investors. Powell and Toth knew this but did not correct it.

74.     At one Point PetroRock's sole managing member was HomeBound Financial Group, LP, located at 1303 W. Walnut Hill Lane, Suite 305, Irving, Texas 75038-2965. Toth managed and controlled both of them during all times relevant herein.

75.     Exhibit 6, Page 4 is an exemplar of language representative of all of the debt programs offered to Plaintiffs by Toth, Powell, and Kuiper. It reads:

"3.9.5. **PetroRock** is affiliated with, among others, HOMEBOUND, INC., a Texas corporation, HOMEBOUND RESOURCES, LLC, a Texas limited liability company, HOME BOUNDFINANCIAL GROUP LP, a Texas limited partnership, and MERCURY OPERATING, LLC and (collectively "HomeBound" and together with other affiliated entities, and the respective successors, assigns, officers, directors, stockholders, managers, members, principals, employees, representatives, agents and attorneys of Homebound and other affiliated entities, and together with **PetroRock**, collectively are the "**PetroRock Related Parties**"), and the **PetroRock Related Parties** may derive direct or indirect benefits from the making of the Business Loan by Lender to Borrower, and the making of the Project Loan by Borrower to PetroRock."

76.     It is believed that Powell, Kuiper, Toth, Etheredge, Cortez, and Taryle are PetroRock related parties.

77.     The standard language in the fund reads (See Exhibit 10, Page 3):

f. Lender acknowledges that the proceeds of the Loan will be used to fund, in part, a loan ("PetroRock Loan") from Borrower to its parent company, PETROROCK MINERAL HOLDINGS, LLC, a Texas limited liability company ("PetroRock"); and that PetroRock will in turn use the

PetroRock Loan to fund its business operations and investments relating to owning or holding (directly or indirectly) oil, gas, or other mineral royalties or leases, or fractional interests therein, or certificates of interest or participation in or investment contracts relative to such royalties, leases, or fractional interests (collectively, "Oil and Gas Interests"), <u>and may include, without limitation, repayment of other debt, loans and promissory notes, marketing fees, legal fees, future acquisition of assets, and cash reserves relating to its Oil and Gas Interests.</u>

g.    PetroRock has provided (or will provide) to Lender an unconditional guaranty ("Unconditional Guaranty") of all amounts due to Lender under the Loan, including, without limitation, all principal and interest due to Lender under the Note."

78.    Plaintiffs allege that PetroRock was used as a conduit for misappropriating monies that were supposed to go to investors. Offering materials created and approved by Powell, Toth, and Kuiper and utilized by Defendants for the debt offerings contained statements and omissions of material facts concerning the use of investor funds that created a materially misleading impression. The offering materials disclosed that the issuers were using the money that Plaintiffs contributed or lent funds to PETROROCK and that PETROROCK would use the funds to acquire oil and gas leases, fund its business operations and investments, and, in certain offerings, make interest payments on other PETROROCK debt. These disclosures were materially misleading because investors were not told that the majority of assets raised would be used to make payments to investors in other Debt or Equity Funds. This allegation is supported by the SEC Order at Exhibit 31 at page 7, para. 20.

79.    Toth allowed investor fund money that was supposed to be used by PetroRock to support oil development and operations to be loaned to TEXAS MINERAL HOLDINGS, which was an unauthorized act in violation of the investment disclosures. TEXAS MINERAL HOLDINGS is believed to be used to manipulate investor money. TEXAS MINERAL HOLDINGS is believed to be owned or controlled by Homebound companies and Powell. This money was supposed to be used to buy oil and gas assets in PetroRock equity funds for the benefit of Plaintiff investors, but was not.

80.    PETROROCK funds were controlled by the Defendants, particularly TOTH and POWELL and overseen by Kuiper, who had full knowledge of what was going on. Kuiper was supposed to be acting as an overseer of operations, but as a compliance officer, she failed in her duties as evidenced by these investments near total failure to perform.

81.    Defendants, POWELL, TOTH, AND KUIPER produced disclosure documents as part of its Strategic Energy Assets VII, LLC equity program (SEA)  that did not adequately disclose all material information and contained misrepresentations. As examples of the false representations made before purchases and sale is what was told to Plaintiff Hollifield in 2018 and Plaintiff Yvette Shaon in 2019 regarding the SEA VII, fund program. There were told the SEA VII was producing or expected to produce over 2,210 barrels per day when it only produced 199 barrels per day.  The SEC investigation that resulted in the cease-and-desist order found that previous programs, namely the SEA IV, V, and VI programs were projected to produce 500 barrels a day, but the actual production, according to the SEC was that these three programs were only producing 3-5 barrels a day each. See SEC Order, Exhibit 31 at Page 5, 6. Had the production been as projected, then there would have been adequate revenue to provide a return on investment to the Plaintiffs, but if it was not that then it needed to be disclosed. It was not. Kuiper and others could have revised the latter offering for SEA VII. In fact securities laws require amendment and updates when material facts change, based on the inaccuracy of the projections in the previous SEA programs, but Defendants chose to continue to mislead the potential investors in SEA VII. Plaintiffs were harmed by this false representation.  This was the work of POWELL, TOTH, AND KUIPER who failed to disclosure that the revenue keeping this going came not from oil production but came from other investor funding. Had plaintiffs known that oil production was this dismal and most of the money was coming from investors, they would not have invested in the program. But that is what happened.

82.    According to the SEC Order at Exhibit 31 at Page 8, para. 24, Powell and Toth touted the success of the HBR VI and SEA III offerings in subsequent offerings. Toth and Powell's apparent success was based primarily on related-party purchases of HBR VI and SEA III well interests. Toth and Powell stated that their investment vehicles had returned $93 million to oil and gas equity and debt investors, and that equity investors in HBR VI and SEA III had enjoyed an average 11% rate of return. These claims were materially misleading because Defendants failed to disclose that these purported returns were based on related-party and not market-based transactions and came primarily from other investor funds as opposed to successful operations. This is information that was not disclosed in its entirety, was deceptive, and misled Plaintiffs herein to buy when they would not have bought had they known this information and the truth.

83.    At all times, the sales and marketing of these securities was under the control, supervision, and final determination and direction of Powell, Toth, and Kuiper. They appeared at meetings, conferences, dinners, and lunches to set policy and guidelines for the Resolute companies salesforce. During these meetings, which started in 2016 and continued until 2021, they communicated to the salesforce what to say to investors. They controlled the message, so they are an integral part of all of the allegations contained in this complaint. They set policies and procedures and communicated the terms of the deals to their agents to act as finders. One such agent was Thomas Chapman, the person who solicited the sale of most of the named Plaintiffs in this matter. He was an agent of Powell, Toth, and Kuiper. Chapman was totally directed by them and paid by them as a Finder.  However, Powell, Toth, and Kuiper and their salesforce closed all deals without Chapman. Nonetheless, Chapman, as the agent of Powell, Toth, and Kuiper, is still considered a seller under federal law and a person liable for providing substantial assistance under state law pursuant to Corporate Code 25403 and Corporate Code 25504.1.

84.    The sellers under federal law would be the actual funds including LEGACY ENERGY, LLC; PRMH LENDERS FUND III, LLC; STRATEGIC ENERGY ASSETS

VII, LLC.  These are the funds that transferred the title to the buyers.  Sellers also include Powell, Toth, Kuiper, and the Resolute companies who as non-transferors solicited the purchasers, the plaintiffs herein.   Toth signed the Promissory Note for the SEA VII equity program, Exhibit 5, and Powell signed the Investment Agreement for the for the SEA VII equity program, Exhibit 9.  Toth signed Choice Energy Business Loan Agreement, a debt program. Either Toth or Powell signed all of the investor agreements. To be a seller they were motivated at least in part by a desire to serve their own financial interests or those of the securities owner (the funds). See Pinter v. Dahl 486 U.S. 622, 108 S. Ct. 2063 (1988). Chapman is also a seller because he solicited most of the Plaintiffs on a face-to-face basis to invest.

85.     Powell, Toth, Kuiper, and the Resolute companies solicited Plaintiffs by using Chapman as the finder and closing the deal themselves using their salesforce and website portal. This is direct or indirect privity. Privity is further documented by fact that Toth and Powell, at least one, if not both, appear as signatories on every one of Plaintiffs' closing documents.  Finders such as Chapman would be on conference calls or go to the headquarters and be indoctrinated on what to say and was only as knowledgeable as Powell, Toth, and Kuiper wanted him to be. Chapman, under the supervision and ultimate direction of Powell, Toth, Kuiper, and the Resolute companies, solicited the Plaintiffs to invest in the abovementioned investment products. Some were equity products; others were debt products.

86.     As to the who, what, when, where  and how this activity took place, the above paragraphs describe the "who." Powell, Toth, and Kuiper and the Resolute companies, through Chapman and other finders are all the sellers to the actual Plaintiffs in this case.

87.     The "what" is covered specifically in all of the false statements, maneuvers, and manipulations that are set forth throughout the complaint and include but are not limited to the references throughout to Exhibit 1, the 2017 undisclosed bankruptcy proceedings, Exhibit 31, the SEC 2021 Cease and Desist Order, and Exhibit 34, the Chart of interrelated affiliated companies, and paragraph 63, which sets forth the

companies Toth created to transfer the money out of PetroRock, and paragraph 99 sets forth the sale of unregistered securities by Toth and Powell acting as unregistered broker-dealers.

88.    The "when" is grounded in the offering materials and the actual visits that Chapman made with each Plaintiff. These correspond with the dates of the investments that are set forth at paragraphs 112 through paragraph 126 herein. The time span where false offerings were submitted to the public is 2016-2021.  The Plaintiffs herein invested between September 26, 2017, and March 31, 2020.  The loans the Plaintiffs made in the debt funds matured and became due between 2019 and May 20, 2022.

89.    The "where" of the fraud is mainly in Texas where Toth and Homebound's family of entities reside, Nevada where Powell and the Resolute companies reside, and California where the Plaintiffs reside and one of Powell's Resolute offices is situated. The false statements, manipulations, and wrongdoings happened mainly in Texas, Nevada, and California. Upon information and belief, Powell officed out of San Francisco, California during much of the time that these events occurred.

90.    How this conduct occurred is the subject matter of this complaint but is basically Powell, Toth, and Kuiper using Resolute, Homebound, PetroRock and other related companies to cheat investors.  They cheated investors by luring them in under false pretenses by not disclosing all material facts such as a previous bankruptcy, lack of production in previous programs and by not disclosing all potential uses of investor's funds.   This investment was always based on obtaining more investor contributions, not the promoters' skill in developing oil production.

91.    Defendant entities were able to misappropriate some of the $250 million of investor money that went into all these investments. By the end of 2019, PETROROCK had less than $100,000 in cash but it was still used as a figurehead in the marketing efforts that POWELL, TOTH, AND KUIPER used to incentivize its agents to sell to investors. The concept of PetroRock possessing large amounts of oil money was a deception that Defendants POWELL, TOTH, AND KUIPER used to induce more sales.

92.     PetroRock, MERCURY, POWELL, TOTH, KUIPER, and the RESOLUTE and the HOMEBOUND companies developed written materials that were given to Plaintiffs that claimed to sufficient cash reserves for a margin of safety, See Exhibit 2. In fact, there was no margin of safety and Defendants abovementioned all knew it. Such statement created the impression that there was built in protection when there was not. This was therefore a false representation. Plaintiffs had no idea that they had been wronged until the company abruptly stopped payment, which shattered the belief that the investments were safe.

93.     By 2019, Powell, Toth, Kuiper, Etheredge, and Cortez knew they lacked sufficient revenues to make it. Instead of squaring up with investors, they divided the spoils amongst themselves and purposely failed to advise Plaintiffs, in fact Chapman sent emails to Plaintiffs during this time frame that "things are going great." Advising Plaintiffs earlier could have allowed Plaintiffs to take action to safeguard most, if not all, of their investments.

94.     Defendants entered into an agreement to sell valuable PetroRock assets to MINERVA RESOURCES, LLC, a partner company. These assets should have remained investor assets in PetroRock. Instead, MINERVA RESOURCES, LLC paid only $3.328 million to PETROROCK for assets, far below fair market value.  This was done with Toth's approval and knowledge. This was not a fair and adequate exchange. For that, MINERVA received a release of liability for more money than it owed PetroRock. This is an example of a voidable or fraudulent transfer because it was consummated with intent to delay, hinder, and defraud PETROROCK and its affiliates and investors, including the Plaintiffs herein. Defendants Toth, Powell, and Kuiper staged transfers out of PetroRock in such a way so as to switch liabilities to PETROROCK. TOTH and other related Defendant entities took advantage of this to increase their wealth at the expense of PETROROCK and investors. The $3.328 million was not a good faith exchange. The release issued by PetroRock should therefore be deemed voidable and fraudulent. It was

1  also not executed properly within legal authority, so it can be voided for that reason as

2  well.

3      95.     In early 2018, the LEGACY Energy investment fund raised approximately

4  $39.7 million from investors, at least four of the Plaintiffs (Hollifield, Cabigas, Anderson

5  and Poyyak)  invested in this Legacy program through the marketing program operated,

6  conducted, supervised and/or managed by POWELL, TOTH, AND KUIPER. This

7  money was raised by the sale of promissory notes offering 8-9% annual interest. This

8  was money that was supposed to be loaned to PETROROCK to be used to produce oil

9  revenue which revenue was supposed to be used to pay back the investors. In the

10  offering materials prepared by Powell, Kuiper and Toth, prospective investors were told

11  that the "primary purpose" of the LEGACY Energy program was to "finance the

12  business and investment operations of PETROROCK in connection with its Oil and Gas

13  Interests" and that the funds they provided would be used for, among other things, the

14  "repayment of other debt, loans and promissory notes" of PETROROCK affiliates. The

15  offering materials for LEGACY as in other of Defendants investments were materially

16  misleading because they failed to disclose the majority of the funds it actually received

17  were from investors.

18      96.     Defendants, including PetroRock and MERCURY in conjunction with Powell,

19  Kuiper and Toth played fast and loose by creating (or ratifying or participating in

20  creating) different entities and programs to administer different element of the

21  investment programs.  This created confusion such that Plaintiffs did not know who was

22  in charge or how things worked for purposes for getting their money back when the

23  money was due.   The sheer number of entities in the caption further supports this. This

24  confusion is a fraud because it prohibited Plaintiffs from figuring out which entity held

25  what assets, how the entities were related to each other, the relationship between each

26  entity and who was in control or considered to be an insider.  This is further compounded

27  because PetroRock and MERCURY in conjunction with Powell, Kuiper and Toth used

28  independent contractors to help them sell the programs and raise capital.  Defendants did

this intentionally,  because it took intricate planning to put together such an array of overlapping, confusing and competing companies that were supposedly all part of the investment program.

97.    It is alleged that PetroRock in conjunction with Powell, Kuiper and Toth stated in its offering materials for the debt programs (that Plaintiffs relied upon) that it would allocate all funds it received in predetermined percentages to specific uses, including land, royalty/mineral rights, oil, and gas and working interests, and 20% for "cash reserves"  for a margin of safety. These statements were materially misleading because, in addition to failing to disclose that funds would be used to repay prior investors, PetroRock did not have the $15 million that it should have held in cash reserves to satisfy the 20% pledge. In fact, by the end of 2019, at the time many of the Plaintiffs were investing, PetroRock had less than $100,000 in cash, with only $12,600 earmarked for the four PRMH Lenders Funds. Plaintiff investments that were bought in 2019 and 2020 were therefore bought on a false premise that there were more cash reserves than there actually were. This did not prevent PetroRock and Mercury in conjunction with Powell, Kuiper and Toth to continue to sell these programs to Plaintiffs. Such a situation was either outright intentional or so reckless such that it is tantamount to intentional deceit by Powell, Kuiper and Toth. See Exhibit 31, page 7, para 21.

98.    Plaintiffs were told by Chapman these investments were suitable for retirement funds and safe investments when in reality, the investments were high-risk endeavors and not suitable for persons who had limited retirement money. It was incumbent for Powell, Kuiper, Toth, and Resolute to do their own suitability analysis to make sure this security investment was suitable for each Plaintiff investor. They did not do this. They wanted the sale at any expense. Powell, Toth, Kuiper, and their salesforce were the closers.  Chapman was merely a finder.  Therefore, Powell, Toth, Kuiper had the duty to perform the suitability analysis and have independent due diligence on the offerings for each particular Plaintiff investor. Had Powell, Toth, Kuiper been registered, or had they used a registered salesforce, the investors would have been afforded the investor

26

protection of a suitability analysis and offering due diligence. By being unregistered, and using an unregistered salesforce violated securities laws and constitutes negligence. According to the SEC, Powell and Toth willfully violated Section 15(a) of the Exchange Act, which makes it unlawful to effect any transaction in the purchase or sale of any security for the account of others that is not registered. See Exhibit 31 throughout for references to the unregistered security offering and Toth and Powell acting as unregistered broker-dealers.

99.     PetroRock, MERCURY, Powell, Toth, Kuiper, the RESOLUTE companies and the HOMEBOUND companies developed the programs that Plaintiff bought.  Plaintiffs relied upon the representations that the program was capable of producing oil at profitable levels. Plaintiff Feig purchased and read Powell's book on oil investing that stated that it is a myth that oil investing is not profitable.  She relied on what Powell stated in the book to her detriment. Profitability never happened so these were false representations given to every Plaintiff investor. It is believed this was so negligent or reckless that it constituted purposeful misrepresentation.

100.   The one-page brochures for the equity investments, referred to above were developed by Powell, Kuiper and Toth, the Resolute and Homebound companies known as SEA IV, SEA V, and SEA VI. They each projected the same production of barrels of oil per day even though each of the different funds owned working interests in different wells in different regions. There is no way these programs could all have had the same production but because they were represented as such, that is further proof of the fabrication of these figures. Exhibit 31, page 5, para. 16.

101.   The SEA VII offering materials, which Plaintiffs invested in and relied upon included misrepresentation of the actual oil production not supported by the facts making their projections false constituting purposeful misrepresentation.

102.   Further evidence of deception is the fact that on some of Plaintiff's quarterly statements for the year 2019 reflect different amounts paid for the same period. That is impossible and evidence of fabrication or manipulation of figures of the Defendant

preparing statements believed to be Resolute. This fabrication is evidence that PetroRock, Powell, Kuiper and Toth through Resolute were fabricating cash flow that did not exist and were by that time operating in a Ponzi scheme fashion.

103.   Defendants including Chapman, Toth, Powell, and Resolute who closed Plaintiffs investments made statements to each of the Plaintiff about potential tax benefits and tax deductions available that were unique to oil investments. This tax deductions does not apply if investments are made through IRA accounts. Many of the Plaintiffs invested through their IRA programs. They were told they could receive the oil tax benefits anyway but that was false. They did not receive oil tax deductions in their IRA investments. This information was then relayed to Plaintiff/Investors before they invested.  Plaintiff/investors relied upon this information before making the investment.

104.   Powell, Kuiper and Toth, in conjunction with the Homebound companies, and the Resolute companies, either by themselves or through designated agents engaged in general solicitation in a way that was against securities laws. They did investor seminars, dinners, and radio shows without being registered all in violation of security laws.  See, SEC Order, Exhibit 31 at Page 4, para 11. Plaintiffs were told by Chapman and Toth and/or Powell or the Resolute salesforce that the offering was legal in all respects and the salespersons were licensed broker dealers or financial advisors. This was not true as Toth, Powell, and the Resolute companies were unlicensed broker dealers.

105.   Powell, Kuiper and Toth, in conjunction with the Homebound companies, and the Resolute companies including Defendant PetroRock and Mercury failed to take adequate steps to verify the accreditation status of investors and sold unregistered securities to approximately 200 non-accredited investors, all in violation of security laws.  None of Plaintiffs were prepared to be in an investment with unaccredited investors as it brings down the sophistication level of the investor group and makes it more likely that Defendants would get away with misappropriating investment money.

106.   Salesmen on behalf of Defendants directed investor money out of IRA companies into IRA self-directed companies that would accept investments in these

unregistered gas and oil offerings, which were not in the investors' best interest because they lost the benefit of certain tax deductions and benefits.

107.    PetroRock, MERCURY, Powell, Kuiper and Toth, in conjunction with the Homebound companies, and the Resolute companies developed a program based upon improper referral fees and commissions to unregistered and unauthorized persons, who sold the various programs to Plaintiffs which was against the law but also created a sales force allegiance to these defendants over and above the customers. This was not disclosed and contributed to sales that were not based on a balanced, full, and fair presentation, and contributed to investors buying investments that were not suitable to their best interest. This is what happened here as most Plaintiffs were introduced to their investment product by Defendant Chapman and his companies. He did not give them full disclosure, as he was just the finder for Defendants. No one disclosed that the salespersons were just finders and not fiduciaries.  He also did not tell the Plaintiff/Investors that he was paid by Defendants to just put them in contact with Defendants. This was less than candid and deceptive. The totality of that relationship needed to be disclosed but was not. None of the Plaintiffs were prepared to be in an investment involving unregistered persons acting against the law and dealing with an agent being paid a finder's fee whose allegiance was to Defendants first. Had Plaintiff known the truth, they would not have invested in any of these investments. The withholding of this information on the part of PetroRock and MERCURY in conjunction with Powell, Kuiper and Toth and by the HOMEBOUND Companies and the RESOLUTE Companies involved omissions of material facts as to each Plaintiff that invested in any of the programs based upon this fact alone.

108.    Plaintiffs were not told that people and companies not disclosed were benefiting from their investment. They were not told that most of their money was used to pay prior investors in other funds.  They were told the money was going to  PetroRock to improve its production. PetroRock, MERCURY, Powell, Kuiper and Toth, the RESOLUTE and the HOMEBOUND companies were remiss not to advise Plaintiffs that

their investments were to benefit others. Had Plaintiffs known the truth as to all the

persons or entities that were benefiting from their money rather than themselves, they

would not have invested in any of these investments. The withholding of this information

on the part of PetroRock and MERCURY in conjunction with Powell, Kuiper and Toth

and by the HOMEBOUND and the RESOLUTE companies involved omissions of

material facts as to each Plaintiff that invested in any of the programs.

109. For purposes of the above PetroRock, MERCURY, Powell, Kuiper and Toth,

the RESOLUTE and the HOMEBOUND companies were the parties responsible for

conveying the above information and making correct disclosures and as a result they

each should stand trial for all the transgressions above related to Plaintiffs' investment

losses which is the subject matter of this suit because full and honest disclosure was not

made.

110. PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE

and the HOMEBOUND Companies portrayed the loans as short-term loans with a

definite maturity date capable of providing regular cash flow from a reputable reliable

source until paid. As it turned out, the borrower were amorphous entities hardly

reputable or reliable and not easily discernable yet that is who these Defendants caused

Plaintiffs to invest in. The borrowers were intertwined with other entities and affiliates

created by Defendants to make the lender relationship difficult to understand. The

structure of the loan or ownership of the borrower entity was so complicated that it is

difficult to understand without possessing significant financial prowess that the Plaintiffs

herein do not possess. Defendants knew that Plaintiffs were not sophisticated and that

they were retail investors. Defendants took advantage of Plaintiffs' lack of financial

prowess or lack of legal knowledge by using complicated, lengthy, and confusing legal

documents which Plaintiffs signed under assurances from Defendants agents that there

was no need to understand the voluminous complicated material as they were standard

boilerplate provisions. In fact, many of the provisions were more than boilerplate and

were in fact not satisfactory for these Plaintiffs. An example of this is the forum and

arbitration provision that together with other aspects discussed above and below made this investment unfair and unconscionable. Also, going to unconscionability and unfairness of this investment is that the debt portion was to be secured upon default. This has turned out to be false and deceptive. All the Plaintiffs were told and thought this investment was secured. None of Plaintiffs were prepared for this kind of illusory security and would not have invested had the truth been properly explained to them. It was further false to call the Plaintiff investors secured lenders. This is a purposeful misnomer. This too amounts to a material omission of material facts or misinformation.

111.    The investment product sold to MICHAEL HOLLIFIELD included a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $490,000 on or about July 2, 2018, (2) a loan to PETROROCK LENDERS FUND II, LLC aka PRMH Lenders Fund II, LLC, hereinafter referred to as "PRMH", for $100,000 on or about September 26, 2017 (3) a loan for CHOICE ENERGY HOLDINGS III, LLC hereinafter referred to as "CHOICE III", for $200,000 on or about January 31, 2019, These loans were to accrue interest in conformity with standardize promissory note. The first investment, LEGACY, had a starting interest of 9.5%, subject to penalties, late fees, and higher interest if late. The second investment, PRMH had a starting interest of 7.5%. The third investment, CHOICE, had a starting interest of 8.5%. MICHAEL HOLLIFIELD also invested in an equity position in Strategic Energy Assets VII, LLC for $100,000 on or about November 29, 2018. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this agreement or on any of the documents.  The investment sold to this Plaintiff was sold to them by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington.

Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

112.   The investment product sold to MICHAEL ANDERSON included a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $256,000 on or about July 18, 2018. This loan was to accrue interest in conformity with standardize promissory note. LEGACY, had a starting interest of 9.5%, subject to penalties, late fees, and higher interest if late. Defendants have advised Plaintiffs MICHAEL and JANELLE ANDERSON that they are not able to perform on the original terms of this agreement or on any of the documents.  The investment sold to this Plaintiff was sold to them by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization.   The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

113.   The investment product Defendants sold to RHONDA AMEY included a loan to CHOICE ENERGY HOLDINGS II LLC, for $50,000 on or about October 2, 2018. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 7.5%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms

of this or any of the documents. The investment sold to this Plaintiff was sold to them by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

114.    The investment product sold to JULIETA CABIGAS included a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $50,000 on or about July 18, 2018. This loan was to accrue interest in conformity with standardize promissory note. LEGACY, had a starting interest of 8%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this agreement or on any of the documents. The investment sold to this Plaintiff was sold to them by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

115.    The investment product Defendants sold to LARRY CARLSON included a loan to PRMH Lenders Fund II, LLC for $114,000 on or about June 27, 2017. This loan was to accrue interest in conformity with a standardized promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to them by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

116.    The investment product Defendants sold to CATHERINE CARLSON included a loan to PRMH Lenders Fund II, LLC for $65,000 on or about November 28, 2017. This loan was to accrue interest in conformity with a standardized promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is

THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

117.    The investment product Defendants sold to THOMAS WAYNE CARLSON and MARILYN L. CARLSON included a loan to CHOICE ENERGY HOLDINGS III, LLC hereinafter referred to as "CHOICE" for $65,000 on or about February 11, 2019, and another loan to CHOICE ENERGY HOLDINGS III, LLC for $75,000 on or about May 31, 2020. These loans were to accrue interest in conformity with a standardize promissory note. The first investment, CHOICE, had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. The second investment, CHOICE, had a starting interest of 8.5%. Even though these Plaintiffs have demanded payment and communication with Defendants personally and through their representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to these Plaintiffs were sold to them by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

118.   The investment product Defendants sold to BENYAPA FEIG and BERNARDO FEIG is an equity position in Strategic Energy Assets VII, LLC for $75,000 on or about December 6, 2018. The investment sold to these Plaintiffs were sold to them by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

119.   The investment product Defendants sold to LINDA V. HILDEBRAND included a loan to CHOICE ENERGY HOLDINGS, LLC, for $50,000 on or about April 10, 2018. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 7.5%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock,

36

MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND

Companies.

120.   The investment product Defendants sold to JOHN MILLHOLLON – TURNER IRA included a loan to ADVANTAGE CAPITAL HOLDINGS IV FUND, LLC EQUITY (held at Forge Trust Co. IRA), for $100,000 on or about April 10, 2018. The investment had a starting interest of 6.75%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform in the original terms of this or any of the documents. The product was offered by RESOLUTE CAPITAL PARTNERS.   The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely POWELL, KUIPER, using the RESOLUTE Companies by using the same finder for purposes of putting together this Plaintiff with these defendants to help make the sale.   The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are POWELL, KUIPER, and the RESOLUTE Companies particularly Resolute Capital Partners, LTD.

121.   The investment product Defendants sold to JAVEN POYYAK included a loan to CHOICE ENERGY HOLDINGS III, LLC, hereinafter referred to as "CHOICE", for $100,000 on or about April 4, 2019, and (2) a loan to LEGACY ENERGY, LLC, hereinafter referred to as "LEGACY", for $50,000 on or about May 23, 2018. These loans were to accrue interest in conformity with its standardize promissory note. The first investment, CHOICE, had a starting interest of 8.5 %, subject to penalties, late fees, and higher interest if late. The second investment, LEGACY had a starting interest of 9%.

Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

122.    The investment product Defendants sold to CONNIE POYYAK included a loan to CHOICE ENERGY HOLDINGS III, LLC for $63,000 on or about April 4, 2019. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 8.5%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder

made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

123.    The investment product Defendants sold to RICHARD SHAON included a loan to PRMH Lenders Fund II, LLC for $274,000 on or about June 1, 2018. This loan was to accrue interest in conformity with a standardized promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. RICHARD SHAON also invested in an equity position in Strategic Energy Assets VII, LLC for $50,000 on or about November 29, 2018. Even though this Plaintiff has demanded payment and communication with Defendants personally and through his representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

124.    The investment product Defendants sold to YVETTE SHAON included a loan to PRMH LENDERS FUND II, LLC for $156,000 on or about June 1, 2018. This loan was to accrue interest in conformity with a standardize promissory note. The first investment had a starting interest of 9%, subject to penalties, late fees, and higher interest if late. YVETTE SHAON also invested in an equity position in STRATEGIC ENERGY ASSETS VII, LLC for $50,000 on or about November 29, 2018. Even though this Plaintiff has demanded payment and communication with Defendants personally and

through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

125.    The investment product Defendants sold to KATHRYN MARY SMITH included a loan to CHOICE ENERGY HOLDINGS I LLC, for $103,000 on or about May 1, 2019. This loan was to accrue interest in conformity with a standardize promissory note. The investment had a starting interest of 4.76%, subject to penalties, late fees, and higher interest if late. Even though this Plaintiff has demanded payment and communication with Defendants personally and through her representative, no payments have been made. In fact, Defendants have advised they are not able to perform on the original terms of this or any of the documents. The investment sold to this Plaintiff was sold to this Plaintiff by the real sellers herein namely PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies through a finder defendants arranged to put this plaintiff together with their organization. The finder is THOMAS CHAPMAN, hereinafter referred to as "CHAPMAN" was the contact person working out of California before transferring to the State of Washington. Hereinafter, "CHAPMAN" refers to THOMAS CHAPMAN, and his companies VELOCITY NORTH INVESTMENTS, INC., and CHAPMAN WEALTH STRATEGIES. The finder made the sale, but the real owners or

sellers are PetroRock, MERCURY, POWELL, TOTH, AND KUIPER, the RESOLUTE and the HOMEBOUND Companies.

126.    The above investments and especially the loans are now due and have been due for months going on years and no cashflow or distributions. Many of the notes matured between 2021 and 2022. There are no distributions on the horizon. It appears there is no company of value or assets left. This is documented as well as other continuing irregularities in Defendant Powell's affidavit of June 3, 2022, attached hereto as Exhibit 33. The only recourse is to sue the persons and entities that have squandered the above investment opportunities, absconded with the money, lied about the investments potential, and have actual ability to pay, and/or to sue the persons or entities that marketed or oversold these investments. Plaintiffs are receiving no monies even though this is supposed to be the kind of investment that suitable for persons in retirement. Plaintiffs now seek all legal remedies available by law to get their money back. Plaintiffs request interest, attorney fees, and punitive and/or treble damages, or whatever the law allows.

127.    Plaintiffs Poyyaks were given an Unconditional Guarantee signed by Toth on behalf of PetroRock.  PetroRock has reneged on the guarantee as there is no security. See Exhibit 8.

128.    POWELL, TOTH with the assistance of KUIPER, and Chapman provided broker and investment advisor functions for all the Plaintiffs which resulted in Plaintiffs investing in the programs. Powell, Toth, Kuiper and Chapman did not perform proper due diligence in evaluating this investment opportunity for each Plaintiff. If they had done proper due diligence, they should not have allowed Plaintiffs to invest in these programs because they had a conflict of interest and the investment was too risky for retirees such as many of the Plaintiffs herein.  Had Plaintiffs been given full disclosure, and the investment been more properly vetted, they would not have invested in these programs. Between Powell and Toth, there was personal contact and/or privity to the extent that at least one of them signed for each of the programs that Plaintiffs signed up

for. Copies of their signature on key Plaintiff documents are included in Exhibit 3, Page 1 as to Powell's signature, Exhibit 4, Page 4 as to Toth's signature, and Exhibit 5, Page 4 regarding Toth being an authorized manager of Resolute.

129.    Plaintiffs specifically allege that Powell, Kuiper, Toth, and the Resolute companies were acting as registered or licensed brokers and that they used their entities RCP, HBR and other Defendant owned entities as vehicles to sell unregistered securities against the law. This violation entitles Plaintiffs to rescission and disgorgement in favor of Plaintiffs. The SEC found POWELL and TOTH violated the laws by acting as unregistered brokers subjecting them to a cease-and-desist order, which POWELL and TOTH accepted. In fact, these defendants were selling unregistered securities without an exemption to do so and they were sending out marketing material creating the false impression that their investments were being offered by FINRA/SIPC members. This was not true. Had it been true, Plaintiffs would have safeguards or investor protections provided to them.  It was an omission of material fact that Resolute, Powell, Toth, and Kuiper that they did not disclose that they were not registered.

130.    Powell, Toth, and Kuiper claim that they are entitled to an exemption from registration under Section 4(a)(2) of the Securities Act of 1933 as a private offering and Rule 506(b) of Regulation D. While claiming they are exempt from registration in their offering material,  they engaged in activity not allowed by exempt offerors.  Exempt offerors are not allowed to engage in general solicitation and they have done so by engaging in general solicitation at dinner presentations.  They allowed unaccredited investors to attend the presentations according to the SEC Order and even sold to unaccredited investors.  Resolute utilized promoters such as Mir jafer ali Joffrey to endorse their securities, podcasts, phone calls, emails, and other public means. Mir jafer ali Joffrey is not licensed.

131.    The Homebound Defendants engaged in "related party transactions to close out other debt funds to make those debt funds look successful when they were not." This was not disclosed to Plaintiffs who relied on the fact that there were prior successful debt

fund transactions that closed. In fact, that reliance was misplaced and is the result of Toth and Homebound Defendants' purposeful deception. Plaintiffs relied upon that when the success was actually Toth and the Homebound Defendants' manipulation.

132.   Toth used Mercury Operating, LLC to bleed PetroRock of investor funds, which funds were supposed to be used to fund PetroRock's oil and gas ventures. He did this by having Mercury charge excessive operating fees to the point where PetroRock owed Mercury more than $23 million as of March 24, 2022. This was inflated and was detrimental to the investors.

133.   Even though PetroRock guaranteed all debt funds, PetroRock could not make good on the guarantee because Toth bled PetroRock to make good on PetroRock's guarantee to Minerva. It is alleged on information and belief that Toth holds 100% of the voting interest in Minerva through various entities including Minerva Resources, LLC, and Defendant Cronus. This again is a fraudulent transfer, that was not disclosed to potential investors and which is the subject of the 2017 Bankruptcy ruling discussed above.

134.   Plaintiffs believe that other evidence of misconduct will be uncovered upon further investigation and as examples of misconduct unfold during litigation.

135.   Defendants Powell, Toth, and Kuiper, operating through Resolute and Homebound companies, had the ultimate authority over the distribution and content of offering materials. They approved them. As indicated above, the offering materials were false, deceptive, inadequate, and omitted material facts.

136.   The person that sold Defendants products to most Plaintiffs, THOMAS CHAPMAN was considered a finder and was an agent of PetroRock, MERCURY, POWELL, TOTH, KUIPER, the RESOLUTE and the HOMEBOUND Companies. CHAPMAN did not sign any paperwork to act as the advisor of Plaintiffs, and he was silent about his role which fooled Plaintiffs into thinking he was acting as their advisor and was committed to serving their best interests. As a result, Plaintiffs were defrauded

in they were left unrepresented, while thinking Chapman was the representative. This left Plaintiffs without anyone performing due diligence or suitability analysis for them.

137.    Toth caused PETROROCK to sell oil and gas assets purchased with investors' funds to TOTH or his companies at discount prices so TOTH or his companies would benefit, not the investors.

138.    It is also believed Cortez and Toth funded MINERVA RESOURCES, LLC and Cronus Mineral Holdings, LLC with Plaintiffs' investor money. It is believed that MINERVA has since acquired oil producing properties using Plaintiffs' investor money. It is now receiving a revenue source from Conoco that should belong to investors but through the above maneuver the stream of income is not going to the Plaintiff investors.

139.    MINERVA is also believed to be holding stock controlled 100% by TOTH. It is believed that MINERVA RESOURCES, LLC has diverted millions of dollars to insiders and for overhead to aid their operations independent of the investors and to Plaintiffs' detriment.

140.    Powell, Kuiper, Toth, and the other Defendants failed to use due diligence to see that its agents like THOMAS CHAPMAN were properly trained and supervised and their third-party independence was not affected.

141.    Further, it was THOMAS CHAPMAN's responsibility to make sure that he had all of the information and that he engaged in due diligence relating to the investment before introducing these investments to these Plaintiffs. THOMAS CHAPMAN was negligent in failing to do adequate due diligence and/or was negligent in portraying these investments to be safe and suitable for Plaintiffs. THOMAS CHAPMAN perpetuated false facts and a false narrative about these investments. Due diligence would have detected the faults outlined above including the likely potential that cash flow would be insufficient,  which later came to plague these investments. Chapman should have properly portrayed the investment as the risky investment it was. Then, Plaintiffs would not have purchased these investments. As such, it was also unsuitable, not in the best interests of Plaintiffs, and should not have been introduced to Plaintiffs.

142.   Neither Powell or Toth were registered with FINRA or the SEC.

143.   Plaintiffs sent via certified mail to all Defendants dated July 15, 2022.
Defendants were given the required 30 days to correct, repair or rescind, and or do any of
the things allowed by California Civil Code §1770 et seq. They have not done anything.
They still have the chance to make good as Plaintiffs will give any defendant 30 days
from the date this complaint is served upon them to comply with California Civil Code
§1770 et seq. Assuming this is not done, Plaintiffs therefore are entitled to the damages
and remedies set forth in California Civil Code §1780 and related sections.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

144.   This is a class action on behalf of persons or entities who purchased or
otherwise acquired investments (also called securities) from the umbrella organization
run by the Defendants (the "class."). Plaintiffs seek to recover comprehensible damages
caused by Defendants' violation of all causes of action especially the violations of Civil
Code 1770 et seq.

145.   Plaintiffs bring this action as a class action. The class is on behalf of persons,
trusts, or entities residing or doing business in or from California that purchased or
otherwise acquired investments (also called securities) from the umbrella organization
run by the Defendants. (the "class."). Excluded from the Class are any investors that are
the Defendants herein, the officers and directors of the Company, at all relevant times,
members of their immediate families and their legal representatives, heirs, successors or
assigns and any entity in which Defendants have or had a controlling interest.

146.   The members of the Class are so numerous that joinder of all members is
impracticable. The exact number of Class members is unknown to Plaintiffs at this time.
They can be ascertained only through appropriate discovery. Plaintiffs believe that there
are hundreds or thousands of members in the proposed Class. Record owners and other
members of the Class may be identified from records maintained by the Company or its
transfer agent and may be notified of the pendency of this action by mail, using the form
of notice similar to that customarily used in securities class actions.

147.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of laws and causes of action set forth herein.

148.   The Representative Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

149.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   Whether Defendants' acts as alleged against the law;

b.   Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.   Whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

e.   Whether Defendants acted knowingly or recklessly in issuing false and misleading statements during the Class Period;

f.   Where the money went and what assets are viable

g.   Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

h.   Whether injunctive relief is necessary for the benefit of all.

150.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. A class action is a more efficient method of bringing this lawsuit rather than individual lawsuits.

**FIRST CAUSE OF ACTION:**
**SECURITIES FRAUD (VIOLATION OF CORPORATE SECTION 25401)**
**AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS JOSEPH POWELL; STEFAN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.;HOME BOUND FINANCIAL GROUP, LP;THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES; TED ETHEREDGE; PABLO CORTEZ; WARREN TARYLE; JAQUELINE KUIPER; and DOES 1-300)**

151.  Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

152.  Defendants, RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; PRMH LENDERS FUND III, LLC; THOMAS JOSEPH POWELL; STEPHEN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES; ) are believed sellers in that they participated in the development of the product to be sold and helped sell the investment products which are the subject of the suit and were purchased by Plaintiffs and by reason of the above mentioned facts as set forth in the General Allegations, sold Plaintiffs securities in violation of California Corporation Code §25401 which prohibits offers or sales of securities including investment opportunities by means of a written or oral communication that contain: "Untrue statement[s] of a material fact or omits to state a material fact necessary in order to make the statement[s] made, in light of the circumstances under which they were made, not misleading."

153.  When reference to the term "funds" is used it means LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; CHOICE ENERGY HOLDINGS,

47

LLC; CHOICE ENERGY HOLDINGS III, LLC; PRMH LENDERS FUND III, LLC; STRATEGIC ENERGY ASSETS VII, LLC, and any and all other funds that come into play. These funds are sellers as they transferred title directly to Plaintiffs by reason of contracts and disclosures between Plaintiff and each of these funds.

154.    Thomas Chapman, Velocity North Investments, Inc., and Chapman Wealth Strategies, herein referred to as the Chapman defendants, or Chapman companies, were sellers by the fact that Chapman had direct privity with the Plaintiffs, and qualifies as a seller as a person who successfully solicits the purchases of a security, which he did being motivated by his own financial interest or the interest of the security owner.

155.    Resolute Capital Partners Ltd., LLC, Resolute Capital Managers LLC; Resolute Energy Capital, LLC, Resolute Capital Advisors, LLC, (hereinafter called Resolute), Thomas Joseph Powell; and Stephen Toth  were sellers because they operated a salesforce which they supervised and had ultimate authority over and used Chapman and or Chapman's companies to bring buyers to them. They are the actual sellers and more importantly, they closed the deal and Powell and/or Toth signed the documents. Chapman or his companies were paid to find the buyers and turned them over to Resolute, Powell and Toth to close the sale. The arrangement of the sale was under the authority of Resolute, Powell, Kuiper and Toth. That is how they worked from 2017-2020, which is the timeframe where Plaintiffs made their purchases. POWELL, TOTH and Resolute were acting as and were broker dealers running a sales force that arranged for all of Plaintiffs' sales to happen. Either Toth or Powell's signature is found on all sales documents and they or their staff made the actual sale not Chapman although that is a grey area as the Plaintiff all believed that Chapman or his companies were representing them. But that is also part of the deception that constitutes fraud or negligence on everyone's part, hiring Chapman as a "finder" but not making full disclosure to the investors of this role and possible conflict of interest.

156.    If any person or entity is deemed a seller, then they are liable (referring to all of the above persons or entities) for false statements made during the sales process. Even if

they are not sellers, they can be liable for violating Corporate Code 25401 for non-seller liability. See Corporate Code 25403. It applies here because all the above parties had knowledge and directly or indirectly controlled the people and offering that spread the false information to Plaintiffs. They also provided substantial assistance in effectuating the sales and used Chapman and other salespersons to perpetrate false information. The above would be considered a dishonest sale and fraudulent.

157.   Defendants also violated California Corporate Code 25401-25501 when selling investment to Plaintiffs. Defendants knew or should have known that the statements outlined in the General Allegation section of this Complaint were false and/or that material facts were omitted, either in the oral presentation, brochures, statements, disclosures, or offerings. All these misrepresentations of material facts were perpetrated at the highest level starting with Powell and Toth who had ultimate authority over the entire sales process. Defendants knew or should have known that there were material facts that needed to be conveyed to Plaintiff investors.  The 2017 bankruptcy findings and the prior fraudulent transfers Defendants engaged in, was material information to be disclosed to Plaintiffs prior to investing, but was not. The complexity of the company structure Defendants were using to operate together was not fully disclosed.  Plaintiffs were entitled to full disclosure of all material facts before being able to make a properly informed decision on these investments. Defendants but did not communicate these things, fully, totally and in a way that was truthful. As a result, the investments became understood in a false light and bought under false pretense.

158.   Plaintiffs reasonably relied on the information given to them as truthful.

159.   Plaintiffs were harmed by the above-mentioned activity.

160.   It was also improper, deceitful, or negligent to do the above and take Plaintiffs' money under the circumstances set forth in the general allegations of this complaint. Defendants intentionally failed to describe the investment truthfully, especially in failing to explain the money invested went into promoting or supporting other investments and in portraying this investment as suitable for retirement money. This investment was also

49

fraudulent because it was represented by the persons who sold this as a reputable firm, using properly licensed persons and selling properly registered security. This was false. Plaintiffs were also not told the true facts about the actual oil production and the true cashflow. Lastly, there was a lack of candidness relating to Chapman's relationship as a "finder" with PetroRock, Resolute, and the Homebound companies.

161.   Plaintiffs allege any fraud set forth anywhere in this document that applies here to keep this cause of action short.

162.   Selling securities and/or an investment opportunity like this under these false pretenses or while omitting material facts is deception and involves misrepresentation of material facts in violation of Corporate Code 25401. Plaintiffs contributed money to Defendants thinking they had made an investment or loan that would make a good return for their retirement when actually the investment products were too risky for that, but Plaintiffs were told otherwise or not told all the facts. This makes the above Defendants liable for misrepresentation of material facts and omission of material facts.

163.   By reason of the above, Plaintiffs are entitled to rescission and damages, and or the damages set forth in California Civil Code § 25401 and/or Civil Code § 25501.

164.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.

165.   Plaintiffs seek all other damages allowed by law for the above-described wrongdoing including costs of suit, investigation, and attorneys' fees.

**SECOND CAUSE OF ACTION:**
**BREACH OF FIDUCIARY DUTY**
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS JOSEPH POWELL; STEFAN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES; TED ETHEREDGE; PABLO CORTEZ; WARREN TARYLE; JAQUELINE KUIPER)**

166.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

167.   The first group of fiduciaries are those acting as sellers. Anyone acting as a dealer has a fiduciary duty to the purchaser under California law. See *Duffy v. Cavalier* 21889 (215) Cal. App. 3rd 1517. The sellers were described above and are incorporated herein as though fully set forth hereat.

168.   The next group of fiduciaries are those considered to be corporate promoters, corporate insiders, and sellers of partnerships interests. Anyone acting as a fiduciary has a fiduciary duty to the purchaser under California law. See *Eisenbaum v. Western Energy Resources, Inc.* (1990) 218 Cal. App. 3rd 314.

169.   That would also include persons who are offering an investment for the account of another, or on behalf of an investor. This is traditionally considered a person who has a fiduciary duty.

170.   Most of the Defendants above listed in this cause of action are in both groups of fiduciaries, but certainly Resolute, Toth, Powell, and Kuiper would be considered to be acting as a broker-dealers or sellers of security, which obligates a fiduciary duty as per the *Duffy v. Cavalier* case. The other Defendants would be in the business corporate promoters, corporate insiders, and sellers of partnership interests' fiduciary group per the *Eisenbaum v. Western Energy Resources* case.

171.   The sellers are obligated and liable as fiduciaries if they sell an investment without presenting a fair, balanced, and complete picture of the investment.  This lack of disclosure is outlined in detail above.  The sellers of securities have a fiduciary duty to do a suitability analysis and only sell to investors who are able to withstand the risk. Selling these risky investments to retirees, such as the Plaintiffs herein, or those Plaintiffs using their retirement money was a breach of fiduciary duty.

172.   The other group of corporate Defendants have a fiduciary duty to preserve the corporate assets and act in the best interest of the investors. These corporate Defendants are liable for a breach of fiduciary duty because they participated or knew or should have

known that there were transfers of money or assets, and inflated prices charged from insider companies that would result in the flagship PetroRock's insolvency, to the detriment of the Plaintiff investors. Under these circumstances, Defendants wrongfully squandered and misappropriated Plaintiffs' money and put their interests before the investors' interest. This was a breach of their fiduciary duty to act in ways that obviously undermined the benefits the Plaintiffs were entitled to, including Defendants not using reasonable care, not having undivided loyalty to the Plaintiffs, and Defendants acting in their own self-interest rather than in the best interests of the Plaintiffs to whom they owed a fiduciary duty.

173.   The Defendants had actual knowledge and inside information that they used for their advantage and took advantage of Plaintiff investors.

174.   Even if one of the Defendants abovementioned can be found not to be a fiduciary owing a fiduciary duty, they are liable by rendering substantial assistance, encouragement, and aiding and abetting those fiduciaries that did take advantage of Plaintiffs and breached fiduciary duties, so they are liable to the same extent. All non-fiduciaries are liable along with the fiduciaries because they were in a joint venture together.

175.   Defendants carried out their breaches of duty in association with each other. Plaintiffs were harmed because they lost the money that they put into this investment plus they suffered other economic, general, and special damages hereby requested.

176.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

177.   Plaintiffs seek all other damages allowed by law for the above-mentioned wrongdoing including costs of suit, investigation, and attorneys' fees.

**THIRD CAUSE OF ACTION:**
**VIOLATION OF PENAL CODE 496**
**(AGAINST STEFAN TOTH, ETHEREDGE, CORTEZ, TARYLE, AND HOMEBOUND COMPANIES)**

178.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

179.    Defendants, Toth, Etheredge, Cortez, Taryle, and the Homebound companies engaged in a course of conduct as described above that swindled Plaintiffs out of the money Plaintiffs gave to the Defendants as part of these investment programs.

180.    Defendants conduct as above described, constitutes violations of Penal Code 496 or theft for the acts of Toth, Etheredge, Cortez, Taryle, and the Homebound companies for Defendants squandering the investors' assets for themselves, which was brazen and unfair.

181.    Plaintiffs seek all damages allowed by law, including treble the amount of actual damages sustained by Plaintiffs, plus attorney fees and costs as allowed by Penal Code 496.

182.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

## FOURTH CAUSE OF ACTION:
## NEGLIGENCE
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS JOSEPH POWELL; STEFAN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP; TED ETHEREDGE; WARREN TARYLE)**

183.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

184.    Defendant listed in the title to this cause of action were negligent for the reasons above described in the general allegations of this complaint in failing to operate responsibly in furtherance of the viability of the investment Defendants controlled and managed. Defendants' negligence includes overextending itself, failing to flag false information, not supervising operations and people properly, miscalculating reserves, lacking timely and honest communication with investors, selling unregistered securities,

by unregistered persons,  as an unregistered broker dealer, and not fully disclosing the "finder" fee arrangement used by the salesforce. There is also negligence in Defendants abandonment of all the Plaintiff investors when Defendants basically just exited the program.

185.   In addition, they were negligent not providing full disclosure as set forth more fully in the general allegations section of this complaint. It was negligent to sell these security investments to these Plaintiff investors because the level of risk was not suitable to them or in their best interest (as described throughout this complaint).

186.   All the above is below the standard of care in the industry and is negligence. It was also below the standard of care to sell unregistered or unqualified securities and /or without a legitimate exemption and to sell these products by and through unregistered or unlicensed persons. It was also below the standard of care to make the misrepresentations described in the General Allegation section of this claim, and in causes of action hereinafter.

187.   As a result of the aforesaid acts of negligence of Defendants, Plaintiffs are damaged by reason of the loss of the monies they contributed to the investments, as well as the loss of their property, money, and expenses necessary to get their money back.

188.   As a result of the above acts, Plaintiffs also claim general damages for special damages including mental and emotional distress, pain, and suffering, caused by Defendants, subject to proof at the time of trial.

189.   Defendants' conduct was a substantial factor in causing Plaintiffs' harm as described above. Plaintiffs seek reimbursement for the costs and expenses of dealing with this investment, including legal fees incurred for having to recover the property.

190.   Plaintiffs seek all other damages allowed by law for the above-mentioned wrongdoing including costs of suit, investigation, and attorneys' fees.

191.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested.

**FIFTH CAUSE OF ACTION:**
**CORPORATE CODE §§§ 25110, 25004, 25501.5, & CCP § 1029.8  VIOLATIONS**
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; THOMAS JOSEPH POWELL; STEFAN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES**

192.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

193.   The above-mentioned facts show that Defendants, the ones described in the title to this cause of action, sold Plaintiffs unregistered or unqualified securities in violation of California Corporation Code, particularly §25110. Defendants also had no state or federal exemption as noted above.

194.   Defendants were sellers because they operated a salesforce that they supervised and had ultimate authority over and used Chapman and or Chapman's companies to make the sale for them, but Defendants being the actual sellers/closers. Chapman or his companies were paid to find the buyers and then turn Investors over to Resolute, Powell, and Toth to make the sale. This sales arrangement was under the authority of Resolute, Powell, and Toth. Powell, Toth, and Resolute were acting as unregistered broker dealers running a sales force. Either Toth or Powell's signature is found on all sales documents and they or their staff made the actual sale, not Chapman. All Plaintiffs believed that their financial advisor or Chapman or his companies were representing them. That is also part of the deception that constitutes fraud or negligence, not making full disclosure to the investors about "finders" not acting as advisors. In the above outlined capacity, Resolute, Powell, and Toth were acting as broker dealers and were considered broker dealers by law.

195.   It was below the standard of care for a seller to sell unregistered securities to Plaintiffs in violation of California Corporation Code, particularly §25110.  This violation makes the transaction void entitling Plaintiffs to their money back. Rescission or disgorgement is mandated, and damages are appropriate.

196.   Failure to comply with California Corporation Code§25110 puts Defendants in violation of California Corporation Code §§ 25004, 25501.5, & CCP §1029.8.  As a result, Plaintiffs seek the relief set forth in those statutes including treble damages.

197.   In addition to the above-mentioned remedies, Plaintiffs have been damaged, and suffered  significant financial losses as above described and seek all general and special damages, including pain and suffering, loss of the use of their money, loss of interest or the loss of the value of a well-managed account, loss of their principal, including accrued interest, for which Plaintiffs seek reimbursement.

198.   By reason of the above, Defendants are liable to Plaintiffs.

199.   It was also improper, illegal, deceitful, or negligent to sell unregistered or unqualified securities to Plaintiffs and take Plaintiffs money under these circumstances.

200.   By reason of the above, and as a proximate result of selling unregistered or unqualified securities, Plaintiffs were harmed because if these securities were registered or qualified, there would have been more investor protections and full disclosures and Plaintiffs would not have bought these products with the enhanced knowledge that would be available from registered or qualified securities sold by registered persons.

201.   By reason of the above, Plaintiffs are entitled to rescission and damages. Plaintiffs seek their money back and interest thereon. Additionally, Plaintiffs seek all damages or other remedies allowed by law for selling unregistered securities.

202.   By reason of the above-mentioned conduct, Plaintiffs are entitled to treble damages and attorneys' fees and costs at the discretion of Court, which Plaintiffs request.

203.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.

**SIXTH CAUSE OF ACTION:**
**FRAUD/FALSE PROMISE**
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS JOSEPH POWELL; STEFAN TOTH; RESOLUTE CAPITAL ADVISORS, LLC;**

**HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES)**

204.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

205.    The conduct of Defendants described in the title to this cause of action was fraudulent because there was omission of material facts and there was misrepresentation of material facts. What information that was provided, was not truthful nor complete, thus Defendants sold or contributed to the sale of Plaintiffs' investment products that were misleading. Full disclosure of all material facts was not even attempted, making this situation all the more fraudulent.

206.    Defendants also made a contract that is comparable to a false promise. Defendants did not intend that the product they were providing would meet Plaintiffs' needs because Defendants knew, or were reckless in not knowing, that they could not and would not be able to perform as promised or as portrayed as above described, yet Defendants sold these investment products anyway knowing this. These false promises include concealments about the actual oil revenue and production and the recent bankruptcy and findings of fraudulent transfers. If Plaintiffs knew these facts earlier, they could have taken immediate action to protect themselves.

207.    Plaintiffs have set forth numerous acts of fraud and misrepresentations that need not be repeated but are incorporated by reference as though fully set forth hereat.

208.    Further, Defendants' statements that there were sufficient cash reserves for a margin of safety, was untrue. In the lender programs and promissory notes, there was a statement that Plaintiffs can get their money back if Plaintiffs request so in writing. Even though Plaintiffs made this request in writing, their money was not returned as promised. Since Defendants knew of these falsities, this is categorized as deceit and fraud.

209.    Defendants intended that Plaintiffs rely on the above. Defendants knew the above statements were false and did not correct or inform the Plaintiffs that Plaintiffs could not get their money back.

210.    Plaintiffs were reasonably relied on Defendants' promises and representations.

211.    Defendants did not perform as represented or promised. Defendants gave Plaintiffs a sub-standard product and sub-standard service. In fact, Defendants sold to Plaintiffs what Defendants knew was inappropriate, unsuitable, onerous, and deceptive, contrary to Defendants' representation as cited in the General Allegation Section of this Complaint.

212.    Plaintiffs were harmed for all the reasons and in all the ways above stated in other causes of action.

213.    Plaintiffs' reliance on Defendants' promise was a substantial factor in causing the present harm. Plaintiffs reliance was reasonable.

214.    Plaintiffs were harmed from their loss of investment including suffering, pain, and mental anguish as a result of the above. Plaintiffs seek all general and special damages allowed by law.

215.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

### SEVENTH CAUSE OF ACTION:
### FINANCIAL ELDER ABUSE (Welfare and Institution Code §15600 et sec.)
### (for RICHARD SHAON, BERNARDO FEIG, and LINDA V. HILDEBRAND only)
### (AGAINST STEFAN TOTH AND THOMAS JOSEPH POWELL)

216.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

217.    All Plaintiffs listed above were over the age of 65  at the time of the sale and therefore considered an "elder." As an "elder," within the meaning of Welfare and Institution Code §15610.27, Plaintiffs RICHARD SHAON, BERNARDO FEIG and LINDA V. HILDEBRAND were entitled to the heightened rights and special statutory protections provided by California's Elder and Dependent Adult Civil Protection Act (EADACPA)", set forth in Welfare and Institution Code §15600 et sec. Under Welfare and Institution Code §15610.30, a person is liable for financial elder abuse or for

assisting financial elder abuse if they obtained the elder's property or money, and  if they knew or should have known the conduct is likely to be harmful to the elder. Defendants did more than one sale with RICHARD SHAON; each time there was an additional sale, the elder person is entitled to extra protection. Plaintiffs as elders needed to improve their health and their surroundings, not make investments that could not likely materialize in their lifetime.

218.   The activity of Defendants was a predatory practice in that it constitutes taking advantage of vulnerable elderly persons for Defendants' financial gain.  When Defendants sold Plaintiffs these investments in 2018, right after the 2017 bankruptcy, Defendants knew or should have known that these elderly Plaintiffs  would lose their money.

219.   The Center for Research at Boston College's study called "Aging Brain" says older people are particularly susceptible to deception and predatory practices because they suffer from cognitive decline, which impacts financial management skills, results in poor decision-making, leaving them particularly vulnerable to fraudulent marketing tactics.

220.   Broker-dealers or people with fiduciary duties like Defendants play a critical role in preventing financial abuse of elderly persons. Reputable persons should have rules and regulations to prevent sales of risky investments to elders in situations like this. It is believed that Defendants were grossly negligent or acted egregiously or intentionally in not having such rules and regulations or not monitoring the sales to elders.

221.   Defendants knew each sale was not suitable for elderly Plaintiffs based on Plaintiffs' expectations because Defendants knew neither Defendants, nor the investment, could deliver as promised, yet Defendants persisted to continue to sell products to Plaintiffs.

222.   Despite being an entity or person in possession of key facts, Defendants knowingly assisted and turned a blind eye and callous heart to the outrageous pilfering of the elderly Plaintiffs' money.

223.   By reason of the above, Toth and Powell, committed the above by knowingly assisting financial elder abuse.

224.   Defendants' financial abuse has caused Plaintiffs to undergo financial losses as well as emotional stress and frustration because of the loss of so much money, depriving Plaintiffs of financial security. Defendants knew or should have known that their conduct was likely harmful to Plaintiffs or otherwise in violation of the Laws particularly California Code of Civil Procedure §15600.30.

225.   Plaintiffs were harmed including suffering from their loss of investment and suffering pain and mental anguish as a result of the above.

226.   By reason of the above-mentioned conduct, Plaintiffs are entitled to treble damages and attorneys' fees and costs at the discretion of Court, which Plaintiffs request.

227.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

228.   Plaintiffs seek all damages available by law.

## EIGHTH CAUSE OF ACTION:
## THIRD PARTY BENEFICIARY CONTRACT
**(AGAINST HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC; HOME BOUND FINANCIAL GROUP; PETROROCK MINERAL HOLDINGS LLC; MERCURY OPERATING, LLC; STEFAN TOTH; THOMAS JOSEPH POWELL)**

229.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

230.   Homebound Resources, LLC; Homebound LLC, Home Bound Financial Group, PetroRock Mineral Holdings LLC, and Mercury Operating, LLC entered into contracts with each of the funds, namely Legacy, Choice, SEA VII,  and PRHM III to name a few. Together all these above entities also had agreements with Resolute, Powell and Toth to work together to service Plaintiff investors who were third party beneficiaries. All of the above entities and persons were responsible to use their best efforts to further operations,  including engaging in efforts to obtain oil production for

purposes of returning interest and /or profit to the investors. The above persons and entities were so intertwined and in a working relationship that that was a separate contractual relationship for which Plaintiffs were the third-party beneficiaries.

231.    As a result of a fall out, See Exhibit 33, June 3, 2022, Affidavit of Thomas Powell, stating that Toth was refusing Powell access to documents, and Toth is "continuing to cause revenues to be transferred to himself and his associates" there has been a breach of the above mentioned third party beneficiary contracts by all the above-named persons and entities to the detriment of Plaintiffs.

232.    As third-party beneficiaries of the abovementioned contracts, Plaintiffs are allowed by law to either enforce the contract or sue for damages. Plaintiffs, therefore, commence this action for this purpose and seek all relief available under the law.

233.    Plaintiffs are third-party beneficiaries to the above contract because all of the elements required are met including:  1) The third party would in fact benefit from the contract, (2) The motivating purpose of the contracting parties was to provide a benefit to the third party, and (3) Permitting a third party to bring its own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties.

234.    All three elements mentioned above favor a finding of a third-party beneficiary contract that Plaintiffs' are entitled to enforce against all of the above parties and entities.

235.    Plaintiffs request the return of all money they paid as part of their investment that was lost due to the breach of the above-named persons and entities.

236.    Plaintiffs seek all remedies and damages and other relief allowed by law including attorney fees and costs to the extent contained in any of the contracts between the abovementioned persons and entities.

**NINTH CAUSE OF ACTION:**
**VIOLATION OF SECTION 5 [PURSUANT OF SECTION 12(a)(1))]OF THE SECURITIES ACT (UNREGISTERED SECURITY)**
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS**

**JOSEPH POWELL; STEFAN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES)**

237.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

238.   By reason of above-mentioned conduct, Defendants POWELL, TOTH, and other PARTIES and entities outlined in the title of this cause of action willfully violated Section 5 of the Securities Act (15 U.S. Code § 77(e) and 15 U.S. Code § 17), which states that "[unless] a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such securities or a medium of any perspective, or (2) to carry or cause to be carried through the mails for an interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for the delivery after sale." Defendants also are not entitled to the exemption claimed because they have not acted in good faith and complied with the necessary requirements to obtain such exemption like not engaging in general solicitation or selling to unaccredited investors.

239.   As a result of the conduct described above, Defendants POWELL, TOTH, RCP, and HOMEBOUND willfully violated Section 5 of the Exchange Act, which states that "[it] shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any perspective or otherwise any security, unless a registration statement has been filed as to such security."

240.   By reason of the above, and Section 12(a)(1), Plaintiff is entitled to bring a civil action to rescind, plus interest and damages, against the issuers. It is alleged all are issuers or controllers of the issuer or violations and liable under Section 20 of the 1934 Securities Act (15 USC §78 t(a)). The remedy is rescission or disgorgement of all monies paid.

241.   Plaintiffs seek all damages allowed by law by reason of Defendants acting as unregistered broker dealers and selling unregistered securities.

242.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitute oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345 or both.

243.   Plaintiffs seek all damages available by law.

**TENTH CAUSE OF ACTION:**
**VIOLATION OF SECTION VIOLATION OF CORP. CODE 25501.5 BY ACTING AS A BROKER-DEALER OR AGENT OR SAME WITHOUT REGISTRATION**
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS JOSEPH POWELL; STEPHEN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; FINANCIAL GROUP, LP; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES)**

244.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

245.   Defendants were sellers because they operated a salesforce that they supervised and had ultimate authority over and used Chapman and/or Chapman's companies and others to make the sale for them, but Defendants being the actual sellers. Chapman or his companies and others were paid to find the buyers and turned them over to Resolute, Powell, and Toth to make the sale. The arrangement of the sale was under the authority of Resolute, Powell, Kuiper and Toth. That is how they worked from 2017-2020, which is the timeframe where Plaintiffs made their purchases. POWELL, TOTH and Resolute were acting as and were broker dealers running a sales force that arranged for all of Plaintiffs' sales to happen. Either Toth or Powell's signature is found on all sales documents and they or their staff made the actual sale not Chapman although that is a grey area as the Plaintiff all believed that Chapman or his companies were representing them. But that is also part of the deception that constitutes fraud or negligence on everyone's part, hiring Chapman as a "finder" but not making full disclosure to the

investors of this role and its possible conflict of interest. In the above capacity Resolute, Powell, and Toth were working as broker dealers and in so doing were considered broker dealers by law. Neither Powell, Toth or any of the Resolute Companies had a certificate of approval to conduct business in the state of California required by Corp. Code 25200 et. seq. nor were they a FINRA member as required to be Broker Dealer at the Federal level.

246.    An unregistered broker selling securities is illegal, and that is what Powell, Toth, or any of the Resolute Companies did. When such violation(s) occurs, which occurred here, Corporate Code 25501.5 applies to give Plaintiff purchasers a right of statutory rescission. As a result of the conduct described above, the Resolute Defendants, POWELL, and TOTH are liable for the remedies or damages set forth in Corporate Code 25501.5.

247.    POWELL, TOTH, and the Resolute Companies acted as brokers without being registered or in the alternative they acted as unlicensed securities sales persons.

248.    In addition, this puts Defendants in violation of California Code of Civil Procedure §1029.8.

249.    California Code of Civil Procedure § 1029.8 states, "unlicensed persons who cause injury or damage … as a result of providing goods or services for which a license is required… shall be liable to the injured person for treble the amount of damages…" Had Plaintiffs dealt with a licensed person instead of an unlicensed people such as Defendants, Plaintiffs would have been provided investor protections and full disclosures of material facts. Plaintiffs would not have invested, because no reputable licensed person would sell these risky securities to Plaintiffs. Even if that were not the case, sales by unlicensed persons render sales void and therefore justify rescission. This allows for treble damages which is requested for each sale made without a license.

250.    By reason of the above, the remedy is rescission of all monies paid.

251.   In the alternative, Plaintiffs seek all damages allowed by law by reason of Defendants acting as brokers, being unregistered, and selling in the way above mentioned.

252.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

253.   Plaintiffs seek all damages allowed by law.

### ELEVENTH CAUSE OF ACTION:
### BREACH OF CONTRACT/RESCISSION
### (AGAINST LEGACY ENERGY, LLC; PRMH LENDERS FUND III, LLC; PETROROCK MINERAL HOLDINGS, LLC AS GUARANTOR)

254.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

255.   As noted above whereby the details including dates and interest were alleged in the General Allegations of this Complaint, the following Plaintiffs entered into a contract where these Plaintiffs loaned LEGACY ENERGY, LLC the following pursuant to a Business Loan Agreement and Promissory Note guaranteed by PetroRock Mineral Holdings, LLC. The agreement was that LEGACY would return the money with the agreed upon interest. The deadline to make this payment has passed. This payment was guaranteed by PetroRock who promised to cover any payment obligation of LEGACY. Proper demand has been made. Therefore, both entities in this paragraph have breached their contract with Plaintiff and are obligated to pay the following amounts plus interest at this time.

    a.  Michael Hollifield - $490,000, investment made July 2, 2018

    b.  Javen Poyyak - $50,000, investment made May 23, 2018

    c.  Michael Anderson - $256,000, investment made July 18, 2018

    d.  Julieta Cabigas - $50,000, investment matured August 8, 2019

256.   As noted above, whereby the details including dates and interest were alleged in the General Allegations of this Complaint, the following Plaintiffs entered into a

contract where these Plaintiffs loaned PRHM Lenders Fund III, LLC (PRHM) the following pursuant to a Business Loan Agreement and Promissory Note guaranteed by PetroRock Mineral Holdings, LLC. The agreement was that PRHM would return the money with the agreed upon interest. The deadline to make this payment has passed. This payment was guaranteed by PetroRock who promised to cover any payment obligation of PRHM. Proper demand has been made. Therefore, both entities in this paragraph have breached their contract with Plaintiff and are obligated to pay the following amounts plus interest at this time.

  a. Michael Hollifield - $100,000, investment made September 26,2017

  b. Richard Shaon - $274,000, investment made June 1, 2018

  c. Richard Shaon - $50,000, investment made September 20, 2019

  d. Larry Carlson - $114,000, IRA investment made June 27, 2017

  e. Catherine Carlson - $65,000, IRA investment made November 28, 2017

257. Three Plaintiffs invested in Strategic Energy Assets, VII (SEA VII) based upon promised production and it being a viable company. Defendant was unable to meet either of these requirements so there is a failure of consideration. Two of the Plaintiff Hollifield, (November 28, 2018), Yvette Sharon, (September 3, 2019) invested $100,000 and $50,000 respectively. Two plaintiffs, Benyapa and Bernardo Feig, (December 6, 2018), invested $75,000 as husband and wife. These Plaintiffs are entitled to this money back (plus interest) from SEA VII.

258. Plaintiff John Millhollon-Turner invested $100,000 on June 8, 2020, in Advantage Capital Holdings IV Fund, LLC, under the auspices of Resolute Capital Partners, based upon him being able to obtain his money back and that there was a viable property underlying the investment. Neither of these things were true and therefore, this constitutes a failure of consideration entitling Plaintiff Millhollon-Turner to his money back plus interest.

259. In alternative to the above, Plaintiff elects to void the contract and seek his money back or seek declaratory relief from the Court, declaring that Defendants, each

above mentioned, presented an illusory, fraudulent, deceptive contract entered into by mistake or trickery justifying returning Plaintiff's money back.

260.   In the alternative, Defendants have breached each of the abovementioned contract by not giving Plaintiff the security and interest promised. Under these circumstances, this constitutes a failure of consideration permitting Plaintiff his money back plus interest. As such, Plaintiff requests the return of his principal as required in the contract.

261.   Plaintiff fully performed but Defendants have not.

262.   Plaintiff seeks return of all monies paid, plus interest and attorney's fees and/or damages allowed by law. The contracts provided for attorney fees.

**TWELFTH CAUSE OF ACTION:**
**CIVIL CODE §3372 VIOLATION**
**THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.;**
**CHAPMAN WEALTH STRATEGIES**

263.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

264.   Defendants above noted in the title of this cause of action, held themselves out as investment advisors, financial advisors, and related terms. Defendants held themselves out as persons engaged in the business of advising others for compensation and as experts with respect to investments, generally, and particularly in the oil and gas investments. Defendants did not serve the best interests of the client, but served his own interest in obtaining a finders fees, and therefore allowed Plaintiffs to purchase unsuitable products. In particular, Defendants represented themselves to be an with respect to the investment decisions in such oil and gas investments and implied that Defendants were acting in the capacity of the terms listed in Civil Code §3372 such as financial adviser, financial counselor, or investment adviser. As a result, Defendants are liable to Plaintiffs under that law.

265.   Defendants obtained compensation as a result of the financial advice rendered to Plaintiffs, but Defendants failed to render the financial advice with due care and skill

reasonably expected of a person who is an expert as defined by and required by Civil Code §3372. Defendants were not properly licensed and/or registered to act as an expert, as defined in Civil Code §3372, or as Defendants represented or implied. This is further against the law for which Defendants are liable.

266.    Plaintiffs relied on Defendants' delivering services and advice of a level reasonable expected and set forth in Civil Code §3372. Plaintiffs were damaged by reason of their reliance on Defendants' services.

267.    Defendants' services were not rendered with due care as reasonably expected and resulted in Plaintiffs not receiving what was portrayed. Defendants' services were instead rendered with fraud, deceit, dishonesty, ignorance, and/or lack of due diligence. Plaintiffs expected Defendants to render sound financial advice. Defendants did not. Plaintiffs were to be the recipients of Defendants' advisory services as defined above. Defendants are liable to Plaintiffs for the damages caused in the purchase of this investment of $20,000,000; or in an amount to be determined according to proof at trial.

268.    Plaintiffs also request all damages or remedies afforded by law including disgorgement of fees covered by this statute and/or anything allowed by law including attorney's fees and costs of suit.

269.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice for which punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

**THIRTEENTH CAUSE OF ACTION:**
**VIOLATION CALIFORNIA LEGAL REMEDIES ACT- CA CIV. CODE 1770 ET SEQ)**
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS JOSEPH POWELL; STEFAN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP**

270.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

271.   This cause of action relates to the Defendants listed in the title of this cause of action.

272.   By reason of the certified letter sent to Defendants on July 14, 2022, pursuant to violations of California Consumers Legal Remedies Acct, and CCCP§1782(a), and the 1st and 2nd Amended Complaints submitted to Defendants over Plaintiffs' concerns related to California Civil Code §1770, Defendants failed to provide any corrective action or remedies. As a result of Defendants' inaction, Plaintiffs are entitled to the remedies set forth in California Civil Code Section 1780. California Civil Code §1780 is incorporated by reference set forth herein. Defendants were required to perform corrective action and have failed to do so. Plaintiffs therefore seek all damages allowed by law.

273.   Defendants sold investments to customers at large, in this case, financial products through a confusing array of companies' programs, sponsors, and salespersons (whose affiliations were blurry and purposely made that way). Defendants played fast and loose in their identity and structure as to which entity held what assets and how entities related to each other and which were for the benefit of investors and which were for and controlled by insiders that might be a threat to the existence of the investment. This made it difficult for Plaintiffs to do any due diligence on their investments and to find out with whom they were actually dealing. Defendants made themselves incognito and non-transparent which made it possible for Defendants to pull off what happened, a takeover of the investment by insiders or third- party participants. Also, the arrangement as set up made it easier for Defendants to exert and /or extort favorable terms for itself in the agreement and all along the way including into non- performance and then allow the investor assets to be taken over by someone else, which is what happened. All because of the confusion over who was the sponsor and in charge and how the affiliates were supposed to interact, Plaintiff investors were unable to comprehend and react in time before the investment was lost or stolen by others.

274.   Actually, it is more than the above and it is alleged that the failure to describe the structure that Defendants developed to operate the investment was a material omission that left Plaintiffs unaware of any specifics relating to the process in which the Defendants interrelated, especially the process that allowed Defendants to have an advantage over the investors when it came to liquidating, transferring assets, exchanging assets, and basically allowing Defendants the bleed the remaining assets in PetroRock and allowed them to destroy PetroRock when PetroRock was vital to the investment viability. It was a deception and violation of Civil Code Section 1770(a) 1-5 because there was confusion over the sponsorship and who had what authority. Plaintiffs were led to believe that there were no issues there but, in the end, the issue was huge, and it was not disclosed. This was a deceit made by the controlling individuals who had the power to take over PetroRock's and Plaintiffs' assets.

275.   There is also deception concerning Civil Code Section 1770 (14) where Defendants represented that Plaintiffs' purchase of the investment would give rights and obligations to a process that would not let a controlling individual, or a sponsor or associated company misappropriate assets. However,  Defendants did misappropriate assets or allowed it to happen.

276.   Defendants advertised and sold to Plaintiffs a financial product that was unregistered and sold by unregistered persons, which is illegal under state and federal law. For all of the reasons set forth in the general allegations section of this complaint, this constitutes fraud. This is a violation of Civil Code Section 1770(a) (26).

277.   All of these investments have contracts that bound Plaintiffs to unconscionable provisions as described earlier but including and not limited to the unconscionable arbitration clause, unconscionable foreclosure provisions, forum clause, and state law selection clauses, and assigning confusingly different entities to have authority and priority and favor over the investors. These unconscionable provisions should be declared void as they violate Civil Code Section 1770(a) at especially (19).

278.   Defendants illegally offered and sold illegal financial products as described above in violation of Civil Code Section 1770(a) (26) as described above. This include "advertising, offering for sale, or selling a financial product that is illegal under state or federal law," RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; LEGACY ENERGY, LLC; PETROROCK MINERAL HOLDINGS, LLC; PRMH LENDERS FUND III, LLC; THOMAS JOSEPH POWELL; STEPHEN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND INC.;HOME BOUND FINANCIAL GROUP, LP; THOMAS CHAPMAN; LOVE 2 LIVE HOLDINGS, INC; 2X5 ENTERPRISES LIMITED PARTNERSHIP; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES; MERCURY OPERATING, LLC; TED ETHEREDGE; PABLO CORTEZ; WARREN TARYLE; JAQUELINE KUIPER; CAL.CODE OF CIV. PRO. §382 DEFENDANTS; LOVE 2 LIVE LLC; FELFRAN INVESTMENTS LLC; V&V RESIDENCE TRUST; and other Defendants facilitated the violation of this provision. This entire investment was illegal under state and federal law. There is no legitimate exemption for the sale of these investments to these Plaintiffs and these securities were not registered - so the sales of these financial products to Plaintiffs were illegal and further violated Civil Code Section 1770(a)(26).

279.   Further and probably the most egregious is that this entire investment program is based on so many unexplained entities and companies associated with it, that benefit the insiders and promoters with financial side payoffs, commissions, and overages that contributes to the confusion about and or ignorance of material facts that needed to be disclosed for Plaintiff/investors to make an informed choice, which amounted to deceit to these Plaintiffs not knowing all of this before investing.

280.   Confusion also abounds for which Defendants are responsible and liable because it is unclear who is in control, who the sponsor is, and what are the affiliations and how are they are related and supposed to control and help each particular investment

thrive. Due to this confusion and the fact that no one was apparently in charge, all Defendants are liable for this failed investment mess that could have been preventable with full and proper implementation and disclosure of all material facts as required by this law.

281.    The above actions of Defendants as above described also violates Section 1770(a) including passing off goods as those of another, false sponsorship, false or confusing, misrepresentation of affiliation.

282.    As a result of the above, the Plaintiff investors were not afforded investor protections that they expected and which are required under security laws, when buying a financial product.  Failure to explain all the above is deception and misrepresentation and violation of Civil Code Section 1770 - 1782. People thought they had registered professionals behind then when they did not.

283.    Plaintiff/Investors relied on the Homebound companies as well as Powell, Kuiper and Toth to see that PetroRock was being managed for Plaintiffs' benefit and that PetroRock was a properly protected entity that had checks and balances preventing the squandering or misappropriating of money by others or insiders.  Plaintiffs reasonably relied on representation that PetroRock would be operated in conformity with the law. Plaintiffs relied upon the validity and truth of the above in making their investment. Further, the presentations made to Plaintiffs were done in a way that made sense and were convincing with having all the facts and knowledge they should have had. If Plaintiffs had known the truth, they would not have invested.

284.    All the misrepresentations set forth in the general allegations apply here and were material to Plaintiff's decision to invest. A reasonable consumer would not have considered investing if they had known the investment company structure was this loose, complex and amorphous, and that there were cracks in the relationships between sponsors and operators that could result and did result in the insiders company partners taking over more than their share of assets.

285.   As a result of Defendants' above violations of Civil Code Section 1170, et seq, Defendants benefited through the use of Plaintiffs' money, which is equivalent to ill-gotten gains. Lack of candor and lack of full disclosure gave Defendants an unfair advantage in raising money compared to other businesses that obey the law. It is unfair because it allows Defendants' businesses to reap benefits that could have been given to legitimate businesses that could have truly benefited investors and provided a just return.

286.   By reason of the above-mentioned facts and all facts set forth in this compliant, Defendants violated all aspects of the California Legal Remedies Act, particularly Civil Code Section 1770 - 1782.

287.   Plaintiffs seek all damages allowed under Civil Code Section 1780, including actual and other relief the Court finds just and equitable including attorney's fees and punitive damages. Remedies at law are inadequate.

288.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitute oppression, fraud, and malice and justifies punitive damages under either Civil Code Section 3294 or 3345 or both.

289.   Plaintiffs also request all damages or remedies afforded by law including disgorgement of money paid, attorney's fees and costs of suit. This includes the senior citizen damages of $5,000 per person pursuant to Civil Code Section 1780.

290.

### FOURTEENTH CAUSE OF ACTION:
### CONSTRUCTIVE TRUST/RECEIVERSHIP
### (AGAINST DEFENDANTS PETROROCK MINERAL HOLDINGS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP; LOVE 2 LIVE HOLDINGS, INC; 2X5 ENTERPRISES LIMITED PARTNERSHIP; LOVE 2 LIVE LLC; FELFRAN INVESTMENTS LLC; V&V RESIDENCE TRUST; MERCURY OPERATING, LLC; STEFAN TOTH;
### THOMAS JOSEPH POWELL)

291.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

292.   Plaintiff investors request a constructive trust be placed over the abovenamed parties that appear to have held and are holding investor money. All investor entity proceeds have been diverted particularly out of PETROROCK and Mercury. It is believed that some the above parties are holding substantial investor money. Plaintiff investors request a constructive trust be imposed on all proceeds generated by the abovenamed Defendants or their operations to the full extent of the law. Legal remedies are unavailable. Therefore, the Court should use its equitable powers to not only void transfers but prevent future transfers. Plaintiffs also ask to be paid for their losses, attorney's fees, costs, and any damages appropriate.

293.   In addition to the above-mentioned remedies, Plaintiffs seek all other remedies available including any general or special damages for monies that cannot be returned.

294.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested under either Civil Code 3294 or 3345 or both.

## FIFTEENTH CAUSE OF ACTION:
## VOIDABLE TRANSFER
**(AGAINST HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP; LOVE 2 LIVE HOLDINGS, INC; PETROROCK MINERAL HOLDNGS, LLC; MERCURY OPERATING, LLC; 2X5 ENTERPRISES LIMITED PARTNERSHIP; LOVE 2 LIVE LLC; FELFRAN INVESTMENTS LLC; V&V RESIDENCE TRUST; STEFAN TOTH; THOMAS JOSEPH POWELL)**

295.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

296.   Even though there is actual fraud, and the Court should find fraud or deceit, with regard to the transfers, all that is required to avoid transfers is to show that reasonable equivalent value was not received by Plaintiffs for their investment.  The above-named companies made transfers to themselves, their companies or to insiders with the intent to hinder, delay, or defraud creditors or investors out of PetroRock or Mercury assets.

297.   There is also liability here under California Civil Code §3439.05 as against all above-named parties. That law says, "A transfer made or obligation occurred by a debtor is voidable as to the creditor whose claim arose before the transfer was made or the obligation occurred if the debtor (in this case, all the Defendants or their predecessor companies) did the transfer and incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation." That is what happened in the instant case. Subsection B states, "A creditor making a claim for relief under subdivision A has the burden of proving the elements of the claim for relief by a preponderance of the evidence." By reason of the above, Defendants transfers whether made before or after, any debt should be voided by this Court and returned to Plaintiffs. What has happened because of the illegal transfers is that all the money that was available to the investors has been misappropriated away from the investors. Plaintiffs herein are directly injured by the wrongful transfers of Defendants.

298.   Plaintiffs seek all relief available by law including the reason of the voidable transfer law of the State of California pursuant to Civil Code 3439-3439.14 as enforced in federal court including damages, attorney's fees, and whether equitable relief is necessary to make the above happen, void the transfer, and return the money to PetroRock, Mercury, or if possible, directly to Plaintiffs.

In addition to the above-mentioned remedies, Plaintiffs have been damaged, in having to suffer significant losses as above described, including pain and suffering, loss of the use of their money, loss of interest or the loss of the value of a well-managed account, loss of their principal, all to the tune of $20,000,000 and according to proof at trial, including accrued interest, for which Plaintiffs seek reimbursement.

### SIXTEENTH CAUSE OF ACTION:
### CONSTRUCTIVE FRAUD
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; MERCURY OPERATING, LLC; PETROROCK MINERAL HOLDINGS, LLC; THOMAS JOSEPH POWELL; STEFAN TOTH; TED ETHEREDGE; PABLO**

**CORTEZ; WARREN TARYLE; RESOLUTE CAPITAL ADVISORS, LLC; HOMEBOUND RESOURCES, LLC; HOMEBOUND LLC.; HOME BOUND FINANCIAL GROUP, LP; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES; JAQUELINE KUIPER)**

299.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein. This cause of action relates to the named parties listed in the title of this cause of action.

300.    The Defendants were fiduciaries and as such had a fiduciary duty to be acting for the benefit and in the best interest of Plaintiffs. In addition or in the alternative, the abovenamed Defendants were sellers or aided and abetted or co-conspired with the abovenamed Defendants in the sale of these security investments to Plaintiffs.

301.    The Defendants were also the promoters and salespersons, or supervisors of same, who were marketing, selling, and operating this investment(s) and/or were aiders and abettors or co- conspirators. The rationale for each person's inducement has already been covered in other securities and fraud causes of action and in the general allegation section of this complaint incorporated by reference as set forth hereat.

302.    There was concealment of material facts and omission of material facts not disclosed, thus Defendants sold Plaintiffs products that were misleading or contained concealment of material facts.  This and what is enumerated below it already enumerated constitute constructive fraud in violation of Civil Code § 1573.

303.    There were many concealments including not disclosing the structure that defined the relationship of the parties operating Plaintiffs' investments, the failure to disclose PetroRock's inability to meet projections of oil production as set forth in the disclosure documents given to Plaintiffs prior to investing, and the failure to disclose key parties involved in the voidable, fraudulent transfers prior to the 2017 bankruptcy, including PetroRock, Mercury, and the Homebound companies. When or if the company structure had been described, it required describing so many moving parts and

companies and programs that it was non-sensible and incomprehensible all-in violation of Civil Code 1770 et seq. It is believed this was done on purpose.

304.   Defendants also knew or were reckless in not knowing, and thus not telling Plaintiffs, that the investments were not a suitable investment for these Plaintiffs as they were not and they should not have been sold these unregistered securities as they violated various laws, securities, rules, and regulations including those set forth in the above causes of action going to the lack of licensing of individuals selling the security, and Defendants being unlicensed broker dealers. It has already been alleged that Plaintiff inventors were deceived about all this and relied on Defendants to be licensed and registered and selling registered stock through proper channels.

305.   Also, Defendants did not tell Plaintiffs how much of the plaintiffs' invested money was going or coming from other investment programs or that Defendants were engaged in Ponzi scheme tactics.

306.   Further, there were statements made by Defendants that there were sufficient cash reserves for a margin of safety, which turned out to be untrue. Plaintiffs were referred to as secured lenders in the debt program and "guarantees" were offered and not honored. All of these were misrepresentations. No Plaintiff was secured as promised nor did any of the guarantees amount to anything. Plaintiffs reasonably relied on these guarantees and the security promised. This was all false. Since Defendants knew of these falsities, this was deceit and actionable constructive fraud.

307.   Plaintiffs were harmed for all the reasons and in all the ways above stated in other causes of action. This is a cause of action for constructive fraud so proof of actual intent to deceive is not required.

308.   Plaintiffs' reliance on Defendants' promise was a substantial factor in causing the present harm including the loss of their investment. Their reliance was reasonable.

309.   Plaintiffs were harmed including from not only the loss of their investment but the suffering, pain, and mental anguish that followed the loss. Plaintiffs seek all general and special damages allowed by law.

310.   Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice and justifies punitive damages under either Civil Code 3294 or 3345.

311.   Plaintiffs seek all damages available by law.

<u>**SEVENTEENTH CAUSE OF ACTION:**</u>
<u>**NEGLIGENCE**</u>
**(Against THOMAS CHAPMAN AND HIS COMPANIES)**

312.   Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

313.   Chapman, acting individually and through his companies, negligently interacted with Plaintiffs. He led them to believe that he was acting as their financial advisor when he was actually a finder for Resolute Capital Partners and/or Resolute related companies.

314.   Chapman was either dishonest about his true role and/or engaged in dual representation, which is tantamount to serving two masters, creating a conflict of interest that cannot be waived. Even if it could be waived, a waiver was not requested. All of this is negligence, but it is compounded by the fact that this investment needed to be vetted, evaluated, analyzed, which it was not making Chapman negligent in performing inadequate due diligence as well. Chapman should have better vetted this product before introducing it to Plaintiffs, or if he did vet the product, he failed to do it appropriately and adequately within the standard of care. Standard of care due diligence would have uncovered that these investments were too risky for Plaintiffs especially with a recent bankruptcy proceeding showing fraudulent transfers had occurred by the parties to this investment. Had Chapman or his companies done their job, these Plaintiffs investments losses would not have occurred, or he could have blown the whistle and mitigated the loses for Plaintiffs. The facts if analyzed and investigated properly required a recommendation of no purchase. Anything less was a violation of the standard of care.

315.   For the totality of reasons cited throughout this complaint, Chapman's services were negligent, either through his reckless investigation of the investment or this outright

failure to investigate. As late as 2021, he was still advising Plaintiffs not to worry.  On May 21, 2021, Chapman wrote an email to Plaintiff Richard Shaon, "Nothing to worry about, they are still performing great! It's just that over the last 6 months or so, they had changed around how to deal with maturities and I want to be sure I have the most up to date info. I'll email (you)…once I get off that call and gather all the intel. Hope you guys have a great weekend!"

316.    As a result of the aforesaid acts of negligence of Defendants, Plaintiffs were damaged by reason of the loss of the monies they contributed to the investments, as well as the loss of their property, money, and expenses  and attorney fees necessary to get their money back.

317.    As a result of the above acts, Plaintiffs also claim general damages for mental and emotional distress, pain, and suffering, caused by Defendants, subject to proof at the time of trial.

318.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm as described above. Plaintiffs seek reimbursement not just for their losses plus interest but for the costs and expenses of dealing with this investment.

319.    Plaintiffs seek all other damages allowed by law for the above-mentioned wrongdoing including costs of suit, investigation, and attorneys' fees.

**EIGHTEENTH CAUSE OF ACTION:**
**NEGLIGENCE**
**(Against JAQUELINE KUIPER)**

320.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

321.    At all times herein, Jaqueline Kuiper had the duty to oversee the propriety of actions of those engaged in selling investments to the public, as the compliance officer and general manager of marketing, public relations, and general operations of all PetroRock investments, the investments that resulted in Plaintiffs' losses. Kuiper was responsible for overseeing persons selling, marketing, and communicating to the public. For reasons set forth in the general allegations of this complaint, she failed to see that

proper and full disclosures were made. She allowed Powell and Toth to run rampant in doing what they wanted in disregard to security laws, regulations, and the public safety of investors. She let them get away with the running of an inefficient, improper, and unethical sales operation that was not honest, complete, fair and balanced in communicating to investors as required by law.

322.    It was negligent for Kuiper to allow the false information about tax benefits to be utilized in the sale process. As the compliance officer, she should not have approved sales of these investments using retirement or IRA money. It was negligent for Kuiper to allow a process where investors were encouraged to move their money out of conservative IRA accounts to IRA custodial accounts recommended by Defendants, that allowed Plaintiffs to buy unregistered securities, such as the risky oil investments. It was negligent for Kuiper to allow so many false statements (those alleged in the general allegations of this complaint) be circulated among the sales teams including the Resolute companies and Chapman and his companies that were used to influence and deceive these Plaintiffs.

323.    It was improper and negligent for Jaqueline Kuiper not to oversee the downline sales activities and sales brochures that contained false projections of current and/or future oil production, (given that over time she had the opportunity and obligation to amend the disclosures based on actual revenue).  She knew or should have known that only 3-5 barrels were being produced, but she, as the compliance officer, allowed the false statements that 500 barrels were being produced. This was a misrepresentation of material fact under her supervision and control. She was negligent for not stopping what turned into a Ponzi type scheme where she knew the success of the operations was based on more investor revenue rather than oil revenue. If she didn't know all the above, then she was negligent for not knowing all the above in her position. She was also negligent for allowing so much not to be disclosed to Plaintiffs (covered in the general allegations of this complaint).

324.      Kuiper was negligent for allowing unlicensed persons to sell. She was negligent for allowing Toth and Powell to act as broker-dealers themselves not being licensed or registered.  She was negligent for allowing these investments to be sold without proper registration.

325.      Kuiper was negligent for failing to put the best interest of the customer first as this investment was too risky for these Plaintiffs. She should have known that and had standards, policies, and procedures in place to prevent these sales to these Plaintiff investors, many using money targeted for retirement.

326.      Kuiper breached her duty by failing to oversee and supervise an operation that touted false data to investors. She further had the duty to come forward and halt the operation earlier than she did, which would have helped Plaintiffs mitigate their losses.

327.      Kuiper was also negligent for not putting investors protections into play that would have limited the transfer of investor money by Toth and the Homebound family of entities, which she was also negligent in not overseeing properly.  She knew or should have known about the fraudulent transfers prior to the 2017 bankruptcy proceedings.

328.      By reason of the abovementioned conduct of Defendant Kuiper, Plaintiffs lost more money than they should have.

329.      As a result of the aforesaid acts of negligence of Defendant Kuiper, Plaintiffs were damaged by reason of the loss of the monies they contributed to the investments, as well as the loss of their property, money, and expenses necessary to get their money back.

330.      As a result of the above acts, Plaintiffs also claim general damages for mental and emotional distress, pain, and suffering, caused by Defendant Kuiper, subject to proof at the time of trial.

331.      Defendant Kuiper's conduct was a substantial factor in causing Plaintiffs' harm as described above. Plaintiffs seek reimbursement for the costs and expenses of dealing with this investment as a result of Kuiper's negligence.

332.    Plaintiffs seek all other damages allowed by law for the above-mentioned wrongdoing.

333.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate and requested.

**NINETEENTH CAUSE OF ACTION:**
**SECURITIES FRAUD (VIOLATION OF CORPORATE CODE §§ 25403, 25504, & 25504.1**
**(AGAINST RESOLUTE CAPITAL PARTNERS LTD., LLC; RESOLUTE CAPITAL MANAGERS LLC; RESOLUTE ENERGY CAPITAL, LLC; THOMAS JOSEPH POWELL; STEPHEN TOTH; RESOLUTE CAPITAL ADVISORS, LLC; THOMAS CHAPMAN; VELOCITY NORTH INVESTMENTS, INC.; CHAPMAN WEALTH STRATEGIES; JAQUELINE KUIPER; ALL THE FUNDS)**

334.    Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

335.    Defendants Thomas Powell, Stephen Toth, and Jacqueline Kuiper are liable for securities fraud alleged throughout this complaint by reason of Corporate Code § 25504 & §25504.1 in that they qualify as the person covered in these statutes. They are all participants in the development of the false and deceptive activity alleged throughout this complaint constituting Corporation Code §25401 and §25501 violations. Powell and Toth were the two controllers of all the companies that made up all the investments and sold to Plaintiffs. Kuiper was a principal executive officer, the compliance officer, or a person who materially aided in all the investment violations set forth in this complaint. All three, Toth, Powell, and Kuiper materially aided in the acts and transactions constituting the violations.

336.    Corporation Code §25401 prohibits offers or sales of securities including investment opportunities by means of a written or oral communication that contain: "Untrue statement[s] of a material fact or omits to state a material fact necessary in order

to make the statement[s] made, in light of the circumstances under which they were made, not misleading." Facts supporting these violations have been set forth throughout this complaint and the first cause of action set forth in a claim for damages allowed by Corporate Code §25501.

337.    Kuiper was in charge of compliance and materially assisted in all violations as asserted hereto alongside Powell and Toth. These violations are alleged in the General Allegation section of this complaint and in previous causes of action.

338.    Powell and Toth supervised and had ultimate authority over and used Chapman and or Chapman's companies and others to make the actual sale. Ultimately, everything went through Powell and Toth and their ultimate control and participation and signatures in all sales with Plaintiffs makes them liable under these California Code sections.

339.    In addition, Kuiper, Powell, and Toth are liable under Corporate Code § 25403 because they had knowledge and directly or indirectly controlled and induced Chapman and others to participate in deceptive sales by controlling the message the salespeople were telling investors. This caused Chapman and his companies to allow illegal sales to take place based upon misrepresentations and omissions of material facts as previously alleged. Kuiper, Powell, and Toth permitted deception in the sales process through their total control of the sales process.  Kuiper, Powell, and Toth used and manipulated Chapman. Chapman knew what was going on, he knew he was a "finder" getting a "finder's fee" and allowed himself to be used in a way that fostered deceit and fraud and by the facts alleged participated in the events that led to the investment losses with the intent to deceive and to defraud.   Kuiper, Powell and Tosh assisted in the intent to defraud. They all are therefore liable under Corporate Code 25504.1

340.    Powell, Toth, and Kuiper used Chapman for investor introductions but Powell, Toth, and Kuiper closed the deals. Kuiper, Powell, and Toth provided substantial assistance to Chapman or used Chapman to solicit the purchases of investment funds on false pretenses.  They did this to put a buffer between themselves and the sales.  The

above would be considered an illegal sale and fraudulent in violation of Corporate Code § 25403.

341.    Powell, Toth, and Kuiper allowed these investments to be sold to Plaintiffs and sold in a way that violated California Corp. Code §25401-25501 statute. Powell, Toth, and Kuiper knew or should have known that the misrepresentations outlined in the general allegation section of this complaint were false and/or that material facts were omitted in the oral presentations, brochures, statements, disclosures, or offerings by activities they controlled or what they instructed Chapman to say and do.

342.    All this false information was perpetrated at the highest level starting with Powell, Kuiper, and Toth who had ultimate authority over the entire sales process. Powell, Toth, and Kuiper knew or should have known that there were important facts that needed to be conveyed to Plaintiff investors and that these Plaintiffs needed to have all material facts in order to make a properly informed decision about this investment. Powell, Toth, and Kuiper did not communicate truthfully and completely to Chapman about the investments, so he was limited when he presented the investments to Plaintiffs. Toth, Kuiper, and Powell  did this purposefully. As a result, the investments became understood in a false light and were bought under false pretenses.

343.    It was also improper, deceitful, or negligent to do the above and take Plaintiffs' money under the circumstances set forth in the general allegations of this complaint. As a result of the above, Plaintiffs did not have the true facts about the lack of oil production in the program and its viability, the issues with lack of cashflow and no margin of safety as stated in the written disclosures,  and issue related to the loose and complex company structure and the interrelationship between the companies. Lastly, there was a lack of candidness relating to who was selling the investment, who was working for which organization, and how they were paid. Plaintiffs allege any fraud set forth anywhere in this complaint applies here as something Powell, Toth and Kuiper perpetuated through others.

344.     Plaintiffs contributed money to Defendants thinking they had made an investment or loan that would make a good return for them or their retirement when the investments was too risky for that, but Plaintiffs were told otherwise or not told all the facts.

345.     By reason of the above, Plaintiffs are entitled to rescission and/or damages, against these Defendants for violations of California Corp. Code § 25401 and § 25501.

346.     Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.

347.     Plaintiffs seek all other damages allowed by law for the above-described wrongdoing including costs of suit, investigation, and attorneys' fees.

## TWENTIETH CAUSE OF ACTION: CONVERSION
### (AGAINST THOMAS JOSEPH POWELL, STEFAN TOTH, ETHEREDGE, CORTEZ, TARYLE, the HOMEBOUND COMPANIES)

348.     Plaintiffs incorporate by reference all paragraphs in this complaint as though fully set forth herein.

349.     Plaintiffs had an ownership of rights in the monies in their funds, the subject matter of this lawsuit.

350.     Powell, Toth, Etheredge, Cortez, Taryle, and the Homebound companies participated in the course of action to transfer that money out to other companies for their own benefit under the guise of legitimate business obligations and equivalent transfers of assets and liabilities. This was a sham and was wrongful, and inconsistent with Plaintiffs' property rights.

351.     By reason of the abovementioned conduct, Plaintiffs seek damages in the amount of the value of the investment money that was taken,  plus interest according to proof of trial.

352.    Defendants' conduct was in reckless disregard for the rights and safety of Plaintiffs and constitutes oppression, fraud, and malice such that punitive damages are appropriate, and hereby requested under either Civil Code 3294 or 3345 or both.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against the Defendants as follows:

1.  For general damages of no less than $20,000,000 and according to proof at trial;

2.  For special damages according to proof at trial;

3.  Damages including for pain suffering and mental anguish;

4.  Return of Plaintiffs' money with interest

4.  Rescission/return of all money plus interest;

5.  Injunctive and mandamus assistance

5.  Punitive damages as allowed by law;

6.  For costs of suit incurred herein; and attorney fees as allowed by law;

7.  For such other and further relief as this Court deems just and proper.

DATED: March 3, 2022                    MURRIN LAW FIRM



_____

J. Owen Murrin
Attorney for Plaintiffs
MICHAEL HOLLIFIELD et al

## DECLARATION OF J. OWEN MURRIN PURSUANT TO CIVIL CODE §1780 (D):

I, J. Owen Murrin, make the following declaration on behalf of Plaintiffs, particularly lead Plaintiff Michael Hollifield, based upon my own knowledge, and believe the information set forth herein to be reliable and admissible and if called upon as a witness, I could and would testify competently thereto regarding the following:

1. At all times herein, all activities and contacts regarding the subject of this matter occurred in California, and the class is California based.

2. The lead Plaintiff, Michael Hollifield resided in Los Angeles County, in the City of Long Beach when he bought his securities from the relevant Defendants. He therefore sustained all his losses in Los Angeles Country. He presently still lives in Long Beach, Los Angeles County, California. A substantial number of other Plaintiffs in this action also reside or did business related to this matter in Los Angeles County, California.

3. Therefore, jurisdiction and venue is proper in California Superior Court, Los Angeles County. Civil Code § 1780 (d), or appropriately removed Federal Court.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Dated: March 3, 2023


_____
        J. Owen Murrin
        Attorney

HOLLIFIELD et al – COMPLAINT

# Exhibits Table of Contents

**Exhibit 1:** 2017 BKY Facts of Fact and Conclusions of Law ..................Pages 1-7

**Exhibit 2:** PetroRock Brochure, 20% cash reserves margin of Safety............Page 1

**Exhibit 3:** Feig SEA VII Powell signature at pg. 2 ...................................Pages 1-2

**Exhibit 4:** Shaon,  Toth signature for Resolute Capital Partners, pg. 4......Pages 1-5

**Exhibit 5:** Hildebrand Promissory Note, Toth Signature, pg. 4 ................Pages 1-4

**Exhibit 6:** Hildebrand Business Loan Agreemnt, Toth signs for Choice, at pg. 4 ...................................................................................................Pages 1-13

**Exhibit 8:** Unconditional Guaranty , Toth signs for PetroRock at pg. 3 ...Pages 1-2

**Exhibit 9:** SEA VII Inv Agrmt Powell signs for Resolute Capital Manager at pg. 7 ...................................................................................................Pages 1-7

**Exhibit 10:** Amendment to Loan Agrmt, Promissory Note, Toth signs for PRMH at pg. 4 ......................................................................................... Pgs 1-14

**Exhibit 11:** Resolute and Homebound Brochure, secured business loan, Choice Energy Holdings ....................................................................Pages 1-11

**Exhibit 31:** SEC Cease & Desist Order, 2021 .........................................Pages 1-14

**Exhibit 33:** Affidavit of Thomas Powell, 2022 .........................................Pages 1-8

**Exhibit 34:** Interrelation Chart ..................................................................Pages 1-3

# EXHIBIT 1



CLERK. U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 3, 2017**

*Honli DeWayne Hale*

**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Aeon Operating, Inc., | § | Case No. 15-33935-hdh7 |
| | § | |
| Debtor. | § | |
| | § | |

---

| | | |
|---|---|---|
| Scott Seidel, Trustee, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 17-03028 |
| | § | |
| Mercury Operating, LLC and | § | |
| PetroRock Mineral Holdings, LLC, | § | |
| | § | |
| Defendants. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

●n April 11, 2017, Scott Seidel, as Chapter 7 trustee in the bankruptcy case of Aeon Operating, Inc. (the "Trustee") filed his *Original Complaint of the Trustee Against Mercury Operating, LLC and PetroRock Mineral Holdings, LLC* [Docket No. 1] (the "Complaint"). Through the Complaint, the Trustee seeks the avoidance and recovery of certain prepetition transfers from Mercury Operating, LLC ("Mercury") and PetroRock Mineral Holdings, LLC

HM 000132
Exhibit 1 Pg.1

Case 2:22-cv-07885-SB-RAO    Document 134    Filed 03/03/23    Page 92 of 194    Page
                                      ID #:1591
Case 17-03028-hdh Doc 25 Filed 10/03/17    Entered 10/03/17 17:35:59    Page 2 of 7

("PetroRock" and together with Mercury, the "Defendants") as either fraudulent transfers or preferences. In the alternative, the Trustee seeks recovery from Mercury and PetroRock for breach of contract. The Court held trial in this matter on September 6, 2017 and took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law.[1]

## I.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding involves a core matter under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

## II.    FINDINGS OF FACT

Mr. Stefan Toth is the principal of both Defendants—PetroRock and Mercury. Specifically, Mr. Toth is President of HomeBound, Inc., which is the general partner of Home Bound Financial Group, L.P. ("HBFG"). HBFG is the managing member of PetroRock. HBFG is also the managing member of Mercury.

Mr. Keith Foree owned and controlled the majority of stock interest in both Aeon Operating, Inc. (the "Debtor") and Aeon Exploration, Inc. (the "AXI"), an affiliate of Debtor.

The Debtor was an oil and gas operator for certain wells known as the "Mina wells." As an oil and gas operator, the Debtor was responsible for the exploration, development, and production of the Mina wells numbers 1 through 5. In addition, the Debtor was responsible for selling the oil produced from these wells and paying the bills associated with such production. As the oil and gas operator, the Debtor incurred debts in its own name, was responsible for paying the

---

[1] The following are the Court's Findings of Fact and Conclusions of Law, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052. Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

HM 000133
Exhibit 1 Pg.2

Case 2:22-cv-07885-SB-RAO   Document 134   Filed 03/03/23   Page 93 of 194   Page
ID #:1592
Case 17-03028-hdh Doc 25 Filed 10/03/17   Entered 10/03/17 17:35:59   Page 3 of 7

operating expenses of the wells, and had discretion over whether and when to pay or dispute its debts.

On September 30, 2015, (the "Petition Date"), the Debtor filed a voluntary petition for bankruptcy, thereby initiating the Bankruptcy Case under Chapter 7 of the Bankruptcy Code.

**The Purchase and Sale Agreement**

AXI owned a working interest in the Mina wells. On or about June 22, 2015 (100 days before the Petition Date), AXI and PetroRock entered into a Purchase and Sale Agreement (the "PSA") pursuant to which AXI sold its interest in the Mina wells to PetroRock.

The Debtor was named as a seller in one place in the PSA, but the PSA did not have a signature line for the Debtor, the Debtor did not sign the PSA, and the Debtor held no interests in the Mina wells to sell. Both Mr. Foree and Mr. Toth testified that the Debtor was not a party to the PSA. Paragraph 25 of the PSA states that "This Agreement is not intended to confer upon any person not a party hereto any rights or remedies hereunder, and no person other than the parties hereto is entitled to rely on any representation, covenant, or agreement contained herein."

In connection with the PSA, a $565,000 payment was made to AXI by wire transfer by one of the Toth affiliated companies. No payment was made to the Debtor in connection with the PSA. Nevertheless, the PSA had certain provisions requiring funds in the possession of the Debtor to be transferred to other parties. Because the Debtor was not an actual party to the PSA, however, the Debtor did not have enforceable obligations under the PSA.

On July 17, 2015 (75 days before the Petition Date), Katherine Hardwick (controller of the Debtor) signed a letter purporting to retroactively assign all of the Debtor's operating revenue as of June 1, 2015 to Mercury.

3

Mercury took over the operations of the Mina wells in Cherokee County as of July 1, 2015 from the Debtor.

**The Revenue Sweep**

On July 20, 2015 (72 days before the Petition Date), Mercury received $236,528.38 directly from purchasers of the Debtor's oil and gas production relating to proceeds from Debtor's operations for the periods prior to July 1, 2015 (the "Revenue Sweep").

The source of the $236,528.38 transferred in the Revenue Sweep was proceeds from the sale of oil and gas for wells operated by the Debtor (Mina wells 3, 4, and 5 in Cherokee County) and sold to Truth Resources. Truth Resources made the $236,528.38 transfer to Mercury in reliance on the July 17, 2015 Assignment of Crude Oil Payments signed by Katherine Hardwick on behalf of the Debtor.

As the operator, Debtor had control of the $236,528.38 that was transferred on July 20, 2015 in the Revenue Sweep. Had the $236,528.38 not been transferred to Mercury in the Revenue Sweep, it would have been available for distribution to the Debtor's creditors.

**The First Wire Transfer**

On July 27, 2015 (65 days before the Petition Date), the Debtor transferred $98,860.89 to Mercury by wire transfer (the "First Wire Transfer").

The source of the First Wire Transfer was the Debtor's operating bank account at Chase. The Debtor's operating bank account at Chase was a commingled account that held funds received from different sources that would be used in different ways. Had the $98,860.89 not been transferred to Mercury in the First Wire Transfer, it would have been available for distribution to the Debtor's creditors.

4

Case 2:22-cv-07885-SB-RAO   Document 134   Filed 03/03/23   Page 95 of 194   Page
ID #:1594
Case 17-03028-hdh Doc 25 Filed 10/03/17   Entered 10/03/17 17:35:59   Page 5 of 7

**The Second Wire Transfer**

On July 27, 2015 (65 days before the Petition Date), the Debtor transferred $18,589.45 to Mercury by wire transfer (the "Second Wire Transfer"). The purpose of the Second Wire Transfer was to reimburse Homebound Resources for an overpayment on the completion of the Mina 5 well. Homebound Resources was a creditor of the Debtor at the time of the Second Wire Transfer.

The source of the Second Wire Transfer was the Debtor's operating bank account at Chase. Had the $18,589.45 not been transferred to Mercury in the Second Wire Transfer, it would have been available for distribution to the Debtor's creditors.

Mr. Foree's testimony supports a finding that the underlying debt for refund of an overpayment on the completion costs of a well was incurred in the ordinary course of the Debtor's business affairs. The evidence presented by the Defendants, including the testimony of Mr. Foree, did not support a finding that the Second Wire Transfer was made in the ordinary course of business or financial affairs of both parties or that it was made according to ordinary business terms. The Court was not able to, for instance, compare the characteristics of this transfer made within ninety days of the Petition Date to similar transfers made preceding the ninety days prior to the Petition Date. Mr. Foree's testimony seemed to suggest that the Debtor would commonly incur debts similar to the obligation owed to Homebound Resources, but the Court was not able to compare the characteristics of this transfer to any other transfers in similar obligations to other parties.

**Facts Common to All Transfers**

The Debtor was insolvent at all times relevant to this case, including at the time of the Revenue Sweep, the First Wire Transfer, and the Second Wire Transfer.

No part of any of the transfers in question in this matter have been returned to the Debtor.

5

Case 2:22-cv-07885-SB-RAO   Document 134   Filed 03/03/23   Page 96 of 194   Page
ID #:1595
Case 17-03028-hdh Doc 25 Filed 10/03/17   Entered 10/03/17 17:35:59   Page 6 of 7

The Defendants did not pay any of the Debtor's operating expenses for April and May 2015, and the Debtor was not able to pay all of those expenses.

It is true that Mr. Foree testified that the funds transferred pursuant to the Revenue Sweep, the First Wire Transfer, and the Second Wire Transfer did not belong to the Debtor, but the Court notes that Mr. Foree was offering legal conclusions that have not been supported by the evidence admitted at trial.

### III.   CONCLUSIONS OF LAW

The Revenue Sweep was a transfer of an interest of the Debtor in property, made within two years before the Petition Date in which the Debtor received less than a reasonably equivalent value in exchange and was insolvent on the date of such transfer.  As a result, the Revenue Sweep is an avoidable fraudulent transfer pursuant to Bankruptcy Code section 548(a)(1)(B).

The First Wire Transfer was a transfer of an interest of the Debtor in property, made within two years before the Petition Date in which the Debtor received less than a reasonably equivalent value in exchange and was insolvent on the date of such transfer.  As a result, the First Wire Transfer is an avoidable fraudulent transfer pursuant to Bankruptcy Code section 548(a)(1)(B).

The Second Wire Transfer was a transfer of an interest of the Debtor in property, for the benefit of a creditor, on account of an antecedent debt, made while the Debtor was insolvent, made within 90 days before the Petition Date, that enabled the creditor to receive more than they would in a Chapter 7.  The Defendants have not presented sufficient evidence to support an ordinary course of business defense under section 547(c)(2).  The Defendants have not presented sufficient evidence to support a new value defense under section 547(c)(4).  As a result, the Second Wire Transfer is an avoidable preference pursuant to section 547(b).

6

With regard to the PSA and the Trustee's breach of contract claim, the Court concludes that the Debtor was neither a party to the PSA nor an intended third party beneficiary of the PSA. As a result, the Trustee's claim for breach of contract fails.

The Trustee may, pursuant to section 550, recover the Revenue Sweep, the First Wire Transfer, and the Second Wire Transfer from Mercury as an initial transferee. No relief is granted against PetroRock.

###END OF FINDINGS AND CONCLUSIONS###

7

HM 000138
Exhibit 1 Pg.7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2



# PETRO ROCK
## MINERAL HOLDINGS
### FIXED RATE PROMISSORY NOTE

**Secured - First Lien Promissory Notes paying 8.0% - 9.0% annual returns** with monthly interest payments are being offered to qualified Direct Lenders. The Direct Loan opportunity is being made through PRMH Lenders Fund, LLC and is secured by a first position lien on specific assets held, and/or to be acquired, by Petro Rock Mineral Holdings, LLC (Petro Rock). Petro Rock is an established company in Texas with a proven track record in acquiring, developing, and liquidating assets in proven Texas oil fields. Assets securing the Direct Loan include, but are not limited to, producing oil and gas wells, mineral leases, royalty interests, and cash holdings at an estimated less than **50% Loan to Value ratio** of assets.



Published 8:26 a.am ET Nov 17, 2016

## USGS: Largest oil deposit ever found in U.S. discovered in Texas

### ENERGY OPPORTUNITIES

Texas leads the nation in energy production from crude oil and natural gas, and although billions of barrels have been pulled out of Texas, there are billions left to recover. In November, 2016 the USGS reported the largest estimate of continuous oil they have ever assessed in the US. This oil reserve was found in a portion of Texas' Permian Basin, and contains an estimated 20 billion barrels of oil reserves.

## FUND ALLOCATION

50% land banking, 15% royalty/mineral rights, 15% oil & gas working interests, and 20% held as cash reserves



## INVESTMENT HIGHLIGHTS

| | |
|---|---|
| TYPE OF INVESTMENT | DIRECT LOAN |
| MINIMUM INVESTMENT | $50,000 |
| LOAN TO VALUE | 50% OF ASSET VALUES |
| LIQUID RESERVES | 20% OF BORROWINGS |
| TERM | 1 OR 2 YEARS |

## RATE & TERM OPTIONS

| 1 YEAR TERM | INTEREST PAID MONTHLY | 2 YEAR TERM |
|---|---|---|
| **8.0%** ANNUAL RETURN | ← → | **9.0%** ANNUAL RETURN |





CONTACT INVESTOR RELATIONS
888.660.8159  //  INVEST@RCP-LTD.COM 1303 WEST WALNUT HILL LANE, SUITE 305 IRVING, TEXAS 75038

Exhibit 2 Pg.1

EXHIBIT 3



## Certificate Of Completion

Envelope Id: 76DB3FE7ED91484FADEE1423B5780792
Subject: Strategic Energy Assets VII, LLC Bernardo Feig and Benyapa Feig
Source Envelope:
Document Pages: 53                    Signatures: 8
Certificate Pages: 2                  Initials: 4
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Envelope Originator:
Angela Flores
4790 Caughlin Pkwy
416
Reno, NV 89519
Angela@rcp-ltd.com
IP Address: 204.12.67.172

## Record Tracking

Status: Original
        12/6/2018 3:25:50 PM

Holder: Angela Flores
        Angela@rcp-ltd.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Bernardo Feig<br>bernard.feig@gmail.com<br>Security Level: Email, Account Authentication (None) | *DocuSigned by:*<br>Bernardo Feig<br>C81336B02B30428...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 141.126.94.61 | Sent: 12/6/2018 3:25:53 PM<br>Viewed: 12/7/2018 9:18:02 AM<br>Signed: 12/7/2018 9:37:34 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |
| Benyapa Feig<br>benyapa.feig@gmail.com<br>Security Level: Email, Account Authentication (None) | *DocuSigned by:*<br>Benyapa Feig<br>39FBBEDB29B8416...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 141.126.94.61 | Sent: 12/7/2018 9:37:36 AM<br>Viewed: 12/7/2018 9:38:56 AM<br>Signed: 12/7/2018 9:40:51 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |
| Thomas J Powell<br>tom@rcp-ltd.com<br>Sr Managing Partner<br>Currie Pfluger Investors, LLC<br>Security Level: Email, Account Authentication (None) | *DocuSigned by:*<br>Thomas J Powell<br>03DEA2C15CE6411...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 107.77.211.125<br>Signed using mobile | Sent: 12/7/2018 9:40:54 AM<br>Viewed: 12/7/2018 10:27:26 AM<br>Signed: 12/7/2018 10:27:33 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

Exhibit 3 Pg.1

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Craig Ponder, Sr.<br>drcraig@ponderfinancialfirm.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/6/2018 3:25:53 PM<br>Viewed: 12/6/2018 6:22:35 PM |
| Electronic Record and Signature Disclosure:<br>    Not Offered via DocuSign | | |

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/7/2018 9:40:54 AM |
| Certified Delivered | Security Checked | 12/7/2018 10:27:27 AM |
| Signing Complete | Security Checked | 12/7/2018 10:27:33 AM |
| Completed | Security Checked | 12/7/2018 10:27:33 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

Exhibit 3 Pg.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 4



August 9, 2017

IRA Services Trust Company

Plan Name:        COLAS INC. AND SUBSIDIARIES 401(K) SAVINGS PLAN
Plan Number:      765468
Participant Name: RICHARD T SHAON



### Subject: Rollover from a Qualified Retirement Account

**IMPORTANT TAX INFORMATION INCLUDED - PLEASE KEEP FOR YOUR RECORDS**

Dear IRA Services Trust Company:

Enclosed is a check in the amount of $275,000.00 which represents a rollover from the account of RICHARD T SHAON to a traditional IRA.

Under Internal Revenue Service (IRS) regulations for this account, the amount distributed will be reported to the IRS. No tax is due on the disbursement if the participant does not take receipt of these funds.

If you have any questions, you may contact us at 877-PRU-2100 (877-778-2100).

Sincerely,

*Prudential Retirement®*

cc: RICHARD T SHAON

Exhibit 4 Pg.1

## Prudential

**Prudential Retirement Services**
Box 5410
Scranton, PA 18505-5410

August 9, 2017



LA PALMA CA 90623

Plan Name:          COLAS INC. AND SUBSIDIARIES 401(K) SAVINGS PLAN
Plan Number:        765468
Participant Name:   RICHARD T SHAON

**Subject:  Rollover from Your Retirement Account**

Dear RICHARD T SHAON:

We have completed a rollover from your Retirement Account in the amount of $275,000.00 to a traditional IRA.  Attached is a copy of the letter that was sent with a check to the financial institution referenced in your instructions as follows:

> IRA Services Trust Company
> ATTN: ROLLOVER DEPT
> 1160 Industrial Road, Unit 1
> San Carlos CA 94070-4128

You may access your account in the following ways:

**Participant Web:**  You may access information on your account at **www.prudential.com/online/retirement** which is generally available 24/7.  If you have not logged into the website before, please follow the  prompts to Register Now and set up access to your account.

**Automated Telephone Service:**  Our Interactive Voice Response (IVR) service is generally available 24/7 by calling us at **877-PRU-2100 (877-778-2100)**.  Personal assistance with a Participant Service representative is also available Monday through Friday, 8 a.m. to 9 p.m. Eastern Time.  Our representatives look forward to providing you with information in English, Spanish, or many other languages through an interpreter service.

**Hearing Impaired Service:**  Account information is available for the hearing impaired by calling us at **877-760-5166**.

D-11200S

Exhibit 4 Pg.2

DocuSign Envelope ID: 68E55E01-103E-4AD8-8AD8-65B735C0371D

# IRA SERVICES TRUST COMPANY

## NOTE MODIFICATION AUTHORIZATION



PO Box 7080 | San Carlos, CA 94070-7080 | www.IRAServices.com
General Phone: (800) 248-8447 | Fax: (605) 385-0050

*This form is to be completed if you wish to modify the terms of a promissory note.*

## PERSONAL INFORMATION (*required field)

Should IRA Services need to contact you in regards to this request, your preferred method of contact is:

☐ Email
☐ Primary Phone

| First Name* | Middle Name | Last Name* |
|---|---|---|
| Richard | | Shaon |

| Account Number (Required if existing IRA Services customer) | Social Security Number* (last 4 digits) | Date of Birth* (MM/DD/YYYY) |
|---|---|---|
| IRA592390 | 2112 | 2/12/47 |

| Phone* XXX-XXX-XXXX | Email |
|---|---|
| 562-244-1543 | rtshaon@hotmail.com |

## NOTE INFORMATION CURRENTLY REFLECTED

| Borrower's Name | | | |
|---|---|---|---|
| PRMH Lenders Fund II | | | |

| Loan Number | Loan Amount | Loan Effective Date (MM/DD/YYYY) | Loan Maturity Date (MM/DD/YYYY) |
|---|---|---|---|
| | 274,000 | 8/25/17 | 6/1/18 |

## BORROWER CONTACT INFORMATION

| Company Name/Individual Name | Contact Person |
|---|---|
| Resolute CApital Partners | Angela Flores |

| Address | | | |
|---|---|---|---|
| 5605 N. MacArthur Blvd. | | | |

| City | State/Province | Zip/Postal Code | Contact Phone XXX-XXX-XXXX |
|---|---|---|---|
| Irving | TV | 75038 | 888-660-8159 |

## NOTE STATUS: EXTENSION TERMS (Your request will not be processed if you do not provide the required documents with this form)

This note has been extended pursuant to the following terms (this section must be fully completed):

Please make sure that all applicable sections are completed to ensure complete and timely processing.

| New Maturity Date (MM/DD/YYYY) | Interest Rate |
|---|---|
| June 1, 2021 | 9 % |

Payment terms

(X) Interest & Principal due at maturity

◯ Periodic payments

Payment Frequency: ◯ Weekly ◯ Monthly ◯ Quarterly ◯ Annually ◯ Other: _____

Amount: _____ ◯ Interest Only ◯ Interest & Principal

Exhibit 4 Pg.3

© 2017 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

ISTC-NMA-170510

DocuSign Envelope ID: 68E55E01-103E-4AD8-8AD8-65B735C0371D

## NOTE STATUS: UNCOLLECTABLE (Your request will not be processed if you do not provide the required documents with this form.)

Based on your note investment status, there may be several documents required to complete the update of your note investment. Your investment update request must accompany all of the required documentation outlined below in order to be processed. Please make sure that all supporting documents are completed in full and submitted at the same time with this form.

This note is uncollectable:

I have used my best efforts to collect on the note and have determined that the note is uncollectable for following reason(s):

*Please check all that apply and provide supporting documentation*

☐ Borrower is in litigation (IMPORTANT: you must provide supporting documentation, such as bankruptcy notice, court documents, etc.)

☐ Note is in foreclosure (IMPORTANT: you must provide foreclosure documents)

☐ Other, explain:

☐ I have enclosed the following documents:

ACKNOWLEDGMENT, AUTHORIZATION, PARTICIPANT & BORROWER SIGNATURE

I hereby acknowledge that I am solely responsible for the investment updates I am making. I hold harmless, protect and indemnify the Custodian and Administrator from and against any and all liabilities, losses, damages, expenses and charges that the Custodian and Administrator may sustain or might sustain resulting directly or indirectly from my investment. I further acknowledge that I am solely responsible for the success or failure of this investment. I hereby authorize the update of the asset(s) listed above for my IRA Services Trust Company account.

Participant Signature
X *Richard Suson*    Date (MM/DD/YYYY) 6/3/2018

Borrower Signature
X    Date (MM/DD/YYYY) 6/3/2018

IMPORTANT INFORMATION

Did you print and sign the form, and attach any necessary documents?

Questions? Please contact IRA Services Customer Service at (800) 248-8447, Monday through Friday, from 7 am to 5 pm Pacific Time.

Fax    (650) 745-3279
Email    notes@IRAServices.com
Web    www.IRAServices.com

Deliver to:

**Regular mail**
IRA Services
PO Box 7080
San Carlos, CA 94070-7080

**Overnight mail**
IRA Services
1160 Industrial Road, Unit 1
San Carlos, CA 94070-4128

Exhibit 4 Pg.4

© 2017 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

ISTC-NMA-170510

DocuSign Envelope ID: 448C6DE9-73BB-454B-A132-77C4E847FC8D

IN WITNESS WHEREOF, the undersigned have executed this Note on and as of the date first above written.

BORROWER:

SEA III, LLC

RESOLUTE CAPITAL PARTNERS, LLC - SIGNATORY

By: _____

Print: Stefan Toth _____

Its: Manger

LENDER:

By: _____

Print: Michelle R. Greenwood-Gambill

Date: _____3/28/2017_____

INTEREST PAYMENT INSTRUCTIONS:

**Please make checks payable to:**
Provident Trust Group FBO Michelle R. Greenwood-Gambill
Ref – Solo K Account #160100189

**Mail to:**
Provident Trust Group
Attn: Lockbox Dept.
PO Box 4330
Ontario, CA 91761

Exhibit 4 Pg.5

# EXHIBIT 5

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

## BUSINESS PROMISSORY NOTE
Dallas, Texas

**$50,000.00**                                    Dated for Reference Purposes: April 10 ,

2018

FOR VALUE RECEIVED, the undersigned, CHOICE ENERGY HOLDINGS – I, LLC, a Nevada limited liability company ("**Borrower**"), with its principal offices at 5605 North MacArthur Blvd., Suite 1003, Irving, TX  75038, promises to pay to the order of **IRA Services Trust Company CFBO: Linda V, Hildebrand IRA586870**                              ("**Lender**"), the principal amount of **FIFTY THOUSAND** and No/100ths DOLLARS **($50,000.00)** ("**Business Loan**"), together with interest as described below and subject to the terms and conditions set forth in this Business Promissory Note.

This Business Promissory Note ("**Business Promissory Note**") is being given by Borrower in connection with a secured business loan ("**Business Loan**") being made by Lender to Borrower pursuant to that certain Business Loan Agreement dated of even date herewith ("**Business Loan Agreement**"). This Business Promissory Note, the Business Loan Agreement, and any additional documents which Borrower may require in connection with the Business Loan evidenced by this Business Promissory Note and the Business Loan Agreement, shall collectively constitute the loan documents with regard to the Business Loan ("**Business Loan Documents**"). Capitalized terms used but not defined in this Business Promissory Note have the meaning given to such terms in the Business Loan Agreement.

1.    Term. Upon the delivery to Borrower, and Borrower's receipt of, the (i) Business Loan proceeds in a "good funds" form (meaning that the funds are usable immediately by Borrower) and (ii) Business Loan Documents completed where necessary by Lender and executed by Lender in a form acceptable to Borrower, interest shall commence accruing at the Interest Rate on the outstanding principal of this Business Promissory Note on the first calendar day after such delivery and receipt ("**Interest Start Date**"). The initial Term ("**Term Start Date**") of this Business Promissory Note shall commence on the first calendar day of the first full month after the Interest Start Date, or on the Interest Start Date if that day is the first calendar day of the month. For example, if subsection (i) and subsection (ii) are satisfied on April 10, 2018, then the Term Start Date is May 1, 2018 and the Interest Start Date is April 11, 2018; or if subsection (i) and subsection (ii) are satisfied on April 30, 2018, then the Term Start Date is May 1, 2018 and the Interest Start Date is May 1, 2018. The Term of this Business Promissory Note shall end on the last day of the month **9 months** following the Term Start Date ("**Maturity**"). For example, if the Term Start Date is May 1, 2018, the Maturity shall be January 31, 2019 (i.e., May through end of January equals 9 months).

2.    Interest Rate. The outstanding principal of this Business Promissory Note shall bear interest on and after the Term Start Date through the Maturity at the fixed rate of interest equal to **7.50% per annum**. The rate of interest charged under this Business Promissory Note shall never exceed the maximum amount, if any, allowable by law. Interest shall be charged on the principal balance from time to time outstanding on the basis of the daily rate produced assuming a 360 day year and a 30 day month. All payments hereunder shall be payable in lawful money of the United States of America which shall be legal tender for public and private debts at the time of payments.

3.    Payments. Monthly interest payments will be made by Borrower to Lender in arrears, on the 25th day of the month (unless the 25th day of the month falls on a bank holiday in the State of Texas in which case the monthly interest payment will be made on the first business day after the 25th day of the month), and such payments shall commence in the month following the Term Start Date month. For example, if the Term Start Date is May 1, 2018 and the Interest Start Date is April 11, 2018, then the first monthly interest payment shall be due on June 25, 2018 and shall be a sum equal to interest owed for 20 days in April and 30 days in May; or if the Term Start Date is May 1, 2018 and the Interest Start Date is May 1, 2018, then the first

File
3:02 PM

Exhibit 5 Pg.1

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

monthly interest payment shall be due on June 25, 2018 and shall be a sum equal to interest owed for 30 days in May.

4.   Repayment and Repayment Date. Subject to **Section 5** below, all amounts owing under this Business Promissory Note, including the entire unpaid principal balance and any outstanding interest, shall be processed for payment by Borrower no later than the 25th day of the month immediately following Maturity (unless the 25th day of the month falls on a bank holiday in the State of Texas in which case the payment shall be processed for payment by Borrower no later than the first business day after the 25th day of the month). For example, if Maturity is April 31, 2021, then all amounts owing under this Business Promissory Note shall be processed for payment by Borrower no later than May 25, 2021. The phrase "processed for payment" means that Borrower has released funds to Lender or to the appropriate payment administrator (whether for Borrower or Lender) for the Business Loan. Borrower may prepay all or any portion of the Business Loan at any time without penalty. Prior to or concurrent with Borrower's repayment to Lender at Maturity or otherwise, Borrower will deliver to Lender a statement of the total sum being repaid by Borrower, which statement will include the outstanding principal sum and any accrued unpaid interest being repaid. The statement shall be binding upon Lender unless Lender notifies Borrower in writing of any objection to such statement within 10 days after Lender's receipt of the statement.

5.   Renewal. Upon Lender's written request, this Business Promissory Note will renew for successive additional terms (each, a "**Renewal Term**"), with each Renewal Term being equal to the original term of this Business Promissory Note set forth in **Section 1** above. If Lender does not request a Renewal Term, then the Business Promissory Note will be repaid in full at Maturity in accordance **Section 4**. Request for a Renewal Term must be made no later than 30 days in advance of Maturity (Borrower may, but is not obligated to, waive this notice period requirement). A Renewal Term shall commence on the first calendar day immediately after the prior date of Maturity ("**Renewal Start Date**") and shall follow the same conditions of this Business Promissory Note, and shall mature at the end of the applicable Renewal Term. Borrower reserves the right to not renew the term of this Business Promissory Note upon Maturity. As used herein, the word "**Maturity**" includes maturity of this Business Promissory Note in connection with any Renewal Term.

6.   Early Termination.  Except if an Event of Default (below defined) has occurred and is continuing, under no circumstances will Borrower be obligated to pay the Business Loan in full prior to Maturity and the Repayment Date (below described).

7.   Default.

    a.   Borrower shall be in default under this Business Promissory Note upon the happening of any condition or event set forth below (each, an "**Event of Default**"):

        (i) Failure to make any payment when due under this Business Promissory Note (including any payment due by reason of acceleration) which default continues un-remedied for a period of ten (10) days;

        (ii) The commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower which results in the entry of an order for relief which remains un-dismissed, un-discharged or un-bonded for a period of 60 days or more.

    b.   The entire unpaid principal balance of this Business Promissory Note and all accrued interest thereon shall immediately be due and payable at the option of the Lender upon the occurrence of any one or more of the Events of Default and at any time thereafter.

    c.   All monies owed on this Business Promissory Note shall bear interest until paid at the lesser of 18% per annum or the highest rate for which Borrower may legally contract under applicable law. All payments hereunder shall be payable in lawful money of the

File
3:02 PM

Exhibit 5 Pg.2

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

United States of America which shall be legal tender for public and private debts at the time of payments.

8.    Security. Security for this Business Promissory Note shall be as set forth in the Business Loan Agreement.

9.    Cumulative Rights. No delay on the part of Lender of this Business Promissory Note in the exercise of any power or right under this Business Promissory Note or under any other instrument executed pursuant hereto shall operate as a waiver thereof, nor shall a single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

10.    Attorneys' Fees and Costs. In the event that this Business Promissory Note is collected in whole or in part through suit, arbitration, mediation, or other legal proceeding of any nature, then and in any such case there shall be added to the unpaid principal amount hereof all reasonable costs and expenses of collection, including, without limitation, reasonable attorney's fees.

11.    Governing Law. This Business Promissory Note shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to conflicts of law provision or rule (whether of the State of Texas or any other jurisdiction) that would result in the application of the laws of any jurisdiction other than the State of Texas.

12.    Usury. All agreements between Borrower and Lender of this Business Promissory Note, whether now existing or hereafter arising and whether written or oral, are expressly limited so that in no contingency or event whatsoever, whether by acceleration of the Maturity of this Business Promissory Note or otherwise, shall the amount paid, or agreed to be paid, to Lender hereof for the use, forbearance or detention of the money to be loaned hereunder or otherwise, exceed the maximum amount permissible under applicable law.

13.    Notices. All notices of communication required or permitted hereunder shall be given according to the terms of the Business Loan Agreement.

14.    Payments. Both principal and interest shall be payable at the address designated in the Business Loan Agreement.

15.    Entire Agreement. THIS BUSINESS PROMISSORY NOTE, THE BUSINESS LOAN AGREEMENT, AND THE OTHER BUSINESS LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THE BUSINESS LOAN DOCUMENTS, AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE TO THE SAME WHICH ARE NOT CONTAINED IN THE BUSINESS LOAN DOCUMENTS ARE SUPERSEDED AND TERMINATED HEREBY, AND THE BUSINESS LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

File
3:02 PM

Exhibit 5 Pg.3

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

IN WITNESS WHEREOF, the undersigned has executed this Business Promissory Note as of the date first
written above.

       BORROWER:

            CHOICE ENERGY HOLDINGS – I, LLC, a Nevada limited liability
            company

                By:     RESOLUTE CAPITAL PARTNERS LTD., a Nevada limited
                liability company
                Its:     Manager

                By:
                Name:  Stefan Toth
                Title:  Authorized Signatory

File
3:02 PM

Exhibit 5 Pg.4

EXHIBIT 6

Loan No. -02910

# BUSINESS LOAN AGREEMENT

This Business Loan Agreement ("**Business Loan Agreement**") is made as of April 10, 2018 ("**Agreement Date**"), by and between CHOICE ENERGY HOLDINGS - I, LLC, a Nevada limited liability company ("**Borrower**"), at 5605 North MacArthur Blvd., Suite 1003, Irving, TX 75038, and the undersigned ("**Lender**").

## RECITALS

A.    Lender desires to make a secured business loan ("**Business Loan**") to Borrower in the principal amount indicated in **Section 1.1** below, which Business Loan will be evidenced by a Business Promissory Note ("**Business Promissory Note**") made by Borrower in favor of Lender dated of even date herewith. This Business Loan Agreement and the Business Promissory Note, and any additional documents which Borrower may require in connection with the Business Loan evidenced by this Business Loan Agreement and the Business Promissory Note, shall collectively constitute the loan documents with regard to the Business Loan (collectively, "**Business Loan Documents**"). Capitalized terms used but not defined in this Business Loan Agreement have the meanings given to such terms in the Business Promissory Note.

B.    Borrower desires to use the proceeds of the Business Loan from Lender to fund a loan ("**Project Loan**") from Borrower to its parent company, PETROROCK MINERAL HOLDINGS, LLC, a Texas limited liability company ("**PetroRock**"). PetroRock will provide to Lender an unconditional guaranty ("**Unconditional Guaranty**") of all amounts due to Lender under the Business Loan, including, without limitation, all principal and interest due to Lender under the Business Promissory Note.

C.    It is anticipated that PetroRock will use the Project Loan to fund its business operations and investments relating to owning or holding (directly or indirectly) oil, gas, or other mineral royalties or leases, or fractional interests therein, or certificates of interest or participation in or investment contracts relative to such royalties, leases, or fractional interests (collectively, "**Oil and Gas Interests**"), and may include, without limitation, repayment of other debt, loans and promissory notes, marketing fees, legal fees, future acquisition of assets, and cash reserves relating to its Oil and Gas Interests. Borrower will be accepting loans, for the same PetroRock business and investment purposes, from other lenders ("**Other Lenders**"), up to an estimated aggregate principal sum of **$25,000,000.00** and not to exceed an aggregate principal sum of **$27,500,000.00**.

D.    It is anticipated that the Project Loan from Borrower to PetroRock will be evidenced by, among other agreements and instruments, a promissory note (as the same may be amended, modified or replaced from time to time, "**Project Note**" and together with such other agreements, instruments and other supporting obligations, "**Project Loan Documents**") made by PetroRock in favor of Borrower. Under this Business Loan Agreement, Borrower grants to Lender a security interest in and to the Project Note and other Project Loan Documents as further outlined in **Section 2** below.

E.    The Business Promissory Note which accompanies this Business Loan Agreement has not been registered with the Securities and Exchange Commission under the Securities Act of 1933, or with any state securities regulatory agency, and Borrower is making the Business Promissory Note to Lender in reliance upon certain exclusions from registration under applicable state and federal securities laws.

F.    Borrower and Lender have agreed to the foregoing transaction on the terms and conditions in this Business Loan Agreement, and in reliance upon the representations, warranties and covenants of Borrower and Lender in this Business Loan Agreement.

File
3:02 PM

Exhibit 6 Pg.1

Loan No. -02910

NOW, THEREFORE, acknowledging the receipt of adequate consideration and intending to be legally bound, the parties hereby agree as follows:

## AGREEMENT

**1.    THE LOAN.**

1.1.    <u>Business Loan</u>. Lender agrees to make the Business Loan to Borrower in the principal amount of $50,000.00. Borrower intends to use the Business Loan for the purposes identified in **Recital B** above; provided however, a failure by Borrower to use the Business Loan for such purposes, for whatever reason, will not be an Event of Default under the Business Loan Documents. Lender acknowledges that Borrower does not and cannot guarantee that PetroRock will need the Project Loan from Borrower because such need depends upon, among other things, PetroRock finding and acquiring Oil and Gas Interests funded with the Project Loan. As a result, Borrower retains the right to hold the Business Loan proceeds and not make the Project Loan, and retains the right to prepay the Business Loan as described in **Section 1.2.3** below and in the Business Promissory Note.

1.2.    <u>Business Loan Terms</u>.

1.2.1.    <u>Term</u>. The term of the Business Loan shall commence on the Term Start Date and terminate on the Maturity as specified in the Business Promissory Note.

1.2.2.    <u>Interest</u>. Interest on the outstanding principal of the Business Loan shall accrue on and after the Interest Start Date through Maturity at the rate specified in the Business Promissory Note.

1.2.3.    <u>Prepayment</u>. Borrower may prepay all or any portion of the Business Loan at any time without penalty.

1.2.4.    <u>Renewal</u>. The Maturity of the Business Promissory Note may be extended as outlined in the Business Promissory Note.

1.3.    <u>Acceleration</u>. If for any reason the Business Loan is not fully satisfied by the Maturity (subject to any and all Renewal Terms), then the Business Loan term shall expire and the outstanding principal amount of the Business Loan, together with all accrued and unpaid interest, shall become immediately due and payable.

1.4.    <u>Business Loan Documents</u>. The Business Loan Documents include the following:
   (a)    Business Loan Agreement
   (b)    Business Promissory Note
   (c)    Unconditional Guaranty
   (d)    Lender Attestation and Suitability Questionnaire; **Exhibit A** to this Business Loan Agreement
   (e)    UCC financing statement pursuant to **Section 2** below
   (f)    Wire/ACH Instructions for Lender's account
   (g)    A completed form W-8/W-9 form

**2.    SECURITY INTEREST.**

2.1.    <u>Grant</u>. Effective immediately upon issuance of the Project Note, Borrower grants to Lender, as security for repayment of the Business Loan, a nonexclusive security interest in and to the Project Note, together with the Project Loan Documents and any other supporting obligations (as that term is defined in the Uniform Commercial Code) of the Project Note which secure payment and

Page **2** of **13**

Exhibit 6 Pg.2

Loan No. -02910

performance of the Project Note. In that regard, Borrower will cause to be filed in the appropriate filing office, a UCC financing statement to perfect the Lender's nonexclusive security interest in the Project Note and Project Loan Documents (and any other supporting obligations). Lender's security interest as described in this Section is nonexclusive and pari passu with the Other Lenders making loans to Borrower (as referenced in **Recital B** above), which other loans are also secured by the Project Note (and supporting obligations). Lender's nonexclusive pari passu interest is determined by a fraction, the numerator of which is the outstanding principal amount of the Business Loan, together with any unpaid interest owed and accruing to the Lender, and the denominator of which is the outstanding principal amount of the Project Note, together with any unpaid interest owed and accruing to all the Other Lenders making loans to Borrower to fund the Project Note, multiplied by 100. Lender's nonexclusive pari passu security interest in the Project Note shall be of equal priority to all Other Lenders making loans to Borrower to fund the Project Note. Lender grants to Borrower or the Representative (defined below) the authority to prepare and file UCC financing statement(s) in which Lender or the Representative is named as secured party to perfect the security interest granted to Lender under this Section, and to modify, amend and terminate any and all such UCC financing statement(s), provided the modification, amendment or termination complies with the terms of the Business Loan Documents (and in the case of termination, Borrower has paid Lender the outstanding principal and unpaid interest under the Business Loan).

2.2.    Representative for UCC Financing Statement. Without limiting the terms of **Section 2.1**, Lender authorizes the naming of the Representative as the secured party in the UCC financing statement(s), as Lender's representative under the Uniform Commercial Code for the purpose of identification of the secured party.

3.    **REPRESENTATIONS, WARRANTIES AND COVENANTS.** The Lender acknowledges the meaning and legal consequences of the representations, warranties and covenants in this Section and that Borrower and the Related Parties are relying upon the Lender's representations, warranties and covenants in this Section in connection with Borrower's acceptance of the Business Loan and in entering into the Business Loan Documents with Lender; as such, the Lender hereby acknowledges and agrees, and represents and warrants to Borrower, as follows:

3.1.    Use of Proceeds. Lender understands that Borrower may use the Business Loan proceeds, and that PetroRock may use the Project Loan proceeds, for the purposes stated in the Recitals above. Notwithstanding any obligations, terms, conditions, representations, warranties and covenants of the Project Loan, Borrower has no obligation to Lender to control, manage, track or audit PetroRock's use of the Project Loan proceeds.

3.2.    Binding Agreement. Lender understands and represents that this Business Loan Agreement, the Business Promissory Note, and all other Business Loan Documents to which Lender is a party, are valid, legal, binding and enforceable against the Lender in accordance with their respective terms.

3.3.    Accuracy of Information. Lender's representations and warranties in the Business Loan Documents are true, accurate and complete.

3.4.    Securities Laws. Lender understands that the Business Promissory Note is not considered a security, and accordingly, has not been registered with the Securities and Exchange Commission under the Securities Act of 1933, or with any state securities regulatory agency, and that the Business Loan is being made, and the Business Loan Documents are being entered into between Lender and Borrower, in reliance upon certain exclusions from registration under applicable state and federal securities laws.

File
3:02 PM

Exhibit 6 Pg.3

Sign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

3.5.     No Solicitation from Advertisement. Lender agrees that it is not making the Business Loan as a result of or in reliance upon any solicitation of Lender by Borrower or any Related Parties, or in reliance upon any advertisement viewed or received by Lender.

3.6.     Review of Information. Lender has received and reviewed sufficient information on the Business Loan and Borrower, and has employed its own legal counsel if so chosen, in the decision to make the Business Loan under the terms of the Business Loan Documents.

3.7.     Opportunity to Ask Questions. By executing this Business Loan Agreement and the Business Promissory Note, Lender acknowledges that any questions Lender may have/had in connection with the Business Loan, the Project Loan, the Business Loan Documents, the Project Loan Documents, Borrower or the Related Parties, or any affiliates of those parties, have been addressed and answered to Lender's satisfaction.

3.8.     References Made in Marketing or Disclosure Materials are Estimates. Lender agrees that any marketing or disclosure materials for the Business Loan are conceptual in nature only, and not legally binding on the parties, including, without limitation, any discussion of targeted assets or loan allocation.

3.9.     DISCLOSURE OF RELATED PARTIES AND CERTAIN FEES. Lender understands the following:

3.9.1.   Borrower is wholly owned by PetroRock and the primary purpose of Borrower is to finance the business and investment operations of PetroRock in connection with its Oil and Gas Interests.

3.9.2.   Borrower is managed by RESOLUTE CAPITAL PARTNERS LTD., a Nevada limited liability company ("**RCP**"), and RCP may derive direct or indirect benefits from the making of the Business Loan by Lender to Borrower, and the making of the Project Loan by Borrower to PetroRock.

3.9.3.   In an Event of Default under the Business Loan Documents, RESOLUTE ENERGY CAPITAL, LLC, a Delaware limited liability company ("**REC**") is the initial Authorized Representative as described in **Section 4**, and REC may derive direct or indirect benefits from the making of the Business Loan by Lender to Borrower, and the making of the Project Loan by Borrower to PetroRock.

3.9.4.   REC is managed by RCP (REC and RCP are collectively with any other affiliated entities, and the respective successors, assigns, officers, directors, stockholders, managers, members, principals, employees, representatives, agents and attorneys of RCP and REC and other affiliated entities, collectively, "**Resolute Related Parties**"), and the Resolute Related Parties may derive direct or indirect benefits from the making of the Business Loan by Lender to Borrower, and the making of the Project Loan by Borrower to PetroRock.

3.9.5.   PetroRock is affiliated with, among others, HOMEBOUND RESOURCES, INC., MERCURY OPERATING, LLC and HOMEBOUND FINANCIAL GROUP, INC. (collectively "**Homebound**" and together with other affiliated entities, and the respective successors, assigns, officers, directors, stockholders, managers, members, principals, employees, representatives, agents and attorneys of Homebound and other affiliated entities, and together with PetroRock, collectively are the "**PetroRock Related Parties**"), and the PetroRock Related Parties may derive direct or indirect benefits from the making of the Business Loan by Lender to Borrower, and the making of the Project Loan by Borrower to PetroRock.

Page **4** of **13**

File
3:02 PM

Exhibit 6 Pg.4

Loan No. -02910

3.9.6.    A fee ("**Fee**") equal to 50 basis points (annualized and paid monthly) will be paid from interest payments made by PetroRock to Borrower under the Project Loan. The Fee is for administrative and management services provided in connection with the Project Loan and/or Business Loan. All or portions of the Fee may be paid to any one or more of the Resolute Related Parties, all as may be required or as RCP may direct from time to time.

3.9.7.    Lender grants to the Resolute Related Parties and PetroRock Related Parties (collectively, "**Related Parties**"), and the Related Parties have and hold, the same indemnification and hold harmless protections as granted to Borrower under **Section 3.26** of this Business Loan Agreement.

3.10.    Lender's Qualifications to Make the Business Loan. Lender has completed and signed the Lender Attestation and Suitability Questionnaire attached as **Exhibit A** to this Business Loan Agreement, meets the suitability requirements set forth therein, and is a sophisticated lender for the Business Loan as further set forth on **Exhibit A** to this Agreement. Lender understands that Borrower and the Related Parties will rely on the accuracy and completeness of the information set forth on **Exhibit A** in its determination to enter into this Business Loan and this Business Loan Agreement with Lender and in its obligation to comply with applicable state and federal securities laws and regulations. If any of the information provided is inaccurate and Borrower or a Related Party is damaged (harmed) as a result, Lender will indemnify Borrower or the Related Party, as applicable, and pay for any damages.

3.11.    HIGH DEGREE OF RISK; NON-RECOURSE OBLIGATION. Lender has been advised that the Business Loan and Business Promissory Note involve a high degree of risk because, among other reasons, the Business Loan proceeds will be used to fund the Project Loan, and the Project Loan will in turn be used by PetroRock to fund its Oil and Gas Interests and for other lawful business or investment purposes. Further, if there is an Event of Default, Lender may be asked to advance further loan proceeds to Borrower or Representative (without Lender having an obligation to so advance loan proceeds) to mitigate the effects of such Event of Default and to protect Lender's principal sum loaned to Borrower. **LENDER FURTHER AGREES AND UNDERSTANDS THAT THE BUSINESS LOAN IS NON-RECOURSE TO BORROWER, WHICH IS ANOTHER REASON THE BUSINESS LOAN INVOLVES A HIGH DEGREE OF RISK. NONRECOURSE MEANS THAT FOR PAYMENT OF SUMS DUE UNDER THIS BUSINESS LOAN AGREEMENT, THE BUSINESS PROMISSORY NOTE AND THE OTHER BUSINESS LOAN DOCUMENTS, LENDER SHALL LOOK SOLELY TO LENDER'S SECURITY INTEREST IN THE PROJECT NOTE AND TO LENDER'S INTEREST IN THE GUARANTY, AND NOT TO BORROWER PERSONALLY, FOR PAYMENTS REQUIRED TO BE MADE UNDER THE BUSINESS LOAN DOCUMENTS IF THERE IS A DEFAULT BY BORROWER UNDER THE BUSINESS LOAN DOCUMENTS. AS A RESULT OF THE FOREGOING, LENDER COULD LOSE ALL OF LENDER'S FUNDS IN MAKING THE BUSINESS LOAN TO BORROWER AND ENTERING INTO THIS BUSINESS LOAN AGREEMENT AND THE BUSINESS LOAN DOCUMENTS.**

3.12.    Legal Power/Authority to Sign and Lend. Lender has the legal power and authority to sign the Business Loan Documents to which Lender is a party, and to enter into the Business Loan, and neither will violate any agreement Lender has entered into with another party. If the Lender is an entity (for example, a limited liability company, partnership, corporation or trust), then the individual signing this Business Loan Agreement or any of the Business Loan Documents is authorized to do so.

3.13.    Acting on Lender's Own Behalf. Lender is acting on Lender's own behalf in making the Business Loan, and not on behalf of any other individual or entity.

File
3:02 PM

Exhibit 6 Pg.5

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

3.14.     Knowledge and Experience. Lender has sufficient knowledge, skill, and experience in business and financial matters to evaluate the merits and risks of the Business Loan being made by Lender.

3.15.     Affordability. Lender can afford to make the Business Loan, even if Lender loses all of Lender's funds and the Business Loan is not repaid. Lender does not need the money that is being loaned under this Business Loan Agreement for Lender's current or future financial obligations.

3.16.     No Government Approval. Lender understands that no state or federal authority has reviewed the Business Loan Documents, nor made any finding relating to the Business Loan, including without limitation, regarding the value or fairness of the Business Loan or the Business Loan Documents.

3.17.     Restrictions on Transfer. Lender shall not sell, transfer, convey, assign or pledge, voluntarily or involuntary, by operation of law or otherwise (collectively, "**Transfer**"), the Business Promissory Note or any of its rights under the Business Loan Documents, without the prior written consent of Borrower, and any such attempted Transfer without such consent shall be null and void. Lender understands that this means that the Business Loan Documents are not transferable and that Lender will be required to hold the Business Promissory Note for an indefinite period of time. If a Transfer occurs, Lender agrees to promptly notify Borrower and provide Borrower with documents that evidence the Transfer and establish the rights of the transferee(s) (collectively, "**Transferee**") in the Business Loan Documents. Before Borrower consents to any Transfer, a Transferee will be required to execute and deliver to Borrower such documents and instruments as Borrower may reasonably request to memorialize the Transfer, the agreement of Transferee to be bound by the Business Loan Documents, and to establish that Transferee is a sophisticated lender for the Business Loan. If Borrower does consent to the Transfer, and the requirements of this Section are met to Borrower's satisfaction, then Borrower will recognize the Transfer. Notwithstanding anything in this Section to the contrary, Borrower has no duty or obligation to Lender, Transferee or any other party, to investigate or verify the rights of the Transferee in the Business Loan Documents or whether the Transfer is legal or proper; and Borrower shall have no liability to Lender, Transferee or any other party in that regard.  Nothing in this Section limits Borrower's right to withhold consent to a Transfer and/or to prepay the Business Loan.

3.18.     No Advice. Borrower and the Related Parties have not provided Lender with any investment, financial, or tax advice. Instead, Lender has been advised to consult with Lender's own legal and financial advisors and tax experts.

3.19.     Tax Treatment. Borrower and the Related Parties have not made any representations about, or promised to Lender, any particular tax outcome from the making of this Business Loan by Lender.

3.20.     Past Performance. Lender understands that even if Borrower or the Related Parties have been successful in the past, that success does not guarantee (and Borrower in no way guarantees) a successful performance and repayment under the Business Loan.

3.21.     Not Borrowed. The funds tendered for the Business Loan do not represent funds borrowed by Lender from any person or lending institution.

3.22.     Fees. Lender acknowledges that Borrower may use Business Loan proceeds, and that PetroRock may use Project Loan proceeds, for purposes of paying interest, reserves, loan origination fees, and marketing fees to third parties for their services, some of whom may be Related Parties or other affiliates. While such fees may be paid for the purpose of raising funds for the Borrower, Lender has performed Lender's own due diligence and made Lender's own decision to lend money to Borrower, only

File
3:02 PM

Exhibit 6 Pg.6

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

after full and independent due diligence of the terms, conditions, merits and risks of the Business Loan and the Business Loan Documents. In addition, if Borrower incurs fees or charges arising from incorrect or incomplete information supplied by Lender to Borrower in connection with Lender's wire instructions for payments under the Business Loan, then such fees and charges will be passed through to and paid for by Lender.

3.23.    Additional Documents. Lender will execute any additional documents which Borrower requests for the purpose of this Business Loan if it reasonably believes those documents are necessary.

3.24.    Confidentiality. Information regarding the operations, Related Parties, security, assets, and collateral underlying or related to the Business Loan is confidential. Lender will not reveal such information to anyone or use such information for Lender's own benefit, except for the making of the Business Loan.

3.25.    **LIABILITY LIMITATION**.  Lender agrees that neither Borrower nor any Related Party shall be directly or indirectly liable or responsible in any way for any cost or expense incurred by Lender arising from enforcement of state or federal securities laws against or in relation to Borrower, any Related Party, the Business Loan or the Project Loan. LENDER FURTHER AGREES THAT UNDER NO CIRCUMSTANCES WILL BORROWER OR A RELATED PARTY BE LIABLE TO LENDER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCURRED BY LENDER ARISING OUT OF THE BUSINESS LOAN DOCUMENTS OR THE PROJECT LOAN.

3.26.    **INDEMNIFICATION AND HOLD HARMLESS**. Lender hereby agrees to indemnify, defend and hold harmless Borrower and the Related Parties, and all officers, directors, employees, agents and controlling persons of Borrower and the Related Parties, from any and all losses, claims, damages, liabilities, expenses (including attorneys' fees and disbursements), judgments or amounts paid in settlement of actions arising out of or resulting from any misrepresentation by Lender in the Business Loan Documents, or the breach of any warranty or covenant by Lender in the Business Loan Documents.

**4.    DEFAULT; REPRESENTATIVE**.

4.1.    Notice of Default. Upon the occurrence of an Event of Default, Borrower shall notify the Lender and all Other Lenders (the Lender and all Other Lenders are collectively the "**Lender Parties**"), describing the circumstances of such Event of Default ("**Notice of Default**"). The Borrower's Notice of Default shall be accompanied by a list showing the names and email addresses of all Lender Parties and the amount outstanding with respect to the Business Promissory Note and all other promissory notes held by the Other Lenders. The Business Promissory Note and all other promissory notes held by Other Lenders are collectively referred to in this Business Loan Agreement as the "**Lender Party Notes**".

4.2.    Representative. REC ("**Appointed Representative**") shall represent Lender and the Other Lenders as a group with regard to the Event of Default. Lender Parties may select an alternative representative ("**Alternative Representative**") to replace the Appointed Representative (or another previously appointed Representative), who may but need not be a Lender Party, by the affirmative vote of Lender Parties holding at least 67% of the Lender Party Notes, which 67% shall be determined by the following computation: (i) a fraction, the numerator of which is the outstanding principal amount of each Lender Party Note making an affirmative vote to terminate the services of a Representative, and the denominator of which is the aggregate outstanding principal amount of all the Lender Party Notes, (ii) multiplied by 100. The Appointed Representative and the Alternative Representative are each referred to in this Business Loan Agreement as the "**Representative**". The appointment of an Alternative Representative to replace the Appointed Representative (or the appointment of a Representative to replace

Page **7** of **13**

Exhibit 6 Pg.7

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

a previously appointed Representative) shall not be effective unless and until the Appointed Representative (or the previously appointed Representative being replaced) is paid the compensation and expenses owed to it pursuant to **Section 4.7**.

4.3.     Representative Authority. The Representative shall have the power and authority, on behalf of each Lender Party, to pursue such remedies against the Borrower and PetroRock (as guarantor under the Unconditional Guaranty) as may be available by law and pursuant to each Lender Party loan agreement, unconditional guaranty and Lender Party Note, for the purpose of maximizing the return to the Lender Parties as a group, and to settle the claims of each Lender Party on such terms as the Representative may determine in its sole and unlimited discretion, subject to the other provisions of this Section. The Representative may pursue such remedies notwithstanding that the Representative does not have physical possession of the Lender Party Notes and without naming the Lender Parties as parties.

4.4.     Power of Attorney. Each Lender Party shall be deemed to have granted to the Representative a limited Power of Attorney for the purpose of carrying out such Representative's responsibilities under this Section. Each Lender Party shall, upon the request of the Representative, execute such additional documents and instruments as may be reasonably necessary to confirm such limited Power of Attorney and otherwise carry out the purposes of this Section.

4.5.     No Separate Claims. No Lender Party may bring any claim against the Borrower to enforce the payment obligation evidenced by a Lender Party Note. All such claims may be brought only by the Representative, acting on behalf of and in the name of each Lender Party.

4.6.     Release. Each Lender Party releases the Representative from any and all claims arising from the Representative's performance of its services pursuant to this Section, except and to the extent that such claims arise from the gross negligence, intentional misconduct or fraud of the Representative.

4.7.     Representative Compensation and Expenses. Representative shall be paid compensation for the services provided; the amount of such compensation shall be a reasonable sum, as determined by the Representative, and shall be consistent with industry/market practices for third-party loan default servicing services. The Representative compensation shall be paid by the Borrower, and no Lender Party shall be obligated to pay such compensation directly, understanding that the compensation paid to the Representative by the Borrower could reduce the amount ultimately paid to the Lender Parties with respect to the Lender Party Notes. Borrower shall pay the reasonable out-of-pocket expenses of the Representative, including the reasonable fees and costs of attorneys engaged by the Representative and all other reasonable costs incurred by the Representative to pursue the remedies set forth herein.

4.8.     Resignation. A Representative may resign at any time by giving notice to the Borrower and all of the Lender Parties at least thirty (30) days before such resignation is to become effective. Upon the resignation of a Representative, a replacement shall be selected by the affirmative vote of Lender Parties holding at least 67% of the Lender Party Notes, which 76% shall be determined as set forth in **Section 4.2**. If the Lender Parties have not selected a replacement Representative within sixty (60) days following the effective date of the resignation, then the Borrower may select a replacement Representative.

4.9.     Termination. The services of a Representative may be terminated at any time by the affirmative vote of Lender Parties holding at least 67% of the Lender Party Notes, which 67% shall be determined as set forth in **Section 4.2**.

4.10.    Affirmative Vote. The affirmative vote of each Lender Party shall be evidenced by a writing signed by the Lender Party with such signature being duly acknowledged.

Page **8** of **13**

Exhibit 6 Pg.8

Loan No. -02910

4.11.    Remedies.  Upon the occurrence of an Event of Default:

4.11.1.  The Representative, on behalf of the Lender Parties, shall be entitled to exercise any right or remedy that may be available under applicable law; provided, however, the Lender Parties acknowledge that the Representative may, but shall not be obligated to, accelerate the payment of outstanding principal with respect to the Lender Party Notes.

4.11.2.  The interest rate payable with respect to each Lender Party Note shall be increased to the lesser of 18% per annum or the highest rate for which Borrower may legally contract under applicable law.

4.11.3.  The non-exercise, failure to exercise, or delay in exercising, any right or remedy under the Business Loan Documents or applicable law shall not constitute a waiver of any rights, remedies or of any breach or default.  No waiver shall be effective unless the waiver is expressly stated in a writing signed by the party to be bound (including Representative).

4.12.    Payments Upon and During Default.

4.12.1.  All payments made by the Borrower with respect to the Lender Party Notes upon and during an Event of Default shall be made in the following order of priority:  (i) first, to pay the Representative compensation and expenses referred in this **Section 4.7**; (ii) second, to pay interest due as of the date of such payment, in the order of the due dates of such interest, with the interest longest overdue paid first, and, if the amount available is insufficient to pay in full all interest due as of a given date, then to pay a *pro rata* portion of all such interest; and (iii) third, to pay principal due as of the date of such payment, in the order of the due dates of such principal, with the principal longest overdue paid first, and, if the amount available is insufficient to pay in full all principal due as of a given date, then to pay a *pro rata* portion of all such principal.

4.12.2.  Any Lender Party that receives a payment while an Event of Default remains in effect in excess of the amount such Lender Party should have received pursuant to **Section 4.1** shall be deemed to be holding such excess in trust for the benefit of other Lender Parties, and shall return such excess on demand.

## 5.    GENERAL PROVISIONS.

5.1.    Governing Law.  The Business Loan, the Business Loan Documents, and Lender's relationship with Borrower, shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to conflicts of law provision or rule (whether of the State of Texas or any other jurisdiction) that would result in the application of the laws of any jurisdiction other than the State of Texas.

5.2.    Successors and Assigns.  Except as otherwise provided in this Business Loan Agreement, this Business Loan Agreement and the Business Loan Documents shall be binding upon, and shall inure to the benefit of, the parties hereto and their successors and assigns.

5.3.    Severability.  The illegality or unenforceability of any provision of this Business Loan Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Business Loan Agreement or any instrument or agreement required hereunder.

Page **9** of **13**

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

5.4.    Survival. The representations, warranties, covenants, indemnities and releases of Lender in the Business Loan Documents survive the repayment of the Business Promissory Note.

5.5.    WAIVER OF JURY RIGHTS.    BORROWER AND LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS BUSINESS LOAN AGREEMENT OR ANY OF THE RIGHTS OR OBLIGATIONS UNDER THIS BUSINESS LOAN AGREEMENT, AND AGREE THAT ANY DISPUTE WILL BE HEARD BY AN ARBITRATOR OR A JUDGE, NOT A JURY.

5.5.1.    Arbitration Claims. If any kind of legal claim arises between Lender and Borrower or the Related Parties, the parties shall arbitrate the claim rather than use the courts. There are only two exceptions to this covenant. First, Borrower will not invoke its right to arbitrate a claim which Lender brings in Small Claims Court or an equivalent court, if any, so long as the claim is pending only in that court. Second, Borrower has the right to seek an injunction in court if Lender violates or threatens to violate his/her/its obligations under the Business Loan Documents.

5.5.2.    Place of Arbitration; Rules. All arbitration will be conducted in Dallas, Texas, unless both Lender and Borrower agree otherwise in writing in a specific case. All arbitration will be conducted before a single arbitrator in accordance with the rules of the American Arbitration Association.

5.5.3.    Appeal of Award. Within thirty (30) days of a final award made by the single arbitrator, either party may appeal the award for reconsideration by a three-arbitrator panel. If there is an appeal, the other party may cross-appeal within thirty (30) days after notice of the appeal. The panel will reconsider all aspects of the initial award that is appealed, including related findings of fact.

5.5.4.    Effect of Award. Any award by the individual arbitrator that is not subject to appeal, and any panel award on appeal, shall be final and binding, except for any appeal right under the Federal Arbitration Act, and may be entered as a judgment in any court of competent jurisdiction.

5.5.5.    NO CLASS ACTION CLAIMS. NO ARBITRATION SHALL PROCEED ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS. No party may join, consolidate, or otherwise bring claims for or on behalf of two or more individuals or unrelated corporate entities in the same arbitration unless those persons are parties to a single transaction. An award in arbitration shall determine the rights and obligations of the named parties only, and only with respect to the claims in arbitration, and shall not (i) determine the rights, obligations, or interests of anyone other than a named party, or resolve any claim of anyone other than a named party, or (ii) make an award for the benefit of, or against, anyone other than a named party. No administrator or arbitrator shall have the power or authority to waive, modify, or fail to enforce this Section, and any attempt to do so, whether by rule, policy, arbitration decision or otherwise, shall be invalid and unenforceable. Any challenge to the validity of this Section shall be determined exclusively by a court and not by the administrator or any arbitrator. If this Section shall be deemed unenforceable, then any proceeding in the nature of a class action shall be handled in court, not in arbitration.

5.5.6.    Right to Legal Fees. If Borrower or the Related Parties have a legal dispute with Lender, the losing party will pay the costs of the winning party, including reasonable legal fees.

5.6.    Modification. The terms of the Business Loan Documents may not be modified or amended except by a writing signed by the party against whom enforcement is sought.

File
3:02 PM

Exhibit 6 Pg.10

Loan No. -02910

5.7.     Electronic Signature and Notices. Lender agrees to sign the Business Loan Documents electronically, rather than physically. Lender agrees that Borrower and the Related Parties may deliver all notices required or desired under the Business Loan Documents, and all tax reports and other documents and information in connection with the Business Loan, to Lender by email or another electronic delivery method of Borrower's choice. Notice from Lender to Borrower under the Business Loan Documents will be made by email to **info @rcp-ltd.com**. Both parties agree to notify the other in the event of a change of email address. Any notice will be considered to have been received on the day it was sent by email, unless a problem with delivery can be evidenced. Respective email addresses should be designated safe senders to avoid spam filter.

5.8.     Payments. Both principal and interest shall be payable at the address below Lender's signature line herein, or at such other place as Lender may from time to time designate in writing. Borrower discloses that ASSURE SERVICES will be responsible for disbursing to Lender payments under the Business Loan (this is subject to change at Borrower's discretion), and may receive a portion of the Fee for such services.

5.9.     ENTIRE AGREEMENT. THIS BUSINESS LOAN AGREEMENT, THE BUSINESS PROMISSORY NOTE AND THE OTHER BUSINESS LOAN DOCUMENTS CONTAIN THE FINAL, ENTIRE AGREEMENT BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THE BUSINESS LOAN DOCUMENTS, AND ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATIVE TO THE SAME WHICH ARE NOT CONTAINED IN THE BUSINESS LOAN DOCUMENTS ARE SUPERSEDED AND TERMINATED HEREBY, AND THE BUSINESS LOAN DOCUMENTS MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES HERETO.

5.10.     **RELEASE. UPON (I) BORROWER'S REPAYMENT TO LENDER AT MATURITY OF THE OUTSTANDING PRINCIPAL SUM AND ACCRUED UNPAID INTEREST UNDER THE BUSINESS LOAN, AND (II) EXPIRATION OF THE 10 DAY TIME PERIOD SET FORTH IN SECTION 4 OF THE BUSINESS PROMISSORY NOTE, BORROWER WILL HAVE NO FURTHER OBLIGATION OR LIABILITY TO LENDER NOR ANY CLAIMS AGAINST LENDER; AND THEREUPON, LENDER FOREVER AND IRREVOCABLY RELEASES BORROWER AND ALL RELATED PARTIES (AS DEFINED ABOVE) FROM ANY AND ALL CLAIMS, ACTIONS, LIABILITIES, DAMAGES, AND COSTS OF ANY KIND OR NATURE WHATSOEVER, IN LAW OR EQUITY, KNOWN OR UNKNOWN, THAT LENDER HAS OR MAY HAVE AS OF SUCH TIME ARISING OUT OF OR RELATED TO THE BUSINESS LOAN AND THE BUSINESS LOAN DOCUMENTS.**

6.  **EXHIBITS**. The following Exhibits are made part of this Business Loan Agreement.

**Exhibit A**: Lender Attestation and Suitability Questionnaire.

**SIGNATURE PAGE TO FOLLOW.**

Page **11** of **13**

File
3:02 PM

Exhibit 6 Pg.11

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

IN WITNESS WHEREOF, this Business Loan Agreement has been executed and delivered to be effective as of the Agreement Date.

**BORROWER:**

CHOICE ENERGY HOLDINGS - I, LLC, a Nevada limited liability company

By:    RESOLUTE CAPITAL PARTNERS LTD., a Nevada limited liability company

Its:    Manager

By:
Name:  Stefan Toth
Title:  Authorized Signatory

**LENDER:**

### SIGNATURE FOR A LENDER WHO IS AN **INDIVIDUAL**

IN WITNESS, WHEREOF, the undersigned has executed this Business Loan Agreement effective on the date first written above.

Signature:                                        Second Signature: _____
                                                   *(if required)*
Print Name:  Linda V Hildebrand                    Print Name: _____

Address:

Email: lvhildebrand1964@gmail.com

Custodian Information:  IRA Services Trust Company CFBO: Linda V. Hildebrand IRA586870

---

### SIGNATURE FOR LENDER WHO IS AN **ENTITY**

IN WITNESS, WHEREOF, the undersigned has executed this Business Loan Agreement effective on the date first written above.

Signature: _____
Print Name: _____
Its (print title): _____

Address: _____
_____

Email: _____

Custodian Information: _____

---

Page **12** of **13**

File
3:02 PM

Exhibit 6 Pg.12

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

Loan No. -02910

## **EXHIBIT A**

**LENDER ATTESTATION AND SUITABILITY QUESTIONNAIRE**
<u>ALSO REQUIRES YOUR SIGNATURE(S).</u>

File
3:02 PM

Exhibit 6 Pg.13

EXHIBIT 8

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

## UNCONDITIONAL GUARANTY

This UNCONDITIONAL GUARANTY ("**Guaranty**") is made by PETROROCK MINERAL HOLDINGS, LLC, a Texas limited liability company ("**Guarantor**"), in favor of <u>IRA Services Trust Company CFBO: Linda V. Hildebrand IRA586870_</u> ("**Lender**"), and is effective as of the date of the below described Business Loan Agreement.

### RECITALS

A.    Lender and CHOICE ENERGY HOLDINGS - I, LLC, a Nevada limited liability company ("**Borrower**"), entered into a Business Loan Agreement ("**Business Loan Agreement**") pursuant to which Borrower executed and delivered to Lender a Business Promissory Note ("**Business Promissory Note**") evidencing a secured business loan ("**Business Loan**") made by Lender to Borrower. Capitalized terms used but not defined in this Guaranty have the meanings given to them in the Business Loan Agreement.

B.    Guarantor, the parent company of Borrower, will derive substantial direct and indirect benefits from the transactions contemplated by the Business Loan Agreement, and has agreed to make this Guaranty in favor of Lender.

NOW THEREFORE, Guarantor agrees follows:

1.    <u>Guaranty.</u>  Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the prompt and full payment and performance of all obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by Borrower under or relating to the Business Loan, plus all costs, expenses and fees, in any way relating to the enforcement or protection of Lender's rights under this Guaranty (collectively, the "**Obligations**"). Guarantor further agrees that all or part of the Obligations may be increased, extended, substituted, amended, renewed or otherwise modified without notice to or consent from such Guarantor and such actions shall not affect the liability of such Guarantor under this Guaranty. This Guaranty is a guaranty of payment and not collection.

2.    <u>Obligations.</u>  Guarantor agrees that its Obligations under this Guaranty shall not be subject to any advance, set-off, counterclaim or recoupment whatsoever, irrespective of the regularity or enforcement of the Business Loan Agreement or any other circumstances which might otherwise constitute a legal or equitable discharge of a surety or guarantor or any other circumstances which might otherwise limit the recourse of the Lender against the Guarantor. No waiver by Lender of any of the rights under the Business Loan, and Lender's failure to take action or delay in taking any such action to enforce any of the rights under this Guaranty, shall not affect Guarantor's Obligations under this Guaranty. The Obligations of the Guarantor under this Guaranty shall remain in full force and effect without regard to, and shall not be affected or impaired by:  (i) any amendment or modification of or addition or supplement to the Business Loan or any of the Business Loan Documents, except insofar as such amendment, modification, addition or supplement shall directly affect any Obligation hereunder; or (ii) any event of bankruptcy, insolvency, reorganization or similar proceeding involving or affecting the Borrower.

3.    <u>Waivers.</u>  Guarantor waives any defense to its obligations under this Guaranty based upon or arising by reason of: (i) any disability or other defense of Borrower or any other person; (ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the indebtedness of Borrower or any other person; (iii) any lack of authority of any officer, director, manager, partner, agent or any other person acting or purporting to act on behalf of Borrower which is a corporation, partnership

File
3 02 PM

Exhibit 8 Pg.1

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

or other type of entity, or any defect in the formation of any such Borrower; (iv) the application by Borrower of the proceeds of any indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Lender or Guarantor; (v) any act or omission by Lender which directly or indirectly results in or aids the discharge of Borrower or any portion of the indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Lender against Borrower; (vi) any impairment of the value of any interest in any security for the indebtedness under the Business Loan or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (vii) any modification of the indebtedness under the Business Loan, in any form whatsoever; or (viii) any requirement that Lender give any notice of acceptance of this Guaranty.

4.      Representations and Warranties.  Guarantor represents and warrants that: (i) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (ii) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and will not violate any order, judgment or decree to which Guarantor or any of its assets may be subject; and (iii) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty.

5.      Assignment.  This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that no party may assign this Agreement without the consent of the other party.

6.      Governing Law. This Guaranty shall be construed and in enforced in accordance with the internal laws of the State of Texas, without giving effect to conflicts of law provision or rule (whether of the State of Texas or any other jurisdiction) that would result in the application of the laws of any jurisdiction other than the State of Texas.

7.      Waiver of Jury Trial.  GUARANTOR, AND LENDER BY LENDER'S ACCEPTANCE OF THIS GUARANTY, HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE OBLIGATIONS UNDER THIS GUARANTY.

8.      Cumulative Rights. Each right, remedy and power hereby granted to Lender or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other.

9.      Severability. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

10.     Electronic Signature and Notices.  Lender agrees that Guarantor may deliver any notices required or desired under this Guaranty and any other documents and information in connection with the Business Loan or this Guaranty, to Lender by email or another electronic delivery method of Guarantor's choice. Notice from Lender to Guarantor under this Guaranty will be made by email to **info @rcp-ltd.com**. Both parties agree to notify the other in the event of a change of email address. Any notice will be considered to have been received on the day it was sent by email, unless a problem with delivery can be evidenced. Respective email addresses should be designated safe senders to avoid spam filter.

File
3:02 PM

Exhibit 8 Pg.2

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

IN WITNESS WHEREOF, Guarantor has executed this Guaranty to be effective as stated in the first paragraph above.

**GUARANTOR:**

PETROROCK MINERAL HOLDINGS, LLC,
a Texas limited liability company

By:
Name: Stefan Toth
Title: President

Address: 5605 North MacArthur Blvd., Suite 1003
            Irving, TX 75038

File
3:02 PM

Exhibit 8 Pg.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 9

DocuSign Envelope ID: 76DB3FE7-ED91-484F-ADEE-1423B5780792

# STRATEGIC ENERGY ASSETS VII, LLC

## INVESTMENT AGREEMENT

This is an Investment Agreement, entered into on December 6, 2018 by and between STRATEGIC ENERGY ASSETS VII, LLC, a Delaware limited liability company (the "Company") and Bernardo Feig and Benyapa Feig ("Purchaser").

### Background

Purchaser wishes to purchase a limited liability company interest in the Company offered pursuant to the Confidential Investor Disclosure Document of the Company dated **June 26, 2018**, which we refer to as the **"Disclosure Document"**.

NOW, THEREFORE, acknowledging the receipt of adequate consideration and intending to be legally bound, the parties hereby agree as follows:

1. **Defined Terms**. Capitalized terms that are not otherwise defined in this Investment Agreement have the meanings given to them in the Disclosure Document. We sometimes refer to the Company using terms like "we" or "us," and to Purchaser using terms like "you" or "your".

2. **Purchase of LLC Interest**. Subject to the terms and conditions of this Investment Agreement, the Company hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from the Company, a limited liability company interest in the Company for $75,000.00, pursuant to the Disclosure Document. We refer to your limited liability company interest as the "LLC Interest".

3. **No Right to Cancel**. You do not have the right to cancel your subscription or change your mind. Once you sign this Investment Agreement, you are obligated to purchase the LLC Interest.

4. **Our Right to Reject Investment**. In contrast, we have the right to reject your subscription for any reason or for no reason, in our sole discretion. If we reject your subscription, any money you have given us will be returned to you.

5. **Your LLC Interest**. You will not receive a paper certificate evidencing your LLC Interest. Instead, your LLC Interest will be issued in electronic form only.

6. **Terms of Use**. The Terms of Use are part of your agreement with us. If there is any conflict between the Terms of Use and this Investment Agreement, the terms of this Investment Agreement will govern.

7. **Your Promises**. You promise that:

    7.1. **Accuracy of Information**. All information you have given us is accurate and we may rely on it. If any of the information you have given us changes before we accept your subscription, you will notify us immediately. If any of the information you have given to us is inaccurate and we are damaged (harmed) as a result, you will indemnify us, meaning you will pay any

damages.

7.2. **Review of Information**. You have read all of the information in the Disclosure Document, including all of the exhibits. Without limiting that statement, you have reviewed the Company's Operating Agreement and understand its terms.

7.3. **Risks**. You understand all the risks of investing, including the risk that you could lose all your money. Without limiting that statement, you have reviewed and understand all the risks listed under "RISKS OF INVESTING" in the Disclosure Document.

7.4. **Accredited Investor**. You are an Accredited Investor pursuant to the accompanying Accredited Investor & Suitability Questionnaire which you have completed.

7.5. **No Representations**. Nobody has made any promises or representations to you, except the information in the Disclosure Document. Nobody has guaranteed any financial outcome of your investment.

7.6. **Opportunity to Ask Questions**. You have had the opportunity to ask questions about the Company and the investment. All of your questions have been answered to your satisfaction.

7.7. **Your Legal Power to Sign and Invest**. You have the legal power to sign this Investment Agreement and purchase the LLC Interest. Your investment will not violate any contract you have entered into with someone else.

7.8. **Acting on Your Own Behalf**. You are acting on your own behalf in purchasing the LLC Interest, not on behalf of anyone else.

7.9. **Investment Purpose**. You are purchasing the LLC Interest solely as an investment, not with an intent to re-sell or "distribute" any part of it.

7.10. **Knowledge**. You have enough knowledge, skill, and experience in business, financial, and investment matters to evaluate the merits and risks of the investment.

7.11. **Financial Wherewithal**. You can afford this investment, even if you lose your money. You don't need this money for your current needs, like rent or utilities.

7.12. **No Government Approval**. You understand that no state or federal authority has reviewed this Investment Agreement or the LLC Interest or made any finding relating to the value or fairness of the investment.

7.13. **Restrictions on Transfer**. You understand that the LLC Interest may not be transferrable, and that securities laws also limit transfer. This mean you will probably be required to hold the LLC Interest indefinitely. In the event a transfer is approved by the Company, you understand that a redemption fee will apply to cover costs incurred by the Company.

7.14. **No Advice**. We have not provided you with any investment, financial, or tax advice. Instead, we have advised you to consult with your own legal and financial advisors and tax experts.

Exhibit 9 Pg.2

7.15.    **Tax Treatment**. We have not promised you any particular tax outcome from buying or holding the LLC Interest.

7.16.    **Past Performance**. You understand that even if we have been successful in the past, this does not mean we will be successful with your LLC Interests.

7.17.    **Money Laundering**. The money you are investing was not acquired from "money laundering" or other illegal activities. You will provide us with additional information relating to the source of the funds if we reasonably believe we are required to request such information by law.

7.18.    **Additional Documents**. You will execute any additional documents we request if we reasonably believe those documents are necessary or appropriate and explain why.

7.19.    **Authority**. If the Purchaser is an entity (for example, a partnership or corporation), then the individual signing this Investment Agreement has the legal authority to do so.

7.20.    **Beneficial Interest Disclosure**. If the Purchaser is an entity (for example, a partnership or corporation), then you affirm that you have disclosed the names of the beneficial interest holders (e.g. the owners) of the entity.

7.21.    **No Solicitation from Advertisement**. This Investment is not being made as a result of any advertisement viewed or received by Investor.

7.22.    **Marketing Fees**. You understand that marketing fees, including expenses and/or reimbursement of expenses, will be paid by the Company and/or Sponsor to licensed companies and/or individuals for the purpose of generating investor interest in this offering and that such fees are further outlined in the Disclosure Document.

8.    **Confidentiality**. The information on the Site, including the information in the Disclosure Document, is confidential. You will not reveal such information to anyone or use such information for your own benefit, except to purchase the LLC Interests.

9.    **Re-Purchase of LLC Interest**. If we decide that you provided us with inaccurate information or have otherwise violated your obligations, we may (but shall not be required to) repurchase your LLC Interest for an amount equal to the principal amount outstanding.

10.    **Governing Law**. Your relationship with us shall be governed by Delaware law, without taking into account principles of conflicts of law.

11.    **Arbitration**.

11.1.    **Right to Arbitrate Claims**. If any kind of legal claim arises between us, either of us will have the right to arbitrate the claim, rather than use the courts. There are only three exceptions to this rule. First, we will not invoke our right to arbitrate a claim you bring in Small Claims Court or an equivalent court, if any, so long as the claim is pending only in that court. Second, we have the

right to seek an injunction in court if you violate or threaten to violate your
obligations. Three, disputes arising under the Operating Agreement, the
Participation Agreement, or the Joint Operating Agreement will be handled as
set forth in those agreements.

11.2.    **Place of Arbitration; Rules**. All arbitration will be conducted in Wilmington,
Delaware, unless we agree otherwise in writing in a specific case. All
arbitration will be conducted before a single arbitrator in accordance with the
rules of the American Arbitration Association.

11.3.    **Appeal of Award**. Within thirty (30) days of a final award by the single
arbitrator, you or we may appeal the award for reconsideration by a three-
arbitrator panel. If you or we appeal, the other party may cross-appeal within
(30) days after notice of the appeal. The panel will reconsider all aspects of
the initial award that are appealed, including related findings of fact.

11.4.    **Effect of Award**. Any award by the individual arbitrator that is not subject to
appeal, and any panel award on appeal, shall be final and binding, except for
any appeal right under the Federal Arbitration Act, and may be entered as a
judgment in any court of competent jurisdiction.

11.5.    **No Class Action Claims**. NO ARBITRATION SHALL PROCEED ON A
CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS. No party may
join, consolidate, or otherwise bring claims for or on behalf of two or more
individuals or unrelated corporate entities in the same arbitration unless those
persons are parties to a single transaction. An award in arbitration shall
determine the rights and obligations of the named parties only, and only with
respect to the claims in arbitration, and shall not (i) determine the rights,
obligations, or interests of anyone other than a named party, or resolve any
claim of anyone other than a named party, or (ii) make an award for the
benefit of, or against, anyone other than a named party. No administrator or
arbitrator shall have the power or authority to waive, modify, or fail to enforce
this paragraph, and any attempt to do so, whether by rule, policy, arbitration
decision or otherwise, shall be invalid and unenforceable. Any challenge to the
validity of this paragraph shall be determined exclusively by a court and not
by the administrator or any arbitrator. If this paragraph shall be deemed
unenforceable, then any proceeding in the nature of a class action shall be
handled in court, not in arbitration.

12.    **Consent to Electronic Delivery**. You agree that we may deliver all notices, tax reports
and other documents and information to you by email or another electronic delivery
method we choose. You agree to tell us right away if you change your email address or
home mailing address so we can send information to the new address.

13.    **Notices**. All notices between us will be electronic. You will contact us by email at info
@rcp-ltd.com. We will contact you by email at the email address you provide to us.
Either of us may change our email address by notifying the other (by email). Any
notice will be considered to have been received on the day it was sent by email, unless
the recipient can demonstrate that a problem occurred with delivery. You should

DocuSign Envelope ID: 76DB3FE7-ED91-484F-ADEE-1423B5780792

designate our email address as a "safe sender" so our emails do not get trapped in your spam filter.

14. **Limitations on Damages**. WE WILL NOT BE LIABLE TO YOU FOR ANY LOST PROFITS OR SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, EVEN IF YOU TELL US YOU MIGHT INCUR THOSE DAMAGES. This means that at most, you can sue us for the amount of your investment. You can't sue us for anything else.

15. **Waiver of Jury Rights**. IN ANY DISPUTE WITH US, YOU AGREE TO WAIVE YOUR RIGHT TO A TRIAL BY JURY. This means that any dispute will be heard by an arbitrator or a judge, not a jury.

16. **Execution of Operating Agreement**. If we accept your subscription, then your signature of this Investment Agreement will also serve as your signature of the Operating Agreement, just as if you had signed a paper copy of the Operating Agreement.

17. **Miscellaneous Provisions**.

   17.1.   **No Transfer**. You may not transfer your rights or obligations.

   17.2.   **Right to Legal Fees**. If we have a legal dispute with you, the losing party will pay the costs of the winning party, including reasonable legal fees.

   17.3.   **Headings**. The headings used in this Investment Agreement (*e.g.*, the word "Headings" in this paragraph), are used only for convenience and have no legal significance.

   17.4.   **No Other Agreements**. This Investment Agreement and the documents it refers to (including the Terms of Use) are the only agreements between us.

   17.5.   **Electronic Signature**. You will sign this Investment Agreement electronically, rather than physically.

   17.6.

   17.7.   **Trust.** Upon receipt of this Agreement executed by the Purchaser, the Company will deposit, or accept deposit of, the payment from Purchaser into a trust account at Wells Fargo Bank or such financial institution of Company's choosing ("Escrow Agent"). The subscription amounts will be held in trust until (i) the Company has confirmed that Purchaser is qualified to purchase the interests (ii) the Company has received subscriptions from qualified investors (who may be owners or affiliates of the Company) representing at least the minimum offering amount we have stipulated; and (iii) we decide to accept your subscription. When the Escrow Agent has determined that the required contingency has occurred, then Escrow Agent shall disburse Subscription Proceeds in its possession.

   17.8.   **Risk of Personal Liability**. UNDER THE OPERATING AGREEMENT, PURCHASER WILL HAVE PERSONAL LIABILITY FOR A PORTION OF ALL LIABILITIES OF THE COMPANY.

Exhibit 9 Pg.5

DocuSign Envelope ID: 76DB3FE7-ED91-484F-ADEE-1423B5780792

INVESTOR INFORMATION

*Social Security Number*
*(If You Are an Individual)*          576487968

*Or*

*Employer Identification Number*
*(If You Are an Entity)*          _____

*Mailing Address*          2156 Driver Lane La Verne California 91750

[*Signatures on Following Pages*]

Exhibit 9 Pg.6

## SIGNATURE PAGE FOR AN INVESTOR WHO IS AN INDIVIDUAL

IN WITNESS, WHEREOF, the undersigned has executed this Investment Agreement effective on the date first written above.

DocuSigned by:

*Bernardo Fiig*
Investor Signature

DocuSigned by:

*Bunyapa Fiig*
Second Signature (if required)

Custodian Information

**ACCEPTED**

Strategic Energy Assets VII, LLC

By:  Resolute Capital Managers LLC
Its:  Manager

Signature: DocuSigned by: *Thomas J Powell*
Name:   Thomas J. Powell
Its:   Authorized Signatory

Exhibit 9 Pg.7

# EXHIBIT 10

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

Loan No. _____

**AMENDMENT TO**
**LOAN AGREEMENT AND PROMISSORY NOTE**

This Amendment to Loan Agreement and Promissory Note ("**Amendment**") is dated for reference purposes only as of May 29, 2018_____ and made effective as of June 1, 2018_____ ("**Amendment Effective Date**"), by and between PRMH LENDERS FUND II LLC, a Delaware limited liability company ("**Borrower**"), at 5605 North MacArthur Blvd., Suite 1003, Irving, TX 75038, and the undersigned ("**Lender**").

**RECITALS**

A.  Borrower and Lender are parties to a Loan Agreement ("**Loan Agreement**") made as of August 17, 2017_____.

B.  In connection with the Loan Agreement, Borrower delivered to Lender a Promissory Note ("**Note**") dated August 17, 2017 evidencing a loan ("**Loan**") made to Borrower by Lender.

C.  The original principal amount of the Note is $ 125,000_____.

D.  Lender has elected to renew the term of the Note for an additional Renewal Term.

E.  The parties have agreed to modify the Note to reflect such renewal, and to make other modifications to the Loan Agreement and Note, all as set forth in this Amendment.

NOW, THEREFORE, acknowledging the receipt of adequate consideration and intending to be legally bound, the parties agree as follows:

**AMENDMENT**

1.  Recitals and Definitions. The above Recitals are true and correct. Capitalized terms used but not defined in this Amendment have the meanings given them in the Loan Agreement and Note.

2.  Loan Amount. **SELECT ONE:**

    ☐ No Modification: The principal amount of the Note is $_____. There is no amendment to the principal amount of the Note. The Loan Agreement, Note, and all other Loan Documents will continue to reflect the amount of the Note and Loan set forth in this paragraph.

    ☒ Modification: The principal amount of the Note and the amount of the Loan is amended to be $ 156,000_____. The Loan Agreement, Note, and all other Loan Documents are amended to reflect the amount of the Note and Loan set forth in this paragraph.

3.  Renewal Term. The Renewal Term of the Note is 3_____ year(s).

4.  Renewal Start Date. The Renewal Start Date of the Note is June 1, 2018_____.

5.  Renewal Maturity. The Renewal Maturity (also referred to as the Maturity) of the Note is June 1, 2021

Amend_PRMH-II-1-3yr_Rel1.1.docx

1

Exhibit 10 Pg.1

DocuSign E.            : 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

Loan No. _____

6.  **T***n & Interest Rate Options.** The renewal of the term of the Note allows Lender to choose one of three (3) renewal terms. **SELECT ONE OPTION.** The selected option shall comprise the Renewal Term and interest rate for the Renewal Term for the Note and Loan.

> **SELECT ONE:**
>
>     ☐ **A.**    Term: One (1) Year
>                   Interest Rate: Eight and 00/100 percent (8.00%) per annum
>
>     ☐ **B.**    Term: Two (2) Years
>                   Interest Rate: Nine and 00/100 percent (9.00%) per annum
>
>     ☒ **C.**    Term: Three (3) Years
>                   Interest Rate: Nine and 00/100 percent (9.00%) per annum

7.  **Interest Payment Method.** The renewal of the term of the Note allows Lender to choose one of two (2) methods of calculating interest. **SELECT ONE OPTION.** The selected Option shall comprise the interest payment method for the Note.

> **SELECT ONE:**
>
> ☐ **Simple Interest.** Monthly interest payments will be made by Borrower to Lender in arrears. Borrower will process the payment to Lender of monthly interest not later than the 25th day of the month (unless the 25th day of the month falls on a bank holiday in the State of Texas in which case the monthly interest payment will be made on the first business day after the 25th day of the month), and such payments shall commence in the month following the Renewal Start Date month. The term **"process the payment"** in this paragraph means that Borrower will release funds to Lender's financial institution or to the appropriate payment administrator (whether for Borrower or Lender) for the Loan.
>
> **OR**
>
> ☒ **Compounding Interest.** Interest shall be compounded monthly and paid out by Borrower to Lender at Maturity along with the then outstanding principal balance of the Note. With compounding interest, each month's interest is added to the principal, thereby increasing the principal balance against which the next month's interest is charged.

8.  **Additional Modifications.** To establish compliance with Borrower's current policies and practices, the following additions, amendments and modifications are made to the Note and Loan Agreement. Reference is made to Lender's original Note and Loan Agreement.

> a.  Interest on the Note and Loan is calculated on the basis of a 360-day year, and paid based on a 30-day month.
>
> b.  Interest at the interest rate set forth in this Amendment on (x) existing funds delivered by Lender to Borrower before this Amendment (and not repaid to Lender), and (y) new funds delivered by Lender to Borrower in connection with this Amendment, shall commence at the rate specified in this Amendment on the first business day after the delivery to Borrower, and Borrower's receipt of, (i) the new funds in a "good funds" form (meaning that the funds are usable immediately by Borrower) and (ii) this Amendment completed where necessary by Lender and executed by Lender in a form acceptable to Borrower. Until subsection (i) and subsection (ii) are satisfied, interest on existing funds delivered by

Exhibit 10 Pg.2

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

Loan No. _____

Lender to Borrower before this Amendment (and not repaid to Lender) will continue to accrue interest at the rate specified in the original Note (before this Amendment).

    c.  At Maturity, Borrower will process the payment to Lender of unpaid principal and unpaid accrued interest not later than the 25th day of the month immediately following Maturity (unless the 25th day of the month falls on a bank holiday in the State of Texas in which case the payment shall be processed for payment by Borrower no later than the first business day after the 25th day of the month). Interest shall not accrue during this period following Maturity. The term **"process the payment"** in this paragraph means that Borrower will release funds to Lender's financial institution or to the appropriate payment administrator (whether for Borrower or Lender) for the Loan. Prior to or concurrent with Borrower's repayment to Lender at Maturity or otherwise, Borrower will deliver to Lender a statement of the total sum being repaid by Borrower, which statement will include the outstanding principal sum and any accrued unpaid interest being repaid. The statement shall be binding upon Lender unless Lender notifies Borrower in writing of any objection to such statement within 10 days after Lender's receipt of the statement.

    d.  Payments under the Loan will be made by Borrower to Lender by electronic delivery of funds (unless requested otherwise by Lender in writing).

    e.  The Note will automatically renew for successive additional Renewal Terms as outlined in the Loan Agreement with each Renewal Term being equal to the Renewal Term of this Amendment unless Lender delivers a notice to Borrower requesting repayment in full upon Maturity that is received by Lender not less than 60 days prior to Maturity.

    f.  Lender acknowledges that the proceeds of the Loan will be used to fund, in part, a loan (**"PetroRock Loan"**) from Borrower to its parent company, PETROROCK MINERAL HOLDINGS, LLC, a Texas limited liability company (**"PetroRock"**); and that PetroRock will in turn use the PetroRock Loan to fund its business operations and investments relating to owning or holding (directly or indirectly) oil, gas, or other mineral royalties or leases, or fractional interests therein, or certificates of interest or participation in or investment contracts relative to such royalties, leases, or fractional interests (collectively, **"Oil and Gas Interests"**), and may include, without limitation, repayment of other debt, loans and promissory notes, marketing fees, legal fees, future acquisition of assets, and cash reserves relating to its Oil and Gas Interests.

    g.  PetroRock has provided (or will provide) to Lender an unconditional guaranty (**"Unconditional Guaranty"**) of all amounts due to Lender under the Loan, including, without limitation, all principal and interest due to Lender under the Note.

9.  <u>No Other Modifications; Conflicts.</u> Except as expressly modified or amended by this Amendment, there are no other modifications or amendments to the Loan Agreement or Note, and the same shall remain in full force and effect. If there are inconsistencies between the terms in the Loan Agreement and Note, and the terms in this Amendment, the terms in this Amendment control.

10. <u>Binding Agreement.</u> The Loan Agreement and Note, and all terms, conditions, warranties, representations and covenants therein, as amended by this Amendment, are binding on the parties to this Amendment and in full force and effect.

Amend_PRMH-II-1-3yr_Rell.i.docx

Exhibit 10 Pg.3

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

Loan No. _____

11. <u>Multiple Counterparts; Electronic Signatures.</u> This Amendment may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Amendment, it shall not be necessary to produce or account for more than one such counterpart with each party's signature. Further, this Amendment may be executed by facsimile or by portable document format (.pdf) signature, such that execution of this Amendment by facsimile or by portable document format (.pdf) signature shall be deemed effective for all purposes as though this Amendment was executed as a "blue ink" original.

IN WITNESS WHEREOF, this Amendment has been executed and delivered to be effective as of the Amendment Effective Date.

**BORROWER:**

> PRMH LENDERS FUND II LLC, a Delaware limited liability company
> By: RESOLUTE CAPITAL PARTNERS LTD., a Nevada limited liability company
> Its:    Manager
>
> By: _____
> Name: Stefan Toth
> Title: Authorized Signatory

**LENDER:**

Signature: _Yvette Shaon_
           41FAFF313B4E4A0...

Print Name: Yvette Shaon

Second Signature: _____
*(if required)*
Print Name: _____

Address: P.O Box 7080
         San Carlos, CA 94070

Email: yvette.shaon@sully-miller.com

Custodian Information: IRA Services Trust Company CFBO Yvette Shaon, IRA592390

Amend_PRMH-II-1-3yr_Rel1.1.docx

Exhibit 10 Pg.4

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

# IRA SERVICES TRUST COMPANY

## NOTE MODIFICATION AUTHORIZATION

PO Box 7080 | San Carlos, CA 94070-7080 | www.IRAServices.com
General Phone: (800) 248-8447 | Fax: (605) 385-0050

 

*This form is to be completed if you wish to modify the terms of a promissory note.*

### PERSONAL INFORMATION (*required field)

Should IRA Services need to contact you in regards to this request, your preferred method of contact is:

☐ Email
☐ Primary Phone

| First Name* | Middle Name | Last Name* |
|---|---|---|
| Yvette | | Shaon |

| Account Number (Required if existing IRA Services customer) | Social Security Number* (last 4 digits) | Date of Birth* (MM/DD/YYYY) |
|---|---|---|
| IRA592390 | 7149 | 08/26/52 |

| Phone* XXX-XXX-XXXX | Email |
|---|---|
| 714-521-0267 | yvette.shaon@sully-miller.com |

### NOTE INFORMATION CURRENTLY REFLECTED

| Borrower's Name | | | |
|---|---|---|---|
| PRMH Lenders Fund II | | | |

| Loan Number | Loan Amount | Loan Effective Date (MM/DD/YYYY) | Loan Maturity Date (MM/DD/YYYY) |
|---|---|---|---|
| | 125,000 | 8/25/17 | 6/1/18 |

### BORROWER CONTACT INFORMATION

| Company Name/Individual Name | Contact Person |
|---|---|
| Resolute Capital Partners | Angela Flores |

| Address |
|---|
| 5605 N. MacArthur Ste. 1003 |

| City | State/Province | Zip/Postal Code | Contact Phone XXX-XXX-XXXX |
|---|---|---|---|
| Irving | TX | 75038 | 888-660-8159 |

### NOTE STATUS: EXTENSION TERMS (Your request will not be processed if you do not provide the required documents with this form)

This note has been extended pursuant to the following terms (this section must be fully completed):

Please make sure that all applicable sections are completed to ensure complete and timely processing.

| New Maturity Date (MM/DD/YYYY) | Interest Rate |
|---|---|
| 06/01/2021 | 9 % |

Payment terms

☒ Interest & Principal due at maturity

☐ Periodic payments

Payment Frequency: ☐ Weekly ☐ Monthly ☐ Quarterly ☐ Annually ☐ Other: _____

Amount: _____ ☐ Interest Only ☐ Interest & Principal

© 2017 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.5

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

**NOTE STATUS: UNCOLLECTIBLE** (you must attach any supporting documents with this form)

Based on your note investment status, there may be several documents required to complete the update of your note investment. Your investment update request must accompany all of the required documentation outlined below in order to be processed. Please make sure that all supporting documents are completed in full and submitted at the same time with this form.

This note is uncollectable:

I have used my best efforts to collect on the note and have determined that the note is uncollectable for following reason(s):

*Please check all that apply and provide supporting documentation*

☐ Borrower is in litigation (IMPORTANT: you must provide supporting documentation, such as bankruptcy notice, court documents, etc.)

☐ Note is in foreclosure (IMPORTANT: you must provide foreclosure documents)

☐ Other, explain:

☐ I have enclosed the following documents:

**ACKNOWLEDGMENT, AUTHORIZATION, PARTICIPANT & BORROWER SIGNATURE**

I hereby acknowledge that I am solely responsible for the investment updates I am making. I hold harmless, protect and indemnify the Custodian and Administrator from and against any and all liabilities, losses, damages, expenses and charges that the Custodian and Administrator may sustain or might sustain resulting directly or indirectly from my investment. I further acknowledge that I am solely responsible for the success or failure of this investment. I hereby authorize the update of the asset(s) listed above for my IRA Services Trust Company account.

| Participant Signature *Yvette Shaon* X | Date (MM/DD/YYYY) 5/30/2018 |
|---|---|
| Borrower Signature X | Date (MM/DD/YYYY) |

**IMPORTANT INFORMATION**

Did you print and sign the form, and attach any necessary documents?

Questions? Please contact IRA Services Customer Service at (800) 248-8447, Monday through Friday, from 7 am to 5 pm Pacific Time.

Fax     (650) 745-3279
Email   notes@IRAServices.com
Web     www.IRAServices.com

Deliver to:

**Regular mail**
IRA Services
PO Box 7080
San Carlos, CA 94070-7080

**Overnight mail**
IRA Services
1160 Industrial Road, Unit 1
San Carlos, CA 94070-4128

© 2017 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.6

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

# IRA SERVICES TRUST COMPANY

## INVESTMENT AUTHORIZATION

PO Box 7080 | San Carlos, CA 94070-7080 | www.IRAServices.com
General Phone: (800) 248-8447 | Fax: (605) 385-0050

   

*This form must be used to authorize the purchase of any investment. Please read the attached instruction sheet on how to complete this form and what documents you will need to submit with this form.*

*IMPORTANT: Asset documents must specify the following registration: "IRA Services Trust Company CFBO: [Investor Name] [IRA Account No.] (Tax ID: 26-2627205)"*

### PERSONAL INFORMATION (*required field)

Should IRA Services need to contact you in regards to this request, your preferred method of contact is:

[x] Email

[ ] Primary Phone

| First Name* | Middle Name | Last Name* |
|---|---|---|
| Yvette | | Shaon |

| Account Number (Required if existing IRA Services customer) | Social Security Number* (last 4 digits) | Date of Birth* (MM/DD/YYYY) |
|---|---|---|
| IRA592390 | 7149 | 08/26/52 |

| Phone* XXX-XXX-XXXX | Email |
|---|---|
| 714-521-0267 | yvette.shaon@sully-miller.com |

### INVESTMENT INSTRUCTIONS (Prior to releasing your funds we may contact you for verbal confirmation of these instructions.)

[ ] Expedited Service: Check this box if you want this request to be expedited. Please read the attached instruction sheet for information regarding this service. By checking this box you agree to the fees and terms of this expedite service.

[ ] Change Request: Check this box if this request is a modification of an original request.

| Asset Name* | PRMH Lenders Fund II |
|---|---|
| Asset Type* | Land Lease |

*(e.g. brokerage account, certificate of deposit (CD), hedge fund, IRA LLC, life settlement, LLC/LP, managed futures/foreign currency account, precious metals, private placement, private stock, promissory note (secured or unsecured), publicly-traded security (stock, bond, mutual fund), real property, REIT, tax lien, structured settlement, etc.)*

Contact Information *(all fields must be completed unless otherwise specified)*

| Name of Investment Sponsor/Managing Entity* | Address* |
|---|---|
| Resolute Capital Partners | 4790 Caughlin Parkway #416 Reno NV 89519 |

| Phone* XXX-XXX-XXXX | Fax Number (optional) | Email* |
|---|---|---|
| 888-660-8159 | | documents@resolutecapitalpartners.com |

Amount to Purchase (select one)

Please note we will retain enough cash to maintain your minimum required balance, and to cover any investment-related fees or any unpaid fees before sending your requested amount. If there are insufficient funds to cover the minimum balance and/or fees, your request will be put on hold until sufficient funds are available.

[x] Invest exactly: $31,000

[ ] Invest all available cash balance less funds on hold, required minimum balance, fees due and transaction fees
    [ ] Optional: Specify amount of cash required in custodial cash account before purchase is made:
    _____
    [ ] Optional: If you wish to retain more than the minimum required balance, specify amount to be retained:
    _____

[ ] Total shares/units/interest to purchase: _____

[ ] Invest exactly: _____    Total shares/units/interest to purchase: _____

© 2016 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.7

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

When to Purchase (select one)

(X) Purchase one-time only as soon as possible (default)

( ) Purchase beginning on or after (MM/DD/YYYY): _____

Frequency: ( ) one-time ( ) weekly ( ) monthly ( ) quarterly ( ) semi-annually ( ) annually

## DOCUMENT REQUIREMENTS (Your request will not be processed if you do not provide the required documents with this form.)

Please refer to the attached *INVESTMENT DOCUMENT REQUIREMENTS* document. There may be several documents required to complete your investment transaction. Your investment request must contain all of the required documentation in order to be processed. Please make sure that all supporting documents are completed in full and submitted at the same time with this form. If this is a subsequent investment in an asset that is already held in your account, you may be required to submit supporting documents. *ASSETS MUST BE REGISTERED AS "IRA SERVICES TRUST COMPANY CFBO [INVESTOR NAME] [ACCOUNT NO.] (TAX ID: 26-2627205)".*

## FUNDING INSTRUCTIONS (Please indicate how funds from your account are to be sent (check or wire) for the purchase of the asset listed above.)

| | |
|---|---|
| (X) Send a WIRE. I have completed and attached a *WIRE REQUEST* form. I understand that an outgoing wire fee applies. | |
| (●) Send a CHECK using the following service: | Payee Name & Address (must not be a bank address*) |
|    (●) Regular Mail | Payee Name |
|    ( ) Overnight Mail (via FedEx) (overnight delivery fee + cost applies) | Address |
|    Charge cost of overnight delivery to: | |
|    FedEx Account #: _____ | City/State/Zip |
|    *If no account # is provided, it will be charged to your IRA account* | *We no longer mail checks to bank addresses. |

## ACKNOWLEDGMENT, AUTHORIZATION & PARTICIPANT SIGNATURE

I hereby acknowledge that I am solely responsible for the investment instructions I am making. I hold harmless, protect and indemnify the Custodian and Administrator from and against any and all liabilities, losses, damages, expenses and charges that the Custodian and Administrator may sustain or might sustain resulting directly or indirectly from my investment. I acknowledge that I am solely responsible for the success or failure of this investment. **I acknowledge that if I do not provide a notarized signature, IRA Services Trust Company may contact me for verbal confirmation of my investment instructions, which may cause delays if I cannot be reached at the phone number provided in Section 1 of this form or any of my phone number(s) on record.** I hereby authorize the purchase of the asset listed above for my IRA Services Trust Company account.

| Account Owner's Signature | Date (MM/DD/YYYY) |
|---|---|
| x *Yuette Shaon* | 5/30/2018 |

## IMPORTANT INFORMATION

Did you print and sign the form, and attach any necessary documents?

Questions? Please contact IRA Services Customer Service at (800) 248-8447, Monday through Friday, from 7 am to 5 pm Pacific Time.

**Fax**   (650) 745-2929
**Email**  investment@IRAServices.com
**Web**   www.IRAServices.com

Deliver to:

**Regular mail**
IRA Services Trust Company
PO Box 7080
San Carlos, CA 94070-7080

**Overnight mail**
IRA Services Trust Company
1160 Industrial Road, Unit 1
San Carlos, CA 94070-4128

© 2018 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.8

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

# IRA SERVICES
## TRUST COMPANY

# PROHIBITED TRANSACTIONS QUESTIONNAIRE

PO Box 7080 | San Carlos, CA 94070-7080 | www.IRAServices.com
General Phone: (800) 248-8447 | Fax: (605) 385-0050

*This form is to be completed by all individuals who are lending funds to, or buying stock or an interest in, a business entity, LLC, Limited Partnership, etc.*

## PERSONAL INFORMATION (*required field)

Should IRA Services need to contact you in regards to this request, your preferred method of contact is:

[x] Email
[ ] Primary Phone

| First Name* | Middle Name | Last Name* |
|---|---|---|
| Yvette | | Shaon |

| Account Number (Required if existing IRA Services customer) | Social Security Number* (last 4 digits) | Date of Birth* (MM/DD/YYYY) |
|---|---|---|
| IRA592390 | 7149 | 08/26/52 |

| Phone* XXX-XXX-XXXX | Email |
|---|---|
| 714-521-0267 | yvette.shaon@sully-miller.com |

## INVESTMENT NAME/DESCRIPTION

Name of company/limited partnership/business entity in which you wish to invest
PRMH Lenders Fund II LLC,

## QUESTIONNAIRE

1. Do you or any family member own any <u>personal</u> units/shares in the company?  ( ) Yes  (x) No

If yes:

| How are you related to the family member? (Write "self" if yourself) | What is the percentage of ownership? |
|---|---|
| | % |

2. Are you or any family member the main decision-maker or majority owner of the company?  ( ) Yes  (x) No

If yes:

| How are you related to the family member? (Write "self" if yourself) |
|---|
| |

3. Are you or any family member employed by the company?  ( ) Yes  (x) No

If yes:

| How are you related to the family member? (Write "self" if yourself) | What position is held? |
|---|---|
| | |

4. Will you or any family member be receiving any <u>personal</u> gain based on your IRA investment in the company?  ( ) Yes  (x) No

If yes:

| How are you related to the family member? (Write "self" if yourself) | Please explain |
|---|---|
| | |

© 2016 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.9

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

5. Additional comments and/or explanations:

## SIGNATURE

| Participant Signature | Date (MM/DD/YYYY) |
|---|---|
| X  *Yvette Shaon* | 5/30/2018 |

*Original signature required; electronic signatures and/or signature fonts are not authorized.*

## IMPORTANT INFORMATION

Did you print and sign the form, and attach any necessary documents?

Questions? Please contact IRA Services Customer Service at
(800) 248-8447, Monday through Friday, from 7 am to 5 pm Pacific Time.

Fax      (650) 745-2929
Email    investment@IRAServices.com
Web      www.IRAServices.com

**Deliver to:**

**Regular mail**
IRA Services Trust Company
PO Box 7080
San Carlos, CA 94070-7080

**Overnight mail**
IRA Services Trust Company
1160 Industrial Road, Unit 1
San Carlos, CA 94070-4128

© 2016 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.10

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

 # IRA SERVICES TRUST COMPANY

# WIRE REQUEST

PO Box 7080 | San Carlos, CA 94070-7080 | www.IRAServices.com
General Phone: (800) 248-8447 | Fax: (605) 385-0050

  

*This form is to be attached to the Investment Authorization or Distribution Request form if you are requesting that we wire your funds.*

## PERSONAL INFORMATION (*required field*)

Should IRA Services need to contact you in regards to this request, your preferred method of contact is:

[X] Email

[ ] Primary Phone

| First Name* | Middle Name | Last Name* |
|---|---|---|
| Yvette | | Shaon |

| Account Number (Required if making IRA Services customer) | Social Security Number* (last 4 digits) | Date of Birth* (MM/DD/YYYY) |
|---|---|---|
| IRA592390 | 7149 | 08/26/52 |

| Phone* XXX-XXX-XXXX | Email |
|---|---|
| 714-521-0267 | yvette.shaon@sully-miller.com |

## TRANSACTION TYPE

These wire instructions are for (select one):

(X) An investment; I am submitting an Investment Authorization with this Wire Request form

(•) A distribution; I am submitting a Distribution Request with this Wire Request form

## WIRE INSTRUCTIONS (Outgoing wire fee applies)

Please wire my funds to the following bank account (fields marked with an asterisk (*) are required):

| | |
|---|---|
| Bank Name* | Wells Fargo Bank |
| Bank Address* | San Francisco CA |
| Bank Phone Number* | 888-660-8159    Attention: |
| ABA (wire routing number)* | 121000248 |
| Account Name* | PRMH Lenders Fund II |
| Account Number* | 9177530129 |
| For Further Credit Account Name | |
| For Further Credit Account Number | |

## INTERNATIONAL WIRE (Optional: Do not complete this section if you do not intend to send an international wire)

For International Wires: Please provide the international wiring instructions in the area below. All international wires must go through a domestic intermediary bank (please fill in this information in the space indicated below). Outgoing international wire fee applies.

International Bank (fields marked with an asterisk (*) are required):

| | |
|---|---|
| Bank Name* | |
| Bank Address* | |
| SWIFT Code/IBAN* | |
| Account Name* | |
| Account Number* | |
| For Further Credit Account Name | |
| For Further Credit Account Number | |

© 2016 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.11

DocuSign Envelope ID: 0FD9DA97-541A-4939-9EC5-FB95082EE2ED

Domestic Intermediary Bank (Mandatory) (fields marked with an asterisk (*) are required):

| | |
|---|---|
| Bank Name* | |
| Bank Address* | |
| Bank Phone Number* | |
| ABA (wire routing number)* | |

## AUTHORIZATION

| | |
|---|---|
| Participant Signature<br>DocuSigned by:<br>X _Yuette Shaun_<br>41FAFFJ1384E4A9... | Date (MM/DD/YYYY)<br>5/30/2018 |

## IMPORTANT INFORMATION

Did you print and sign the form, and attach any necessary documents?

Questions? Please contact IRA Services Customer Service at        Deliver to:
(800) 248-8447, Monday through Friday, from 7 am to 5 pm Pacific Time.

**For Investment wires:**
Fax      (650) 745-2929
Email  investments@IRAServices.com
Web   www.IRAServices.com

**For Distribution wires:**
Fax      (650) 745-1403
Email  distributions@IRAServices.com
Web   www.IRAServices.com

**Regular mail**
IRA Services Trust Company
PO Box 7080
San Carlos, CA 94070-7080

**Overnight mail**
IRA Services Trust Company
1160 Industrial Road, Unit 1
San Carlos, CA 94070-4128

© 2016 IRA Services Trust Company. On this form, "IRA Services" means IRA Services Trust Company and its affiliates.

Exhibit 10 Pg.12



## Certificate Of Completion

Envelope Id: 0FD9DA97541A49399EC5FB95082EE2ED
Subject: PRMH Lenders Fund II Renewal Documents - Yvette Shaon
Source Envelope:
Document Pages: 12                    Signatures: 5
Certificate Pages: 2                  Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Sent

Envelope Originator:
Angela Flores
4790 Caughlin Pkwy
416
Reno, NV 89519
Angela@rcp-ltd.com
IP Address: 75.140.35.125

## Record Tracking

Status: Original
    5/29/2018 3:58:10 PM

Holder: Angela Flores
    Angela@rcp-ltd.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Yvette Shaon<br>yvette.shaon@sully-miller.com<br>Security Level: Email, Account Authentication (None) | *Yvette Shaon*<br>41FAFF313B4E4A0...<br><br>Using IP Address: 146.20.120.75 | Sent: 5/29/2018 4:55:24 PM<br>Viewed: 5/30/2018 2:37:11 PM<br>Signed: 5/30/2018 5:06:48 PM |

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Stefan Toth
stefan@hb-resources.com
Manger
Security Level: Email, Account Authentication (None)

Sent: 5/30/2018 5:06:50 PM

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| AAI Admin<br>admin@aaishares.com<br>AAI Global Pacific<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 5/29/2018 4:55:25 PM |

**Electronic Record and Signature Disclosure:**
  Not Offered via DocuSign

Thomas Chapman
tom@cwsadvisor.com
Security Level: Email, Account Authentication (None)

**COPIED**

Sent: 5/29/2018 4:55:25 PM
Viewed: 5/29/2018 5:09:49 PM

Exhibit 10 Pg.13

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |
| Yvette Shaon | | |
| yvette.shaon@sully-miller.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |
| Thomas Chapman | | |
| tom@cwsadvisor.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |
| AAI Admin | | |
| admin@aaishares.com | | |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/30/2018 5:06:50 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

Exhibit 10 Pg.14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT 11

25
26
27
28

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857







CHOICE
ENERGY
HOLDINGS

SECURED
BUSINESS LOANS

Exhibit 11 Pg.1

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

2 | CHOICE ENERGY HOLDINGS

# DISCLAIMER

This Executive Summary has been prepared solely for the benefit of eligible private lenders interested in making a loan to the Company. This disclosure contains information which may not be disclosed to anyone other than persons such as accountants, financial planners, or attorneys retained by the eligible lender for the purpose of rendering professional advice related to the making of a loan to the Company, (collectively "recipient"). This disclosure may not be reproduced, divulged, or used for any other purpose unless written permission is obtained from the Company.

This Executive Summary is for informational purposes only and does not constitute an offer to sell or the solicitation of an offer to buy any securities. Neither the Company nor any of its officers, directors, employees, affiliates or representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of any of the information contained in this Executive Summary or in any other written or oral communication transmitted or made available to a recipient. No person has been authorized to give any information or to make any representations other than those in this Executive Summary. Any prospective lender who receives information or representations from any other source about the Company, the loan, the Project(s), or any other matter relevant to the lender's decision to make the loan, should contact the Company immediately to determine the accuracy of such information. Only those specific, express representations and warranties, if any, which may be made to a recipient in one or more definitive written agreements when, as and if executed, and subject to all such limitations and restrictions as may be specified in such definitive written agreements, may be relied on by a recipient or have any legal effect whatsoever.

Prospective lenders should not regard the information provided by the Company as a substitute for careful and independent tax and financial planning. Before making the loan, you are encouraged to consult with your own independent legal counsel, accountant, and other professionals with respect to the legal and tax aspects of making the loan, with specific reference to your own tax and financial situation and whether the loan meets your financial objectives and risk tolerance.

Target returns set forth within any marketing or disclosure materials may not be realized; actual results may differ materially from the stated goals. Past performance is no guarantee of future results. All loans involve risk, including the loss of principal and the potential requirement to lend additional money in order to protect your loan principal in the event of a default. Any portions of the information presented in this Executive Summary which constitute "forward-looking statements" (which can be identified using forward-looking terminology such as "may", "will", "expect", "anticipate", "estimate", "plan", or "continue" or the negative form thereof or other variations thereon or comparable terminology) are estimates of future performance based upon assumptions which the Company believes are reasonable but which may or may not prove to be correct.

The Company reserves the right to reject any prospective lenders in whole or in part for any reason, or for no reason, at Company's sole discretion. The sale or other transfer of the Loan is restricted by contract. No independent person has confirmed the accuracy or truthfulness of this Executive Summary, nor whether it is complete. Any representations to the contrary is illegal.

The Company will make available to any prospective lender the opportunity to ask questions and receive answers concerning the terms and conditions of the loan, the Company, or any other relevant matters, and to obtain any additional information that is necessary to verify the accuracy of the information provided, to the extent the Company possesses such information or can acquire it without unreasonable effort or expense. All pictures of nodding donkeys/pump-jacks are for aesthetic purposes only and should be dismissed as irrelevant to the investment decision process.

Exhibit 11 Pg.2

# WELCOME TO CHOICE ENERGY HOLDINGS

### OVERVIEW

Secured Business Loans paying 7.5% annual returns, with monthly interest payments are being offered to eligible lenders. Each lender holds a "pari-passu" first position security interest in the Project Loan Documents (including a secured Promissory Note) from PetroRock Mineral Holdings, LLC to Choice Energy. PetroRock is an established company in Texas with a demonstrated track record of acquiring, developing, and liquidating mineral assets in proven Texas oil fields.

Funds will be utilized by PetroRock for its oil and gas exploration and production program. The Project Loan from Choice Energy to PetroRock is secured by first position liens against specific assets of PetroRock; these assets are located in identified core production areas of Texas and include producing oil and gas wells, mineral leases, royalty interests, and cash reserves.

PetroRock adds value, stability and diversity to its asset holdings by acquiring producing wells with upside drilling potential, as well as assembling groups of leases which can be packaged for larger development and sale to partner companies, independents, or institutional developer/operators. Homebound Resources, as a partner company to PetroRock, serves as the primary purchaser of PetroRock's assets. Key to PetroRock's success is the ability to apply advanced technology and expertise in niches which are too complex for small developers and too small for large corporations.



Exhibit 11 Pg.3

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

4    CHOICE ENERGY HOLDINGS

## STRUCTURE

Each Business Loan is secured by a pari passu* security interest in Project Loan Documents, perfected via a UCC Financing Statement in favor of each Lender. Perfected liens are created when the lender files a UCC financing statement with the appropriate authority (commonly the office of the secretary of the state). This statement specifies the collateral used to secure the loan and gives the lender precedence in the collection process if the borrower defaults. Unperfected liens leave lenders open to the possibility that other creditors can make a claim against the collateral used in the loan. The Project Loan will be secured by liens against real and personal property of Sponsor. **

## PAYMENTS

Monthly interest payments will be processed in arrears, on the 25th day of the month, starting the month following the first full calendar month from the start date. The start date is the first business day following receipt of funds and completed documents.

## RENEWAL PROCESS

The loan will not automatically renew. Any request for renewal must be received in writing 30 days prior to maturity.

## REPAYMENT

If the lender does not opt for an additional term, principal and last interest payment will be processed 25 days after maturity.



*Pari-passu: loans have equal rights of payment /equal seniority.
** The above statements and diagrams are simplified and for illustration purposes only.

Exhibit 11 Pg.4

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

# OIL & GAS EXPENDITURES

## LEASES AND MINERAL INTERESTS

Oil and gas land bank companies are formed to acquire, manage and sell related oil and natural gas (mineral) leases, mineral interest ownership, equipment, and producing properties. The leases entitle the lessee the right to explore, produce, and sell oil and natural gas extracted from the leased property. These rights are conveyed from the mineral interest owner to the lessee. Mineral interest ownership refers to ownership of the right to exploit, mine, or produce all minerals lying beneath the surface of a property. Equipment refers to above ground pipelines, production facilities and separation equipment used in oil and gas operations. Producing properties are properties that already have hydrocarbon production.

## ROYALTY/MINERAL INTERESTS

"Oil and Gas royalties refer to funds received from the production of oil or gas, free of costs except taxes. Oil and gas royalties are also the cash value paid by a lessee to the royalty interest owners, based on a percentage of gross production from the property, free and clear of all costs"[1] owner who owns a royalty interest participates in the revenue produced from the resource but does not bear responsibility for any costs.

## WORKING INTERESTS

Working Interests (WI) are a form of investment in oil and gas drilling operations in which the investor shares in the profits of successful wells and is directly liable for a portion of the ongoing costs associated with exploration, drilling and production. The Project Loan to PetroRock will be secured by WI, among other assets.

## CASH RESERVES

An allocation of Cash Reserves provides PetroRock the necessary liquidity to meet short-term capital needs along with the ability to capitalize on opportunities in the fast-paced energy industry. The allocation provides a margin of safety for the Lenders and for PetroRock.

[1] 1 Oil and Gas Royalties Law and Legal Definition. USLegal.com accessed 8March2017 https://definitions.uslegal.com/o/oil-and-gas-royalties/



Exhibit 11 Pg.5

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

6 | CHOICE ENERGY HOLDINGS

# AREAS OF INTEREST

## TEXAS

Texas leads the nation in energy produced from crude oil and natural gas; although billions of barrels have been extracted from Texas, according to Walter Guidroz, program director for the USGS Energy Resources Program, there is potential to find billions more.[2, 3]



## THE PERMIAN BASIN

The Permian region, in western Texas and southeastern New Mexico, has been one of North America's major oil and natural gas producing areas for nearly a century. In November of 2016, the U.S. Geological Survey (USGS) reported that the Wolfberry play in the Midland Basin portion of Texas' Permian Basin province contains an estimated 20 billion barrels of oil, making it the largest estimated continuous oil accumulation that USGS has assessed in the United States to date. The USGS also estimates the basin contains 16 trillion cubic feet of associated natural gas, and 1.6 billion barrels of natural gas liquids.[2]



## EAST TEXAS BASIN

The East Texas Oil Field, located in east Texas, was discovered in 1930 and has one of the largest proven oil reserves in the United States. The East Texas Basin encompasses over 80 separate oil pools, containing an estimated ultimate recoverable reserve of 7.7 billion barrels of oil.[4]

## WESTERN GULF BASIN

The Eagle Ford formation, found in the Western Gulf Basin, ranges from Eastern to Southwest Texas and southward into Mexico. According to the USGS, the conventional Eagle Ford formation holds an estimated 141 million barrels of oil, 16 million barrels of natural gas liquids, and 502 billion cubic feet of natural gas.[5]

---

[2] Texas, State Profile and Energy Estimates. U.S. Energy Information Administration, January 19, 2017. https://www.eia.gov/state/analysis.php?sid=TX

[3] USGS Estimates 20 Billion Barrels of Oil in Texas' Wolfcamp Shale Formation. U.S. Geological Survey November 15, 2016. https://www.usgs.gov/news/usgs-estimates-20-billion-barrels-oil-texas-wolfcamp-shale-formation

[4] Nontechnical Guide to Petroleum Geology, Exploration, Drilling & Production / Edition

[5] Norman J. Hyne, 2012. ISBN-10: 1593702698.

Exhibit 11 Pg.6

DocuSign Envelope ID: E1D4E613-DF51-4A83-AD90-77D6D393C857

# PETROROCK TEAM



### STEFAN TOTH - CHAIRMAN & CEO

Stefan Toth is a distinguished entrepreneur with over 20 years of experience in strategic planning and company growth in both the energy and real estate industries. As Chairman and CEO Stefan provides leadership and strategic vision to the PetroRock team.



### TED ETHEREDGE - PRESIDENT & COO

Ted Etheredge is the former CEO of ARMtech Insurance Services, Inc., the 5th largest publicly traded crop insurance company in the nation. Ted brings 30 years of involvement in oil and gas investing to the PetroRock management team. He is responsible for operational management, oversight of the day-to-day operations, and compliance issues for the company.



### PABLO CORTEZ - EVP, BD & FINANCE

As the Business Development and Finance lead, Pablo Cortez is responsible for acquisition and divestitures, as well as budgeting and reserves. He brings extensive experience in the energy sector including oil and gas exploration and renewable energy. Prior to joining PetroRock and HomeBound Resources, Pablo worked for a boutique oil and gas development firm in Dallas, assisting in acquisitions.

In addition to the Senior Executive Team, PetroRock has acquired a wealth of highly skilled and experienced oil and gas industry professionals, including the following:

- 3 Senior Geologists; 67 years combined practice in oil and gas exploration and production.
- 2 Senior Reservoir Engineers; 48 years combined experience in the geo-scientific field.
- Geologist/Geophysicist; Certified by the Texas Board of Professional Geologists, provides expert analysis; credited with numerous discoveries in East Texas and the Gulf Coast.
- Production Operations Manager; 19 years in petroleum operations for 6 drilling companies across Texas, Louisiana, and Mississippi.
- Senior Geological Technician; over 10 years extensive background in technical operations, IT solutions, and database management for geosciences.
- Land Operations Manager; 12 years of experience across states of Texas, Oklahoma, and Louisiana; awarded Certified Professional Landman in 2015.
- 2 Field Operations Managers; 52 years combined experience.
- Engineering Technician; 19 years of experience, including well data collection, budgeting, and compliance.
- Controller; 17 years specific industry experience in accounting, finance, and human resources.

Exhibit 11 Pg.7

8 | CHOICE ENERGY HOLDINGS

# STRATEGIC PARTNERS

### RESOLUTE CAPITAL PARTNERS
Resolute is a private equity group that invests in operating companies and projects through a variety of investment strategies. The Resolute Deal Committee brings decades of proven experience in wealth management, capital raising, investment banking, and commercial banking within the commercial real estate, oil and gas, and alternative investment sectors.

### THOMAS J. POWELL - SENIOR MANAGING PARTNER
Tom is an innovative investment manager and banker with extensive experience in investment banking, private equity, and alternative asset management. His career began in 1988 in Silicon Valley at Wells Fargo Bank where he earned the distinction of being named the youngest Vice President in the Company's then 140-year history. In 1999, Tom founded and led the growth of ELP Capital, Inc., a multi-billion-dollar mortgage banking and investment company.  Spanning a career of almost 30 years, Tom has been responsible for raising and managing more than $1.4 billion of institutional grade and private investments. As an Alumni of Harvard University, Tom has taught international graduate students as an instructor in Harvard's Office of Executive Education.  He is the author of numerous publications, including *Six Secrets: An Entrepreneur's Guide to Attracting Startup Capital* (co-author), and pens a newsletter and blog, *The Powell Perspective: Observations on the Economy, Real Estate, Finance and Investing.*

### HOLLAND & HART
Holland & Hart is a renowned law firm and the largest in the Mountain West Region. Formed 70 years ago, the firm's commitment to integrity, excellence, and innovation has propelled its growth to over 400 attorneys in 16 offices, including Colorado, Wyoming, Idaho, Montana, Nevada, New Mexico, Utah, and Washington D.C. Its extensive team of legal experts in securities law, finance, and real estate development make it a vital resource for the Company.

### ASSURED SERVICES
Assure Services is a private equity, back office services firm providing fund administration to Resolute Capital Partners. Functions provided include quarterly account reconciliation, investment valuations, quarterly and annual financial statements, audit and tax return support, payment processing, and expense tracking.



Exhibit 11 Pg.8

# EXHIBIT 31

## UNITED STATES OF AMERICA
### Before the
### SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 10987 / September 24, 2021**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 93124 / September 24, 2021**

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 5872 / September 24, 2021**

**INVESTMENT COMPANY ACT OF 1940**
**Release No. 34382 / September 24, 2021**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20597**

|  |  |
|---|---|
| In the Matter of<br><br>**Resolute Capital Partners LTD, LLC,**<br>**Homebound Resources, LLC,**<br>**Thomas J. Powell, and**<br>**Stefan T. Toth,**<br><br>**Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, SECTION 9(b) OF THE INVESTMENT COMPANY ACT OF 1940, AND SECTION 203(f) OF THE INVESTMENT ADVISERS ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

### I.

The Securities and Exchange Commission ("SEC" or "Commission") deems it appropriate and in the public interest that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") against Resolute Capital Partners LTD, LLC ("RCP") and Homebound Resources, LLC ("Homebound"); that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act, Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Section 9(b) of the Investment Company Act of 1940 ("Investment Company Act") against Stefan T. Toth ("Toth"); and that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act, Sections 15(b), and 21C of the

Exhibit 31 p.1

Exchange Act, Section 9(b) of the Investment Company Act, and Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act") against Thomas J. Powell ("Powell") (collectively, "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have each submitted an Offer of Settlement (the "Offers") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933, Sections 15(b) and 21C of the Securities Exchange Act of 1934, Section 9(b) of the Investment Company Act of 1940, and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order").

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[1] that

### Summary

1.     These proceedings concern material misrepresentations and omissions made in connection with unregistered oil and gas securities offerings by Powell and Toth, and two entities they respectively control, RCP and Homebound.  Between 2016 and 2019 (the "Relevant Period"), Respondents and salespeople acting on their behalf sold more than $250 million of debt and equity securities in unregistered offerings, based on working interests in oil and gas wells, to retail investors.  Respondents provided insufficiently supported projections of future oil production, made statements about potential tax benefits that were unavailable to certain investors, overstated cash reserves, and made incomplete disclosures regarding potential uses of investor funds, including the amount of funds that would be used for payments to prior debt and equity investors. Respondents should have known that their statements and omissions were materially misleading.

2.     As a result, Respondents violated the antifraud provisions of Securities Act Sections 17(a)(2) and 17(a)(3).  In addition, Respondents violated Sections 5(a) and 5(c) of the Securities Act by offering and selling securities without having a registration statement filed or in effect with the Commission.  Finally, Respondents Powell and Toth violated Section 15(a) of the Exchange Act by acting as unregistered brokers in connection with the offerings.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

Exhibit 31 p.2

## Respondents

3.      **Resolute Capital Partners LTD, LLC** ("RCP") is a Nevada company with offices in Texas, California and Minnesota.  Powell was the owner of RCP and its Senior Managing Partner during the Relevant Period.  RCP created numerous oil and gas debt and equity investment vehicles using wells identified by Homebound Resources, LLC and its affiliates.  RCP, through its affiliates, also has ownership stakes in certain of the equity offerings.  RCP describes itself as a private equity firm that "gives smart investors access to beyond-Wall Street assets, such as oil and gas wells."

4.      **Homebound Resources, LLC** ("Homebound") is a Texas company located in Irving, Texas.  Homebound, created in 2014 and managed by Toth, is a subsidiary of Homebound Financial Group, LP ("Homebound Financial").  Homebound acts as a project sponsor for RCP's offerings and was responsible for identifying and purchasing the oil and gas wells in which the RCP investment vehicles owned working interests.

5.      **Thomas Joseph Powell**, age 53, is a resident of Reno, Nevada.  Powell is the owner of RCP and other related entities, and serves as the Senior Managing Partner of RCP.  During the Relevant Period, Powell was the owner and Chief Executive Officer of Resolute Capital Advisors, LLC, an SEC-registered investment adviser responsible for advising various RCP and Homebound funds.  For part of the Relevant Period, Powell also was a consultant to Homebound and its acting Chief Financial Officer.  Powell has never been associated with a registered broker-dealer.  Powell held a Series 65 license.

6.      **Stefan Tiberiu Toth**, age 48, is a resident of Frisco, Texas.  Toth is the founder, co-owner, Chairman and Chief Executive Officer of Homebound Financial, and also operates and controls its subsidiaries, including Homebound and PetroRock Mineral Holdings, LLC.  Toth has never been associated with a registered broker-dealer.

## Other Relevant Entities

7.      **PetroRock Mineral Holdings, LLC ("PetroRock")** is a Texas company located in Irving, Texas.  Like its sister company Homebound, PetroRock is a subsidiary of Homebound Financial and is managed by Toth.

8.      **Resolute Capital Advisors, LLC ("RCA")** was formed as a Nevada limited liability company in June 2017, and was converted to a Delaware LLC in November 2018.  RCA registered with the SEC in September 2018 as an investment adviser.  RCA is the adviser to certain of the issuers described below (Choice Energy Holdings II, LLC, Choice Energy Holdings III, LLC, Legacy Energy, LLC, Legacy Energy II, LLC, and SEA IV-VIII).

Exhibit 31 p.3

## Facts

### Unregistered Offerings

9.    Respondents sold equity securities to investors in the form of membership interests in the pooled investment vehicles listed in Figure 1 ("Equity Funds") below.  The offering materials for these equity securities offered investors monetary distributions based on well revenue and any subsequent sale of the wells.  None of these offerings were registered with the Commission.

10.    Respondents also sold debt securities to investors in the form of promissory notes. The promissory notes were issued by the companies listed in Figure 2 ("Debt Funds") below, which raised money and lent it to their parent company.  The notes offered fixed returns ranging from 8% to 12% per year, depending on the term.  None of these offerings were registered with the Commission.

11.    Respondents claimed exemptions from registration for all of these offerings pursuant to provisions of the Securities Act and Regulation D, but no exemption from registration was applicable.  Respondents offered the securities through general solicitation, including seminars, dinners and paid radio shows.  Moreover, Respondents failed to take reasonable steps to verify the accredited status of investors when applicable under the claimed exemption, and sold certain of the unregistered securities to approximately 200 non-accredited investors.

12.    Salespeople acting on behalf of Respondents directed investors with traditional retirement accounts that did not allow investments in unregistered oil and gas offerings to companies that assisted the investors in opening, and transferring their retirement funds to, self-directed individual retirement accounts.  Investors then used those accounts to purchase securities issued by the Equity and Debt Funds.

13.    Neither Powell nor Toth was registered as a broker-dealer or associated with a registered broker-dealer, yet each participated in selling these unregistered securities.  They described RCP and Homebound and the Equity and Debt Funds at investor dinners and investor seminars and advised potential investors on the merits of participating, were involved in setting the contractual terms between the issuers and investors, and oversaw the handling of investors' funds. Each of them also directed RCP and Homebound to pay transaction-based compensation in the form of commissions to salespeople who referred investors to the Equity and Debt Funds, and were entitled to certain transaction-based compensation themselves, in the form of overrides, based on the performance of these salespeople.

Exhibit 31 p.4

**Respondents Made Material Misstatements and Omitted Material Facts in the Equity Offerings**

14.    The Equity Funds were pooled investment vehicles that sold LLC interests to investors.  Each of the Equity Funds then purchased a percentage working interest in a set of oil and gas wells identified and purchased by Homebound.  Respondents offered the following Equity Funds during the Relevant Period:

Figure 1:  Unregistered Equity Offerings During the Relevant Period

| Offering | Open Date | Money Raised |
|----------|-----------|--------------|
| HBR VI | July 2016 | $3,295,000 |
| SEA III | December 2016 | $3,995,520 |
| SEA IV | February 2017 | $4,000,000 |
| SEA V | September 2017 | $4,393,300 |
| SEA VI | December 2017 | $4,587,600 |
| SEA VII | May 2018 | $30,589,300 |
| SEA VIII | October 2019 | $10,480,000 |
| **Total** | | **$61,340,720** |

15.    Powell and Toth had ultimate authority over the statements in the offering materials for these Equity Funds that were provided to investors.  The offering materials were approved by Powell on behalf of RCP and Toth on behalf of Homebound, and created a materially misleading impression of RCP and Homebound's operations.  For example, the offering materials stated that the securities were being sold by SEC-registered and FINRA-member broker-dealers.  In fact, the primary sellers of the securities were unregistered brokers.

16.    In addition, potential investors in the Equity Funds were provided with a "one-pager" document that typically featured the RCP and Homebound logos.  The documents were approved by Powell on behalf of RCP and Toth on behalf of Homebound.  The one-pagers contained insufficiently supported oil well production projections regarding the performance of the oil wells in which the Equity Funds owned working interests, particularly in light of prior experience.  The one-pagers for SEA IV, SEA V and SEA VI each projected the same production of barrels of oil per day even though each of the Funds owned working interests in different wells in different regions.  Moreover, at the time of these offerings, the wells owned by Homebound had a track record that fell well short of RCP's prior projections.  For example, RCP had similarly projected 510 barrels of oil per day and 762,625 total barrels over a 3 to 5 year period for SEA III.  Instead, after nearly two years of production, the SEA III wells produced an average of 40 barrels of oil per day, with just 27,857 total barrels.  The SEA IV through SEA VI one-pagers nevertheless

Exhibit 31 p.5

included, and failed to meet, the exact same projections.  The SEA VII materials included even larger insufficiently supported projections that Respondents could not meet:

| Offering | Projected Production | Actual Production |
|----------|---------------------|-------------------|
| SEA IV | 510 barrels/day | 5 barrels/day |
| SEA V | 510 barrels/day | 3 barrels/day |
| SEA VI | 510 barrels/day | 5 barrels/day |
| SEA VII | 2,210 barrels/day | 199 barrels/day |

17.  Offerings materials for the Equity Funds also did not adequately disclose the amount or percentage of investor funds that would be used for marketing expenses, commissions to salespeople, expenses and salaries of Homebound and RCP employees and consultants, and payments to investors from prior offerings.

18.  In addition, Respondents made statements about the potential tax benefits of these investments that were misleading to retirement account investors.  Specifically, Respondents provided investors with a document drafted by Powell entitled "Tax Benefits of U.S. Oil & Gas Investments."  The document described potential tax benefits associated with investments in oil and gas, but did not disclose that the benefits were not available to retirement account investors.

**Respondents Made Material Misstatements and Omitted Material Facts in the Debt Offerings**

19.  The debt offerings sold by Respondents involved promissory notes issued by financing companies wholly-owned by PetroRock, a company owned by Homebound Financial and managed by Toth.  Each of the Debt Funds lent the money it raised from investors to PetroRock.  Respondents offered and sold securities issued by the following Debt Funds during the Relevant Period:

Exhibit 31 p.6

Figure 2:  Unregistered Debt Offerings During the Relevant Period

| Offering | Open Date | Money Raised |
|---|---|---|
| HBR VI | May 2016 | $3,200,000 |
| SEA III | November 2016 | $3,750,000 |
| PRMH Lenders Fund | April 2017 | $20,008,750 |
| PRMH Lenders Fund II | May 2017 | $19,491,250 |
| PRMH Lenders Fund III | November 2017 | $20,529,000 |
| PRMH Lenders Fund IV | December 2017 | $21,643,000 |
| Choice Energy I | January 2018 | $13,418,000 |
| Legacy Energy | March 2018 | $39,702,000 |
| Legacy Energy II | May 2018 | $7,454,517 |
| Choice Energy II | July 2018 | $13,134,600 |
| Choice Energy III | August 2018 | $37,673,764 |
| **Total** | | **$192,550,364** |

20.      Offering materials approved by Powell and Toth and utilized by Respondents for the debt offerings contained statements and omissions concerning the use of investor funds that created a materially misleading impression.  The offering materials disclosed that the issuers would lend funds to PetroRock and that PetroRock would use the funds to acquire oil and gas leases, fund its business operations and investments, and, in certain offerings, make interest payments on other PetroRock debt.  These disclosures were materially misleading because investors were not told that the majority of assets raised would be used to make payments to investors in other Debt Funds.

21.      The offering materials for the PRMH Lenders Fund I-IV debt offerings stated that PetroRock would allocate *all funds* it received in predetermined percentages to specific uses, including land, royalty/mineral rights, oil and gas working interests, and 20% for "cash reserves."  These statements were materially misleading because, in addition to failing to disclose that funds would be used to repay prior investors, PetroRock did not have the $15 million that it should have held in cash reserves to satisfy the 20% pledge.  In fact, by the end of 2019, PetroRock had less than $100,000 in cash, with only $12,600 earmarked for the four PRMH Lenders Funds.

22.      In early 2018, Legacy Energy raised approximately $39.7 million from investors through the sale of promissory notes offering 8-9% annual interest, and loaned the money raised from investors to PetroRock.  In the offering materials prepared by Powell and Toth, prospective investors were told that the "primary purpose" of Legacy Energy was to "finance the business and investment operations of PetroRock in connection with its Oil and Gas Interests" and that the funds

Exhibit 31 p.7

they provided may be used for, among other things, the "repayment of other debt, loans and promissory notes" of PetroRock affiliates.

23.    The offering materials for Legacy Energy were materially misleading because they failed to disclose that some of the funds it received from investors and loaned to PetroRock would be used to make distributions to equity investors in an undisclosed related-party transaction. Nearly half of the money raised was used to close-out the HBR VI and SEA III Funds, including making distributions to equity investors in those Funds.  Respondents made those payments through a series of related-party transactions that Respondents did not disclose in the offering materials.  PetroRock loaned the money it received from Legacy Energy to Texas Mineral Holdings, LLC ("TMH"), an entity owned by Homebound, Powell, and other RCP employees. TMH then used the money to purchase the oil well interests owned by HBR VI and SEA III. Respondents set the price for that transaction without an independent appraisal or any other market-based valuation.

24.    Respondents touted the success of the HBR VI and SEA III offerings in marketing efforts for subsequent offerings, while failing to disclose the related-party nature of the sale of the HBR VI and SEA III well interests.  Respondents stated that their investment vehicles had returned $93 million to oil and gas equity and debt investors, and that equity investors in HBR VI and SEA III had enjoyed an average 11% rate of return.  These claims were materially misleading because Respondents failed to disclose that these purported returns were based on related-party and not market-based transactions, and came primarily from other investor funds as opposed to successful operations.

## Violations

25.    As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully[2] violated Section 17(a)(2) of the Securities Act, which makes it unlawful for "any person in the offer or sale of securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material

---

[2] "Willfully," for purposes of imposing the relief contained in this Order, "'means no more than that the person charged with the duty knows what he is doing.'"  *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "also be aware that he is violating one of the Rules or Acts."  *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965).  The decision in *The Robare Group, Ltd. v. SEC*, which construed the term "willfully" for purposes of a differently structured statutory provision, does not alter that standard.  922 F.3d 468, 478-79 (D.C. Cir. 2019) (setting forth the showing required to establish that a person has "willfully omit[ted]" material information from a required disclosure in violation of Section 207 of the Advisers Act).

Exhibit 31 p.8

fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[3]

26.     As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully violated Section 17(a)(3) of the Securities Act, which makes it unlawful for "any person in the offer or sale of any securities . . . to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

27.     As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully violated Section 5(a) of the Securities Act, which states that "[u]nless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such a security through the use or medium of any prospectus or otherwise, or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

28.     As a result of the conduct described above, Respondents Powell, Toth, RCP and Homebound willfully violated Section 5(c) of the Securities Act, which states that "[i]t shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security."

29.     As a result of the conduct described above, Respondents Powell and Toth willfully violated Section 15(a) of the Exchange Act, which makes it unlawful for any broker or dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance" with Section 15(b) of the Exchange Act. Section 3(a)(4) of the Exchange Act defines "broker" generally to mean "any person engaged in the business of effecting transactions in securities for the account of others."

## **Undertakings**

Respondents Powell, Toth, RCP and Homebound undertake to:

30.     Refrain from participating, directly or indirectly, in any unregistered offer, issuance or sale of a security related to oil and gas for a period of two years after the date of this Order; provided, however, that such undertaking shall not prevent Respondents from purchasing or selling any securities, other than penny stocks, for their own personal accounts.

---

[3] A violation of either Section 17(a)(2) or Section 17(a)(3) of the Securities Act does not require scienter and may rest on a finding of negligence. *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980).

Exhibit 31 p.9

31.     Within ten (10) days of the entry of this Order, and for a period of three years, Respondents shall post a clearly referenced link to the Order in a prominent area of the home page of all RCP and Homebound web sites, and all other commercial web sites under Respondents' direction or control.

32.     Engage, at Respondents' own expense, an Independent Compliance Consultant (the "Consultant"), not unacceptable to the Commission's staff, within forty-five (45) days of the issuance of this Order, and for a period of three years from the date of the Consultant's engagement.  Respondents shall supply a copy of this Order to the Consultant.  No later than twenty (20) days following the date of the Consultant's engagement, Respondents shall provide the Enforcement Division ("Division") staff with a copy of the engagement letter detailing the Consultant's responsibilities, which shall include the reviews and reports to be made by the Consultant as set forth in this Order.

    a.  For the three year engagement period, Respondents shall require the Consultant to:

        i.  Review Respondent RCP's and Homebound's policies and procedures, proposed offering materials for any securities offered by Respondents or any entity under the control of any of the Respondents, this Order, the federal securities law registration exemption that would be relied upon for the specific offering, and any other materials that the Consultant deems relevant, concerning the following topics:

- policies and procedures to provide reasonable assurance of the material accuracy and completeness of disclosures made in the offering materials;
- policies and procedures for determination of the accredited status of potential investors in light of the registration exemption applicable to the offering;
- the plan of distribution for the offering;
- policies and procedures for acceptance of retirement account funds in the offering;
- policies and procedures for determining any performance projections disclosed in the offering materials;
- policies and procedures for identifying and tracking marketing expenses relating to the offering;
- policies and procedures for setting and maintaining any cash reserves disclosed in the offering materials;
- policies and procedures for identifying and disclosing any related-party transactions concerning fund assets; and
- any other topic that the Consultant deems relevant to reasonably ensure compliance with the federal securities laws.

Exhibit 31 p.10

    ii.    Certify, in writing (with a copy sent to the Division), prior to any offering of securities by Respondents, or any entity under the control of any of the Respondents, that the Consultant has reviewed the above-referenced policies and procedures and related materials in paragraph 32(a)(i), and any other materials that the Consultant deems relevant, and based on its review, (1) has determined that Respondents' policies and procedures for each of the above-referenced topics are reasonably designed to promote Respondents' compliance with the federal securities laws identified as violations in this Order, and (2) that Respondents are in compliance with the above-referenced policies and procedures in paragraph 32(a)(i). In instances where Respondents are not in compliance with the above-referenced policies and procedures or where the Consultant has identified any potential noncompliance with the federal securities law, the Consultant will promptly notify Respondents and propose steps to bring Respondents into compliance. If Respondents remain noncompliant after 45 days of any reported noncompliance, Consultant shall promptly notify the Division and copy the Respondents on such notification.

    iii.    Submit an annual report to Respondents and the Division that describes the work done by the Consultant, including, but not limited to, the steps taken by Respondents to ensure that any offerings of securities are in compliance with the federal securities laws.

b.    Respondents shall cooperate fully with the Consultant and shall provide the Consultant with access to such of Respondents' files, books, records, and personnel, except as protected by privilege and/or as attorney work product, as are reasonably requested by the Consultant for review.

c.    Respondents shall require the Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity. The agreement will also provide that the Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Commission's Director of Enforcement, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

Exhibit 31 p.11

d.  To ensure the independence of the Consultant, Respondents: (1) shall not have the authority to terminate the Consultant or substitute another Independent Compliance Consultant for the initial Consultant, without the prior written approval of the Commission staff; and (2) shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to this Order at the rates agreed to in the engagement letter.

e.  The reports by the Consultant will likely include confidential financial, proprietary, competitive business or commercial information. Public disclosure of the reports could discourage cooperation, impede pending or potential government investigations or undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except (1) pursuant to court order, (2) as agreed to by the parties in writing, (3) to the extent that the Commission determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) is otherwise required by law.

33.    Certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondents agree to provide such evidence. The certification and supporting material shall be submitted to Assistant Director Brian O. Quinn (100 F Street NE, Washington, D.C. 20549), with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act, Sections 15(b)(6) and 21C of the Exchange Act, Section 203(f) of the Advisers Act, and Section 9(b) of the Investment Company Act, it is hereby ORDERED that:

A.    Respondents shall cease and desist from committing or causing any violations and any future violations of Sections 5(a), 5(c) and 17(a)(2) and (3) of the Securities Act.

B.    Respondents Powell and Toth shall cease and desist from committing or causing any violations and any future violations of Section 15(a) of the Exchange Act.

C.    Respondents shall comply with the undertakings enumerated in paragraphs 30 through 33 above.

Exhibit 31 p.12

D.     Respondents Powell and Toth be, and hereby are:

barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization;

prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter; and

barred from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock.

with the right to apply for reentry after two (2) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

E.     Any reapplication for association by Respondents Powell and Toth will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, compliance with the Commission's order and payment of any or all of the following:  (a) any disgorgement or civil penalties ordered by a Court against the Respondents in any action brought by the Commission; (b) any disgorgement amounts ordered against the Respondents for which the Commission waived payment; (c) any arbitration award related to the conduct that served as the basis for the Commission order; (d) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (e) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

F.     Respondent Powell shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $75,000 to the Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

G.     Respondent Toth shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $75,000 to the Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

H.     Respondent RCP shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $225,000 to the Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Exhibit 31 p.13

I.      Respondent Homebound shall, within seven days of the entry of this Order, pay a civil money penalty in the amount of $225,000 to the Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

      (1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

      (2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

      (3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying the respective Respondent's name as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Carolyn Welshhans, Associate Director, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

J.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the penalties referenced in paragraphs F through I above.  Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in these proceedings.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on

Exhibit 31 p.14

behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in these proceedings.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. § 523, the findings in this Order are true and admitted by Respondents Powell and Toth, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents Powell and Toth under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with these proceedings, is a debt for the violation by Respondents Powell and Toth of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. § 523(a)(19).

By the Commission.

Vanessa A. Countryman
 Secretary

Exhibit 31 p.15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# EXHIBIT 33

25
26
27
28

CAUSE NO. DC-22-04656

| | | |
|---|---|---|
| PETROROCK MINERAL HOLDINGS, LLC, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § § | |
| MINERVA RESOURCES, LLC, MERCURY OPERATING, LLC, STEFAN T. TOTH, 2X5 ENTERPRISES LIMITED PARTNERSHIP, THE 2X5, LLC, and CRONUS MINERAL HOLDINGS, LLC, | § § § § § § § § | DALLAS COUNTY, TEXAS |
| Defendants. | § § | 101ST JUDICIAL DISTRICT |

## AFFIDAVIT OF THOMAS J. POWELL

STATE OF _____  §
                                                           §
COUNTY OF _____  §

Before me, the undersigned notary, on this day personally appeared Thomas J. Powell, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1. "My name is Thomas J. Powell. I am over the age of 21 and have never been convicted of a felony. I am of sound mind, am capable of making this affidavit, and have personal knowledge of each of the facts set forth herein, which are true and correct. I attest to and sign this Affidavit under penalty of perjury.

2. I am the sole Manager of Resolute Energy Capital, LLC ("REC"), the manager of PetroRock Mineral Holdings, LLC ("PetroRock"), the owner of all Managing Rights Units of PetroRock, and the Selector of PetroRock. As such, I am authorized to execute this Affidavit on behalf of PetroRock. Based upon my position with REC and REC's position with PetroRock, my review of REC's and PetroRock's respective business records, and my knowledge of both REC and PetroRock, I have personal knowledge of the facts set forth below, which are true and correct.

3. Additionally, REC retains, and I have access to, certain business records for REC, in its capacity as PetroRock's manager and Selector and the owner of all Managing Right Units of PetroRock, and am familiar with the manner in which its records are created

and maintained by virtue of my duties and responsibilities. The documents attached hereto as Exhibits 1 through 34 are business records of REC. The documents attached hereto as Exhibits 1 through 34 are original records or exact duplicates of REC's original records. These records are kept by REC in the regular course of business and it was the regular course of business of REC for an employee or representative of REC, with knowledge of the acts, events, conditions, opinions or diagnoses that were recorded, to make the records or to transmit the information to be included in these records. The records were made at or near the time or reasonably soon after the acts, events, conditions, opinions or diagnoses that were recorded.

4. PetroRock is the Plaintiff in the above-captioned lawsuit. PetroRock has filed *Plaintiff's Motion to Appoint CR3 Partners, LLC as Wind UP Representative for PetroRock Mineral Holdings, LLC* (the "Wind Up Motion"), which seeks appointment of a neutral, third-party "Wind Up Representative" to conduct the wind up of PetroRock's business and the liquidation of its assets for the benefit of its creditors.

5. Defendant Stefan Toth ("Toth") is the former President, authorized signatory, officer, director, and control person of PetroRock.

6. On or about March 3, 2014, Stefan Toth, as the signatory for both PetroRock and Mercury Operating, LLC ("Mercury") signed that certain Management Agreement wherein Mercury was to be PetroRock's manager for operations of PetroRock's oil and gas assets. A true and correct copy of the Management Agreement between PetroRock and Mercury is attached hereto as Exhibit 1. The Management Agreement provides that PetroRock would pay Mercury operating fees as follows: "The fees for all operation services is a monthly reoccurring fee for each well, producing or not and a onetime drilling gee for new drills and/or completions as needed per scope of job." However, the Management Agreement does not state what the amount of that recurring fee would be.

7. On February 28, 2022, I spoke to Toth, among others, on a conference call. During this call, Toth stated that the monthly fee was greater than $1,000.00 per well, and that non-operating working interest holders had no right to dispute the per-well fee amounts. Toth also confirmed on this call Mercury had no assets apart from receivables owed under management agreements. Finally, Toth reported that everyone working for Mercury was also working for an affiliated entity, Minerva Resources LLC ("Minerva").

8. Pablo Cortez, Davood Ghorbani, Debbie Davis, and Toth have all served as employees or control persons of both Mercury and Minerva ("Toth affiliates"). Presently, Toth, the controller, and these other employees jointly operate Minerva and Mercury from an office in Irving, Texas. The office contains the combined records of HomeBound, PetroRock, Mercury, and Minerva. Previously, these same four persons performed duties for, operated, or otherwise controlled PetroRock. In shifting operations from PetroRock to Minerva, the same personnel simply put on new hats.

---

9. On or about March 17, 2014, Stefan Toth, as the signatory for both PetroRock and Homebound Inc. ("Homebound") signed that certain Management Agreement wherein Homebound was to be PetroRock's manager for PetroRock's employment-related operations. A true and correct copy of the Management Agreement between PetroRock and Mercury is attached hereto as Exhibit 2. The Management Agreement does not include the "Fee" Homebound was to receive for these services.

10. Beginning in 2016, PetroRock and HomeBound raised over $200 million dollars from investors through various finance subsidiaries, or debt funds (the "Debt Funds"), which in turned loaned the proceeds of those investments to PetroRock. PetroRock was originally owned and controlled by Toth and Ted Etheredge. The Debt Funds, wholly owned by PetroRock and structured as finance subsidiaries, lent money to PetroRock based on loan covenants. The loan-to-value covenants required that collateral be pledged in an amount sufficient to meet the covenants. It appears PetroRock did not meet its loan covenants.

11. Attached as Exhibit 3 is a true and correct copy of the SEC-issued *Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Section 8A of the Securities Act of 1933, Sections 15(b) and 21C of the Securities Exchange Act of 1934, and Section 203(f) of the Investment Advisors Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order.*

12. Investor funds flowed not just into PetroRock, but also to each of the Defendants, directly or indirectly. In regard to Defendant Minerva, there were transactions between PetroRock and Minerva whereby investor funds and/or their proceeds were transferred to Minerva, and there were also various equity fund offerings that were substantially similar to the above-referenced Debt Funds from which investor funds flowed into Minerva. Since it operates oil and gas assets of PetroRock, Defendant Mercury Operating, LLC ("Mercury") presently receives revenues from oil and gas assets purchased with investor funds, and disburses those revenues to other Defendants. Defendants Toth and 2x5 Enterprises Limited Partnership ("2x5 LP") both receive monthly transfers from the operation of oil and gas assets purchased with investor funds. Other than the distinction between secured debt and equity investments, the fund offerings were made using similar offering documents, and proposed essentially the same business plan to be executed by the same management and personnel.

13. Investors have asserted that a constructive trust should apply to both PetroRock and the Defendants, arguing that all of the invested funds should be preserved. For its part, PetroRock is attempting to address the investor claims and produce an appropriate accounting of the use of investor funds. But, Toth is refusing to provide access to the office in Irving, and is continuing to cause revenues to be transferred to himself and his associates.

14. On or about August 2, subject to the default of the Debt Funds, Toth agreed to permit REC to take over the management of the PetroRock assets. But, in practice, this did not occur, since Toth and his associates have denied direct, ongoing access to the

complete books and records in the office in Irving, and are still operating the assets and controlling the distribution of all of the revenues by virtue of Mercury's position as operator, and Toth has refused to provide full management control to be exercised over the assets he controls through Defendants. Toth specifically told me in person, in Dallas, that he was drawing a $50,000.00/month salary from Mercury.

15. REC is not an oil and gas expert, but has hired oil and gas professionals with Toth's agreement, including a company with oil and gas operator experience known as Fortify Energy ("Fortify") to take over the management of Mercury. Fortify subsequently resigned because "obtaining the requisite accounting information from Mercury has been an insurmountable challenge." One additional way in which investor funds are still being dissipated are through overriding royalty interests that Toth provided to himself and his associates, some of which Mercury is causing to be honored. [Attached as Exhibit 4 is a true and correct copy of the termination letter provided by Fortify].

16. In April of this year, Minerva produced a tax return for 2021 that indicated gross receipts from operations of $12.8 million. A true and correct copy of that tax return is attached hereto as Exhibit 5. It reported Minerva charged management fees of $1.8 million, plus twenty percent (20%) of revenues, which would have flowed to Toth and his associates. According to the return, there remained $3.8 million in cash in Minerva at the end of 2021. It is also my understanding that the small team necessary to run Minerva was also working on Mercury operations, and Mercury was reimbursing Minerva for those employee expenses.

17. On January 9, 2022, Toth provided me with an excel spreadsheet showing all Working Interests and ORRIs issued by Division Order on PetroRock's assets and/or assets purchased with investors' funds. The date of the conveyance appears to be indicated in the column labeled "Last Changed date." When a filter is applied to the "Owner" column in this spreadsheet such that only Working Interests and ORRIs granted to named Defendants appear on the screen, it shows a record of the Working Interests and ORRIs granted to the Defendants in 2020 and 2021. It appears Toth, through entities which he owns or otherwise controls, took the overriding royalty interests in the weeks and days leading up to the default of the Debt Funds. Attached hereto as Exhibit 6 is a true and correct copy of a PDF containing the relevant data produced by Toth regarding the Working Interests and ORRIs granted to the named Defendants.

18. As a result of its Working Interests in these assets, Minerva receives significant revenue—hundreds of thousands of dollars each month—based upon these oil and gas interests. For example, Centennial Resource Production, LLC ("Centennial") is the operator of record for some of the oil and gas interests Minerva received. Attached hereto as Exhibit 7 is a true and correct copy of a Revenue Statement reflecting Minerva received $448,583.85 on or about February 28, 2022 from Centennial. Attached hereto as Exhibit 8 is a true and correct copy of a Revenue Statement reflecting Minerva received $116,045.19 on or about March 31, 2022 from Centennial.

19. ConocoPhillips is another operator of record for some of the oil and gas interests Minerva received. Attached hereto as Exhibit 9 is a true and correct copy of a Revenue

Statement reflecting Minerva received $189,285.25 on or about August 25, 2021 from ConocoPhillips. Attached hereto as Exhibit 10 is a true and correct copy of a Revenue Statement reflecting Minerva received $273,252.04 on or about September 24, 2021 from ConocoPhillips. Attached hereto as Exhibit 11 is a true and correct copy of a Revenue Statement reflecting Minerva received $175,995.15 on or about September 30, 2021 from ConocoPhillips. Attached hereto as Exhibit 12 is a true and correct copy of a Revenue Statement reflecting Minerva received $20,779.71 on or about ●ctober 25, 2021 from ConocoPhillips. Attached hereto as Exhibit 13 is a true and correct copy of a Revenue Statement reflecting Minerva received $209,028.55 on or about November 24, 2021 from ConocoPhillips. Attached hereto as Exhibit 14 is a true and correct copy of a Revenue Statement reflecting Minerva received $164,627.14 on or about December 24, 2021 from ConocoPhillips. Attached hereto as Exhibit 15 is a true and correct copy of a Revenue Statement reflecting Minerva received $152,460.84 on or about January 25, 2022 from ConocoPhillips. Attached hereto as Exhibit 16 is a true and correct copy of a Revenue Statement reflecting Minerva received $458,024.83 on or about February 25, 2022 from ConocoPhillips. Attached hereto as Exhibit 17 is a true and correct copy of a Revenue Statement reflecting Minerva received $155,980.84 on or about March 25, 2022 from ConocoPhillips.

20. Devon Energy Production Company, LP ("Devon") is another operator of record for some of the oil and gas interests Minerva received. Attached hereto as Exhibit 18 is a true and correct copy of a Revenue Statement reflecting Minerva received $92,055.23 on or about January 15, 2022 from Devon. Attached hereto as Exhibit 19 is a true and correct copy of a Revenue Statement reflecting Minerva received $78,871.95 on or about March 15, 2022 from Devon.

21. Additionally, based upon the data Toth provided on January 9, 2022, it became clear to PetroRock that Toth had caused a number of ORRIs to be issued to Defendant Cronus Mineral Holdings, LLC ("Cronus"), including ORRIs on wells in the Hamlin Unit, the Hull-Silk-Sikes 4300' Sand Unit, the Mina Gas Unit, the Cypress Bayou pipeline, and the Vicki Lynn Unit. However, these units were a part of the collateral PetroRock had given to investor funds to secure the investors' investments. As part of the investments, PetroRock had to pledge collateral to secure the investment funds in certain amounts. For example, PetroRock pledged its oil and gas interests in the "Hamlin Unit" located in Fisher County as collateral. A true and correct copy of the deed of trust on the Hamlin Unit which was recorded on June 20, 2018, is attached hereto as Exhibit 20. PetroRock pledged its oil and gas interests in the "Hull-Silk-Sikes 4300' Unit" located in Archer County as collateral. A true and correct copy of the deed of trust on the Hull-Silk-Sikes 4300' Unit which was recorded on June 13, 2018, is attached hereto as Exhibit 21. PetroRock also pledged its oil and gas interests in the "Mina Gas Unit", including its Amherst overriding royalty interest, located in Cherokee County as collateral. A true and correct copy of the deed of trust on the Mina Unit which was recorded on June 22, 2018, is attached hereto as Exhibit 22. PetroRock also pledged its oil and gas interests in the "Cypress Bayou pipeline" located in Marion County as collateral. A true and correct copy of the deed of trust on the Cypress Bayou pipeline, which was recorded on June 22, 2018, is attached hereto as Exhibit 23. PetroRock also pledged its oil and gas interests in the "Vicki Lynn Unit" located in Marion County as

collateral. A true and correct copy of the deed of trust on the Vicki Lynn Unit is attached hereto as Exhibit 24. By granting Cronus an ORRI on these units, Toth has taken away the value and a part of the income stream of the collateral that rightfully belongs to investors.

22. Based upon the documents REC has been able to obtain, it appears that cash has been dissipated during the Spring of 2022.

23. Additionally, from current revenues, the documents REC has been able to obtain indicate Toth is receiving approximately $400,000 monthly, with additional funds flowing to 2x5 LP and Toth's associates.

24. Meanwhile, investors are not receiving material distributions.

25. REC has attempted to retain professionals to aid addressing the dissipation of oil and gas revenues. First, REC caused PetroRock to hire an oil and gas consulting firm, but Toth and his associates would not provide the requested information and cooperation, and therefore that firm reported it could not perform its work. Second, REC appointed CR3 as the liquidator, which has made numerous requests of its own, including, most importantly, actual access to the office in Irving, which has been denied. Instead, piecemeal documentation has been provided. True and correct copies of requests are attached as Exhibits 25 to 26.

26. On or about December 10, 2019, for Toth's benefit, Toth entered into the Partnership Interest Purchase and Division of Assets Agreement purportedly on behalf of PetroRock in his capacity as CEO, as well as on behalf of Homebound, Homebound Resources, LLC ("Homebound Resources"), Love 2 Live LP ("Love 2 Live"), Homebound Financial Group LP ("Homebound Financial"), Mercury Operating, LLC ("Mercury"), with 2x5 Enterprises Limited Partnership ("2x5 LP"). A true and correct copy of this agreement is attached hereto as Exhibit 27. Under Section 2.5 of this agreement, PetroRock conveyed certain non-operating, non-production-expense-bearing overriding royalty interests ("ORRIs") to 2x5 LP. PetroRock did not receive reasonably equivalent value in exchange for the transfer of these ORRIs. In exchange for the ORRIs, 2x5 LP assigned its 48% limited partnership interest in Homebound Financial to Love 2 Live, its 50% ownership interest in Homebound to Love 2 Live, and made other accommodations with respect to certain real property not owned by PetroRock. In short, it appears Toth traded certain PetroRock mineral interests in order to satisfy his other entities' obligations and buy out a business partner. In so doing, Toth effectuated a fraudulent transfer through payment of the overriding royalty interests. Toth did not have the right to transfer the assets belonging to PetroRock. The transfer was fraudulent because PetroRock had provided an unlimited guarantee to its subsidiaries, which, in effect, caused these assets to have security interests pledged against them. Further, my understanding is that overriding royalty interests place the burden of operating expenses on working interest owners, so – in effect – these transfers took both real value and real income streams away from the various Debt Funds. Additionally, due to the transfer of the overriding royalty interests, the values of the

underlying assets securing the Debt Funds are reported by the oil and gas professionals hired to evaluate them to have dropped considerably.

27. A true and correct copy of the year-end draft Income Statement and Balance Sheet for PetroRock for the year 2019 is attached hereto as Exhibit 28. As shown therein, PetroRock operated at a loss during the year 2019. As reported in this document, the sum of PetroRock's debts in 2019 was greater than the sum of PetroRock's assets.

28. After Plaintiff filed its petition in this lawsuit, Defendants Minerva Resources, LLC ("Minerva") and Cronus Mineral Holdings, LLC ("Cronus") filed a motion to compel arbitration (the "Motion to Compel Arbitration"). Attached to the Motion to Compel Arbitration was a Unit Purchase Agreement dated June 24, 2021, which was purportedly between PetroRock and Minerva. Although that document was signed by Jason Kramer in the capacity as "Manager" of PetroRock, Jason Kramer has never been the Manager of PetroRock.

29. Although Jason Kramer eventually became an authorized signatory for REC, his authority and scope was limited, and I did not give him specific authority to execute the Unit Purchase Agreement. Attached hereto as Exhibit 29 is a true and correct copy of that certain *Corporate Resolution and Agreement of Resolute Energy Capital, LLC* (the "Resolution") which governs the authority of Jason Kramer to execute documents on behalf of various entities. Jason Kramer's authority to sign for REC was subsequently revoked.

30. As of June 30, 2021, PetroRock's cash ending balance was approximately $1,104,255.00.

31. Jason Kramer is the principal of KEJ Energy LLC, a Delaware Limited Liability Company ("KEJ"). PetroRock recently discovered that Kramer is selling securities in the form of Class A Units with a minimum initial investment of $100,000.00 and Minerva is the Manager under the proposed subscription agreement. A true and correct copy of the proposed Subscription Agreement being circulated by Kramer/KEJ is attached hereto as Exhibit 30. Kramer confirmed his involvement with KEJ and Minerva in a text message to me dated December 30, 2021. Attached hereto as Exhibit 31 is a true and correct copy of a text message conversation between Jason Kramer and I, with text messages originating from the phone number I know to be Jason Kramer's number and from which number I have previously received calls and text messages from Jason Kramer.

32. On August 2, 2021, the Debt Funds declared PetroRock to be in default on the loans the Debt Funds had made to PetroRock. Toth knew there were signs of default as early as 2019, when loan documents were modified to accommodate delayed repayment. We were aware of technical defaults but were led to believe at the time there was adequate protective equity, so the fund manager treated the loans as essentially in forbearance, a fact of which Toth was aware.

33. A true and correct copy of the Balance Sheet for PetroRock as January 1, 2021 and December 1, 2021 is attached hereto as Exhibit __32__. As shown therein, PetroRock operated at a loss during the year 2021. As reported in this document, the sum of PetroRock's debts in 2021 was greater than the sum of PetroRock's assets.

34. TPS Energy 2, LLC ("TPS 2") is a wholly owned subsidiary of PetroRock. Attached hereto as Exhibit __33__ is a true and correct copy of the corporate records of TPS 2. Toth has improperly retained control over TPS 2, and continues to write checks on behalf of PetroRock's subsidiary. True and correct copies of checks signed by Toth on behalf of TPS 2 during the months of May 2022 are attached hereto as Exhibit __34__. Despite demand, Toth has refused to turn over the bank accounts for TPS 2."

Further Affiant sayeth naught.

Thomas J. Powell

SWORN TO and SUBSCRIBED before me by Thomas J. Powell on this __3__ day of June, 2022.

[Notary Seal]:

ANGEL FELIMON IBARRA
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 12-13-24
Certificate No: 21-1186-02

Angel Ibarra
Notary Public in and for

The State of __Nevada__

Angel Ibarra
Notary's (Printed Name

My commission expires __12-13-24__

# EXHIBIT 34

**Mercury Operating and Homebound "Family of Entities" Owners Include(d): STEFAN TOTH**; (Love 2 Live, LLC; Love 2 Live Holdings, LLC; Felfran Investments, LLC; V & V Residence Trust; Felfran Trust; Cronus Mineral Holdings;) and former owners Ted Etheredge (2x5 Enterprises) and Pablo Cortez (Constantine Capital). Mr Etheredge received a buy-out in December of 2019, and Mr. Cortez relinquished ownership in 2021, and now runs Minerva Resources.



Finance Subsidiaries of Parent:
PetroRock
**"DEBT FUNDS":**
Choice Energy Holdings, LLC
Choice Energy Holdings II, LLC
Choice Energy Holdings III, LLC
PRMH Lenders Fund
PRMH Lenders Fund II, LLC
PRMH Lenders Fund III, LLC
PRMH Lenders Fund IV, LLC
Legacy Energy, LLC
Legacy Energy II, LLC

Resolute Capital Partners, Ltd is the ultimate manager. See Consent Order from Washing Department of Financial Institutions, Security Division on May 7, 2021. Strategic Energy Assets, LLC is a holding company for Resolute Capital Partners and the equity funds.

**"EQUITY FUNDS"**
SEA IV
SEA V
SEA VI
SEA VII
SEA VIII

Exhibit 34 Pg.1

DocuSign Envelope ID: 9908C59D-4B83-424C-87BD-5B7766534AFA

Loan No. _____

IN WITNESS WHEREOF, this Business Loan Agreement has been executed and delivered to be effective as of the Agreement Date.

**BORROWER:**

CHOICE ENERGY HOLDINGS - III, LLC, a Delaware limited liability company

By:    PETROROCK MINERAL HOLDINGS, LLC, a Texas limited liability company

Its:    Member

By: _____

Name: ~~Steven~~ ~~Nasseth~~

Title: President

**LENDER:**

SIGNATURE FOR A LENDER WHO IS AN **INDIVIDUAL**

IN WITNESS, WHEREOF, the undersigned has executed this Business Loan Agreement effective on the date first written above.

Signature: *Connie Poyyak*

Print Name: Connie Poyyak

Second Signature: _____
*(if required)*
Print Name: _____

Address: P● BOX 7080, San Carlos, California 94070

Email: cpoyyak@gmail.com

Custodian Information: IRA Services Trust Company CFBO: Connie Poyyak IRA798654

SIGNATURE FOR LENDER WHO IS AN **ENTITY**

IN WITNESS, WHEREOF, the undersigned has executed this Business Loan Agreement effective on the date first written above.

Signature: _____
Print Name: _____
Its (print title): _____

Address: _____

_____

Email: _____

Custodian Information: _____

**Page 13 of 14**

File

Exhibit 34 Pg.2

DocuSign Envelope ID: 9908C59D-4B83-424C-87BD-5B7766534AFA

Loan No. _____ ___

## **EXHIBIT A**

**LENDER ATTESTATION AND SUITABILITY QUESTIONNAIRE**
<u>ALSO REQUIRES YOUR SIGNATURE(S).</u>

File

Exhibit 34 Pg.3

**PROOF OF SERVICE**

United States District Court, Central District of California

*Michael Hollifield et. al v. Resolute Capital Partners, LTD., et al.*

Case No.:  2:22-cv-07885-SB-RAO

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 7040 E. Los Santos Drive, Long Beach, CA 90815. On the date set forth below, I served a true and correct copy of the following document:

- **SECOND AMENDED COMPLAINT**

on the list of interested parties below:

| | |
|---|---|
| Lindsey H. Raspino<br>(CA State Bar No. 268660)<br>lraspino@reynoldsfrizzell.com<br>Reynolds Frizzell LLP<br>1100 Louisiana, Suite 3500<br>Houston, Texas 77002 | Attorneys for Defendants Stefan Toth;<br>Homebound Resources, LLC;<br>HomeBound Financial Group, LP;<br>Homebound, LLC; Love 2 Live<br>Holdings, Inc.; Love 2 Live LLC;<br>Felfran Investments LLC; and V&V<br>Residence Trust |
| Stefan Toth<br>5942 Haley Way<br>Frisco, Texas 75034<br>Stoth2007@yahoo.com | |
| Anthony M. Farmer<br>Texas Bar No. 24057844<br>afarmer@farmerlawgroup.com<br>Carl A. Smart<br>Texas Bar No. 24033815<br>csmart@farmerlawgroup.com<br>Farmer Law Group<br>400 S. Zang Blvd., Suite 350<br>Dallas, Texas 75208 | Attorneys for PETROROCK MINERAL HOLDINGS, LLC |
| Matthew Burton<br>mburton@morrisonsund.com<br>Morrison Sund PLLC<br>5125 Country Road 101, Suite 200<br>Minnetonka, MN 55345 | Attorney for Defendants Thomas Joseph Powell; Resolute Capital Partners LTD; Resolute Energy Capital, LLC. |
| Gabriel Z. Reynoso<br>Reynoso.g@wssllp.com<br>Winget, Spadafora & Schwartzberg, LLP<br>1900 Ave. of The Stars, Suite 450<br>Los Angeles, CA 90067 | Attorney for Defendant Thomas Chapman |
| Akhil Sheth<br>akhil.sheth@dlapiper.com<br>DLA Peiper LLP<br>2000 Avenue of the Stars, Suite 400 North Tower | Attorney for Defendants Ted Etheredge and 2X5 ENTERPRISES LIMITED PARTNERSHIP |

1

| | |
|---|---|
| Los Angeles, CA 90067-4735 | |
| Warren Taryle<br>757 East McDonald Drive<br>Scottsdale AZ 85250 | DEFENDANT |

☒ **By United States Mail** (CCP §§1013a, et seq.): I enclosed said document(s) in a sealed envelope or package to each addressee. I placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, with postage fully prepaid.

☐ **By Overnight Delivery** (CCP §§1013, et seq.): I enclosed said document(s) in a sealed envelope or package to each addressee. I placed the envelope for express delivery, following our ordinary business practices. I am readily familiar with the firm's practice for collecting and processing correspondence for express delivery. On the same day that correspondence is placed for express delivery, it is deposited in the ordinary course of business with the express service carrier, with fees fully prepaid.

☐ **By Messenger Service:** I enclosed said document(s) in a sealed envelope or package to each addressee. I provided them to a professional messenger service (Signal Attorney Service) for service. An original proof of service by messenger will be filed pursuant to CRC, Rule 3.1300(c).

☒ **Electronic Mail** (CCP § 1010.6(d), CRC Rule 2.251(b)(1)(B) & (c)(3), Rule 2.253(b)(1)(B), and mandatory efiling for attorneys by local court order is your consent requiring you to accept electronic service from us.) I served via email to the electronic address shown above.
Our electronic service address is: jmurrin@murrinlawfirm.com

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 3, 2023, at Long Beach, California.


*Cameron R. Kleinberger*

Cameron R. Kleinberger

PROOF OF SERVICE